UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOSE QUEZADA,

                                        Plaintiff,
                                                            9:13-CV-00885
v.
                                                            (MAD/TWD)
BRIAN FISCHER, et. al.


                                        Defendants.
_____

APPEARANCES:                            OF COUNSEL:


Plaintiff *pro se*
04-A-3690
Five Points Correctional Facility
Caller Box 119
Romulus, New York 14541

HON. ERIC T. SCHNEIDERMAN              CHRISTOPHER J. HUMMEL, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

## I.    INTRODUCTION

*Pro se* Plaintiff Jose Quezada commenced this action under 42 U.S.C. § 1983, Title II of

the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131, *et seq*. ("ADA"), and the

Rehabilitation Act of 1973, 29 U.S.C. §794(a) ("RA") on May 7, 2013, in the Southern District

of New York.  Following transfer of the case to the Northern District of New York, the Hon. Mae

A. D'Agostino issued a Decision and Order severing and transferring the claims against twenty Defendants and claims relating to Green Haven Correctional Facility ("Green Haven") back to the Southern District of New York, and retaining the remaining seventeen Defendants and the claims asserted against them in the Northern District of New York.  (Dkt. No. 38.)

Subsequent to the transfer, Plaintiff filed a second amended complaint against the Northern District Defendants (Dkt. No. 111), who thereafter filed a motion to dismiss in part for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt. No. 116.)  On March 22, 2016, Judge D'Agostino filed an Order (Dkt. No. 143) adopting this Court's Report-Recommendation on the partial motion to dismiss. (Dkt. No. 140.)

The Defendants remaining in the case after Judge D'Agostino's Order are Eric Gutwein, Donnie C. Riley, Daniel King, S. Brown, John Cross, J. Monacelli, Rosanna Lordi, William Chase, Ronald Laroque, Andrew Bouchey, Andrew Streeter, T. Brousseau, R. Lee, and S. Beaudette.  (Dkt. No. 143 at 2.[1])  The remaining claims are Plaintiff's: (1) Fourteenth Amendment procedural due process claim against Gutwein; (2) Eighth Amendment excessive force claims against Monacelli, Laroque, Chase, King, Bouchey, and Streeter, and failure to intervene claim against Riley; (3) First Amendment retaliation claims against Defendants Brousseau, Brown, Cross, Lee, and Beaudette; (4) Eighth Amendment medical indifference claims against Lordi and Cross; (5) Eighth Amendment conditions of confinement claim against Beaudette; (6) ADA and RA claims against Cross in his official capacity; and (7) an Eighth Amendment sexual assault claim against Lee.  (*See generally* Dkt. Nos. 140 and 143.)

─────────────

[1]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

Now before the Court for review and recommendation is the remaining Defendants'

motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

(Dkt. No. 157.)  Plaintiff has responded in opposition to the motion.  (Dkt. Nos. 178, 179, and

188.)  For reasons explained below, the Court recommends that Defendants' motion for summary

judgment (Dkt. No. 157) be granted in part and denied in part.

Because Plaintiff's second amended complaint (Dkt. No. 111) includes numerous,

disparate claims against a number of Defendants, the facts relevant to each claim on which

Defendants seek judgment will be set forth with the Court's analysis of that claim.

## II.     APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477

U.S. 248,  (1986).  The party moving for summary judgment bears the initial burden of showing,

through the production of admissible evidence, that no genuine issue of material fact exists.

*Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the

[record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d

at 273.  The nonmoving party must do more than "rest upon the mere allegations . . . of the

[plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

"Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[2] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for

---

[2] Plaintiff's second amended complaint is verified and is treated as an affidavit herein. (Dkt. No. 111 at 158.)

4

summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[3] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (credibility issues which are questions of fact for resolution by a jury, are inappropriately decided by a court on a motion for summary judgment).

## III. PLAINTIFF'S FAILURE TO COMPLY FULLY WITH N.D.N.Y. L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the Statement

---

[3] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

of Material Facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3) by

neglecting to set forth a specific citation to the record in numerous instances where he

"disagreed" with Defendants' individually numbered statements of undisputed facts.[4] (See Dkt.

Nos. 157-1 and 178.)

Where, as in this case, a party has failed to respond to the movant's statement of material

facts in the manner required under N.D.N.Y. L.R. 7.1(a)(3), the facts in the movant's statement

to which Plaintiff has not properly responded will be accepted as true (1) to the extent they are

supported by evidence in the record,[5] and (2) the nonmovant, if proceeding *pro se*, has been

specifically advised of the possible consequences of failing to respond to the motion.[6] *See*

*Champion,v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, the Second Circuit,

acknowledging a court's broad discretion to determine whether to overlook a failure to comply

with local rules, has held that "while a court is not required to consider what the parties fail to

point out in their [local rule statements of material facts], it may in its discretion opt to conduct

---

[4] L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

[5] L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[6] Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 157 at 2.)

an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status and the degree of effort he clearly put into his response to Defendants' statement of material facts, the Court has opted to review the entire record in determining if there are material facts in dispute.

## IV. FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS CLAIM AGAINST GUTWEIN

### A. May 17, 2011, Inmate Misbehavior Report and Tier III Disciplinary Hearing

Defendant Eric Gutwein is a Commissioner's Hearing Officer ("CHO") with the New York State Department of Corrections and Community Supervision ("DOCCS") (Dkt. Nos. 157-7 at 101.) Gutwein was the CHO at the Tier III disciplinary hearing on a May 17, 2011, Inmate Misbehavior Report ("IMR") issued to Plaintiff by Green Haven Correctional Officer ("C.O.") MacIsaac.[7] *Id*. at 19, 101. According to the IMR, on May 16, 2011, when MacIsaac went to Plaintiff's cell to pack his things for transfer, Plaintiff began violently attacking him with a razor blade and failed to comply with several direct orders to drop the weapon. *Id*. at 19. MacIsaac sustained two lacerations on his arm, requiring twenty stitches, and smaller lacerations on his face. *Id*. at 135.

Plaintiff was charged with violation of 100.11 assault on staff, 113.10 weapon, 106.10 direct order, 107.10 interference, and 104.11 violent conduct. *Id*. Plaintiff has denied attacking MacIsaac, claiming that MacIsaac, against whom Plaintiff had filed grievances and complaints, cut himself so he could blame Plaintiff, and it was Plaintiff who was assaulted on

---

[7] The IMR was served on Plaintiff on May 17, 2011, and a Spanish version was served on him on May 20, 2011. (Dkt. No. 157-7 at 4, 19, 90.)

May 16, 2011.[8]  (Dkt. Nos. 157-2 at 304; 157-7 at 138, 141, 162-63, 187.)  Plaintiff's disciplinary hearing, which began on May 26, 2011, was held at Shawangunk Correctional Facility ("Shawangunk"), and Plaintiff was provided with a Spanish translator, Correctional Counselor, Mary Robles.  *Id*.  Plaintiff plead not guilty to all of the charges.  *Id*. at 103-04.

The hearing ended on June 17, 2011, following the testimony of numerous witnesses and submission of documentary evidence.  (Dkt. No. 157-7 at 101-94.)  Gutwein found Plaintiff guilty on all of the charges and imposed a penalty of sixty months in the Special Housing Unit ("SHU"); sixty months recommended loss of good time; and sixty months loss of packages, commissary, and phone.  *Id*. at 75, 192-93.  A copy of the disposition was given to Plaintiff in both English and Spanish.  *Id*. at 75-88.  Plaintiff appealed from the disposition on July 16, 2011.  (Dkt. No. 179-6 at 10.)  The disposition was affirmed by the DOCCS Commissioner on August 4, 2011.  (Dkt. No. 157-7 at 28.)

---

[8]  Plaintiff has alleged in his second amended complaint (Dkt. No. 111 at ¶ 145) that:

> On June 3, 2011, Plaintiff testified at the hearing and his defense was that the Defendants, including Officers Macisaac (sic) and Cefaloni, while acting in conjunction with each other, Sgt. Surber, Sgt. Alexander, and C.O. Filipponi and others retaliated harassed and made false reports to cause harm to Plaintiff by virtue of malicious and sadistic assault and battery and planting a weapon in Plaintiff's cell, while he was not present and caused self-inflicted injuries to falsely accuse Plaintiff, all in violation of Plaintiff's state and federal rights.

**B.      Article 78**

After the disposition was affirmed, Plaintiff brought a proceeding under N.Y. CPLR

Article 78  in New York State Supreme Court for review of the Commissioner's determination.

The proceeding was transferred to the Appellate Division, Third Department by the Albany

County Supreme Court.  *See Quezada v. Fischer*, 979 N.Y.S.2d 426, 427 (N.Y. App. Div. 2014).

In his brief submitted in the Article 78 proceeding, Plaintiff specifically challenged: (1)

Gutwein's denial of thirty-four witnesses requested by Plaintiff with no reason and failure to

determine why requested witnesses had refused to testify (Dkt. No. 157-2 at 306-09); (2)

violation of Plaintiff's right to assistance in preparation of his defense where his assigned

assistant failed to seek out and interview witnesses and assist Plaintiff in marshaling the

documentary evidence necessary to his defense, *id*. at 325-27; (3) bias on the part of Gutwein as

CHO, *id*. at 328-30; (4) insufficient notice in the IMR of the facts upon which the charges were

based, *id*. at 331-32; and (5) imposition of a sentence that was unduly harsh and grossly

disproportionate to the charges against him.  *Id.* at 336-37; Dkt. No. 179-1 at ¶ 59.

The Appellate Division, Third Department, finding that "the misbehavior report and

related documentation, together with the testimony adduced at the hearing, provided substantial

evidence supporting the determination of guilt," confirmed the Commissioner's determination

and dismissed Plaintiff's petition.  *Quezada,* 979 N.Y.S.2d at 427-28.  In its Opinion, the Third

Department found that Plaintiff's claims that the IMR was prepared in retaliation for grievance

and complaints filed by him, MacIsaac's injuries were self-inflicted, and it was Plaintiff who was

assaulted by the officers, all presented credibility issues for resolution by the Hearing Officer.  *Id.*

at 427. The Court concluded that the IMR was sufficiently detailed to provide Plaintiff with adequate notice of the charges to enable him to prepare a defense. *Id*. In addition, the Court, finding that there was no evidence that Gutwein was biased or that the determination flowed from any alleged bias, also rejected Plaintiff's claim that he was denied a fair hearing. *Id*. at 427-28. The Third Department found Plaintiff's other contentions properly before the Court, including his challenge to the penalty imposed by Gutwein, to be unpersuasive.[9] *Id*. at 428.

## C. Facts Relevant to Plaintiff's Section 1983 Procedural Due Process Claim

In this lawsuit, Plaintiff claims Gutwein violated his Fourteenth Amendment right to due process in connection with the June 17, 2011, disciplinary hearing by: (1) providing insufficient of the notice of the charges; (2) failing to provide Plaintiff with his hearing aids for the hearing; (3) denying witnesses and documentary evidence requested by Plaintiff; (4) denying Plaintiff the right to adequate assistance in the preparation of his defense; and (5) acting in a biased manner. (Dkt. No. 111 at 48-54; 179 at 43-45.)

### 1. Notice of the Charges

The IMR included the date, location, and time of the incident, along with a description of the incident and the charges against Plaintiff. (Dkt. No. 157-7 at 19.) Plaintiff acknowledged the IMR was provided to him in English on May 18, 2011, and in Spanish on May 20, 2011. (Dkt. No. 111 at ¶¶ 132, 134.)

---

[9] Plaintiff initially asserted and subsequently withdrew claims for retaliation, false disciplinary claims, excessive force, failure to protect, and harassment. (Dkt. Nos. 111 at 150-51; 157-2 at 309-24, 333-36.) Remaining contentions asserted by Plaintiff and not specifically addressed by the Third Department in its opinion included denial of requested witnesses and violation of his right to adequate assistance in preparing his defense. (Dkt. No. 157-2 at 306, 09, 325-27, 336-37.)

2.      Plaintiff's Hearing Aids

Plaintiff is hearing impaired.  (Dkt. No. 111 at ¶ 138.)  Plaintiff has alleged in his second amended complaint that he objected to not being provided with his hearing aids for the disciplinary hearing.  *Id*.  According to Gutwein, Plaintiff spoke and responded to questions from him throughout the proceeding with no apparent difficulty.  (Dkt. No. 157-7 at 15.)  Gutwein did not notice any instance where Plaintiff was unable to hear or be heard during the testimony, and Plaintiff responded to his questions, listened to the testimony of witnesses, and asked questions of witnesses without any apparent difficulty.  *Id*.  Plaintiff has disagreed with Gutwein's assessment, claiming that because he did not have his hearing aids he had no choice but to try to read Gutwein's lips and listen to the "couple questions he asked Plaintiff."  (Dkt. No. 178 at ¶ 163.)

3.      Plaintiff's Witness Requests

Plaintiff requested the testimony of approximately thirty-four witnesses at the hearing, the majority of whom he wanted to testify regarding his troubled history with MacIsaac and others prior to the May 16, 2011, incident, complaints he had made to requested witnesses about MacIsaac, and his fear that MacIsaac and others at Green Haven were going to kill him.  (Dkt. Nos. 111 at ¶¶ 139-141; 157-7 at 111-117; 179-1 at ¶ 5.)  Gutwein questioned Plaintiff at length at the beginning of the hearing regarding why he wanted the various witnesses on his list, including those whom Plaintiff wanted to testify with regard to his history with MacIsaac, and Plaintiff's expressions of fear and concern regarding his safety.  (Dkt. No. 157-7 at 34-47; 111-119.)

The witnesses Plaintiff requested before and during the hearing ranged from DOCCS

officers to whom Plaintiff had complained or asked for assistance; Plaintiff's lawyer and doctors, including his psychiatrist and the Office of Mental Health Unit Chief; inmates who had helped him with legal work; inmates who had seen him being harassed; the Muslim, Protestant, and Catholic Chaplains at Green Haven; correctional counselors; the Dutchess County Clerk and District Attorney; State Police and FBI employees; and inmates who were housed or present near his cell at the time of the May 16, 2011, incident. (Dkt. No. 157-7 at ¶ 34 and pp. 7-9, 34, 47, 111-119, 167-68.) Plaintiff informed Gutwein that many of the requested witnesses would be able to testify Plaintiff had complained of and expressed fear regarding MacIsaac and others, and had sought protection from them over a period of years. *Id.* at 111-119. Some could testify Plaintiff had told them if anything happened to him MacIsaac would be one of those responsible. *Id*.

A number of inmate witnesses requested by Plaintiff refused to testify. (Dkt. No. 157-7 at 62-73.) On the Requested Inmate Witness Refusal to Testify form, some inmates provided reasons why they would not testify and signed the form. *Id*. at 62-64. Others provided no information and refused to sign the form. *Id*. at 65-66, 72.

According to Gutwein, he diligently considered each of the witnesses requested by Plaintiff and rejected most of them on relevance grounds.[10] *Id*. at ¶ 35. Gutwein found that the requests had no relevance because the testimony sought concerned alleged prior complaints or conversations that were unrelated to the incident on May 16, 2011. (Dkt. No. 157-7 at ¶ 35.)

_____

[10] At the end of the hearing, Plaintiff was provided with a list in both English and Spanish of his requested witnesses, Gutwein's decision as to whether they would be allowed to testify, and reasons for denial. (Dkt. No. 157-1 at 155-156.)

Inmate Paul Bridgefourth was allowed to testify regarding hearing Sgt. Surber call Plaintiff a bitch and tell him he should have come to her before writing something up, and Plaintiff telling Bridgefourth that he felt that his life was being threatened and he was afraid something was going to happen to him. *Id.* at 150-52. In addition, C.O. Bielefieldt, C.O. MacIsaac, and C.O. Filliponi testified at Plaintiff's request either via speaker phone or in person at the hearing. (Dkt. No. 157-7 at ¶ 35.) C.O. McDonough, Sgt. Alexander, Inmate Pena, and an Office of Mental Health staff member testified at the hearing at Gutwein's request. (Dkt. No. 157-1 at ¶ 154.)

4.   Documents and Other Evidence Requested By Plaintiff During the Hearing

During the course of the hearing, Plaintiff requested the MacIsaac medical report on his lacerations, fingerprints from the razor blade weapon, photographs of his cell, a log book entry, and a videotape of his cell. (Dkt. No. 157-7 at ¶ 36.) Gutwein denied the medical records request based upon policy precluding inmates from possessing staff medical records on privacy and security considerations. *Id.* at ¶ 37. He denied the fingerprint request because DOCCS does not have the capability to perform fingerprinting. *Id.* Plaintiff's request for photographs of his cell was denied because there were no pictures relating to the May 16, 2011, incident other than those shown Plaintiff during the course of the hearing. *Id.* The log book entry was denied due to lack of relevance and the video tape of Plaintiff's cell was denied because it was determined that no such video existed. *Id.* at 14.

Plaintiff was, however, allowed to introduce documents such as correspondence with the New York State Police, Dutchess County District Attorney, the FBI, Department of Justice, and letters/complaints he had sent to DOCCS officials, counselors and chaplains, some dating back

as far as 2006, concerning problems with MacIsaac, fear for his safety, and requests for protection. (Dkt. No. 157-7 at 165-67.)

### 5. Assistance in the Preparation of his Defense

On May 20, 2011, Plaintiff chose Robles as his assistant for the June 17, 2011, hearing. (Dkt. No. 157-7 at 97.) The Assistant Form from the Disciplinary Office advising Robles she had been selected to assist Plaintiff was completed and signed by her on May 25, 2011. (Dkt. No. 11-2 at 108.) Plaintiff refused to sign the form. *Id.* The completed form indicated that Plaintiff had requested Robles interview inmates Rawling and Rodriguez and both had refused to testify at his hearing. *Id.* According to the form, Plaintiff had also asked Robles to find out whether anyone else signed the IMR (answered no), to obtain a videotape of Plaintiff being escorted from his cell to SHU (indicated it would be at the hearing), a photograph of Plaintiff (would ask at the hearing), to speak to Plaintiff's attorney (no time), to obtain a recording of the 911 call (does not exist), and to obtain a copy of a videotape of the State Police (illegible). *Id.* The form indicates that Plaintiff had requested and Robles had obtained copies of the Unusual Incident Report, Use of Force Report, and the To-Froms. *Id.*

Plaintiff claims that his right to assistance was violated because Robles failed to provide and produce documents related to his retaliation defense, failed to interview the witnesses on his list, and failed to inform him of the results of her investigation. (Dkt. No. 111 at ¶ 156.) At his deposition, Plaintiff testified that he had given Robles a list of more than thirty witnesses he wanted her to interview, including from the Inspector General's Office, a New York State Police Captain who had been asked to interview MacIsaac, the Dutchess County DA, and someone from the State Police Office, who had been at Green Haven on the day of the incident. (Dkt. No. 157-

2 at 140-148.)  According to Plaintiff, Robles never talked to his proposed witnesses and never

came back to him to report whether she had found the proposed witnesses and whether they had

refused to testify, thereby keeping him in limbo.  (Dkt. No. 157-2 at 151.)

Plaintiff also testified that he had asked Robles to obtain documents including MacIsaac's

medical records, injury reports, and photographs of MacIsaac and Plaintiff's injuries, and

contrary to the Assistant Form, she had given him nothing.  *Id.* at 160-61.

6.      Claimed Bias on the Part of Gutwein

In his second amended complaint, Plaintiff has alleged that Gutwein was biased and

refused to consider the merits of Plaintiff' evidence and defense.  (Dkt. No. 111 at ¶ 156.)  In

addition, Plaintiff complains that Gutwein disallowed Plaintiff's witnesses and never informed

him as to why he was not going to allow the witnesses he had requested until the end of the

hearing.  (Dkt. No. 157-2 at 151.)  Plaintiff has also claimed that the penalty imposed by Gutwein

was unduly harsh.  *Id*.

**D.      Due Process Rights in a Prison Disciplinary Hearing**

A prison inmate may not properly be deprived of a cognizable liberty interest without due

process of law.  *See Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974).  A prison disciplinary

hearing implicates a protected liberty interest if  it imposes an "atypical and significant hardship

on the inmate in relation to the ordinary incidents of prison life."[11]  *Sandin v. Conner*, 515 U.S.

---

[11]  Defendants do not appear to dispute that Plaintiff, who was sentenced to sixty months
in SHU, was deprived of a cognizable liberty interest, and the Court, in any event, finds a
cognizable liberty interest in this case.  *See, e.g., Colon v. Howard*, 215 F.3d 227, 315 (2d Cir.
2000) ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient
departure from the ordinary incidents of prison life to require procedural due process protections
under *Sandin*.")

472, 484 (1995); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

It is well-established that "[t]he due process protections afforded a prison inmate do not equate to 'the full panoply of rights' due to a defendant in a criminal prosecution." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (quoting *Wolff*, 418 U.S. at 556). The Supreme Court explained in *Wolff* that

> [p]rison disciplinary proceedings . . . take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. Some . . . have repeatedly employed illegal and often very violent means to attain their ends . . . [and] may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life. . . . Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace. Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner.
>
> It is against [that] background that disciplinary proceedings must be structured by prison authorities; and it is against [that] background that we must make our constitutional judgments. . . .

418 U.S. at 561-62. To comply with procedural due process, prison authorities must provide an inmate charged with a violation in a disciplinary hearing with: (1) written notice of the charges; (2) the opportunity to appear and be heard at a disciplinary hearing and to present witnesses and evidence subject to legitimate safety and penological concerns; (3) a limited right to assistance in preparing a defense; and (4) a written statement from the hearing officer explaining his or her decision, and the reasons for the actions taken. *Id*. at 564-71.

A prison inmate is also entitled to a fair and impartial hearing officer, *Sira*, 380 F.3d at 69, and to a determination that is supported by "some evidence" in the record. *Superintendent v.*

16

*Hill*, 472 U.S. 445, 455 (1985) (ascertaining whether the "some evidence" standard is satisfied, "does not require examination of the entire record, independent assessment of witness' credibility, or weighing of the evidence. . . .  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."). The Second Circuit has held that "only reliable evidence can constitute 'some evidence.'" *Sira*, 380 F.3d at 76 (quoting *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004)).

In his second amended complaint, Plaintiff claims he was denied the following *Wolff* due process protections in the disciplinary hearing before Gutwein: (1) use of his hearing aids; (2) sufficient notice regarding the charges against him in the IMR; (3) the opportunity to present relevant witnesses; and (4) his right to adequate assistance by his assistant in interviewing witnesses and collecting and presenting evidence.  (*See generally* Dkt. Nos. 111 at ¶¶ 139-42; pp. 148.[12])  Plaintiff also claims that Gutwein was unfair and biased against Plaintiff in the handling of the disciplinary hearing.  *Id*.

### E.    Grounds for Summary Judgment Asserted by Gutwein

#### 1.    *Peralta* Bar

Gutwein contends that under *Peralta v. Vasquez*, 467 F.3d 98 (2d Cir. 2006), Plaintiff is prohibited from pursuing his § 1983 due process claim because Plaintiff's disciplinary hearing on the May 17, 2011, IMR resulted in "mixed sanctions" affecting both the duration and conditions of his confinement.  (Dkt. No. 157-14 at 28-30.)  Under the Second Circuit's holding in *Peralta*, where a prisoner is subject to mixed sanctions he can proceed separately under

---

[12]   Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

§ 1983 with conditions of confinement claims without satisfying the favorable termination rule under *Heck v. Humphrey*, 512 U.S. 477 (1994), which was made applicable to § 1983 claims involving disciplinary proceedings in *Edwards v. Balisok*, 520 U.S. 641 (1997). *Peralta*, 467 F.3d at 103. However, he can only do so "*if he is willing to forgo once and for all any challenge to any sanctions that affect the duration of his confinement.* In other words the prisoner must abandon, not just now, but also in any future proceeding, any claims he may have with respect to the duration of his confinement that arise out of the proceeding he is attacking in his current § 1983 suit." *Id*. at 104. (emphasis in original).

In his declaration in opposition to Defendants' motion for summary judgment, Plaintiff has included the following written waiver: "Plaintiff waive and forever abandon any legal claims he has or may have with respect to the loss of good time stemming from the June 17, 2011, disciplinary hearing." (Dkt. No. 179-1 at ¶ 61.) Based upon Plaintiff's written waiver, the Court recommends that Gutwein be denied summary judgment under *Peralta*.

### 2. Collateral Estoppel

"Under the Full Faith and Credit Statute, 28 U.S.C. § 1738, federal courts must give a prior state court judgment the same preclusive effect that such a judgment would be given in the courts of the state from which the judgment emerged." *Giakoumelos v. Coughlin*, 88 F.3d 56, 59 (2d Cir. 1996) (citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466 (1982)). The rule applies fully to civil rights actions brought pursuant to § 1983. *Id*. Inasmuch as the state court judgment in Plaintiff's Article 78 proceeding was rendered in New York State, the Court must look to New York law to determine any preclusive effect the prior judgment in the Article 78 proceeding has in this case. *Id.*

"New York courts apply collateral estoppel, or issue preclusion, 'if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *LaFleur v. Whitman*, 300 F.3d 256, 271 (2d Cir. 2002) (quoting *Parker v. Blauvelt Volunteer Fire Co.*, 690 N.Y.S. 2d 478, 483 (1999)). The burden of proving the issues raised and necessarily decided in the previous proceeding are the same "rests squarely on the party moving for preclusion." *La Fleur*, 300 F.3d at 272. The burden of proving the absence of a full and fair opportunity to litigate the claims rests with the party opposing the application of collateral estoppel. *See Giakoumelos,* 88 F.3d at 59 (citing *Schwartz v. Public Administrator*, 298 N.Y.S.2d 955, 960 (1969)).

The Court finds Defendants have established the claims Plaintiff has asserted in this action with regard to: (1) sufficiency of notice of the charges against him in the IMR (Dkt. No. 157-2 at 19); (2) Gutwein's denial of thirty-four witnesses requested by Plaintiff with no reason and failure to determine why requested witnesses had refused to testify (Dkt. No. 157-2 at 306-09); (3) violation of Plaintiff's right to assistance in the preparation of his defense where his assigned assistant failed to seek out and interview witnesses and assist Plaintiff in marshaling the documentary evidence necessary to his defense, *id*. at 325-27; and (4) bias on the part of Gutwein as CHO, *id*. at 328-30, are the same issues raised and necessarily decided, and material in Plaintiff's Article 78 proceeding. *See LaFleur*, 300 F.3d at 271.

The failure of the Third Department to directly address the claims made by Plaintiff regarding denial of witnesses and the lack assistance in his defense in its Opinion in no way renders collateral estoppel inapplicable. As noted above, in its Opinion, the Court made clear it

19

had "considered petitioner's many other contentions . . . and [found] them unpersuasive." *See Quezada v. Fischer*, 979 N.Y.S.2d 426. The Second Circuit, in determining the applicability of collateral estoppel in *Winters v. Lavine*, 574 F.2d 46 (2d Cir. 1978), reasoned that:

> It is not significant, moreover, that the Appellate Division's opinion does not allude to the constitutional issue which [petitioner] had clearly submitted to the court for resolution, for, as appellant concedes, it is entirely possible for a court to consider and reject a particular claim presented to it without any express discussion or allusion to that claim. Indeed, on two recent occasions we have emphasized this very point. "The silence of the (court's) opinion on the constitutional issue is of course immaterial." *Tang v. Appellate Division, [First Dept.]*, 487 F.2d [138], 141 n.2 [2d Cir. 1973]; *accord, Lecci v. Chan* F.2d 826, 830 (2d Cir. 1974) ("The fact that the affirmances of the state courts were without opinion or without specific reference to the constitutional question is of course immaterial.")

*Id*. at 60-61. The unaddressed issues must, however, have been necessary to the determination of the action. *Id*. at 60. The Court finds that they were necessary to the state court determination.

Plaintiff contends he was denied a full and fair opportunity to litigate the issues he raised in the Article 78 proceeding because: (1) he had attempted unsuccessfully to withdraw his Article 78 petition because medical problems were making it difficult for him to proceed in a timely manner; and (2) he did not learn that the Third Department had returned his reply brief with instructions to reduce the number of pages to comply with court rules and refile until it was too late to refile in a timely manner. (Dkt. Nos. 111 at ¶¶ 318-330; 179-1 at ¶¶ 58-61.)

Plaintiff wrote a series of letters to the Clerk of the Third Department in September 2012 requesting permission to withdraw his petition without prejudice due to health problems. (Dkt. No. 111-7 at 142-44.) Rather than allow Plaintiff to withdraw his petition without prejudice, the Third Department granted Plaintiff the alternative relief of an extension of time to perfect the

proceeding.  *Id*. at 146.  The Clerk's Office sent Plaintiff motion forms in case he needed to

request a further extension on March 5, 2013.  *Id*. at 145.  Plaintiff's brief was sent for filing on

March 25, 2013.  *Id*. at 150.

Plaintiff has the burden of proving the absence of a full and fair opportunity to litigate his

claims in the Article 78 proceeding.  *See Giakoumelos,* 88 F.3d at 59.  The Court finds that

inasmuch as Plaintiff was given extra time to perfect the proceeding after informing the Third

Department of his health problems, and he was able to file a substantial Petitioner's brief (Dkt.

No. 157-2), albeit one including some claims not properly before the Court for review on an

Article 78, the Court's denial of his request to withdraw his petition without prejudice did not

deprive him of a full and fair opportunity to litigate the issues he had raised.  Moreover, the reply

brief that was not filed in time for consideration by the Court addressed the same issues as those

addressed in Plaintiff's initial brief.[13]  (Dkt. No. 157-2.)  Finally, Plaintiff has failed to show the

alleged deficiencies in his disciplinary proceeding "produced some significant effect on their

review by the Appellate Division in the Article 78 Proceeding," particularly inasmuch as the

record from the disciplinary hearing provided the Appellate Division with notice of Plaintiff's

defense even though most of his witnesses were denied on relevance grounds.  *See Giakoumelos,*

88 F.3d at 60.

Based upon the foregoing, the Court recommends Plaintiff be collaterally estopped from

relitigating the following claims against Gutwein in this § 1983 action: (1) sufficiency of notice

---

[13]  Plaintiff included that he told the interpreter he could not hear without his hearing aids
in his reply brief and Gutwein nonetheless continued the hearing.  (Dkt. No. 157-2 at 425.)
However, the Court has not found Plaintiff's hearing aid claim to be among those necessarily
decided in the Article 78 proceeding for collateral estoppel purposes since the reply brief was
ultimately not accepted for filing and the issue was not raised in his initial brief.

of the charges against him; (2) denial of requested witnesses at his disciplinary hearing; (3)

violation of his right to assistance in the preparation of his defense; and (4) bias on the part of

Gutwein.  Because it is not clear to the Court from the summary judgment record that Plaintiff's

claims that Gutwein deprived him of use of his hearing aids at the hearing, and denied Plaintiff

documentary evidence he requested at the hearing were raised and necessarily decided in the

Article 78, the Court recommends that Plaintiff not be collaterally estopped from litigating his

procedural due process claim as to those issues.

3. Plaintiff's Hearing Aids and Documentary Evidence Claims

Having recommended that Plaintiff not be collaterally estopped from litigating his

hearing aids and documentary evidence claims, the Court is left to consider whether Gutwein is

entitled to summary judgment on those claims on the merits.

Under *Wolff*, 418 U.S. at 564-71, Gutwein was required to provide Plaintiff with the

opportunity to appear and be heard at his disciplinary hearing.  Plaintiff has alleged in conclusory

fashion that he objected he was not provided with his hearing aids for the disciplinary hearing.

(Dkt. No. 111 at ¶ 138.)   Plaintiff has provided no factual detail regarding his hearing aid claim,

other than writing in his reply brief submitted and rejected in the Article 78, that on May 25,

2011, after telling Gutwein for the second time he did not understand what Gutwein was saying,

Plaintiff told the interpreter he was hearing impaired and used hearing aids in both ears.  (Dkt.

No. 157-2 at 425.)  There is nothing in the transcript and no other non-conclusory evidence in the

record indicating that the lack of hearings aids was an issue throughout the hearing or that it

affected the outcome of the hearing.  (Dkt. No. 157-7 at 101-194.)  Plaintiff engaged in back and

forth with Gutwein and asked questions of witnesses throughout the hearing without any problem

in hearing and understanding that would suggest he was prevented from fully participating in the hearing apparent from the transcript. (Dkt. No. 157-7 at 101-194.)

The evidence in the summary judgment record also fails to support Plaintiff's claim that Gutwein denied his right to procedural due process by failing to provide him with documents and things relevant to his defense. As noted above, certain evidence requested by Plaintiff did not exist, *i.e.*, fingerprints, videos, and photographs. (Dkt. No. 157-7 at ¶ 37.) Evidence denied by Gutwein was found to be subject to privacy rules or not relevant, i.e., MacIsaac's medical records and a log book. *Id*. Moreover, Plaintiff's assistant obtained copies of the Unusual Incident Report, Use of Force Report, and the To-From. (Dkt. No. 111-2 at 108.)

In order to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing. *See Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("[I]t is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial."); *Clark v. Danheim*, 590 F.Supp. 2d 426, 429-31 (W.D.N.Y. 2008) ("[t]o establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing").

The Court finds Plaintiff has failed to show he was prejudiced by not having his hearing aids at the disciplinary hearing, and to the extent, if at all, Plaintiff was deprived of relevant documents and things at the hearing, Plaintiff has failed to show prejudice as a result of the deprivation. Inasmuch as the hearing aid and documentary evidence claims are the only

23

procedural due process claims raised by Plaintiff that are not barred by collateral estoppel, the

Court recommends Gutwein be granted summary judgment on Plaintiff's Fourteenth Amendment

due process claim against him.

**V.    EXHAUSTION OF PLAINTIFF'S EIGHTH AMENDMENT EXCESSIVE FORCE, ENCOURAGING THE USE OF EXCESSIVE FORCE, FAILURE TO PROTECT, AND MEDICAL INDIFFERENCE CLAIMS**

Defendants Upstate Correctional Facility ("Upstate") Sergeants Chase, Riley, Monacelli,

and King, Correctional Officers Laroque, Bouchey, and Streeter, and Registered Nurse ("RN")

Lordi, seek summary judgment for failure to exhaust with respect to Plaintiff's § 1983 claims for

use of excessive force, encouragement of the use of excessive force, failure to protect, and

medical indifference in violation of Plaintiff's Eighth Amendment right to be free from cruel and

unusual punishment which allegedly occurred on July 21 and 22, 2011.  (Dkt. Nos. 111 at ¶¶ 1-

37, 157-176; 157- 14 at 4-11.)  For reasons described below, the Court recommends that the

Defendants' motion be denied.

**A.    Legal Standard for Exhaustion Under the PLRA**

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under

section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such

administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see Ross v. Blake*,

___ U.S. ___, 136 S.Ct. 1850, 1856 (2016).  "[T]he PLRA's exhaustion requirement applies to

all inmate suits about prison life, whether they involve general circumstances or particular

episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534

U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion," which means using all steps required by the

administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). *See also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

In New York state prisons, DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.5 (2013). Generally, the DOCCS IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*id*. at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id*. at § 701.5(c)(3)(1).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. at § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id*. at § 701.5(c)(3)(I). Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. at

§ 701.5(d)(1)(I).  CORC is to render a written decision within thirty calendar days of receipt of the appeal.  *Id*. at § 701.5(d)(3)(ii).  If the IGRC or superintendent fail to timely respond to a grievance or first-level appeal, the grievant can and must appeal to the next level, including to CORC to complete the grievance process.  *Id*., at § 701.6(g); *see also Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at * 2 & n.4 (N.D.N.Y. Mar. 31, 2010) (collecting cases).

Grievances claiming employee harassment "are of particular concern to the administrators of [DOCCS] facilities," and are subject to an expedited procedure whereby the grievance goes directly to the facility superintendent.[14]  *Id*. at § 701.8.  The grievant still must follow the procedures in § 701.5(a) by filing the grievance with the clerk of the IGRC.  *Id*. at § 701.8(a).  The grievance is to be given a grievance calendar number and recorded in sequence with all other grievances and must be forwarded to the superintendent by the close of the business day.  *Id*. at § 701.8(b).  The superintendent is required to initiate an in-house investigation by higher ranking supervisory personnel; request an investigation by the inspector general's office; or request an investigation by the New York State Police Bureau of Investigation if he determines that criminal activity may be involved.  *Id*. at 701.8(d).  A grievance referred to the superintendent and determined to be an allegation of harassment, may not be withdrawn and must be addressed by the superintendent.  *Id*. at 701.8(e).  The superintendent is required to render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant.  *Id*. at § 701.8(f).  If the

---

[14]  Section 701.8 has been found applicable to claims of excessive force.  *See, e.g., Torres v. Carry*, 691 F. Supp. 2d 366, 370  (S.D.N.Y. 2009).

superintendent fails to respond within the required twenty-five days, the grievant may appeal the grievance to CORC by "filing a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id*. at § 701.8(g).

If a prisoner has failed to properly follow each of the applicable steps, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies and is barred from commencing a federal lawsuit. *Woodford*, 548 U.S. at 93; *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001) (inmate commencing litigation before receiving a decision from CORC does not satisfy PLRA's requirement that administrative remedies be exhausted before filing suit), *overruled on the other grounds*, *Nussle*, 534 U.S. 516; *Martin, II v. Niagara County Jail*, No. 05-CV-868 (JTC), 2012 WL 3230435, at * 6 (W.D.N.Y. Aug. 6, 2012) (inmate who fails to exhaust his administrative remedies is barred from commencing a federal lawsuit).

Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies.[15] *See Murray,* 2010 WL 1235591, at *4; *Bailey v. Fortier,* No. 09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6 (N.D.N.Y. Oct. 4, 2012) (party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

### B.    July 21 and 22, 2011

Plaintiff was transferred to Upstate Correctional Facility ("Upstate") on July 21, 2011, to serve the sixty months SHU time imposed by Gutwein.  (Dkt. No. 111 at ¶ 157.)  According to

---

[15]  Defendants have asserted failure to exhaust administrative remedies as an affirmative defense in their answer to Plaintiff's complaint.  (Dkt. No. 145 at ¶ 19.)

Plaintiff, when he arrived, Defendant Chase confronted him with the assault on MacIssac and threatened him with physical harm. (Dkt. No. 111 at ¶ 157.) Chase screamed out to other officers in the area that Plaintiff had assaulted MacIsaac and encouraged them to physically assault Plaintiff and cause him serious injury. *Id*. After the other inmates were processed, Chase called Plaintiff out into the middle of the floor and told ten officers in the area about the assault of MacIsaac and informed them that they had to do something about it. *Id*. at ¶ 159.

Plaintiff was taken to the facility clinic by Defendants Chase, Monacelli, Laroque, and Riley, where Monacelli directed the camera officer not to record Plaintiff entering the room. *Id*. at ¶ 163. According to Plaintiff, he was taken into a room by Monacelli and told to remove all of his clothes and was then maliciously beaten by Monacelli, Laroque, and non-defendant officers. *Id*. at ¶ 163. Plaintiff was punched, elbowed, and kicked all over his body, including his head and face, and his head was shoved into the wall. *Id*. Monacelli and Laroque punched Plaintiff in the back and ribs, kicked and punched Plaintiff from behind, and kicked Plaintiff in the testicles. *Id*. Plaintiff called out for help from Riley several times during the beating, but Riley just watched.

Plaintiff claims to have suffered serious bodily injury to his face, shoulder, back, ribs, including a large bump on his forehead, and he was left dizzy and in excruciating pain. (Dkt. No. 111 at ¶ 169.) Plaintiff requested and was denied medical care. *Id*. According to Plaintiff, Laroque and Riley falsified the log book to say that Plaintiff had banged his head against the wall to cover up the beating. *Id*. at ¶ 169. Plaintiff claims to have been in excruciating pain over night, with his head feeling like it was going to explode, and when he could sleep, he had nightmares. *Id*. at ¶ 165.

Plaintiff claims that Defendant Lordi came into the clinic the morning of July 22, 2011, and rejected Plaintiff's requests for medical attention. *Id*. at ¶¶ 166-168. In her declaration in support of her motion for summary judgment, Lordi has stated that she did not work in the Upstate Infirmary where Plaintiff was located on July 22, 2011, and her name did not appear in the Infirmary log.[16] (Dkt. No. 157-7 at 2.) Lordi confirmed in her declaration that the infirmary log indicated that Plaintiff was sent to the infirmary because he was banging his head and threatening self harm. *Id*. at 2, 12-13.

According to Plaintiff, after Lordi had allegedly failed to provide medical care to Plaintiff, a psychiatrist came to see him, and Plaintiff told him about the beating, showed him his injuries, and indicated he was afraid for his life. *Id*. at ¶ 169. The psychiatrist told Plaintiff he would recommend Plaintiff be transferred to Clinton Correctional Facility. *Id*. Later in the day on July 22, 2011, Defendants Streeter, Bouchey, and King transported Plaintiff to Clinton. *Id*. at ¶¶ 170-75. While in transport, either Streeter and Bouchey punched Plaintiff's face and the back of his head several times, as if he were trying to decapitate Plaintiff or cause internal bleeding in his brain. *Id*. at ¶ 171. Streeter or Bouchey continuously struck Plaintiff's head, back, face and all over his body like a machine. (Dkt. N. 111 at ¶ 172.) Plaintiff became dizzy and experienced more pain in his head, back, and face. One of the officers attempted to pop Plaintiff's ear drums. *Id*. at ¶ 173. Plaintiff claims King was aware of the beating the whole time and did nothing to stop it.[17] *Id*. at ¶ 176.

---

[16] Chase, Riley, Monacelli, Laroque, Streeter, Bouchey, and King have not submitted declarations in support of the summary judgment motion. (*See generally* Dkt. No. 157.)

[17] Plaintiff has also described the July 21 and 22, 2011, incidents in his declaration in response to Defendants' motion for summary judgment. (Dkt. No. 179-1 at ¶¶ 8-19.)

**C.     Plaintiff's Attempt to Grieve the Actions of Chase, Riley, Monacelli, Laroque, Lordi, Streeter, Bouchey, and King**

Plaintiff claims that on August 8, 2011, while he was in SHU at Clinton, he gave a grievance against the Upstate staff members involved in his assault and refusal of medical care to an officer to forward to the grievance office.[18]  (Dkt. Nos. 111 at ¶ 21; 179-1 at ¶ 21.)  At his deposition, Plaintiff explained that there are no mail boxes available to inmates in SHU, so the grievance, after being placed in an envelope and addressed to the grievance supervisor, has to be given to an officer to mail.  (Dkt. No. 157-2 at 105-06.)  The fourteen page grievance described in substantial detail the incidents of July 21 and 22, 2011, as described above.  (Dkt. No. 26-13 at 2-15.)  The last page of the grievance indicated that copies were being sent to Inspector General Richard Roy, Karen Bellamy, the Department of Justice, the Hon. Denise Cote, U.S. District Judge, New York State Police Officer David McNulty, the Dutchess County District Attorney, and the Dutchess County Court.  (Dkt. No. 26-13 at 15); *see also* Dkt. No. 157-2 at 106.  In her declaration submitted in support of Defendants' motion, Defendant Clinton IGP Supervisor Tara Brousseau stated she does not recall she or her office receiving or filing the grievance with the IGP, and that a review of her office records did not reflect receipt of the grievance.  (Dkt. No. 157-3 at ¶¶ 1, 8-9.)

---

[18]   The record indicates that in addition to the August 8, 2011, grievance (Dkt. No. 26-13 at 2-15), Plaintiff drafted an August 6, 2011, complaint letter regarding the same incidents which he sent to Inspector General Richard Roy in August 2011.  (Dkt. No. 157-12 at 2, 5-13.)  Plaintiff also sent a copy of the complaint to Superintendent LaValley on August 31, 2011.  (Dkt. No. 179-9 at 26.)  In a November 10, 2011, memorandum to Superintendent of Security, S. Brown, Plaintiff explained that he had sent a follow up letter to LaValley on September 15, 2011, and received a response that the complaint letter had been forwarded to the acting Superintendent of Security for review and appropriate action.  (Dkt. No. 179-9 at 28.)  According to Plaintiff, he also wrote to former Commissioner Fischer and was informed the incident was being investigated at the facility level.  *Id*.

On August 30, 2011, Plaintiff wrote to Tara Brousseau filing an August 24, 2011, grievance and reminding her that he had written to her about the grievance he had filed more than two weeks before against Upstate and had received no response. (Dkt. No. 179-5 at 7.) Plaintiff wrote:

> I still waiting for the copy of the grievance and number that my grievance was processed. I would like to know about this grievance if I can get any response from you I will notify everybody and take another steps to the court if necessary. The I.G. also had a copy of the grievance and Captain Lacy, so it is not that my grievance was loss.

*Id*. Brousseau does not recall receiving the August 30, 2011, letter, and a review of her office's records did not reflect receipt of the letter. (Dkt. No. 157-3 at ¶ 11.)

On August 31, 2011, Plaintiff wrote a letter to Superintendent LaValley which reported that Plaintiff had filed a grievance on August 8, 2011, regarding the assault at the Upstate facility and that he had not yet received a copy of the grievance with the code and title, and had received no acknowledgment of receipt of the grievance by the grievance office. (Dkt. No. 157-3 at 7.) According to Brousseau, Superintendent LaValley referred Plaintiff's August 31, 2011, letter to her for a response on September 6, 2011. (Dkt. No. 157-3 at ¶ 12 and p. 9.)

After receiving a September 15, 2011, follow-up letter requesting the status of the August 8, 2011, grievance from Plaintiff (Dkt. No. 157-3 at at 11), Brousseau responded to Plaintiff's letter to LaValley on October 20, 2011, a month and a half after LaValley's September 6, 2011, letter directing her to respond. *Id*. at 13. Brousseau informed Plaintiff that her office had no record of Plaintiff having filed a grievance. *Id*. at 13. Plaintiff wrote to Brousseau on September 29, 2011, prior to her October 20, 2011, response, informing her that due to a lack of response

from the IGRC, he wanted to appeal his August 8, 2011, grievance to the next stage, which

Plaintiff believed at that time to be the superintendent. (Dkt. No. 26-13 at 20.)  In the letter,

Plaintiff reiterated that he had filed his grievance on August 8, 2011, and had not received any

response from the IGRC or seen an extension and informed Brousseau that he was "exercising

[his] right under Directive 4040 to appeal to the next stage," and "want[ed] his appeal sent to the

next stage (superintendent)." *Id*.  According to Brousseau, she does not recall ever having

received Plaintiff's September 29, 2010, letter and a review of her office's records did not reflect

that the letter was received.  (Dkt. No. 157-3 at ¶ 11.)

    According to Plaintiff, on October 23, 2011, after receiving Brousseau's October 20,

2011, response, Plaintiff attempted to refile the August 8, 2011, grievance by giving a copy to

Grievance Sgt. Ludwig, who said he would re-file it because Brousseau refused to file it.  (Dkt.

Nos.  111 at ¶ 193; 157-2 at 108-09.)  Plaintiff never received notice that the grievance was filed

and did not receive a grievance number.  (Dkt. No. 157-2 at 108.)   Brousseau stated in her

declaration that she does not recall receiving a complaint from Plaintiff or it being filed as a

grievance, and her office's records indicate that no such complaint was received on or about

October 23, 2011.  (Dkt. No. 157-3 at ¶ 23.)  According to Brousseau, if the grievance had been

submitted, it would have been rejected as untimely.  *Id.*

    Plaintiff never received any confirmation that his August 8, 2011, had been received in

the grievance office and did not receive responses to his letters to Brousseau.  (Dkt. 157-2 at 108-

09.)  By letter of October 23, 2011, to Inspector General Roy, Plaintiff requested that an

investigation be done regarding his August 8, 2011, grievance, and what he believed to be "a

clear cover-up."  (Dkt. No. 3-17 at 3.)  On November 21, 2011, Plaintiff wrote to Karen Bellamy,

DOCCS Inmate Grievance Director, requesting that an investigation be conducted regarding his August 8, 2011, grievance which was never filed and he believed had been destroyed. (Dkt. No. 3-17 at 9-10.) Brousseau has stated with certainty in her declaration that she has never failed to process an inmate's grievance sent to the IGP as a grievance and has never destroyed a grievance rather than file it, including those filed by Plaintiff. (Dkt. No. 157-3 at ¶ 17.)

### D.     DOCCS Grievance Records

Christine Gregory, Inmate Grievance Program Supervisor in the Main Building at Clinton since 2012, is responsible for maintaining grievance records filed by Clinton inmates housed in the Main Building. (Dkt. No. 157-11 at ¶ 5.) According to Gregory, Clinton had a fully functional grievance program available to inmates in 2011. *Id*. at ¶ 6. Gregory has reviewed her office's record of grievances filed by Plaintiff, which show that Plaintiff filed five grievances in 2011, twenty-three grievances in 2012, and thirty-five grievances in 2013, none of which contain allegations that Plaintiff was assaulted by staff at Upstate on July 21 and 22, 2011, or denied medical care on July 22, 2011. *Id*. at ¶¶ 8-10 and pp. 5-8.

Jeffrey Hale, Assistant Director of the DOCCS IGP is the custodian of records maintained by CORC. (Dkt. No. 157-10 at ¶¶ 1 and 2.) CORC maintains records on grievance appeals for the current year and the previous four calendar years in accordance with DOCCS policy. *Id*. at ¶ 7. The CORC computer database contains records of all appeals of grievances heard and decided by CORC dating back to 1990. *Id*. Hale has conducted a diligent search for appeals by Plaintiff based on grievances denied at the facilities level and found that Plaintiff appealed to CORC four grievances originally filed at Clinton in 2011, twenty-one grievances filed at Clinton in 2012, and thirty grievances filed at Clinton in 2013. *Id.* at ¶ 11. None of the

grievances appealed to CORC by Plaintiff pertain to allegations that Plaintiff was assaulted by

Upstate staff on July 21 and 22, 2011, or denied medical care on July 22, 2011. *Id*. at ¶¶ 13 and

14.

E.     **Analysis of Defendants' Exhaustion Defense**

Plaintiff does not dispute that his August 8, 2011, grievance (Dkt. No. 26-13 at 2-15),

which was never filed in the Clinton grievance office, was not appealed to CORC. Therefore, the

Court finds that Plaintiff failed to exhaust his administrative remedies under the DOCCS IGP.

*See Woodford*, 548 U.S. at 93 (prisoner who has failed to properly follow each of the applicable

steps, including receipt of a decision from CORC, prior to commencing litigation, has failed to

exhaust his administrative remedies and is barred from commencing a federal lawsuit).

However, as recognized by the Supreme Court in *Ross*, a finding of failure to exhaust

does not end a court's exhaustion review because "the PLRA contains its own, textual exception

to mandatory exhaustion." *Ross,* 136 S.Ct. at 1858. Under the PLRA, "the exhaustion

requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must

exhaust available remedies, but need not exhaust unavailable ones." *Id*. Thus, courts are tasked

with determining whether or not a prisoner's administrative remedies are, in fact, "available."

The Supreme Court found the ordinary meaning of the word "available" to be "'capable

of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'"

*Id*. (quoting *Booth v. Churner*, 532 U.S. 731, 737-38 (2001)). "Accordingly, an inmate is

required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain

'some relief for the action complained of.'" *Id*. at 1859 (citation omitted).

To guide courts in the "availability" analysis, the Supreme Court in *Ross* identified "three

kinds of circumstances" in which an administrative remedy, "although officially on the books," is not "available."[19] *Id*. at 1853. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. at 1853-54. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1854. When one of the three circumstances is found, "an inmate's duty to exhaust 'available' remedies does not come into play. *Id*. at 1859.

There is conflicting evidence in the record concerning whether Plaintiff filed a grievance regarding the alleged July 21 and 22, 2011, assaults by Upstate staff, and the July 22, 2011, medical indifference. The summary judgment record includes the August 8, 2011, grievance Plaintiff claims to have given to an officer to mail to the grievance office while he was in SHU at Clinton. (Dkt. No. 26-13 at 2-15.) The record also contains a series of follow-up letters from Plaintiff to Brousseau regarding the status of the grievance, including a letter of intent to appeal to the next step, and a number of letters to DOCCS personnel, including Superintendent LaValley, Bellamy, and former Commissioner Fischer referencing the grievance, seeking assistance in finding out the status of the grievance, and complaining that Brousseau had violated

---

[19] In a footnote in *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive, given the Court's focus on three kinds of circumstances that were 'relevant' to the facts of the case." Because the same three circumstances were relevant to the PLRA exhaustion issue in *Williams*, the Second Circuit did not "opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use." *Id.*

Directive 4040 and had destroyed his grievances and refused to file an appeal with CORC for the sole purpose of covering up official misconduct. (Dkt. No. 111 at ¶¶ 194-201.)

Brousseau has stated in her declaration that she has no recollection of Plaintiff filing the August 8, 2011, grievance regarding the assault by Upstate personnel or, with the exception of Plaintiff's September 15, 2011, letter, receiving any of his follow up correspondence. (Dkt. No. 157-3 at ¶ 23.) Brousseau has also stated that searches have revealed no records in the grievance office regarding the August 8, 2011, grievance. *Id.* Gregory and Hale, in their declarations, have stated that there is no record of Plaintiff having filed a grievance regarding the July 21 and 22, 2011, assaults and July 22, 2011, medical indifference, or of an appeal to CORC. (Dkt Nos. 157-10 at ¶¶ 13-14; 157-11 at ¶¶ 8-10.)

When questions of fact and issues of credibility exist regarding the failure to exhaust remedies under the DOCCS IGP, a court should neither engage is fact finding nor make determinations as to credibility in addressing a defendants' motion for summary for failure to exhaust. *See, e.g., White v. Clark*, No. 9:12-CV-986 (NAM/DJS), 2016 U.S. Dist. LEXIS 17689, at * 16-18 (N.D.N.Y. Feb. 11, 2016)[20] (finding that assessments of credibility are not proper on summary judgment and disputed issues of material fact had to await an exhaustion hearing); *Nelson v. Plumley*, No. 9:12-CV-422 (TJM/DEP), 2014 WL 4659327, at * 13 (N.D.N.Y. Sept. 17, 2014) (denial of summary judgment and referral for an exhaustion hearing where issues of fact were found in the question of exhaustion); *Bailey*, 2010 WL 4005258, at *7 and n.7 (summary judgment not appropriate where genuine issues of fact exist as to whether plaintiff was

---

[20] There is no Westlaw cite for this Report-Recommendation, nor is it contained in the official reporters.

precluded from exhausting administrative remedies by the actions of prison officials); *Collins v. Goord*, 438 F. Supp. 2d 399, 414 (S.D.N.Y. 2006) (summary judgment denied where plaintiff's submissions found sufficient to raise an issue of fact on whether the IGP process was, in fact, "available" to him). The Court finds that the squarely conflicting accounts of the parties regarding the exhaustion issue give rise to a material dispute of fact regarding whether Plaintiff was thwarted from taking advantage of the grievance process through "machination, misrepresentation, or intimidation," thereby precluding summary judgment. *Ross*, 136 S.Ct. at 1853-55.

In addition, Plaintiff, who sent a letter attempting to appeal his August 8, 2011, grievance to the next level after he had heard nothing, argues in his declaration in response to Defendants' motion that the DOCCS appeals process, particularly when an inmate has no knowledge whether his grievance "was filed, destroyed, or assigned a different code or title," is "so opaque and so confusing that no reasonable person can use it." (Dkt. No. 179-1 at ¶ 27.) In *Williams*, 829 F.3d at 126, the Second Circuit concluded that exhaustion is unavailable where "the regulations plainly do not describe a mechanism for appealing a grievance that was never filed," and the "process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it."

Based upon the foregoing, the Court recommends that Defendants' motion for summary judgment, insofar as it raises the affirmative defense of failure to exhaust with respect to the Eighth Amendment claims against Chase, Riley, Monacelli, Laroque, Lordi, Streeter, Bouchey, and King, be denied.

## VI.    FIRST AMENDMENT RETALIATION CLAIMS

Defendants seek summary judgment on Plaintiff's First Amendment retaliation claims against Brousseau, Brown, Cross, Lee, and Beaudette.  (Dkt. No. 157-14 at 11-21.)  To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action."  *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema*, 534 U.S. 506, 508 (2002)).  "Adverse action" for purposes of a retaliation claim has been defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights."  *Pidlypchak*, 389 F.3d at 381.  Otherwise, the retaliatory act is simply *de minimis* and outside the scope of constitutional protection.  *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (citing *Dawes*, 239 F.3d at 492-93).

An inmate bears the burden of showing that "the protected conduct was a substantial or motivating factor" in the defendants' decision to take action against the plaintiff.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).  In evaluating whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, "a number of factors may be considered, including: (I) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a

hearing on the matter; and (iv) statements by the defendant concerning his motivation.

*Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 873).

"The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* A showing of temporal proximity, without more, has generally been found insufficient to survive summary judgment. *See Roseboro,* 791 F. Supp. 2d at 370 (citations omitted). There are, however, decisions by the Second Circuit in which courts have concluded that temporal proximity between protected activity and allegedly false disciplinary charges may be enough to withstand summary judgment where combined with evidence that the author of the charges knew of the protected conduct, as well as evidence of a prior record of good behavior, or that the charges were dismissed or successfully appealed. *See Washington v. Donahue*, 146 F. Supp. 3d 503, 506-07 (W.D.N.Y. 2015) (collecting Second Circuit cases).

Because of the relative ease with which claims of retaliation can be incanted, courts have scrutinized retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds*, *Swierkiewicz,* 534 U.S. at 506. As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized as a constitutionally proscribed retaliatory act.

*Dawes,* 239 F.3d at 491. Accordingly, claims of retaliation must be supported by specific facts; conclusory statements are not sufficient. *Flaherty*, 713 F.2d at 13; *see also Houston v. Goord*, No. 9:03-CV-1412 (GTS/DEP), 2009 WL 890658, at * 11 (N.D.N.Y. Mar. 31, 2009) ("Analysis of retaliation claims . . . requires thoughtful consideration of the evidence presented concerning the protected activity in which the inmate Plaintiff has engaged and the adverse action taken against him or her, as well as the evidence tending to link the two. When such claims, which ordinarily are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is warranted.").

Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid liability if he demonstrates that he would have taken the adverse action even in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred.") (citation omitted); *Roseboro*, 791 F. Supp. 2d at 371.

### A. Brousseau

#### 1. Retaliation Claim

Plaintiff claims that Brousseau retaliated against him by failing to file or by destroying grievances he submitted to the grievance office. The first grievance Plaintiff claims Brousseau refused to file was the August 8, 2011, assault grievance against the Upstate staff members. (Dkt. No. 157-2 at 121.)

In his second amended complaint, Plaintiff has alleged that on November 21, 2011, he complained to Bellamy that Brousseau had "violat[ed] Directive 4040 and destroy[ed] the Plaintiff's Grievances and refus[ed] to file an appeal with CORC for the sole purpose of covering up Official's misconduct." (Dkt. Nos. 3-17 at 9-10; 111 at ¶ 201.) In his declaration in response to Defendants' motion, Plaintiff has repeated that he had sent the November 21, 2011, complaint to Bellamy regarding the destruction of his grievances, including the August 8, 2011, assault grievance against the Upstate staff "for the sole purpose of covering up official misconduct." (Dkt. No. 179-1 at ¶ 29.) Plaintiff also stated in the declaration that on December 22, 2011, he filed a complaint against Brousseau with the Superintendent "for the ongoing and repeatedly refusing to file his grievances, harassment, and retaliation while acting in concert with others to cover up misconduct by destroying Plaintiff's grievances." *Id.* at ¶ 31.

Plaintiff testified at his deposition that Brousseau had retaliated against him by failing to file his grievances because Plaintiff had filed complaints against Brousseau with DOCCS administrators. (Dkt. No. 157-2 at 118, 120-22.) Plaintiff's retaliation claim against Brousseau appears to be based in significant part on an incident he contends occurred outside of his SHU cell in January of 2012. According to Plaintiff, a male whom Plaintiff believed at the time to be grievance supervisor Tara Brousseau (who is a female), stopped outside his cell and told Plaintiff he wanted to speak with him about all of the letters and complaints he had sent to the Superintendent and Albany about his job as grievance supervisor.[21] (Dkt. No. 111 at ¶ 212.) When Plaintiff explained he only wanted to know what had happened to the grievances he had

---

[21] At the time, Tara Brousseau's husband, who is not a defendant, was also employed at Clinton during the time relevant to Plaintiff's retaliation claim against her. (Dkt. No. 157-3 at ¶ 6.)

filed, the man Plaintiff believed to be Brousseau screamed at Plaintiff that he had filed every

grievance received by his office.  *Id*. at ¶ 213.  According to Plaintiff, the man then screamed:

> Mr. Quezada, I don't fucking care what happened to you at Upstate
> Correctional Facility.  You're in SHU for assaulting an officer at
> Green Haven C.F. and on top of that, you cut the officer with a
> razor blade.  So Mr. Quezada, "what's go around come around."
> You don't told me how to do my job, you're an inmate in SHU, I
> answer the grievances when I wanted, so if you don't like it,
> stopped filing grievances and the complaint to the Superintendent
> about my job because you just made everything worse for you and I
> don't like heard from Superintendent about you every day.

*Id*. at ¶ 214.  Plaintiff described the encounter again at his deposition and claimed that Brousseau

had retaliated against him by telling him to stop filing grievances.  (Dkt. No. 157-2 at 119.)

Plaintiff also testified that he believed Brousseau had sent an officer to search his cell and destroy

another copy of the grievance.  *Id*. at 120-21.

Defendant Brousseau denies ever having approached Plaintiff at his cell and verbally

harassing him or having failed to process or having destroyed Plaintiff's grievances "neither in

order to retaliate against plaintiff for filing letters of complaint about me with DOCCS

administrators or otherwise."  (Dkt. No. 157-3 at ¶ 21.)  Brousseau further denies ever having

sent a corrections officer to Plaintiff's cell to destroy his grievance or property and denies having

the authority to have done so.  *Id.* at ¶ 22.  According to Brousseau, she has "never taken any

action of any kind against plaintiff in order to retaliate against him because he filed grievances or

sent letters of complaint to DOCCS administrators alleging misconduct on [her] part."  *Id*. at ¶

24.

      2.    <u>Analysis</u>

As noted above, Plaintiff has, on occasion, attributed Brousseau's alleged failure to file,

or her destruction of, his August 8, 2011, grievance as an act of retaliation against him for filing grievances and complaints. (Dkt. No. 157-2 at 118, 120-22). The filing of prisoner grievances and complaints has been found to constitute protected conduct under the First Amendment for purposes of a retaliation claim. *See Colon v. Coughlin*, 320 F.3d 346, 352 (2d Cir. 2003) (prisoner grievances); *Moore v. Philips*, No. 04 Civ. 8908 (DLC), 2006 WL 1006538, at * 3 (S.D.N.Y. April 18, 2006) (complaint letters to DOCCS officials). However, even assuming for purposes of this motion that the refusal to file and/or the destruction of two of Plaintiff's grievances is sufficient to constitute adverse action, the Court finds that Plaintiff has failed to raise an issue of fact precluding summary judgment on the issue of causation    whether the causal connection between Plaintiff's complaints against Brousseau and her alleged refusal to file, or her destruction of, Plaintiff's grievances is sufficient to support an inference that the protected conduct played a substantial part in the adverse action. *See Baskerville,* 224 F. Supp. 2d at 732.

Plaintiff's alleges in his second amended complaint and states in his declaration in response to Defendant's motion that Brousseau's "sole purpose" in refusing to file his grievances regarding the assault by Upstate officers was to cover up "official misconduct," not to retaliate against Plaintiff. (Dkt. Nos. 111 at ¶ 201; 179-1 at ¶ 29.) While at his deposition, Plaintiff testified that Brousseau retaliated against him because he had filed a grievance against staff (presumably the Upstate staff), as a general matter, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for filing a grievance against another party. *See Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when the only alleged basis for retaliation was a complaint about an incident involving

another corrections officer); *Guillory v. Ellis*, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at 18 (N.D.N.Y. Aug. 18, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"); *Roseboro,* 791 F. Supp. 2d at 369 (failure by plaintiff to provide any basis to believe corrections counselor would retaliate for a grievance in which she was not personally named); *Ciaprazi v. Goord*, No. 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at * 8-9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicate the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary hearing). Moreover, to the extent Plaintiff may intend to claim that Brousseau retaliated against him for filing a grievance against Upstate staff members, the claim is wholly conclusory and thus inadequate to raise an issue as to causation. *See Dorsey v. Fisher,* 468 F. App'x 25, 27 (2d Cir. 2012) ("[W]here . . . the plaintiff alleges the ultimate fact of retaliation in a conclusory and speculative manner, he fails to state a claim for retaliation.") (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

As to Plaintiff's claim that Brousseau refused to file or destroyed the August 8, 2011, grievance in retaliation for Plaintiff's complaints about her to DOCCS administrators, the Court notes that Plaintiff's complaints were not made until after Plaintiff had been unsuccessful in getting his grievance filed. *See Seale v. Madison*, No. 5:11-CV-0278 (GTS/ATB), 2015 WL 667531, at * 22 (N.D.N.Y. Feb. 17, 2015) ("[I]t is obvious that protected activity must precede any purported retaliation to [establish] a First Amendment retaliation claim.") (citation and internal quotation marks omitted).

Plaintiff also claims that Brousseau failed to file or destroyed his October 23, 2011, re-submission of his August 8, 2011, grievance in retaliation for his having filed complaints against her with DOCCS administrators. (Dkt. No. 157-2 at 118, 120-22.)  However, in both his second amended complaint and declaration, Plaintiff has claimed that when he attempted to re-file the grievance, he placed Brousseau on notice that if the IGP did not file the grievance, she would be added to Plaintiff's lawsuit for "denying Plaintiff his right to complain to the Government and denying access to the Court, with the only sole purpose of covering up official's misconduct." (Dkt. No. 111 at ¶ 193; see also 179-1 at ¶ 28.)

Brousseau has denied failing to file or destroying any of Plaintiff's grievances and has stated that if Plaintiff had submitted the October 23, 2011, grievance for filing it would have been rejected as untimely under the DOCCS IGP in any event.  *Id*. at § 701.5(a).  (Dkt. No. 157-3 at ¶ 21, 23.)  Plaintiff has submitted no non-conclusory evidence to the contrary.  (Dkt. No. 111 at ¶ 193.)  Furthermore, Plaintiff's complaints to DOCCS administrators against Brousseau generally post-dated the re-filing of his August 8, 2011, grievance on October 23, 2011.  (*See* Dkt. No. 111 at ¶¶ 192, 196, 199-201.)  Even if that were not the case, a showing of temporal proximity, which is all Plaintiff has shown in support of his retaliation claim, has generally been found insufficient to survive summary judgment.  *See Roseboro,* 791 F. Supp. 2d at 370 (citations omitted).

The only other grievance Plaintiff has identified as having not been filed or having been destroyed by Brousseau is a grievance allegedly written on November 26, 2011, and re-filed on December 12, 2011, requesting transfer to a federal prison.  (Dkt. Nos. 111 at ¶¶ 203, 206; 157-14 at 15.)  In her declaration, Brousseau denies having refused the grievance and states that her

records indicate that the IGRC filed a grievance by Plaintiff on February 7, 2012, pertaining to the request for a transfer to federal prison. (Dkt. No. 157-3 at ¶ 19. The grievance was denied by the IGRC and on appeals to both the Superintendent and CORC. *Id*. at ¶ 19 and pp. 16, 18-35. The Court finds no evidence in the record to the contrary.

Brousseau has also denied ever approaching Plaintiff's cell, and in response to Plaintiff's "belief" that she sent officers to search his cell to destroy his grievances and property (Dkt. No. 157-2 at 120-21), has denied doing so. *Id*. at ¶ 22. Plaintiff has submitted no evidence other than his "belief" to the contrary, and the person Plaintiff identified as Brousseau, who allegedly came to Plaintiff's cell, was described by Plaintiff as a man in his second amended complaint and deposition testimony. (Dkt. Nos. 111 at ¶ 212; 157-2 at 119.) It was only after Plaintiff learned at his deposition that Defendant Brousseau is a woman that he identified her as a woman in his description of the incident in his declaration. (Dkt. No. 179-1 at ¶ 32.) In short, there is no evidentiary support for a retaliation claim against Brousseau by Plaintiff based on the claim that she visited his cell or that she directed officers to search his cell and destroy grievances and property.

Based upon the foregoing, the Court finds that Plaintiff has failed to submit evidence from which a jury could reasonably find that there was a causal connection between his filing of grievances or his complaints to DOCCS administrators regarding Brousseau and the non-filing or destruction of his grievances. That is especially so given Plaintiff's oft repeated conflicting claim that Brousseau's motivation in refusing to file or destroying his grievances was to cover up the misconduct of the Upstate staff members. *See Jeffreys*, 426 F.3d at 554 (finding it is only "in the rare circumstances where the plaintiff relies almost exclusively on his own testimony, much

of which is contradictory and incomplete," that the district court may conclude that no reasonable jury would credit the plaintiff's testimony.) The Court therefore recommends that Brousseau be granted summary judgment on Plaintiff's retaliation claim.

### B. Brown

#### 1. Retaliation Claim

Plaintiff claims that Defendant Brown, Deputy Superintendent of Security at Clinton, retaliated against him for filing grievances against a Clinton corrections officer. According to Plaintiff, on January 17 and 20, 2012, he filed grievances against Clinton Sgt. Delutis for refusing to provide him with reasonable accommodations by moving him to 4 Company, a special unit that could accommodate his physical disabilities. (Dkt. No. 111 at ¶¶ 221-22.) Plaintiff has alleged that Delutis had ignored his requests and "retaliated because they wanted to read Plaintiff's legal documents and refused to let him seal his legal mail in a box" for two months. *Id*. at ¶ 222. Plaintiff notified his attorney who in turn called Brown, which according to Plaintiff, resulted in his being allowed to send his legal mail out in the manner allowed by law. *Id*. Plaintiff may also be claiming that Brown was upset because Plaintiff had complained about Brown attempting to cover up problems at Clinton to an investigator from the Inspector General's Office who had come to interview Plaintiff about the July 21, 2011, assault at Upstate, and the investigator told Plaintiff he would discuss it with Brown. *Id.* at ¶ 225.

Plaintiff contends that on January 20, 2012, Brown came to his cell and began screaming at him about the grievance he had filed against Delutis and the phone call he had received from Plaintiff's attorney. *Id.* at ¶ 223. According to Plaintiff, Brown told him that because Plaintiff had filed a grievance against Delutis after Brown had taken care of the problem with Plaintiff's

lawyer, Plaintiff was going to have to stay where he was for six months, and if he did not cause

any more problems during that time he might be moved to 4 Company, the unit he had requested

to accommodate his physical disabilities.  *Id.*  Plaintiff claims that Brown told him to stop

writing grievances for "petty shit" or he would never go to the special unit.  *Id.*  Plaintiff

contends he became fearful and did not write other grievances because he was afraid it would

impact upon his request to move.[22]  *Id.*  at ¶ 224.

However, on January 24, 2012, Plaintiff did write a grievance against Brown claiming

that Brown had retaliated against him for filing grievances against Sgt. Delutis by denying him a

transfer to 4 Company.[23]  (Dkt. No. 157-4 at 11-15.)  Plaintiff requested transfer to a federal

prison or transfer to 4 Company at Clinton to accommodate his disabilities.  (Dkt. No. 157-4 at

15.)  The grievance was treated as a Code 49 and passed through to the Superintendent.  *Id.* at 10.


In a February 3, 2012, memorandum in response to Plaintiff's grievance, Brown stated

that while he was making rounds in SHU on January 20, 2012, Plaintiff asked him about a move,

and Brown told him that his present placement was appropriate and he would not be moved.[24]

---

[22]  Plaintiff largely repeated the factual allegations in his second amended complaint
regarding Brown's alleged retaliation in his declaration in opposition to Defendants' motion
(Dkt. No. 179-1 at ¶¶ 33-36), and in his deposition testimony.  (Dkt. No. 157-2 at 202-05.)

[23]  In his declaration, Plaintiff also claims, without factual support, that Brown retaliated
against him for the assault at Upstate.  (Dkt. No. 179-1 at ¶ 34.)

[24]  It was noted both in CORC's decision and Brown's declaration that the area log book
revealed that Brown had not been in SHU on January 20, 2012, although Brown had
acknowledged speaking to Plaintiff that day in his February 3, 2012, memorandum.  (Dkt. Nos.
157-4 at ¶ 12.)  Brown stated in his declaration that he instead spoke to Plaintiff on January 26,
2012.  However, that cannot be reconciled with the January 24, 2012, date of Plaintiff's
grievance describing the encounter that both Plaintiff and Brown acknowledge, albeit differently,

*Id*. at 22.  Plaintiff stated that denying him the move was retaliatory for a grievance he had filed, and he was going to contact his lawyer.  *Id*.  Brown then questioned Plaintiff as to why he felt the need to grieve things, i.e., his legal mail complaint, that had already been taken care of, and Plaintiff explained that he filed the grievance before his legal mail was sent.  *Id*.  According to Brown, Plaintiff was "told in no uncertain terms that whether a grievance was filed or he notified his lawyer, if he was due something he would receive it . . . and he should talk to staff or himself and the end results will be the same."  *Id*.  Brown also noted that Plaintiff had made it known he would do anything he could to be transferred to a federal prison, and he would try any means possible, including making medical claims, to move to 4 Company.  *Id*.

The Superintendent, who denied the grievance, found that "[a]n investigation  was conducted and it was determined that the grievant was given sound advice regarding facility procedures by the DDS.  It is noted the grievant did not accept the constructive criticism well and subsequently filed the grievance against Brown."  (Dkt. No. 157-4 at 16.)  Plaintiff appealed to CORC, and CORC, concluding it had not been provided with sufficient evidence to substantiate retaliation by Brown, upheld the Superintendent's determination.  *Id*. at  7. According to CORC, Plaintiff was "not entitled to be housed on the company of his choice, and that he is appropriately housed in SHU due to his own misbehavior."  *Id*.

The record reveals that Plaintiff requested reasonable accommodations to move to 4 Company on February 1, 2012.  (Dkt. No. 157-6 at 16.)  His request was granted by the doctor and Deputy of Programs on February 22, 2012, a month after his discussion with Brown, and he was moved to 4 Company.  *Id*.; *see also* Dkt. Nos. 111 at ¶ 236; 179-1 at ¶ 49.  However,

---

had occurred on January 20, 2012.

Plaintiff's stay in 4 Company was short lived as he was moved back to 3 Company on June 27, 2012. (Dkt. No. 111 at ¶ 244; 157-6 at 16.) According to Defendant Lee, Plaintiff's move back to 3 Company was made for security reasons. (Dkt. No. 157-8 at ¶ 18.) Plaintiff thereafter, on or about July 9, 2012, filed a grievance against Defendant Cross for denying reasonable accommodations for his physical disabilities by moving him back to 3 Company. (Dkt. No. 157-2 at 14-20.) The grievance was denied by CORC which found that the reasonable accommodations deemed medically necessary for Plaintiff were being provided where he was being housed. *Id*. at 9.

> 2.     Analysis

As noted above, the filing of prisoner grievances is protected conduct for purposes of a retaliation claim. *See Colon,* 320 F.3d at 352. Therefore, Plaintiff has shown that he engaged in protected conduct in filing the grievances against Delutis and possibly in complaining to his attorney about Brown.

In addition, the Court cannot rule out Brown's alleged threat regarding a move to 4 Company could be found to constitute adverse action, especially since shortly thereafter Plaintiff's physical limitations were found to be serious enough to warrant the move. *See Pidlypchak*, 389 F.3d at 381 (adverse action defined as conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights). Plaintiff claims Brown's actions made him so fearful that he did not write other grievances because he was afraid it would negatively impact his chances to move. (Dkt. No. 111 at ¶ 224.)

Until *Ford v. Palmer*, 539 F. App'x 5, 5 (2d Cir. 2013), verbal threats alone were generally not considered as adverse action for purposes of a First Amendment retaliation claim

unless they were sufficiently direct and specific. *See Mateo v. Fischer*, 682 F.Supp. 2d 423, 434 (S.D.N.Y. 2010) (collecting cases). In *Ford*, the Second Circuit indicated that certain less direct and specific verbal threats could also constitute adverse action for purposes of retaliation. *Ford*, 539 F. App'x at 7. In *Ford*, a correctional officer had threatened to poison plaintiff by putting "some kind of substance in [his] hot water" in retaliation for filing a grievance against him. The Second Circuit concluded the district court had "erred in reasoning, as a matter of law, that verbal threats must be more definite and specific than the [defendant's] alleged threat in order to constitute 'adverse action.'" *Id*. The Court noted the vague nature of the threat not telling plaintiff how or when he planned to poison him "could have enhanced the effectiveness as a threat and increased the likelihood that a person of ordinary firmness would be deterred from filing additional grievances." *Id*.

In this case, Brown's alleged threat was specific in the sense that Plaintiff was threatened with being unable to move to 4 Company unless his conduct met certain standards for six months. However, it was vague in the sense that Plaintiff was allegedly told generally that he would be required not to cause any more problems or file grievances for "petty shit" for six months, without being given any specific guidance as to what would be considered a problem or a grievance for "petty shit." (Dkt. No. 111 at ¶ 224.) The Court finds the uncertainty created by the absence of any such guidelines might reasonably be found to deter a "similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381.

Whether Plaintiff was actually deterred from filing grievances as a result of Brown's threat, as he claims, is called into serious doubt by his January 24, 2012, grievance against Brown

for his allegedly retaliatory actions in refusing to allow Plaintiff to move because of grievances he had filed.  (Dkt. No. 157-4 at 11-15.)  However, the test for adverse action is an objective one, and the fact that Plaintiff may have responded with greater than ordinary firmness in filing the January 24, 2012, grievance against Brown does not deprive him of his claim.  *See Ford*, 539 F. App'x at 6 ("As we have stated, the 'objective test' [for First Amendment retaliation] applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits.") (quoting *Pidlypchak*, 389 F.3d at 381)).

The Court also concludes that there are issues of material fact with regard to causation that preclude summary judgment in Brown's favor.  Although it is difficult to establish retaliation for complaints against a third party, *Wright*, 554 F.3d at 274, in this action Brown, by speaking with Plaintiff's attorney, became personally involved in the subject matter of the grievances and was angry at Plaintiff for filing a grievance after Brown had fixed the problem.  (Dkt. No. 111 at ¶ 222.)  Brown has conceded that during the encounter he asked Plaintiff why he had filed a grievance regarding something that had already been resolved.  (Dkt. No. 157-4 at 22.)  However, Brown has denied that telling Plaintiff he would not be moved was retaliatory, claiming that he told Plaintiff it was because his present placement was appropriate.  (Dkt. No. 157-4 at 22.)

Brown has argued that he is entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff would not have been transferred to 4 Company even absent a retaliatory motive.  (Dkt. No. 154-14 at 18-19.)  *See Scott*, 344 F.3d at 287-88.  The Court finds that Brown's reliance on Plaintiff having been moved from a cell with an adjacent shower some months later on December 24, 2012, due to misbehavior fails to establish by a preponderance of the evidence that Plaintiff would not have been transferred to 4 Company in January 2012 absent a retaliatory

motive by Brown. *See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). In fact, as noted above, Plaintiff was moved to 4 Company to accommodate his physical impairments a month after his encounter with Brown in July 2012. (Dkt. Nos. 111 at ¶ 236; 157-6 at 16; 179-1 at ¶ 49.)

The Court finds that there are credibility issues with regard to Plaintiff's and Brown's differing descriptions of the July 2012 encounter out of which the retaliation claim arises. These issues, which are material to the determination of Plaintiff's claim, are for determination by the factfinder, not the Court. *See Rule*, 85 F.3d at 1011. Accordingly, the Court recommends that Brown's motion for summary judgment be denied.

### C. Cross

#### 1. Retaliation Claim

As aptly described by Defendants, Plaintiff "[i]n entirely conclusory and formulaic fashion . . . merely labels certain events in the complaint as 'retaliation' by defendant Cross." (Dkt. No. 157-14 at 19.) Plaintiff claims that Cross retaliated against him for filing unidentified grievances by denying him headphones, moving him out of 4 Company into an unsanitary unit for disruptive inmates, denying him a shower chair, and forcing him to sit on the floor instead of sitting on his bed to put on his knee brace, thereby depriving Plaintiff of the opportunity to move around during his recreation time. (Dkt. Nos. 111 at ¶¶ 267-69, 272, 277-81, 293-94, 304-05; 179 at 27-28; 179-1 at ¶¶ 55-56.)

#### 2. Analysis

Filing grievances is protected conduct for purposes of a retaliation claim. *See Colon,* 320 F.3d at 352. However, Plaintiff has not identified any particular grievances that preceded the

alleged retaliation or alleged any facts that support the requisite causal connection.  He has merely claimed retaliation in conclusory fashion.

Plaintiff has alleged he filed grievances against Cross.  However, with the exception of a grievance filed seeking reasonable accommodations under the ADA and RA in the form of a move to 4 Company (Dkt. No. 157-6 at 14), the grievances identified in the record as having been filed by Plaintiff complaining of retaliation by Cross appear to have been filed after, not before, the alleged retaliatory acts.  For example, in his December 26, 2012, grievance against Cross, Plaintiff complained, *inter alia*, that Cross had retaliated against him for filing too many grievances and asking for too many videos of incidents by moving him back to 2 Company, requiring him to use an unsanitary shower, and forcing him to bend his back to remove his knee brace.  The allegedly retaliatory acts took place before the filing of the grievance, and Plaintiff did not specifically identify grievances filed before as the protected conduct necessary for a First Amendment retaliation claim.  (Dkt. Nos. 111 at ¶¶ 266, 269; 157-6 at 46.)

On February 16, 2013, Plaintiff submitted a grievance against Cross for retaliating against him by not allowing him to sit on the bed to put on his knee brace.  (Dkt. Nos. 157-6 at 74.)  Plaintiff did not identify the protected grievance or grievances that had led to the retaliation.  *Id.*  On April 29, 2013, Plaintiff submitted a grievance against Cross for retaliation arising out of his March 2013 memorandum to staff prohibiting Plaintiff from using his knee brace in his cell or sitting on his bed to put on the knee brace for security reasons, again without identifying a specific grievance as protected conduct.  (Dkt. No. 111 at ¶ 282; Dkt. No. 157-6 at 111.)

Claims of retaliation must be supported by specific evidence.  *Flaherty*, 713 F.2d at 13.  Conclusory assertions of retaliation are not sufficient.  *Id.*  Furthermore, protected activity, such

54

as the filing of grievances, must precede any purported retaliation, and Plaintiff has failed to show that to be the case. *See Seale*, 2015 WL 667531, at * 22. Therefore, Plaintiff's grievances that grieve the retaliatory conduct of which he now complains cannot satisfy the causation element of a grievance claim, and the Court recommends that Cross be granted summary judgment on Plaintiff's First Amendment retaliation claim.

**D.     Lee**

1.     <u>Retaliation Claim</u>

C.O. Lee was assigned to the SHU (or "Unit 14") at Clinton and was the 3 Company officer on Unit 14 on June 26, 2012, when following an order from Captain Lucia, he unsealed Plaintiff's draft bags to allow him to retrieve legal material he needed for a September 19, 2012, court deadline. (Dkt. Nos. 111 at ¶ 242, 179-1 at ¶ 28, 157-8 at ¶ 8.) Lee has stated in his declaration that he allowed Plaintiff to retrieve materials that looked like they might have been related to his legal papers and denied those that did not. (Dkt. No. 157-8 at ¶ 11.)

According to Plaintiff, Lee placed documents he needed for the court deadline back in the draft bag, and when Plaintiff complained Lee told him to file a grievance. (Dkt. Nos. 111 at ¶ 242; 179-1 at ¶ 28.) When Plaintiff was returned to his cell, he asked Lee to correct paperwork to indicate there were three, not two, draft bags. (Dkt. No. 111 at ¶ 244.) Plaintiff claims that Lee became upset and told Plaintiff he could start packing his things because he was going to be moved from 4 Company and would not be coming back. (Dkt. No. 179-1 at ¶ 28.) Plaintiff contends that Lee was upset about the grievances Plaintiff had filed against Delutis and other officers and because Captain Lucia had ordered him to retrieve Plaintiff's documents. (Dkt. Nos. 111 at ¶¶ 244, 246; 179-1 at ¶ 28.)

55

Plaintiff was moved to 3 Company June 27, 2012.  (Dkt. No. 157-8 at ¶ 18.)  Plaintiff claims that Lee moved him without regard to his medical disabilities and his reasonable accommodation approval from medical and administration, in retaliation for grievances Plaintiff had filed against Delutis and Brown and for asking for permission to retrieve his legal papers.  (Dkt. Nos. 111 at ¶¶ 244, 246; 179-1 at ¶ 39.)  According to Lee, as a corrections officer, he had no authority to move Plaintiff's cell location and had no involvement in Plaintiff's June 27, 2012, cell move.  (Dkt. No. 157-8 at ¶¶ 17-18.)

The day he was moved to his new cell, Plaintiff found a weapon he believed to have been planted by Lee so that he could falsely accuse Plaintiff.  (Dkt. No. 111 at ¶ 247.)  When Captain Lucia stopped at Plaintiff's cell, Plaintiff told him that he had discovered the weapon, and that Lee had planted it in retaliation for being asked to provide Plaintiff with his legal documents and the filing of grievances by Plaintiff.  *Id.* at ¶ 248.  Lee has denied planting a weapon in Plaintiff's cell and retaliating against Plaintiff because he reported finding a weapon in his cell.  (Dkt. No. 157-8 at ¶¶ 17-18.)

According to Plaintiff, when Lee learned that he had told Lucia about the planted weapon, Lee put a second plan in effect and denied Plaintiff legal supplies he needed for his legal work.  (Dkt. No. 179-1 at ¶ 39.)  Lee denies that he denied Plaintiff legal supplies, stating in his declaration that he always provided Plaintiff with any and all legal supplies Plaintiff needed.  (Dkt. No. 157-8 at ¶¶ 14-15.)

 Lee allegedly fabricated an IMR against Plaintiff on June 27, 2012 charging him with threats    102.10 and harassment    107.11 in retaliation for Plaintiff returning the planted weapon to Lucia.  (Dkt. No. 111 at ¶ 249.)  Lee contends that he issued the IMR because as he was

handing out legal supplies on June 27, 2012, Plaintiff threatened him stating "You gonna get hurt by me soon Lee." (Dkt. No. 157-8 at ¶ 24.) According to Lee, he took the threat seriously in light of Plaintiff's violent disciplinary history, and because threats to correctional staff are a violation of disciplinary rules, he felt that the threatening comment warranted an IMR. *Id*.

Plaintiff was found guilty and commenced an Article 78 proceeding which was dismissed after the state court was advised that the guilty finding had been reversed. (Dkt. No. 111 at ¶ 250.) Plaintiff filed a grievance against Lee on July 11, 2012, claiming that Lee had verbally threatened and harassed him and issued a false IMR in retaliation for Plaintiff filing the June 27, 2012, grievance. (Dkt. No. 157-8 at 14-21, 48-51.) The grievance was denied through CORC. *Id*. at 56.

### 2.   Analysis

Plaintiff claims that Lee retaliated against him by moving him from 4 Company, planting a weapon in his cell, and denying him legal supplies, all because Plaintiff asked for permission to retrieve legal documents and filed grievances against Delutis and Brown. (Dkt. Nos. 111 at ¶¶ 244, 246-47; 179-1 at ¶ 39.) As noted above, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for filing a grievance against a third party. *Wright*, 554 F.3d at 274. Plaintiff has offered no evidence as to why Lee would retaliate for grievances against Delutis and Brown.

Furthermore, assuming for purposes of this motion that the reach of the First Amendment right to access to court extends to Plaintiff's request to retrieve legal papers that were in storage for a pending court action and his request for legal supplies, for purposes of finding protected conduct, Lee has denied having any authority to, or involvement in, moving Plaintiff out of 4

Company, has denied planting a weapon in Plaintiff's cell, and has stated that he never denied Plaintiff legal supplies. (Dkt. No. 157-8 at ¶¶ 14, 17-18.) Plaintiff has submitted nothing more than his conclusory accusations, which are insufficient to defeat summary judgment. *See Flaherty*, 713 F.2d at 13 (claims of retaliation must be supported by specific facts; conclusory statements are not sufficient). Moreover, temporal proximity alone is insufficient to avoid summary judgment. *See Roseboro*, 791 F.Supp. 2d at 370.

In his July 11, 2012, grievance Plaintiff claims that Lee verbally harassed and threatened him. (Dkt. Nos. 111 at ¶ 254; 157-8 at 48-51.) Verbal harassment is generally held not to rise to the level of adverse action for purposes of a retaliation claim. *Roseboro*, 791 F.Supp. 2d at 375. Plaintiff claims that Lee threatened him by telling Plaintiff that "I'm going to make sure you never get out of SHU. If you make it to population, I going to make sure to take care of you." (Dkt. No. 111 at ¶ 254.) As discussed above with regard to the retaliation claim against Brown, verbal threats alone are generally not considered as adverse action for purposes of a retaliation claim unless they were specific and direct, *Mateo*, 682 F.Supp. 2d at 434, or as in *Ford*, 539 F. App'x at 5, where a vague threat enhances its effectiveness and increase the likelihood that a person of ordinary firmness would be deterred from filing other grievances. Unlike with Brown, who is the Deputy Superintendent of Security, the Court finds that a reasonable jury could not find that the very general threats allegedly made by Lee in the yard constitute adverse action for purposes of a retaliation claim.

In his second amended complaint, Plaintiff has claimed in conclusory fashion that Lee filed the June 27, 2012, IMR against him in retaliation for returning the allegedly planted weapon to Lucia. (Dkt. No. 111 at ¶ 215.) In his July 11, 2012, grievance against Lee, Plaintiff has

claimed, also in conclusory fashion, that Lee filed the false IMR in retaliation for Plaintiff filing the June 27, 2012, grievance. (Dkt. No. 157-8 at 14-21, 48-51.) However, Plaintiff's grievance was not received by the grievance office until July 2, 2012, several days after Lee allegedly filed the IMR in retaliation for Plaintiff's June 27, 2012, grievance. Unless Lee knew about the grievance prior to the time he wrote the IMR, the IMR cannot be found to have been filed in retaliation for the grievance. *See Seale*, 2015 WL 667531, at 22.

Plaintiff claimed in his July 11, 2012, grievance that Lee saw him writing the grievance on June 27, 2012. (Dkt. No. 157-8 at 48.) The Court finds that Plaintiff's conclusory assertion that Lee saw him writing the grievance, without supporting evidence or at least more detailed factual support, fails to establish a nexus between Plaintiff's return of the weapon to Lucia and the June 27, 2016, grievance, on the one hand, and Lee's IMR, on the other. *See Jeffreys*, 426 F.3d at 554 ("To defeat summary judgment . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation."). Based upon the foregoing, the Court recommends that Lee be granted summary judgment on Plaintiff's First Amendment retaliation claim.

### E.    Beaudette

Plaintiff has alleged that Beaudette retaliated against him for filing grievances by making his shower too hot and too short, denying him soap and a razor or electric clippers, and by moving him from 4 Company to 2 Company in December 2012. (Dkt. No. 111 at ¶¶ 263, 265, 299-302.) Plaintiff filed grievances against Beaudette complaining of the allegedly retaliatory hot and too short shower (Dkt. No. 157-9 at 12-13); retaliatory denial of showers, soap, razor, and clippers, *id*. at 34-35, 45, 53-54; retaliatory search of Plaintiff's cell, *id*. at 84; and an unjustified retaliatory move from 4 Company to 2 Company. *Id*. at 72-82.

The Court finds that denial of the limited number of showers claimed by Plaintiff as well as soap, razor, and clippers, does not constitute adverse action for purposes of a retaliation claim. *See Pidlypchak*, 389 F.3d at 381 (adverse action for purposes of retaliation is retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights").  Furthermore, Plaintiff's claim that Beaudette was responsible for moving him from 4 Company to 2 Company has no evidentiary support in the record beyond Plaintiff's conclusory assertion.  *See Flaherty*, 713 F.2d at 13.  The undisputed evidence in the record includes Beaudette's statement that as a correction officer he has no authority to transfer an inmate to another cell (Dkt. No 157-9 at ¶ 29), and a memorandum from R. Farrell that cell moves in SHU must be approved by the security supervisor. *Id*. at 83.  A February 9, 2013, memorandum from Beaudette to Farrell states that the cell search which Plaintiff claims was retaliatory was a daily random cell search ordered by the Deputy Superintendent of Security. *Id*. at 84.  Plaintiff has submitted no evidence refuting the nature of the search.

In short, Defendants have established as a matter of law that there was is no adverse action supporting Plaintiff's retaliation claims against Beaudette regarding the shower, soap, razor, and clippers; that Beaudette had no authority to move Plaintiff from 4 Company; and that the search of Plaintiff's cell was a daily random search.  Because Plaintiff has raised no material issues of fact in dispute, the Court recommends Beaudette be granted summary judgment on Plaintiff's retaliation claim.

## VII. EIGHTH AMENDMENT MEDICAL INDIFFERENCE CLAIM AGAINST LORDI AND CROSS

### A. Legal Standard for a Medical Indifference Claim

Defendants have moved for summary judgment on the Eighth Amendment medical indifference claims Plaintiff has asserted against Defendants Lordi and Cross.[25] (Dkt. Nos. 111 at ¶¶ 13-15; 157-14 at 22-24.)

Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials must ensure that inmates receive adequate medical care. *Id*. (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). A claim that a prison official has intentionally disregarded an inmate's serious medical needs has both objective and subjective elements. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). The plaintiff must show that he had a serious medical condition and that it was met with deliberate indifference. *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted). "[N]ot every lapse in medical care is a constitutional wrong. Rather, a prison official violates the Eighth Amendment only when the two requirements are

---

[25] Defendants also seek summary judgment on an Eighth Amendment medical indifference claim against Beaudette. (Dkt. No. 157-14 at 25-26.) Plaintiff's claims against Beaudette regarding the shower is addressed herein as an Eighth Amendment conditions of confinement claim.

met." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citation and internal quotation marks omitted).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted); *accord Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Factors informing the inquiry into whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

To satisfy the subjective element of deliberate indifference, a plaintiff must establish the equivalent of criminal recklessness, i.e., "that the charged official act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin,* 467 F.3d at 280; *see also Farmer*, 511 U.S. at 837 ("[T]he official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

## B. Lordi

Plaintiff spent the night in the infirmary at Upstate on July 21, 2011. (Dkt. Nos. 111 at ¶¶ 163-64; 157-2 at 69-70.) According to Plaintiff, he was in the infirmary because he had been badly beaten by Monacelli and Laroque and sustained serious bodily injury to his face, shoulders, back, and ribs, including a large bump on his forehead, and was extremely dizzy. (Dkt. No. 111

at ¶¶ 163-65.)  The Infirmary Log for July 22, 2011, however, indicates that Plaintiff had been sent to the infirmary the night before because he was banging his head against the wall and making threats of self-harm.  (Dkt. No. 157-5 at 12.)  Plaintiff claims the log entry was a cover-up of the assault.  (Dkt. No. 111 at ¶ 169.)

Plaintiff claims that RN Lordi rejected his requests for medical help while she was present in the clinic speaking with a correctional officer outside Plaintiff's room the morning of July 22, 2011.  (Dkt. Nos. 111 at ¶¶ 166-168; 157-2 at 70-71.)   According to Plaintiff, he told Lordi that he had severe injuries from being hit in the head and needed a doctor.  (Dkt. No. 157-2 at 71.)  Plaintiff contends that Lordi, who did not come into his room, told him from the hall that she did not see any injury and began screaming at him about attacking an officer at Green Haven. *Id*.

According to Lordi, on July 22, 2011, the nurses assigned to the infirmary were responsible for inmates housed in the infirmary.  (Dkt. No. 157-5 at ¶ 12.)  According to the Infirmary Log for July 22, 2011, the nursing staff assigned to the infirmary were Amy Cushman and Martha Sturgeon.  *Id.* at ¶ 11.  Lordi's name does not appear in the Infirmary Log for July 22, 2011, and she was assigned to provide nursing care to inmates in 8 Building.  *Id*. at ¶ 10. Although Lordi would have been in the infirmary at various times throughout the day on July 22, 2011, to retrieve medications, at no time did her job responsibilities entail providing medical care to inmates housed in the infirmary, and she spent the majority of the day in 8 Building.  *Id.* at ¶ 13.  According to Lordi, had she been in the infirmary on July 22, 2011, and felt that Plaintiff needed emergency medical care, she would have provided the care or taken steps to ensure the care was provided.  *Id*. at ¶ 14.

The record evidence reveals that Plaintiff was on special watch during the night he spent in the infirmary, requiring the correctional officer assigned to him to enter his observations on a Special Watch Log every fifteen minutes. (Dkt. 157-13 at ¶¶ 7 and 8 and pp. 5-7.) Furthermore, records reveal that Plaintiff was offered a sick call by RN Surgeon at 6:15am on July 22, 2011, and was seen by a mental health specialist approximately three hours later. *Id*. at ¶ 10.

Whether or not Plaintiff sustained injuries as severe as he claims as a result of the alleged assault by Monacelli and Laroque remains open to question. The investigation report on Plaintiff's assault which was prepared by Investigator Weishaupt disputed Plaintiff's claim of serious injury, concluding that his medical records and photographs did not show the substantial injuries Plaintiff should have had if the assaults he described were as brutal and lengthy as he claimed. (Dkt. No. 157-12 at ¶ 7 and p. 17.)

However, even assuming for purposes of this motion that Plaintiff did have a serious medical condition on July 22, 2011, the evidence reveals that Lordi was not a "charged" official who failed to provide Plaintiff medical care, since her work assignment was in 8 Building, and medical care was available and offered to Plaintiff by RN Surgeon, one of the nurses who was assigned to the infirmary. *See Salahuddin*, 467 F.3d at 280 (plaintiff must establish that the charged official acted or failed to act while actually aware of a substantial risk of serious harm).

Based upon the record evidence, the Court finds that a jury could not reasonably conclude that Lordi acted with deliberate indifference, and therefore recommends Lordi be granted summary judgment on Plaintiff's Eighth Amendment medical indifference claim.

**C.      Cross**

     1.      <u>Medical Indifference Claim</u>

According to Plaintiff's medical records, he had surgery for "anterior cruciate ligament reconstruction with Achilles allograft and with medial and lateral meniscectomies" on December 20, 2006.  (Dkt. No. 111-6 at 11-13.)  The operative report indicates the surgery was the second attempt at reconstructing Plaintiff's ACL.  *Id*. at 11.  He complained of pain, his knee giving way, swelling, limping, and frequent falls after the first surgery.  *Id*. at 2.  Plaintiff had a third knee surgery on June 1, 2007, to remove a screw.  *Id*. at 27-29.  He was provided with a knee brace after the surgery.  *Id*. at 3.   Plaintiff saw Orthopedic Surgeon Harrison in or about March of 2008.  *Id*. at 2-8.  He complained of pain, swelling, unsteadiness of his knee which still gave way, and stiffness and limitation of motion.  *Id*. at 3.  With his knee giving way and buckling, Plaintiff had a tendency to fall.  (Dkt. No. 111-6 at 8.)  Dr. Harrison indicated that Plaintiff had never fully recovered from his knee injury and had to be allowed to wear a knee brace.  *Id*.  He recommended that further stabilization surgery be attempted, with the likelihood that Plaintiff would ultimately require a total knee replacement.  *Id*.

Plaintiff had also complained to Dr. Harrison about pain in his lower back which Plaintiff attributed to his limping.  *Id*. at 3.  An MRI of Plaintiff's lumbar spine done on September 19, 2005, showed mild to moderate disc degeneration at L4-L5 and a diffusely bulging disc at L4-L5.  *Id*. at 5.

Plaintiff claims that from early February 2013 to early May 2013, Cross refused to allow him to sit on the bed to put on his knee brace, instead requiring him to sit on the floor to put on

the brace, which caused Plaintiff considerable back pain.  (Dkt. Nos. 111 at ¶¶ 272-83; 179-1 at ¶ 50.)  Cross continued to refuse even after Plaintiff told him sitting on the floor to put the brace on caused him excruciating pain.  (Dkt. No. 111 at ¶ 272.)  At his deposition, when asked if he could put his knee brace on while sitting on the floor, Plaintiff testified "[n]o, I never try.  I tried one time and I almost fall. So I never try again because I can't.  By medical order I can't do that. It's difficult.  The knee brace, the day I tried, the knee brace went all the way down to my ankle and I almost fall."  (Dkt. No. 157-2 at 197.)

According to Plaintiff, because he needed to sit on a chair to put on his brace properly, most of the time he had to go to recreation without his brace, or with it on improperly, and simply stand in the corner of the recreation cage even in cold weather.  (Dkt. Nos. 111 at ¶ 273; 157-2 at 197-98; 179-1 at ¶¶ 50-51.)  Plaintiff testified at his deposition that Cross made him sit on the dirty floor in the back of his cell to put his knee brace on because Plaintiff filed too many complaints and requested the video every time a violation was committed against him.  (Dkt. No. 157-2 at 195.)

Cross explained in his declaration that Plaintiff's knee brace was frisked and searched for contraband and placed in the back of Plaintiff's cell when it was removed by Plaintiff.  (Dkt. No. 157-6 at ¶ 26.)  Allowing Plaintiff to sit on his bed to put the brace on would cause a security breach because Plaintiff would be out of sight while putting it on, thereby nullifying the frisk search on the brace.  *Id*. at ¶ 27.  Moreover, according to Cross, because of his history of violent and assaultive behavior, Plaintiff was not allowed to keep the brace in his cell and was required to put it on under the observation of an officer.  *Id*. at ¶ 25; Dkt. No. 157-2 at 191.  Plaintiff claims that he could be observed sitting on his bed from the front of his cell.  (Dkt. No. 111 at ¶

272.)

Cross asserted in his declaration that medical staff had not placed any restrictions on how Plaintiff's knee brace was to be applied, and it was Cross's understanding that Plaintiff could stand or sit on the floor in the back of his cell. (Dkt. 157-6 at ¶ 24.) According to Cross, on a daily basis, Plaintiff was able to walk to the recreation area without his knee brace and walk around inside the recreation pen for an hour without his brace or cane. *Id.* at ¶ 32.

On March 11, 2013, Cross issued a memorandum to staff advising them that Plaintiff had a permit for a knee brace for out of cell use, the brace was to be secured in the back of his cell, and it was to be put on by Plaintiff in the back of his cell. *Id.* at 139. In the memorandum, Cross informed staff that "**Medical staff stated Inmate Quezada does not have any restrictions on how he puts the knee brace on; he can stand up or sit on the floor, in the back of his cell**. He does not need to sit on his bed or have a chair or stool in the back of his cell." *Id.* (emphasis in original). In a May 14, 2013, memorandum to the grievance supervisor, Cross indicated that he contacted medical staff and was informed Plaintiff did not have to sit down to put on his knee brace. *Id.* at 138. Plaintiff, however, testified at his deposition that the doctor ordered him to sit down when he put his knee brace on, but Cross refused to allow him to do so. (Dkt. No. 157-2 at 194.)

On May 6, 2013, when he did not have his knee brace on, Plaintiff slipped and fell on a wet spot in front of the shower when his knee gave out. (Dkt. No. 179-1 at ¶ 53.) The same day Deputy Superintendent of Security Brown directed that a plastic bucket be placed in the back of Plaintiff's cell for him to sit on while he put on his knee brace. *Id.* at ¶ 33; Dkt. No. 111 at 98.

2.    Analysis

Based upon Plaintiff's medical records regarding his surgeries, the lack of stability of his knee, and the order by Dr. Harrison that Plaintiff wear the brace, the Court finds there is a question of fact as to whether Plaintiff had a serious medical need that required him to wear a knee brace when he walked around outside his cell.  (Dkt. No. 111-6 at 8.)  The Court also finds there is a material factual dispute as to whether Plaintiff was able to put the knee brace on while sitting on the floor, with Plaintiff claiming that he could not because of the pain to his back and because he could not put it on properly and it would slip down.  (Dkt. Nos. 111 at ¶ 272; 157-2 at 197.)

Moreover, the Court finds that there are issues of material fact as to whether Cross was deliberately indifferent to whether Plaintiff was able to properly put on the knee brace sitting on the floor, whether doing so would cause Plaintiff excruciating pain, and the risk to Plaintiff's safety of walking around without his knee brace.  Cross has indicated that there was a security reason behind not allowing Plaintiff to sit on his bed when he put on the knee brace.  (Dkt. No. 157-6 at ¶ 32.)  However, he has identified no security issue involved in refusing to allow Plaintiff to sit on something in the back of his cell so that he could wear the brace to protect himself from falls like the one he took on May 6, 2013, caused in part by the instability of his knee described by Dr. Harrison.  (Dkt. No. 111-6 at 8.)  Cross appears to have gone out of his way to prevent anyone from giving Plaintiff something to sit on in the back of his cell, even though he was aware that Plaintiff was going out on a daily basis, to walk to the recreation area without his knee brace and to walk around inside the recreation pen for an hour without his brace

or cane. (Dkt. 157-6 at ¶ 32 and p. 139.) In contrast, Brown ordered that a bucket be placed in the back of Plaintiff's cell for him to sit on when he put on his knee brace immediately after Plaintiff fell because he was not wearing the brace and his knee gave out when he slipped on some water. (Dkt. No. 179-1 at ¶ 33.)

Because the Court finds that there are material issues of fact in dispute as to both the objective and subjective elements of Plaintiff' Eighth Amendment medical indifference claim against Cross, it recommends that Cross be denied summary judgment on the claim.

## VIII. EIGHTH AMENDMENT CONDITIONS OF CONFINEMENT CLAIM AGAINST BEAUDETTE

### A. Legal Standard

"While the Eighth Amendment's prohibition against cruel and unusual punishment 'does not mandate comfortable prisons,' the conditions must at least be humane." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). "Prisoners live every aspect of their lives completely under the State's control, and the State must exercise that control in accordance with society's standards of decency. Those standards dictate that the conditions of confinement in American prisons "must not involve the wanton and unnecessary infliction of pain." *Rhodes*, 452 U.S. at 347.

To establish a claim under the Eighth Amendment based upon conditions of confinement, an inmate must allege that: "(1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measures of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir.

69

2013) (citations and internal quotation marks omitted)  As to the objective element, an inmate must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."  *Id*.  Prison officials violate the Eighth Amendment when they "deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions."  *Id*. (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)).  There is no "static test" for determining whether a deprivation is serious enough to violate an inmate's Eighth Amendment rights.  *Id.* (citing *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).  "The conditions themselves must be evaluated in light of contemporary standards of decency."  *Jabbar,* 683 F.3d at 57 (citation and internal quotation marks omitted)*.

To constitute deliberate indifference under the subjective element, "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety.  *Jabbar*, 683 F.3d at 57; *see also Trammel v. Keane*, 338 F.3d 155, 162-63 (2d Cir. 2003) (the state of mind for the subjective element in cases involving prison conditions is "deliberate indifference to inmate health or safety.").  Mere negligence is not enough.  *Farmer,* 511 U.S. at 835.

### B.     Analysis of Claim

Plaintiff claims that on July 3, 2012, when Defendant Beaudette took him to the shower, Plaintiff complained to him that the shower was too hot and he could suffer burns if he got in. (Dkt. No.  179-1 at ¶ 42.)  Rather than adjust the temperature, Beaudette told Plaintiff his shower was over.  *Id*.  On August 14, 2012, Beaudette took Plaintiff to the shower, and the water was again too hot.  *Id*. at ¶ 43.  Beaudette checked the water with his hand and told him Plaintiff it was good.  *Id*.  He then told Plaintiff he was crying too much so the shower was over.  *Id*.

According to Beaudette, Plaintiff was allowed ten minutes to shower in compliance with

DOCCS Directive 4933.  (Dkt. No. 157-9 at ¶ 9.)  In his declaration, Beaudette references an

August 20, 2012, grievance filed by Plaintiff complaining that he was denied a full shower and

that the water was too hot on August 19, 2012.[26]  *Id*. at ¶ 7 and pp. 12-13. The Superintendent

denied the grievance noting that staff present for the showers had gone on record and denied the

allegations by Plaintiff, and that staff members had stated that shower temperatures are adjusted

to inmate request.  *Id*. at 10.  CORC upheld the Superintendent's determination.  *Id*. at 7.

The Court finds that even if, contrary to Beaudette's assertion, the water was too hot for

Plaintiff to comfortably shower on two occasions, and Plaintiff's shower time on those days was

shorter than required under the DOCCS Directive, no reasonable jury could find that Plaintiff has

satisfied the objective requirement for an Eighth Amendment conditions of confinement claim.

*See, e.g., Barnes v. County of Monroe*, 85 F.Supp. 3d 696, 738 (W.D.N.Y. 2015) (holding four-

day suspension of showers does not state Eighth Amendment conditions of confinement claim);

*McCoy v. Goord*, 255 F.Supp. 2d 233, 260 (S.D.N.Y. 2003) (dismissal of conditions of

confinement claim because a two-week suspension of shower privileges did not suffice as a

denial of a "basic hygienic need").  Therefore, the Court recommends that Beaudette be granted

summary judgment on Plaintiff's Eighth Amendment conditions of confinement claim

## IX.    ADA AND RA CLAIMS

### A.    Legal Standards for Claims Under Title II of the ADA and the RA

Title II of the ADA provides in relevant part that "no qualified individual with a disability

---

[26]  The date in the grievance appears to be either August 14 or 19, 2012.  (Dkt. No. 157-9 at 12.)  The superintendent's decision on the grievance notes that Plaintiff changed the date from August 19, 2012, to August 20, 2012.  *Id*. at 10.  The Court has assumed that the August 14, 2012, date in Plaintiff's declaration is intended to refer to the incident complained of in the grievance.

shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "The purpose of [Title II of the ADA] is to 'eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and able-bodied.'" *Maccharulo v. New York State Dept. of Corr. Servs*., No. 08 Civ 301 (LTS), 2010 WL 2899751, at *2 (S.D.N.Y. July 21, 2010) (quoting *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)). Under Title II of the ADA, a defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified disabled individual "to have access to and take a meaningful part in public services." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir 2004), *corrected at* 511 F.3d 238 (2d. Cir. 2004); *Disabled In Action v. Board of Elections of New York,* 752 F.3d 189, 197 (2d Cir. 2014) ("A public entity discriminates against a qualified individual with a disability when it fails to provide 'meaningful access' to its benefits, programs, or services.")

 The RA prohibits disability discrimination using language similar to Title II of the ADA. Section 794(a) provides "[n]o otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Like Title II of the ADA, "the Rehabilitation Act requires specified 'otherwise qualified' disabled individuals receive reasonable accommodations from programs receiving federal financial assistance." *Harris v. Mills*, 572 F,3d 66, 73 (2d Cir. 2009) (citing 29 U.S.C. § 794(a)); *Alexander v. Choate*, 469 U.S. 287, 301 (1985)). Because the elements of Plaintiff's ADA and RA claims for disability

discrimination are the same, the Court considers these claims together and applies a single analysis to both. *See Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) ("Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem.").

In order to establish a claim under Title II of the ADA and the RA, Plaintiff must show "1) he is a qualified individual with a disability; 2) DOCCS is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from DOCCS services, programs, or activities, or DOCCS otherwise discriminated against him by reason of his disability." *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)). Both Title II of the ADA and the RA apply to state prisons and their prisoners. *Id.* (citing *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998)).

In examining an ADA claim, the court must ask whether a plaintiff with disabilities "as a practical matter" was denied "meaningful access" to services, programs, or activities to which he was "legally entitled." *Henrietta D.*, 331 F.3d at 273. "Reasonable accommodations" must be made to "assure meaningful access." *Choate*, 469 U.S. at 301. "The hallmark of a reasonable accommodation is effectiveness." *Wright*, 831 F.3d at 72 (quoting *Dean v. Univ. Sch. of Med. & Biomedical Scis*, 804 F.3d 178, 189 (2d Cir. 2015)) (internal quotations omitted). "Specifically, a reasonable accommodation need not be perfect or the most strongly preferred by the plaintiff, but it still must be effective. Determining the reasonableness of an accommodation is a fact-specific question that often must be resolved by a factfinder." *Id.* (internal citations, quotation marks and punctuation omitted).

A defendant is "entitled to summary judgment [on a Title II ADA claim] only if the undisputed record reveals that the plaintiff was accorded a 'plainly reasonable accommodation." *Dean*, 804 F.3d at 189 (quoting *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015)).

## B.    Eleventh Amendment

State officials, like Cross, may not be sued in their individual capacities under either Title II of the ADA or the RA. *See Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001). Furthermore, the Eleventh Amendment bars actions for money damages in federal court against a state or its officials when acting in their official capacity unless the state has waived its sovereign immunity or Congress has abrogated it.[27] *Dean,* 804 F.3d at 193. Claims against state officials in their official capacities are treated as claims against the State. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Therefore, Plaintiff's ADA and RA claims against Cross are treated herein as claims against DOCCS.[28]

In *Garcia*, the Second Circuit recognized that Section 5 of the Fourteenth Amendment grants Congress some authority to abrogate a state's sovereign immunity. *Garcia*, 280 F.3d at 111-12. The Court, in determining how money claims under the ADA could be limited so as to

---

[27]  Plaintiff has sought injunctive relief on his ADA claim in his second amended complaint. (Dkt. No. 111 at 156.) However, Plaintiff is no longer being housed at Clinton, and the Court finds his claim for injunctive relief to be moot. *See Salahuddin* 467 F.3d at 272 ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.")

[28]  In *Alster v. Goord*, 745 F.Supp. 2d 317, 339 (S.D.N.Y. 2010), the District Court explained that where a plaintiff "may proceed on his ADA claims against the State entity directly, courts in this Circuit 'dismiss [ ] the official capacity claims because they [are] redundant of the claims against the government entity.'" (quoting *Fox v. State Univ. of N.Y.*, 497 F.Supp.2d 446, 451 (E.D.N.Y. 2007)). DOCCS is not presently a defendant in this case, and the District Court has not been asked to dismiss the official capacity ADA and RA claims against Cross because DOCCS could be named as defendant.

comport with Congress's Section 5 authority, held "a private suit for money damages may only be maintained against the state [and its officials in their official capacities] if the plaintiff can establish that the Title II violation was motivated either by discriminatory animus or ill will due to disability." *Id*.

Subsequently, in *United States v. Georgia*, 546 U.S. 151, 159 (2009), the Supreme Court held the enforcement power granted Congress under Section 5 "include[d] the power to abrogate state sovereign immunity by authorizing private suits for damages against the States" for conduct actually violating the Fourteenth Amendment. *See also Bolmer v. Oliveira*, 594 F.3d 134, 147 (2d Cir. 2010). In *Georgia*, the Court "explicitly left open the question of whether Congress may validly abrogate sovereign immunity with respect to a particular class of misconduct which violates Title II but does not violate the Fourteenth Amendment." *Dean*, 804 F.3d at 194-95.

The Second Circuit noted in *Dean* there was a "growing fracture among the district courts in this Circuit in their approach to determining whether Congress validly abrogated state sovereign immunity under Title II of the ADA," with some courts following the discriminatory animus standard set forth in *Garcia* and others the Fourteenth Amendment test in *Georgia*. 804 F.3d at 195. In analyzing Plaintiff's ADA and RA claims for summary judgment purposes, the Court considers both.

### C. Analysis of Plaintiff's ADA and RA Claims

#### 1. Hearing Impairment

Plaintiff describes himself as a disabled inmate who has suffered from a hearing loss since childhood and wears hearings aids in both ears. (Dkt. No. 179-1 at ¶ 48.) According to Plaintiff, after thirty days, inmates in SHU are issued earbuds to listen to radio and television.

Plaintiff could not use the ear buds issued to him because he has hearing aids in both ears, so he requested headphones. *Id*. at ¶ at 49. Plaintiff also requested a shake alarm and visual smoke detector. (Dkt. No. 157-6 at 150.)

On November 1, 2012, Plaintiff filed a grievance against Clinton Superintendent LaValley complaining that he had been denied reasonable accommodations for his hearing impairment including headphones, a shake alarm, and a visual smoke detector. *Id*. at 149-51. The IGRC found Plaintiff had not submitted a reasonable accommodation form with regard to the headphones. *Id*. at 155. The Superintendent responded that Plaintiff had been provided with reasonable accommodation forms and Plaintiff's form was received by the Deputy Superintendent of Programs on December 6, 2012. (Dkt. No. 157-6 at 156.)

According to CORC's April 24, 2013, decision on appeal, Plaintiff's reasonable request form had been denied by the Superintendent because the headphones and shake alarm clock were not medically indicated. *Id*. at 146. CORC noted Plaintiff had been seen by audiologist on January 18, 2013, and his hearing aids were found to be functioning properly. *Id*. Moreover, Plaintiff was designated with a non-significant hearing loss and was entitled only to hearing aids and preferred seating. *Id.*

The determination Plaintiff did not need headphones, even though he could not use the standard ear buds because his hearing aids were in his ears, seems questionable. (*see* Dkt. No. 179-7 at 70.) Nonetheless, the Court finds only conclusory evidence in the summary judgment record that DOCCS denied Plaintiff's request out of discriminatory animus or ill will due to his disabilities. Rather, the Court finds that the denial was based on the audiologist's findings regarding the degree of Plaintiff's hearing impairment and his needs. (Dkt. No. 157-6 at 146.)

*See Garcia*, 280 F.3d at 111-12.  The same is true with regard to the shake alarm and visual smoke detector.  Given the audiologist's determination that Plaintiff's hearing loss was non-significant, and Plaintiff was only entitled to hearing aids and preferred seating, and DOCCS's reliance on the audiologist in denying Plaintiff's request for the headphones, shake alarm, and a visual smoke alarm, the evidence does not support a finding of deliberate indifference on the part of DOCCS and its officials sufficient to support an Eighth Amendment medical indifference or conditions of confinement claim.  *See Nanc*e, 912 F.2 d at 607 (medical indifference); *Walker,* 717 F.3d at 125 (conditions of confinement).  Therefore, the Court concludes no reasonable jury would find Plaintiff's substantive due process rights under the Fourteenth Amendment were violated under *Georgia*, 546 U.S. at 159, by denial of the headphones (Dkt. No. 157-6 at 146), and recommends Plaintiff's hearing impairment claim under the ADA and RA be found barred under the Eleventh Amendment.

2.    Plaintiff's Remaining ADA and RA claims

Plaintiff claims DOCCS violated the ADA and RA by denying him housing in 4 Company where he would have a shower in the back of his cell instead of having to walk to the shower; forcing Plaintiff to sit on the floor in the back of his cell to put on his knee brace, resulting in his knee brace being unavailable for recreation; and denying Plaintiff a shower chair to accommodate his physical impairments.  (Dkt. Nos. 111 at ¶¶ 266-83; 179-1  at ¶¶ 49-52, 55, 57.)

The evidence is clear that Plaintiff's knee has a significant physical impairment as the result of an ACL tear which multiple surgeries were unable to repair, and Plaintiff is therefore a qualified individual with a disability.  (Dkt. No. 111-6 at 2-8, 11-13, 27-29.)  According to Dr.

Harrison, Plaintiff's knee was unstable and required further stabilization surgery. *Id.* at 8. Dr. Harrison indicated that Plaintiff had to be allowed to use a knee brace. *Id.* It is also clear that both the ADA and RA apply to state prisons and their prisoners. *Yeskey*, 524 U.S. at 210. Therefore, the only issue before the Court for consideration is whether Plaintiff was denied the opportunity to participate in and benefit from DOCCS's services, programs, or activities, or discriminated against by DOCCS by reason of his disability. *Wright*, 831 F.3d at 72.

a.      4 Company Reasonable Accommodation

In January of 2012, Plaintiff was housed in a company in Unit 14 which did not have showers in the cells, requiring him to walk down the hall to take a shower. (Dkt. No. 111 at ¶¶ 221-223.) Plaintiff filed a grievance seeking reasonable accommodations in the form of a move to 4 Company, in which the cells had showers in the back, to accommodate his physical disabilities. *Id.* Plaintiff filed a reasonable accommodations form requesting the move to 4 Company so he could take showers in his cell in early February 2012, and his request was granted on February 22, 2012, resulting in Plaintiff's move to 4 Company. (Dkt. Nos. 157-6 at 16; 157-8 at 35.)

By the end of 2012, Plaintiff had been moved in and out of 4 Company on two occasions. Plaintiff was first moved out of 4 Company in June 2012, allegedly for consistently poor attitude and behavior towards other inmates, and subsequently moved back in and moved out again in December 2012, allegedly because excess state property was found in his cell on two occasions. (Dkt. Nos. 111 at ¶¶ 244-246; 157-6 at ¶ 17; 157-9 at 86.) There is no indication in the record that Plaintiff returned to 4 Company during his remaining time in Clinton.

Plaintiff's grievance complaining of being moved from 4 Company in June 2012 was

denied by Superintendent LaValley who found that "[a]ll needs for grievant are being addressed and accommodated." (Dkt. No. 157-6 at 14-16, 22.) CORC affirmed, finding that Plaintiff "received reasonable accommodations allowing him to shower on the block." *Id.* at 9. Plaintiff also filed a grievance complaining, *inter alia*, of the December 2012, removal from 4 Company for the alleged possession of contraband. (Dkt. No. 157-9 at 72-82.) In its decision denying Plaintiff's grievance, CORC advised Plaintiff that "no inmate has the right to a specific housing location and that internal moves are conducted for security reasons." *Id.* at 68.

The Court has found no evidence in the record suggesting the reasonable accommodation approval for 4 Company had been rescinded, and no mention of the reasonable accommodation by either the Superintendent or CORC in the decisions on the grievances. *Id.* at 9, 22, 68, 71. Nonetheless, the Court finds no clear evidence in the summary judgment record before it establishing that DOCCS was motivated by either "discriminatory animus or ill will due to disability" in removing Plaintiff from 4 Company in June or December of 2012, although Plaintiff has made that claim in many of his grievances involving reasonable accommodations. (*See, e.g.*, Dkt. Nos. 111-5 at 29-30; 157-6 at 14-15; 157-8 at 48; 157-9 at 72.) *See Garcia*, 280 F.3d at 111-12. However, given the documented issues with Plaintiff's knee and the February 22, 2012, reasonable accommodation finding, both of which were known to DOCCS, the Court does find an issue for the factfinder as to whether Plaintiff has an Eighth Amendment medical indifference or conditions of confinement claim with regard to denial of 4 Company housing for purposes of finding abrogation of Eleventh Amendment immunity as a result of a deprivation of substantive due process under the Fourteenth Amendment,. *See Georgia*, 546 U.S. at 159.

Cross, in his official capacity, is entitled to summary judgment on Plaintiff's ADA and

RA claims regarding housing only if "the undisputed record reveals that plaintiff was accorded a 'plainly reasonable accommodation'" in 3 Company and 2 Company where he was housed before and after being removed from 4 Company. *Dean*, 804 F.3d at 189. The Court finds issues of fact regarding whether the housing areas other than 4 Company provided Plaintiff meaningful access to the shower, particularly in light of the February 22, 2012, finding that 4 Company, where Plaintiff had a shower in the back of his cell, provided a reasonable accommodation for his well-documented knee problem.

The Court further finds there is a factual issue regarding whether moving Plaintiff out of 4 Company was warranted for security reasons. *See Wright*, 831 F.3d at 75 ("While we are sensitive to the fact that prisons are unique environments with heightened security and safety concerns (citation omitted), because the ADA and RA 'unmistakably' apply to State prisons and prisoners (citation omitted), DOCCS is statutorily required to ensure that all of their inmates . . . have the opportunity effectively to access the services and programs DOCCS provides.")

Therefore, the Court recommends that Cross, in his official capacity, be denied summary judgement on Plaintiff's ADA and RA claims regarding housing in 4 Company.

b.      Putting on the Knee Brace

Plaintiff's claim regarding Cross not allowing him to sit on his bed while putting his knee brace on or providing something on which Plaintiff could sit in the back of his cell has been covered in detail in connection with the analysis of Plaintiff's Eighth Amendment medical indifference claim against Cross. The Court found an issue of material fact with regard to the medical indifference claim and recommended denial of summary judgment. The same issue of fact is present in determining whether Plaintiff's ADA and RA claims are barred by the Eleventh

Amendment.  *See Georgia*, 546 U.S. at 159.

The Court finds that Defendants have failed to establish entitlement to summary judgment on Plaintiff's ADA and RA claims regarding his knee brace.  Under the ADA and RA, inmates are entitled to meaningful access to recreational activities.  *See Wright*, 831 F.3d at 72. Plaintiff claims he was unable to put the brace on sitting on the floor, forcing him to spend his limited recreation time standing in the corner of the recreation area rather than being able to walk around.  (Dkt. Nos. 111 at ¶ 273; 157-2 at 197-98; 179-1 at ¶¶ 50-51.)  The Court finds material issues of fact in dispute regarding whether denying Plaintiff the reasonable accommodation of something on which to sit in the back of his cell while he put on his knee brace for a three month period denied him meaningful access to DOCCS provided recreation in violation of the ADA and RA and recommends denial of summary judgment on that part of Plaintiff's ADA and RA claim.

c.       Shower Chair

Plaintiff complains that his request for a shower chair as a reasonable accommodation for his knee was denied by DOCCS in violation of the ADA and RA.  (Dkt. No. 111 at 156.)  When Brown ordered that a bucket be placed in the back of Plaintiff's cell to sit on while putting on his knee brace following Plaintiff's May 6, 2013, fall, Sgt. Farrell wrote on the staff memorandum "Do not remove for showers," depriving Plaintiff of use of the bucket to sit on in the shower. (Dkt. No. 111-6 at 98.)  On November 21, 2013, a request to transfer Plaintiff to a facility that could accommodate a recommendation that he be provided with access to a shower with handrails was approved, and Plaintiff was transferred to Five Points Correctional Facility ("Five Points").  (Dkt. No. 111-7 at 32.)  Plaintiff's grievance requesting that relief was granted by CORC.  *Id*. at 23. The record reveals that in or about May 2015, Plaintiff was given a shower

chair as a reasonable accommodation at Five Points. (Dkt. Nos. 179-5 at 21, 24.) At his deposition, Plaintiff testified he had a shower chair in his shower at the back of his cell at Five Points as a reasonable accommodation for his knee problems. (Dkt. No. 157-2 at 184.)

As with Plaintiff's housing accommodation claim the Court finds no clear evidence in the summary judgment record establishing that DOCCS was motivated by either "discriminatory animus or ill will due to disability" in refusing to provide Plaintiff with a shower chair, although Plaintiff claims it to be so. (Dkt. No. 157-6 at 14-20.) *See Garcia*, 280 F.3d at 111-12. However, as with Plaintiff's housing accommodation claim, the Court does find an issue for the factfinder as to whether Plaintiff has an Eighth Amendment medical indifference or conditions of confinement claim with regard to denial of the shower chair for purposes of finding abrogation of the Eleventh Amendment, given the documented issues with regard to Plaintiff's knee, and his need for a knee brace, back brace, and cane. (Dkt. No. 11-6 at 2-8, 11-13, 27-29.) *See Georgia*, 546 U.S. at 159.

Plaintiff, like all other inmates was entitled to meaningful access to the showers at DOCCS. *See, e.g., Alster v. Goord*, 745 F.Supp. 2d 317, 339 (S.D.N.Y. 2010) (involving an inmate's wheel-chair access to the shower). Plaintiff claims that because of his knee, he could not stand in the shower and was required to sit on the dirty floor because he was denied a shower chair at Clinton. (Dkt. No. 179-1 at ¶ 55.) The Court finds this is not a case where an "undisputed record reveals [P]laintiff was accorded a 'plainly reasonable accommodation'" for showering with his physically impaired knee, *Wright*, 831 F.3d at 73, and recommends that Cross, in his official capacity, be denied summary judgment on Plaintiff's ADA and RA claims, with the exception of his hearing impairment claim wherein the Court has recommended

summary judgment be granted.

## X. PLAINTIFF'S SEXUAL ASSAULT CLAIM AGAINST LEE

Plaintiff has alleged that on August 7, 2012, Defendant Lee ordered him to assume the pat frisk position against the wall. (Dkt. Nos. 111 at ¶ 257; 179-1 at ¶ 40.) Plaintiff is disabled and walks with a cane, wears a knee brace, back brace, and medical boots. *Id.* His mobility is seriously limited, and when Lee told him to take additional steps away from the wall and spread his legs more, Plaintiff told Lee he could not spread his legs more due to his disabilities. *Id.* Lee grabbed Plaintiff's left leg and deliberately pushed it to the left side to force Plaintiff to spread his legs beyond his capability. *Id.* Lee began the frisk search and maliciously grabbed Plaintiff's genitals. *Id.* At is deposition, Plaintiff testified that Lee sexually abused him by grabbing his testicle, but did not penetrate him. (Dkt. No. 157-2 at 208.) Plaintiff claims he did not go into the yard because he was in excruciating pain in his legs and testicles and ultimately required pain medication. (Dkt. No. 1 79-1 at ¶ 40.)

According to Plaintiff that was not the first time Lee had conducted a sexually abusive pat frisk. Another time during a pat frisk, Lee grabbed Plaintiff's testicles and squeezed, causing Plaintiff a lot of pain. (Dkt. No. 111 at ¶ 259.) Plaintiff also claims that on an unspecified occasion, Lee told him that if Plaintiff would show Lee his genitals, Lee would stop fucking with him. *Id.*; see also Dkt. No. 179-1 at ¶ 41.

Lee stated in his declaration that Plaintiff's claim that he sexually assaulted Plaintiff during a pat frisk is completely false. (Dkt. No. 157-8 at ¶ 4.) According to Lee, on August 7, 2012, Lee pat frisked Plaintiff before he went out for recreation as required by Directives 4910 and 4933. *Id.* at ¶¶ 27 and 28. Lee claims to have pat frisked Plaintiff as he did all pat frisks, in

full compliance with the directives, and he never forced Plaintiff's legs apart or grabbed his leg during the frisk. *Id*. at ¶ 29. Lee denies intentionally touching or squeezing Plaintiff's genitals during the August 7, 2012, pat frisk or any other pat frisks, and Lee denied telling Plaintiff that if Plaintiff showed him his genitals, Lee would stop bothering him. *Id.* at ¶ 30.

"Because sexual abuse of a prisoner by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997). In *Crawford v. Cuomo*, 796 F.3d 252, 257-58 (2d Cir. 2015), the Second Circuit wrote that "[i]n determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." The Court explained that:

> To be sure, prison officials looking for contraband may subject inmates to reasonable strip searches and cavity searches. (citation omitted). Indeed prison security and safety may require frequent searches of an intensely personal nature and not every search is properly the subject of a lawsuit. Searches that do not uncover contraband may be no less penologically justified than those that do. And even an officer who is meticulous in conducting a search does not violate an inmate's constitutional right as long as the officer had no intention of humiliating the inmate or deriving sexual arousal or gratification from the contact. But a search may not be undertaken maliciously or for the purposes of sexually abusing an inmate.

Id. at 258.

The evidence shows that Lee was performing a legitimate official duty in conducting a required pat frisk on Plaintiff on August 7, 2012, and there is no evidence in the record that

supports a finding that Lee was deriving sexual arousal or intended to humiliate Plaintiff allegedly grabbing Plaintiff's testicles. Moreover, the Court finds that Plaintiff's vague claim that Lee had also grabbed Plaintiff's testicles on a pat frisk on an earlier occasion, without more, is inadequate to show a pattern of sexual abuse by Lee.

The Court construes Plaintiff's claim that Lee told him he would stop bothering Plaintiff if Plaintiff showed Lee his genitals as one for verbal sexual harassment. The Court notes that Plaintiff has offered no evidence placing the comment allegedly made by Lee in any particular context or time frame that would tend to show a connection to the pat frisks alleged by him. District courts in the Second Circuit have held that isolated instances of improper verbal sexual harassment, with no allegation of contact or physical harm, "while clearly distasteful is not severe enough to be objectively, sufficiently serious." *Phelan v. Durniak*, No. 9:10-CV-666 (FJS/RFT), 2014 WL 4759937, at * 6 (N.D.N.Y. Sept. 24, 2014) (quoting *Boddie*, 105 F.3d at 861); *see also Brown v. Annucci*, No. 9:16-CV-0808 (TJM/ATB), 2017 WL 1040416, at * 2 (N.D.N.Y. March 16, 2017) (dismissing plaintiff's verbal sexual harassment claim where he did not claim he was touched or physically harmed in any manner from the verbal sexual harassment).

Based on the foregoing, the Court finds that Plaintiff has failed to raise an issue of material fact as to his Eighth Amendment sexual abuse claim against Lee and recommends that Lee be granted summary judgment on the claim.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 157) be **GRANTED** in part and **DENIED** in part; and it is further

**RECOMMENDED** that summary judgment be **GRANTED** as to Defendants Gutwein, Lordi, Brousseau, Lee, Beaudette, and to Cross on Plaintiff's First Amendment retaliation claim and, in his official capacity, Plaintiff's ADA and RA hearing impairment claim; and it is further

**RECOMMENDED** that summary judgment be **DENIED** as to Defendants Chase, Riley, Monacelli, Laroque, King, Bouchey, Streeter, Brown, and as to Cross on Plaintiff's Eighth Amendment medical indifference claim and ADA and RA claims, with the exception his hearing impairment claim; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[29]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:  August 31, 2017
         Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[29]  If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2012 WL 6935254
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
|
Oct. 4, 2012.

**Attorneys and Law Firms**

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Everton Bailey, a federal prison inmate, has commenced this *Bivens* [1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative remedies, I recommend that his

complaint be dismissed on this procedural basis, without addressing its merits.

I. *BACKGROUND*

Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84. [2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see also* VanWeelden Decl. (Dkt. No. 10–4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face. [3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–14; Tr. 32, 84–85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59–60, 85.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 *et seq.; see also Macias v. Zenk,* 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution

of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint. [4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances. [5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for commencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit

team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor. [6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was required to visit inmates in the SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being

met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No." [7] *Id.*

## II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Officer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties. [8] , [9]

## III. *DISCUSSION*

### A. *Governing Legal Principles*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at \*4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,*

495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must then determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements.[10], [11] *Id.*

### B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003)); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for example—that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

*6 Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at * 4 and n. 17 (N.D.N.Y. Mar.31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

### C. *Application of Governing Legal Principles*

#### 1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion

analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

### 2. *Presentation of Defense/Estoppel*

**\*7** The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff clearly failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)."). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at \*3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at \*5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at \*4 (citing *Bennett v. James,* 737 F.Supp.2d

219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and cooperate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at \* 3. Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

### 3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at \*10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at \*10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at \*6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from

relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

 **\*8** During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

## IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6935254

## Footnotes

1    *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2    The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. _____".

3    According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

4    Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

5    Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr. 43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

6    Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

7    During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

8    The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco,* 814 F.2d 859, 862 (2d Cir.1987). At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

9    Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

10   In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantially exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford* would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

11   In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

---

**End of Document**                                            © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1040416
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Carl BROWN, Plaintiff,

v.

Anthony ANNUCCI, et al., Defendants.

9:16-CV-0808 (TJM/ATB)
|
Signed 03/16/2017

**Attorneys and Law Firms**

CARL BROWN, 01-A-0717, Green Haven Correctional
Facility, P.O. Box 4000, Stormville, NY 12582, Plaintiff,
pro se.

**DECISION and ORDER**

Thomas J. McAvoy, Senior, U.S. District Judge

## I. INTRODUCTION

**\*1** Plaintiff Carl Brown commenced this action by filing
a pro se civil rights complaint pursuant to 42 U.S.C. §
1983 ("Section 1983"), together with an application to
proceed in forma pauperis. Dkt. No. 1 ("Compl."), Dkt.
No. 5 ("IFP Application"). By Decision and Order filed
August 30, 2016 (the "August Order"), this Court granted
plaintiff's IFP application, but found that plaintiff's
complaint failed to allege sufficient facts to state a
plausible claim against any of the defendants. *See* Dkt.
No. 11, *generally.* Accordingly, plaintiff's complaint was
dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28
U.S.C. § 1915A(b). *See id.* at 8-9. In light of his pro se
status, plaintiff was afforded an opportunity to submit an
amended complaint. *See id.*

Plaintiff has submitted an amended complaint in response
to the August Order. Dkt. No. 22 ("Am. Compl."). [1] For
the reasons set forth below, this action is dismissed in
its entirety pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28
U.S.C. § 1915A(b) because plaintiff has failed to state a
claim upon which relief can be granted.

## II. LEGAL STANDARD

The legal standard governing the dismissal of a pleading
for failure to state a claim pursuant to 28 U.S.C. § 1915(e)
(2)(B) and 28 U.S.C. § 1915A(b) w as discussed at length
in the August Order and will not be restated here. *See*
Dkt. No. 11 at 2-4. Taking into account plaintiff's pro
se status, the Court construes the allegations in plaintiff's
amended complaint with the utmost leniency. *See., e.g.*,
*Haines v. Kerner*, 404 U.S. 519, 521 (1972) (holding that a
pro se litigant's complaint is to be held "to less stringent
standards than formal pleadings drafted by lawyers."):
Despite this liberal reading, for the reasons discussed
below, a review of plaintiff's amended complaint reveals
that it does not cure the deficiencies identified in the
original complaint, and fails to state a claim upon which
relief may be granted under Section 1983.

## III. REVIEW OF AMENDED COMPLAINT [2]

The facts set forth in the amended complaint are
largely identical in content to the allegations set forth
in the original complaint. Plaintiff alleges that defendant
Ms. Stoddard ("Stoddard") sexually harassed him in
violation of his Eighth Amendment rights and that
defendants Superintendent Graham ("Graham"), Sgt.
Murray ("Murray"), Lt. Fasce ("Fasce"), Inspector
General D. Miller ("Miller") and Captain B. Chutley [3]
("Chutley") failed to properly investigate the incident. *See*
Am. Compl., *generally.*

**\*2** The amended complaint does not contain any claim
against Commissioner Anthony Annucci ("Annucci") and
Annucci is not named in the list of defendants. [4] Plaintiff
named "John Doe" as an additional defendant and alleges
a new retaliation claim against Miller. [5] For a more
complete statement of plaintiff's claims, reference is made
to the amended complaint.

## IV. ANALYSIS

### A. Sexual Harassment

In the August Order, the Court discussed the law
as it pertains to plaintiff's Eighth Amendment sexual
harassment claim. *See* Dkt. No. 11 at 7-8. The Court held:

> Here, plaintiff complains of one
> instance of verbal sexual harassment
> by Stoddard. *See* Compl. at 5.
> Plaintiff does not contend that

he was touched or physically harmed in any manner from this conduct. Consequently, plaintiff's Eighth Amendment claim for verbal sexual harassment is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)and 28 U.S.C. § 1915A(b) for failure to state a claim. *See Phelan v. Durniak*, No. 9:10-CV-666 (FJS/RFT), 2014 WL 4759937, at *6 (N.D.N.Y. Sept. 24, 2014) (holding that allegations of isolated verbal sexual harassment, without physical harm or contact, failed to state a claim).

Dkt. No. 7 at 6-7.

The Court has reviewed the amended complaint and finds that plaintiff's claim suffer from the same infirmities as the original pleading. Accordingly, plaintiff's Eighth Amendment claim against Stoddard is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**B. Failure to Investigate**

In the August Order, the Court dismissed plaintiff's claims against Miller, Chutley, Fasce, and Murray holding that plaintiff does not have a constitutional right to an investigation "of any kind by government officials." Dkt. No. 11 at 9. In the absence of any additional factual allegations, beyond those previously asserted in the original complaint, the amended complaint fails to state a cause of action against the defendants for failure to investigate.

**C. Supervisory Claims**

In the August Order, the Court discussed the law as it pertains to plaintiff's supervisory claim against Graham. *See* Dkt. No. 11 at 10-12. The Court dismissed plaintiff's claims against Graham holding:

> While cognizant of *Grullon*, the Court finds that, as presently plead, plaintiff has failed to establish that Graham was personally involved in any constitutional deprivation. Plaintiff claims that he submitted a

complaint to Graham but failed to plead any facts establishing when the complaint was sent, where it was sent, by what means it was forwarded, or what response, if any, he received from Graham. Without more, the allegations are not enough to allege personal involvement in any constitutional deprivation. *See Bridgewater*, 698 F.Supp.2d at 359; *Guillory v. Cuomo*, 616 Fed.Appx. 12, 14 (2d Cir. 2015) (summary order). The Court recognizes that plaintiff is proceeding pro se and that this requires the Court to treat his pleadings with a certain degree of liberality; despite this, plaintiff's conclusory allegations against defendants are wholly insufficient to state a plausible claim. Therefore, plaintiff's claims against Annucci and Graham are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**\*3** Dkt. No. 11 at 12.

In the amended complaint, plaintiff claims that on April 20, 2013, he "went back to my cell and proceeded to write and subsequently file a complaint explaining what just happened." Am. Compl. at 5. The amended complaint however, still lacks facts related to when the complaint was sent, where it was sent, by what means it was forwarded, or what response, if any, he received from Graham. As presently plead, the amended complaint does not cure the deficiencies in plaintiff's supervisory claims. For the reasons set forth in the August Order, plaintiff's supervisory claims against Graham are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**D. Misbehavior Report and Retaliation Claim**

In the August Order, the Court held that plaintiff did not have the constitutional right to be free from being falsely accused in a misbehavior report. Dkt. No. 11 at 9.

The Court held, "[i]n the absence of any allegation that defendants acted in retaliation for plaintiff's exercise of a protected right, plaintiff's claim that defendants issued a false disciplinary report is not cognizable in this action pursuant to 42 U.S.C. § 1983 and is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b)." *Id.* In the amended complaint, plaintiff attempts to allege a retaliation claim against Miller. Am. Compl. at 5.

To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)). The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dawes*, 239 F.3d at 491, *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988).

It is well-settled that filing a grievance is constitutionally protected conduct. *Johnson v. Eggersdorf*, 8 Fed.Appx. 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). A plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted). While there is no "bright line" defining the limits of the temporal relationship, courts in the Circuit have held that an adverse action taken within three months after a protected activity can reasonably be perceived as retaliatory. *See Gorman-Bakos v. Cornell Coop. Extn. of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001); *see also Ashok v. Barnhart*, 289

F.Supp.2d 305, 314 (E.D.N.Y. 2003) (reasoning that the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months).

**\*4** In the amended complaint, plaintiff alleges that Miller wrote a disciplinary report charging plaintiff with fabricating the incident with Stoddard in retaliation for complaining to Graham about the incident. Am. Compl. at 5. While the misbehavior report is not part of the amended complaint, from a review of the documents attached to the amended complaint, it may be inferred that the misbehavior report was issued on or before May 2, 2013. [6] As presently plead, the retaliation claim is subject to dismissal. As discussed *supra*, the amended complaint lacks any facts related to plaintiff's complaint to Graham. Thus, the amended complaint is void of any facts establishing how Miller became aware of plaintiff's complaint to Graham. *See Faulk v. Fischer,* 545 Fed.Appx. 56, 59 (2d Cir. 2013) (holding that the plaintiff failed to produce evidence suggesting that the defendants were "motivated by, or even aware of," his grievance); *see also Davidson v. Talbot*, No. 01-CV-473 (RFT), 2005 WL 928620, at *16 (N.D.N.Y. March 31, 2005) (finding that the plaintiff's allegation that he was attacked for filing grievances failed to allege when the grievances were filed and thus, "th[e] Court had no way of assessing the strength or validity of such claim."); *see Guillory v. Haywood*, No. 13-CV-1564 (MAD/TWD), 2015 WL 268933, at *23 (N.D.N.Y. Jan. 21, 2015) (concluding that the plaintiff failed to allege facts identifying the grievances and lawsuits from which the defendant's awareness could be inferred). As plaintiff has not sufficiently alleged a causal connection between any protected activity and Miller's alleged retaliatory conduct, plaintiff has not stated a plausible claim for retaliation against Miller in violation of the First Amendment, related to the April 2013 incident, and this claim is dismissed.

**E. Defendant John Doe**

The law regarding personal involvement in § 1983 actions was discussed in the August Order. Dkt. No. 11 at 10. In the amended complaint, plaintiff names John Doe as a defendant in the caption. Am. Compl. at 1. The amended complaint however, contains no specific allegations of wrongdoing by John Doe or any claim that John Doe was personally involved in any constitutional violation. Accordingly, any claim against John Doe is dismissed

pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *See Cipriani v. Buffardi*, No. 06–CV–0889 (GTS/DRH), 2007 WL 607341, *1 (N.D.N.Y. Feb. 20, 2007)* ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff.") (citation omitted); *see also Casino v. Rohl*, No. 14-CV-2175, 2014 WL 5425501, at *6 (E.D.N.Y. Oct. 23, 2014)* (dismissing complaint since the plaintiff had not adequately pled the defendant's personal involvement in any of the constitutional deprivations alleged in the amended complaint).

### F. Timeliness of Claims

Even assuming plaintiff sufficiently plead a viable claim, despite being given an opportunity to present tolling arguments, plaintiff's amended complaint lacks any reasonable explanation for this untimely filing. As discussed in the August Order, plaintiff's claims that arose before June 28, 2013 fall outside the three-year statute of limitations applicable to Section 1983 actions. Dkt. No. 11 at 14. Plaintiff has not demonstrated "extraordinary circumstances" that would compel this Court to apply the tolling doctrine. Thus, plaintiff's claims are also subject to dismissal based upon the applicable statute of limitations.

### V. LEAVE TO AMEND TO CURE DEFICIENCIES

Ordinarily, a court should not dismiss a complaint filed by a pro se litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991); *see also* Fed.R.Civ.P. 15(a) ( "The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)

("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95–CV–1641, 1997 W L 599355, at *1 (N.D.N.Y. Sept. 22, 1997)* (Pooler, J.).

**\*5** In this instance, plaintiff has already been provided one opportunity to amend his complaint. The deficiencies with his original complaint, identified by the court in its decision, have not been cured with the amended complaint. Accordingly, the Court finds that any further amendment would be futile.

### VI. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that the Clerk of the Court is directed to amend the docket as follows: (1) substitute "Captain B. Chutley" for "Captain B. Chuttey"; (2) dismiss Annucci as a defendant herein; and (3) add John Doe as a defendant; and it is further

**ORDERED** that this action is **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted, **without leave to replead**. The Clerk is directed to close this case; and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff together with a copy of Dkt. No. 23 and the docket report for this action.

### IT IS SO ORDERED.

### All Citations

Slip Copy, 2017 WL 1040416

---

Footnotes

1   Plaintiff provided a second copy of the amended complaint with a letter requesting that it be returned if the Court had already received his submission. Dkt. No. 23. The second copy is a duplicate of the amended complaint and thus, the Clerk of the Court is directed to forward a copy of the submission (Dkt. No. 23) and the docket report to plaintiff.

2   Plaintiff annexed exhibits to the amended complaint. Dkt. No. 22-1. To the extent that the exhibits attached to the amended complaint are relevant to the incidents in the amended complaint, the Court will consider the documents. *See Cortec*

*Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991) (holding that the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

3    In the amended complaint, plaintiff refers to Captain B. Chuttey as "Chutley." Am. Compl. at 1. The Clerk of the Court is directed to amend the docket accordingly.

4    The Clerk of the Court is directed to dismiss Annucci as a defendant herein.

5    The Clerk of the Court is directed to add John Doe as a defendant herein.

6    In a memorandum addressed to plaintiff and dated May 2, 2013, Chuttey advised that, "[t]his complaint has also been investigated by the Inspector Generals Office in which a Misbehavior Report has been issued." Dkt. No. 22-1 at 1.

**End of Document**      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 3531464
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Roberto CIAPRAZI, Plaintiff,
v.
Glenn S. GOORD; et al. Defendants.

No. Civ.9:02CV00915(GLS/.
|
Dec. 22, 2005.

**Attorneys and Law Firms**

Roberto Ciaprazi, Clinton Correctional Facility, Dannemora, New York, Plaintiff pro se.

Hon. Eliot Spitzer, Attorney General, State of New York, The Capitol, Albany, New York, for the Defendants.

Patrick F. MacRae, Assistant Attorney General, of counsel.

*MEMORANDUM-DECISION AND ORDER*

SHARPE, J.

### I. *Introduction*

*1 Plaintiff *pro se* Roberto Ciaprazi brings this action pursuant to 42 U.S.C. § 1983. Ciaprazi alleges that the defendants violated his First, Eighth, and Fourteenth Amendment rights. Pending are Ciaprazi's objections to Magistrate Judge David E. Peebles' Report-Recommendation. Upon careful consideration of the arguments, the relevant parts of the record, and the applicable law, the court adopts the Report-Recommendation in its entirety. [1]

### II. *Procedural History*

Ciaprazi commenced this action on July 15, 2002. *Dkt. No. 1.* On February 27, 2003, the defendants moved for summary judgment. *Dkt. No. 39.* On March 14, 2004, Judge Peebles issued a Report-Recommendation which recommended that the defendants' motion for summary

judgment be granted in part, and denied in part. *Dkt. No. 47.* Ciaprazi objected. *Dkt. No. 48.* His objections are now before this court.

### III. *Discussion* [2]

#### A. *Standard of Review*

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the court may "accept, reject, or modify, in whole or in part, the findings or the recommendations made by the magistrate judge." *Id.* Having reviewed the unobjected to portions of the Report-Recommendation, the court adopts them in their entirety because they are not clearly erroneous.

#### B. *Report-Recommendation*

Although Judge Peebles examined the merits of the case and found that many of Ciaprazi's claims were meritless, this court only conducts *de novo* review of the objected to portions of the Report-Recommendation. Specifically, Judge Peebles found no evidence tending to establish that the adverse actions taken against Ciaprazi were motivated by disciplinary animus, and thereby recommended dismissing Ciaprazi's First Amendment retaliation claim. *Report and Recommendation, pp. 13-23, 45, Dkt. No. 47.* He further found that Ciaprazi lacked standing to bring a cause of action challenging the Tier III disciplinary system under the Eighth Amendment. *Id. at 27.* Lastly, Judge Peebles dismissed both of Ciaprazi's claims under international law and his personal involvement claim against defendant Goord. *Id. at 41, 43-4.* [3]

#### C. *Objections*

##### 1. *First Amendment Claim*

First, Ciaprazi contends that his retaliation claim under the First Amendment should not have been dismissed because the defendants did not satisfy their initial evidentiary burden. *Pl. Objs. pp. 1-7, Dkt. No. 48.* Specifically, he argues that Judge Peebles did not properly

consider the falsity of a misbehavior report as evidence of retaliation by the defendants.

The court rejects Ciaprazi's argument because as Judge Peebles noted, a prisoner does not have a right to be free from false misbehavior reports. *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir.1986). As Judge Peebles further noted, the defendants have shown sufficient evidence to establish that there is no specific link between Ciaprazi's grievances and the defendants' actions. Accordingly, Ciaprazi's retaliation claim is dismissed.

### 2. *Eighth Amendment*

**\*2** Next, Ciaprazi objects to Judge Peebles' finding that he did not have standing to challenge the disciplinary authority of the Tier III system. *Pl. Objs. p. 7, Dkt. No. 48.* This objection is without merit. As Judge Peebles noted, since the length of Ciaprazi's disciplinary confinement was within the bounds of constitutionally acceptable levels, he has no standing to sue. Second, as Judge Peebles further noted, any generalized complaints Ciaprazi has against the Tier III system are more appropriately addressed as part of his due process claims. Accordingly, Ciaprazi's claims against the Tier III system are dismissed.

### 3. *Human Rights Claims*

Ciaprazi also objects to Judge Peebles' finding that he did not have claims under the Universal Declaration of Human Rights (UDHR) and the International Covenant on Civil and Political Rights (ICCPR). Ciaprazi's contention is without merit. As Judge Peebles noted, Ciaprazi has failed to establish that these treaties provide private causes of action. *See Report Recommendation p. 41, Dkt. No. 47.* Accordingly, Ciaprazi's claims under international law are dismissed.

### 4. *Personal Involvement*

Ciaprazi also objects to Judge Peebles' dismissal of his personal involvement claim against defendant Goord. As Judge Peebles noted, Ciaprazi merely made allegations against Goord in his supervisory capacity. Accordingly, the personal involvement claim against Goord was properly dismissed.

### IV. *Conclusion*

Having reviewed the objected-to portions of the Report and Recommendation *de novo,* the remainder under a clearly erroneous standard, and Ciaprazi's objections, this court accepts and adopts the recommendation of Judge Peebles for the reasons stated in the March 14, 2004 Report-Recommendation.

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, the defendants' motion be DENIED.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

PEEBLES, Magistrate J.

Plaintiff Roberto Ciaprazi, a New York State prison inmate who by his own account has frequently lodged complaints against prison officials and been openly critical of their practices, has commenced this proceeding against the Commissioner of the New York State Department of Correctional Services ("DOCS") and several of that agency's employees pursuant to 42 U.S.C. § 1983, complaining of constitutional violations occurring during the course of his confinement. In his complaint, Ciaprazi alleges that 1) a misbehavior report was filed against him in retaliation for his having previously engaged in protected activity; 2) he was deprived of procedural due process during the course of the hearing and resulting adverse finding associated with that misbehavior report; and 3) the conditions which he faced while in disciplinary confinement, following that hearing, were cruel and unusual. Plaintiff asserts claims pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution, as well as under certain international human rights accords.

**\*3** Currently pending before the court is a motion by the defendants seeking summary judgment dismissing plaintiff's complaint in its entirety. Having carefully

reviewed the record in light of Ciaprazi's claims and defendants' arguments, I find that many of plaintiff's causes of action are devoid of merit, as a matter of law, and thus subject to dismissal. Because I find the existence of genuinely disputed issues of material fact surrounding certain of plaintiff's claims, however, including notably his due process claim against defendants Melino, Kohl, Graham, Fitzpatrick, and Rogers, I recommend denial of defendants' motion seeking dismissal of plaintiff's claims against them.

## I. *BACKGROUND*

At the times relevant to his complaint, Ciaprazi was a prisoner entrusted to the custody of the DOCS. Plaintiff alleges that after having been confined within the Clinton Correctional Facility since February, 1997, he was transferred into the Coxsackie Correctional Facility in April of 1998. Complaint (Dkt. No. 1) ¶ 3. Ciaprazi asserts that while at Coxsackie he was administered more than a dozen allegedly false misbehavior reports, resulting in disciplinary cell confinement of over 200 days as well as other "deprivations" of an unspecified nature. *Id.* ¶ 3. Plaintiff contends that the issuance of those misbehavior reports was motivated by his having filed multiple complaints involving conduct of corrections workers and staff at Coxsackie.

At the heart of plaintiff's claims in this action is an incident which occurred at Coxsackie on July 31, 1999. On that date, Ciaprazi and various other prisoners were taken to an enclosed holding area to provide specimens for use in conducting drug screening urinalysis testing. As a result of an interaction occurring during the course of that testing between the plaintiff and defendant Fitzpatrick, a corrections lieutenant at the facility, plaintiff was placed in keeplock confinement and issued a misbehavior report on the following day, charging him with creating a disturbance (Rule 104.13), interference with a prison employee (Rule 107.10), harassment (Rule 107.11), refusal to obey a direct order (Rule 106.10), and making threats (Rule 102.10). [1] Defendants' Motion (Dkt. No. 39) Exh. A.

On July 31, 1999, following the underlying events and the imposition of keeplock confinement but prior to receiving the misbehavior report, plaintiff filed a grievance regarding the incident; plaintiff followed the filing of that grievance with a request on August 3, 1999 for prehearing

release from confinement. Complaint (Dkt. No. 1) ¶ 19. Plaintiff received no response to that grievance. *Id.*

A Tier III disciplinary hearing in connection with the charges stemming from the July 31, 1999 incident was conducted by defendant Melino, a corrections counselor at Coxsackie, beginning on August 4, 1999, and concluding on August 10, 1999. Defendants' Motion (Dkt. No. 39) Exh. A at 2; *id.* Exh. B at 17, 152. [2] Defendant Cole, who according to the plaintiff is a civilian employee working at Coxsackie, was assigned as plaintiff's inmate assistant in connection with that hearing. The evidence adduced at that hearing included the misbehavior report, as well as testimony from the plaintiff, Corrections Lieutenant Fitzpatrick, Corrections Officer Marshal, Corrections Counselor Cole, Corrections Officer Rogers, Corrections Officer Simonik, Corrections Lieutenant McDermott, and Corrections Officer Phillips. Defendants' Motion (Dkt. No. 39) Exh. B.

**\*4** At the conclusion of the hearing, plaintiff was found guilty on all five counts, and a penalty of ten months of disciplinary confinement within the Coxsackie Special Housing Unit ("SHU"), with a corresponding loss of commissary, telephone and package privileges, was imposed. [3] Defendants' Motion (Dkt. No. 39) Exh. A at 00. Ciaprazi was not present when Hearing Officer Melino read her decision into the record, having previously been removed from the proceeding for engaging in what the hearing officer regarded as disruptive behavior. *See* Defendants' Motion (Dkt. No. 39) Exh. B at 152. Plaintiff appealed the hearing officer's decision to Donald Selsky, the DOCS Director of Special Housing/ Inmate Disciplinary Program, who on September 27, 1999 affirmed the determination. Complaint (Dkt. No. 1) ¶ 51.

On August 20, 1999, plaintiff was transferred into the Upstate Correctional Facility, where he was apparently placed in SHU confinement to serve his disciplinary sentence. Complaint (Dkt. No. 1) ¶ 52. Plaintiff asserts that during that period, as well as while in keeplock confinement at Coxsackie, he was subjected to significant deprivations, which are described in summary fashion in his complaint, until September 16, 1999 when he was transferred into Clinton and exposed to similarly unpleasant conditions. *Id.* ¶¶ 53-55; Ciaprazi Aff. (Dkt. No. 46) ¶¶ 54-57. Plaintiff describes the keeplock confinement conditions at Coxsackie as even more

unpleasant than those experienced in SHU, having included the deprivation of certain personal items such as food and snacks, toiletries, musical instruments, and other similar amenities. Ciaprazi Aff. (Dkt. No. 46) ¶ 54. The deprivations experienced by the plaintiff while in keeplock confinement at Coxsackie also entailed being subjected to "loud and non-stop noise from other frustrated prisoners yelling and banging on the doors," as well as the denial of access to the law library, books and other reading materials, and various programs available to those in general population. *Id.* ¶ 55. While at Upstate, plaintiff contends that he was exposed to cell lighting between 6:00 am and 1:00 am; he was denied reading materials; his medical requests "were ignored"; and he experienced cold conditions and the inability to participate in available recreation due to the lack of warm clothing. *Id.* ¶ 57; Complaint (Dkt. No. 1) ¶ 53. Similar conditions were experienced by the plaintiff while at Clinton, including exposure to cold and lack of warm clothing and blankets, together with the deprivation of medical and mental health services. Ciaprazi Aff. (Dkt. No. 46) ¶ 57; Complaint (Dkt. No 1) ¶ 54..

## II. *PROCEDURAL HISTORY*

The plaintiff, who is proceeding *pro se* and *in forma pauperis,* commenced this action on July 15, 2002. Dkt No. 1. Named as defendants in plaintiff's complaint are New York DOCS Commissioner Glenn S. Goord; Ellen J. Croche, Chair of the New York State Commission of Correction; Fred Lamey, a member of the New York Commission of Correction; Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program; Corrections Counselor Melino, whose first name is unknown; Cole, another DOCS employee whose complete name is unknown to the plaintiff; H.D. Graham, Deputy Superintendent for Security at Coxsackie; Corrections Lieutenant Fitzpatrick; and Corrections Officer Rogers. *Id.* In his complaint, plaintiff asserts nine separate causes of action, including claims 1) against defendants Rogers and Fitzpatrick, for infringement of his First Amendment right to free speech, and due process and equal protection violations under the United States Constitution, as well as under the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"); 2) against defendant Graham, for failure to investigate plaintiff's grievance and to take actions to prevent infringement of his constitutional rights; 3) against defendant Cole, for failing to properly

perform his duties as Ciaprazi's inmate assistant; 4) against defendant Melino, for deprivation of due process, based upon her conduct and bias during the disciplinary hearing; 5) of retaliation against defendant Melino, asserting that her actions were taken in response to the filing of complaints and grievances by the plaintiff; 6) against defendants Goord and Selsky, based upon their failure to overturn plaintiff's disciplinary conviction and remediate the constitutional deprivations suffered by him; 7) against defendants Goord and Selsky for retaliation, based on plaintiff's prior filing of complaints and grievances; 8) against defendants Croche, Lamey and Goord, in their supervisory capacities, for failure to properly oversee DOCS employees and enact policies to prevent such abuses; and 9) against defendants Goord, Croche and Lamey, for maintaining and fostering a policy of widespread and disportionate disciplinary punishments within the state's prison system. Complaint (Dkt. No. 1) at 14-16. Plaintiff's complaint seeks both injunctive and monetary relief. *Id.*

**\*5** Following the filing of an answer on behalf of the eight defendants who have been served in the action on December 3, 2002, generally denying plaintiff's allegations and setting forth various affirmative defenses, Dkt. No. 13, and pretrial discovery, on February 27, 2004 those defendants moved seeking entry of summary judgment on various bases.[4] Dkt. No. 39. Aided only by plaintiff's complaint, the record related to the relevant internal disciplinary proceedings against the plaintiffs, and answers by plaintiff to defendants' interrogatories, and without the benefit of either a transcript of plaintiff's deposition or any affidavits, other than from their counsel, defendants have moved for summary judgment seeking dismissal of plaintiff's claims on various grounds. *Id.* In their motion, defendants argue that 1) plaintiff has failed to offer proof from which a reasonable factfinder could conclude that cognizable constitutional violations have occurred; 2) defendants Goord and Selsky lack the requisite personal involvement in the constitutional violations alleged; and 3) plaintiff should be denied the injunctive relief which he seeks. *Id.* Plaintiff has since submitted papers in opposition to defendants' summary judgment motion.[5] Dkt. No. 46. Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*
Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Insurance Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Insurance,* 391 F.3d at 83.

In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. [6] Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. When deciding a summary judgment motion, the court must resolve any ambiguities and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [nonmovant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

B. *Plaintiff's First Amendment Retaliation Claim*
**\*6** Plaintiff's complaint asserts several claims of unlawful retaliation. In his first cause of action, plaintiff asserts that the actions of defendants Rogers and Fitzpatrick in confining him to a cell and issuing, or directing the issuance of, misbehavior reports were taken in retaliation for his having filed prior grievances and complaints regarding DOCS officials, including those working at Coxsackie. Complaint (Dkt. No. 1) First Cause of Action.

Plaintiff's second claim alleges that defendant Rogers' failure to investigate plaintiff's complaint regarding the allegedly false misbehavior report, and to order his release from confinement pending a disciplinary hearing, were similarly retaliatory. *Id.* Second Cause of Action. Plaintiff further alleges in his fifth cause of action that the actions of Hearing Officer Melino, including in finding him guilty on all five counts, were motivated by Ciaprazi's filing of prior grievances and complaints. *Id.* Fifth Cause of Action. Plaintiff's seventh claim similarly attributes the failure of defendants Goord and Selsky to reverse the hearing officer's determination, on appeal, to retaliation for his having engaged in protected activity. *Id.* Seventh Cause of Action. Defendants maintain that these retaliation claims are legally deficient, and that the record contains no evidence upon which a factfinder could conclude that unlawful retaliation occurred.

Claims of retaliation like those asserted by the plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See id.* at 81-83. Because of the relative ease with which claims of retaliation can be incanted, however, as exemplified by plaintiff's claims in this action, the courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002).

In order to state a *prima facie* claim under section 1983 for unlawful retaliation in a case such as this, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct or speech at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492). If the plaintiff carries this burden, the defendants must then show, by a preponderance of the evidence, that they would have taken action against the plaintiff "even in the absence of the protected conduct ." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*7** As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around both the engaging in protected conduct and establishment of a nexus between that conduct and the adverse action ultimately taken. In making the required analysis in this case, however, the court is somewhat disadvantaged by virtue of the fact that defendants' summary judgment motion is not particularly enlightening as to the basis for their claim that the court is positioned to find, as a matter of law, that plaintiff's retaliation claims are lacking in merit.

In their motion the defendants, in the context of the now-familiar standard governing analysis of First Amendment retaliation claims, acknowledge that the plaintiff, who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity. That plaintiff has filed an unusually large number of grievances and lawsuits, and taken other steps to complain publicly about matters associated with his confinement by the DOCS, is both apparent from the record before the court, and not controverted by

the defendants. Indeed, in his response to defendants' summary judgment motion, plaintiff proudly states that he has "systematically exposed, vehemently criticized, and even ridiculed the inappropriate and arbitrary policies and actions of the staff at Coxsackie, including the actions of defendant Goord and of the Superintendent and Deputy Superintendents of Coxsackie." [7] Plaintiff's Affidavit (Dkt. No. 46) ¶ 32. Plaintiff has therefore established, at least for purposes of the instant motion, that he was engaged in protected activity sufficient to trigger First Amendment rights against acts taken in retribution for having voiced those types of complaints. *Graham,* 89 F.3d at 80; *Morello v. James,* 810 F.2d 344, 346-47 (2d Cir.1987).

Defendants argue, however, that the record is lacking in evidence to establish the requisite connection between that protected activity and the adverse actions taken against Ciaprazi by prison officials. Defendants' legal position is advanced, in part, in an affidavit from their counsel, Patrick F. MacRae, Esq., outlining the evidence relied upon by the defendants in making their motions. [8] Defendants also note, in further support of their motion, the requirement that retaliation claims rest upon more than mere conclusory allegations regarding the state of mind of prison officials. *See* Dkt. No. 39 at 8-9; *e.g., Flaherty,* 713 F.2d at 13.

As plaintiff correctly notes, the applicable pleading requirements, including Rule 8 of the Federal Rules of Civil Procedure, provide for mere "notice" pleading, and do not require that complaints contain every detail associated with a plaintiff's claims except in categories not applicable to this case. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 167-69, 113 S.Ct. 1160, 1162-63 (1993). Accordingly, the mere fact that the plaintiff's retaliation claims are pleaded in non-specific, conclusory terms does not alone entitle defendants to summary dismissal of those claims.

**\*8** In this case the defendants have satisfied their initial, modest threshold burden of establishing the lack of evidentiary support for plaintiff's retaliation claims. Though conventional wisdom might dictate the submission of affidavits from the primary actors, including notably defendants Rogers and Fitzpatrick, disavowing any retaliatory motives associated with their actions, defendants' decision to rely instead upon the lack of evidentiary support for plaintiff's retaliation claims,

including through plaintiff's responses to defendants' interrogatories as well as the proceedings associated with the underlying disciplinary matter, is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact for trial with regard to those claims. *Celotex,* 477 U.S. at 323-34, 106 S.Ct. at 2553; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. There is no requirement under Rule 56 of the Federal Rules of Civil Procedure or otherwise that a party affidavit be submitted to support such a motion, which instead can be based upon any admissible evidence. *Id.*

To demonstrate that a reasonable factfinder could discern a nexus between plaintiff's filing of grievances and the disciplinary matters associated with the incident at issue, Ciaprazi essentially makes two arguments. First, he contends that the manifest falsity of the misbehavior report as well as testimony proffered during the disciplinary hearing give rise to an inference that the disciplinary matters were motivated toward retaliatory animus. Secondly, plaintiff argues that the sheer number of grievances and formal complaints lodged by him, including some close in temporal proximity to the underlying incident, similarly gives rise to a legitimate inference of retaliatory motivation. *See* Ciaprazi Memorandum (Dkt. No. 46) at 14.

Plaintiff's argument in this regard is significantly diluted by the sheer number of complaints lodged by him over time. By his own admission, plaintiff has regularly and openly complained of prison policies and practices and during the relevant time period prior to the July 31, 1999 incident, and indeed had filed many formal complaints regarding his treatment while at Coxsackie. Yet, plaintiff has submitted no evidence that any of those complaints related to defendants Rogers or Fitzpatrick, the two principal actors in this case, nor has he pointed to any collaboration between those named in his prior complaints and Fitzpatrick and Rogers. At best, plaintiff has argued that prior to July 31, 1999 he "filed complaints and/or grievances against Lieutenants Sweeney, Armstrong, Skrocky and McDermott, all colleagues of defendant Fitzpatrick of the same rang [sic] with defendant Fitzpatrick." *Id.* ¶ 32.

In an equally tenuous attempt to link his protected activity with the issuance of a misbehavior report, plaintiff notes that on May 26, 1999 he filed a grievance for

harassment against an employee named Fitzpatrick, who was assigned to assist him in connection with another Tier III disciplinary hearing, stating his naked belief, lacking in evidentiary support, that the employee named in that complaint "may be and apparently is a relative of defendant Fitzpatrick." *Id.* ¶ 33, Exh. 39. Plaintiff also notes that on July 21, 1999 he filed a grievance accusing defendant Goord of "gross abuse of power", requesting an investigation of defendant Goord by the New York State Police and federal authorities, and that five days later, on July 26, 1999, he filed a complaint with various agencies including the United States Department of Prisons complaining of mistreatment. *Id.* ¶¶ 34, 35.

**\*9** While there is some appeal to finding the requisite fact issue to avoid the entry of summary judgment on plaintiff's retaliation claims based upon the timing of these events, that factor is undermined by the steady stream of grievances filed by him on a regular and continuing basis. Were the plaintiff someone who had rarely if ever complained about prison conditions, but shortly before being issued a misbehavior report had lodged a formal complaint against or implicating the conduct of the officer who issued the disciplinary citation, a very different set of circumstances would be presented, and summary judgment would not be warranted. In this case, however, plaintiff can point to no complaints lodged by him against or implicating the conduct of defendant Fitzpatrick, who issued the disputed misbehavior report. Accordingly, I find that the defendants have established that they are entitled to summary dismissal of plaintiff's retaliation claims based upon plaintiff's failure to establish a basis on which a reasonable factfinder could find the requisite connection between plaintiff's grievance activities and the issuance of the misbehavior report and subsequent disciplinary hearing. [9] *E.g., Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 389 (W.D.N.Y.1998).

### C. *Plaintiff's Eighth Amendment Cruel And Unusual Punishment Claim*

In his complaint Ciaprazi, in somewhat indiscriminate fashion, asserts that the actions taken against him by the various defendants resulted in his exposure to cruel and unusual punishment, in violation of the Eighth Amendment. [10] Plaintiff's cruel and unusual punishment claims appear to center upon the conditions which he faced as a result of the disciplinary proceedings

against him and resulting in SHU confinement initially at Coxsackie, and later at Upstate and at Clinton. In their motion, defendants assert that these claims are similarly deficient as a matter of law.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). The Eighth Amendment does not mandate comfortable prisons, but yet it does not tolerate inhumane ones either; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J .) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

**\*10** Plaintiff's cruel and unusual punishment claim challenges the fact that 1) he was placed in a double bunk cell at Upstate; 2) was placed in isolation and exposed to light except for five hours each night; 3) was deprived of such amenities such as writing paper and envelopes, proper access to the law library, medical care, access to newspapers, magazines and books, access to the courts, and legal papers; 4) was exposed to loud and boisterous behavior on the part of other inmates;

5) was denied essential clothing and bedding as well as personal hygiene materials, radios or headphones, books, newspapers and magazines; and 6) was exposed to cold conditions, leading him to suffer at least one case of the flu. Complaint (Dkt. No. 1) ¶¶ 52-56; *see also* Plaintiff's Affidavit (Dkt. No. 46) ¶¶ 53-57. To counter these allegations, defendants have submitted nothing to reflect the lack of a basis upon which a reasonable factfinder could conclude that plaintiff was exposed to cruel and unusual punishment while in disciplinary isolation as a result of the Tier III determination now at issue. Instead, defendants' motion focuses upon a narrow aspect of plaintiff's Eighth Amendment claim, in which they assert that the lack of policies guaranteed to result in uniformity throughout the DOCS system of punishments to result in a Eighth Amendment violation.

As skeptical as perhaps one may be regarding plaintiff's ability to ultimately persuade a factfinder that the admittedly unpleasant conditions to which he was apparently exposed and the deprivations suffered while in disciplinary confinement rise to a constitutionally significant level, I am unable to state, based upon the record as currently constituted, that no reasonable factfinder could so conclude. I therefore recommend denial of defendants' motion to dismiss plaintiff's Eighth Amendment cruel and unusual punishment claim relating to the conditions of his confinement. [11]

Included within his Eighth Amendment claim, though more appropriately grouped with his due process cause of action, is plaintiff's contention that because the Tier III hearing officer was provided the unfettered discretion, in the event of finding of guilt, to impose a penalty of whatever magnitude seen fit, the disciplinary scheme in place at the DOCS is constitutionally infirm. In plaintiff's case, however, the imposed penalty of ten months of disciplinary confinement, 180 days of which were deferred, fell comfortably within the bounds of acceptable levels under the Eighth Amendment. Consequently, whatever may be said about plaintiff's arguments regarding the discretion affording to hearing officers, he lacks standing to raise such a claim. *See Trammell v. Mantello,* No. 90-CV-382, 1996 WL 863518, at *8-*9 (W.D.N.Y. June 10, 1996) (Tier III regulations pass constitutional muster).

D. *Plaintiff's Procedural Due Process Claim*

In their motion, defendants also challenge plaintiff's contention that he was denied procedural due process during the course of the disciplinary hearing which resulted in his disciplinary confinement for a period of five months. In support of their motion, defendants argue both that plaintiff was not deprived of a constitutionally cognizable liberty interest, and that even assuming he was, he was afforded the requisite process due under the Fourteenth Amendment in connection with that deprivation.

**\*11** To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

### 1. *Liberty Interest*
Addressing the first of these required showings, in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658.

Defendants challenge the applicability of both of these factors. Initially, defendants question whether New York has, by statute or otherwise, created a protected liberty interest in prisoners remaining free from segregation, including for disciplinary reasons, arguing that it has not. Defendants' Memorandum (Dkt. No. 39) at 14. The cases cited in support of that proposition, however, which relate to whether there is a constitutional or liberty interest in being assigned to a particular program, job assignment, or facility, are inapposite. *See, e.g., Klos v. Haskell,* 48 F.3d 81, 87-88 (2d Cir.1995) (involving revocation of assignment to "shock incarceration" program); *Hall v. Unknown Named Agents of N.Y. State Dept. for Corr. Servs. for APPU Unit at Clinton Prison,* 825 F.2d 642, 645-46 (2d Cir.1987) (involving assignment to Assessment Program and Preparation Unit); *see also Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547 (1976)

(no constitutional right of inmate to be placed in any particular facility); *Frazer v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996) ("no protected liberty interest in a particular job assignment"). Despite defendants' assertion to the contrary, it is now firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999); *see also LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at \*6 (S.D.N .Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.).

Having rejected defendants' contention that the State has not created such an interest, I next turn to examination of whether the conditions of plaintiff's disciplinary confinement, as alleged by him, rise to the level of an atypical and significant hardship under *Sandin*. Atypicality in a *Sandin* inquiry normally presents a question of law. [12] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a cognizable liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary. [13] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

**\*12** Given that plaintiff has shown that he was subjected to disciplinary confinement for a period of five months, and has alleged his exposure to conditions beyond those normally associated with such SHU confinement, as described in the applicable regulations, at this juncture I am unable to conclude, as a matter of law, that he was not deprived of a constitutionally significant liberty interest as a result of the disciplinary proceeding at issue. I therefore recommend against summary dismissal of plaintiff's due process claims on this basis.

### 2. *Due Process*

The procedural protections to which a prison inmate is entitled before being deprived of a recognized liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988).

Plaintiff's procedural due process claim is multi-faceted. In that claim, Ciaprazi maintains that 1) he was denied meaningful assistance by defendant Cole, who refused his request to interview potential witnesses identified by the plaintiff; 2) Hearing Officer Melino effectively denied the plaintiff access to witnesses since witness waiver forms, not to plaintiff's liking in form, were allegedly presented by an unknowledgeable corrections officer to those inmates whose testimony was requested by Ciaprazi, following which those inmates apparently refused to sign the waiver forms and appear to testify on his behalf; 3) the hearing officer was biased and partial, and demonstrated open hostility toward the plaintiff; 4) the hearing officer's disciplinary determination was not supported by the evidence; and 5) the hearing officer refused plaintiff's suggestion to administer polygraph tests to defendants Rogers and Fitzpatrick, as well as to Ciaprazi. Also implicit in plaintiff's due process claim is his contention that his constitutional rights were violated through the issuance of a false misbehavior report. [14]

Plaintiff's arguments relating to the sufficiency of evidence supporting the hearing officer's finding of guilt can be swiftly discounted. The Constitution, including its Due Process Clause, requires only that there be some evidence of guilt supporting a prison disciplinary determination. *Superintendent, Massachusetts Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455-56, 105 S.Ct. 2768, 2774 (1985). Having reviewed the record of plaintiff's disciplinary proceeding in light of his submissions, I find that this standard has been met.

*13 Plaintiff's claims regarding the allegedly false misbehavior report also lack merit. It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report. [15] *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988). The rationale supporting this general rule is that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman,* 808 F.2d at 953.

As for plaintiff's contention that his due process rights were violated when polygraph tests were not administered to key corrections officials, as requested by him, plaintiff has cited no cases-nor is the court aware of any-which require the administering of polygraph tests in connection with parties and witnesses in the context of an inmate disciplinary determination. *See Hinebaugh v. Wiley,* 137 F.Supp.2d 69, 79 (N.D.N.Y.2001) ("some evidence" does not require independent examination of credibility and therefore "certainly does not require" court to order personnel to submit to polygraph to ascertain if hearing testimony was truthful). This issue, then, provides no basis for finding the existence of a procedural due process violation.

Plaintiff's allegations regarding the ineffectiveness of his assigned assistant provide a greater basis for pause. While the requirements associated with the provision of such assistance are modest, they are not non-existent. Under *Wolff,* an inmate facing a Tier III disciplinary hearing is entitled to meaningful assistance in preparing his or her defense. *Eng,* 858 F.2d at 897-98. In this case, plaintiff asserts that while he was assigned an assistant, he was denied meaningful assistance from that individual. In support of this contention, plaintiff alleges that he identified certain witnesses critical to his defense, but that his assistant refused to interview those witnesses with an eye toward requesting their testimony during the hearing. Complaint (Dkt. No. 1) ¶¶ 20-21; Ciaprazi Aff. (Dkt. No. 46) ¶ 40. This, if true, could establish a due process violation based on the inadequacy of the inmate assistance provided to the plaintiff. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998).

In light of my inability to find, as a matter of law, that plaintiff did not suffer the deprivation of a liberty interest as a result of his five month period of

disciplinary confinement, and additionally to conclude that no reasonable factfinder could find the existence of a due process violation associated with that disciplinary confinement, I recommend denial of the portion of defendants' summary judgment motion which seeks dismissal of plaintiff's due process claims.

### F. *Equal Protection*

In his complaint plaintiff also complains of the alleged deprivation of equal protection. Defendants contend that this claim is also subject to dismissal as a matter of law.

**\*14** "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tx. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985) (citation omitted). The general rule is that a policy is presumed to be valid and will be sustained if the classification drawn by that policy is rationally related to a legitimate state interest. *Id.* at 440, 105 S.Ct. at 3254. One exception to that rule, however, is when a policy classifies by race, alienage, or national origin-"[t]hese factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy-a view that those in the burdened class are not so worthy or deserving as others." *Id.* For this reason, these policies are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. *Id.* The essence of a cognizable equal protection claim includes a showing of "clear and intentional discrimination." *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401 (1944) (internal quotation and citations omitted).

The apparent basis for plaintiff's equal protection claim is his contention that in light of his national origin, he was treated differently than United States citizen counterparts. [16] In the face of defendants' summary judgment motion, it was incumbent upon the plaintiff to come forward with evidence which could support a claim that he was treated differently than other inmates, and that the difference in treatment could properly be attributed to his status as a Romanian. As such evidence, plaintiff offers only a statement made to him by defendant Fitzpatrick at one point, in substance, that plaintiff had "now ...

learned to speak English." *See* Plaintiff's Memorandum (Dkt. No. 46) at 29. Beyond this slender reed, plaintiff offers no evidence to support his claim that he was treated differently than inmates not of his national origin, and indeed acknowledges mere speculation on his part as to this premise, arguing that "discrimination based on national origin *may* ... have placed [sic] a role in defendants' unlawful actions[.]" Plaintiff's Memorandum (Dkt. No. 46) at 29 (emphasis added). Instead, plaintiff's equal protection claims consist of mere surmise and speculation, and are subject to dismissal on this basis. *See, e.g., Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ( "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").

Despite being obligated to do so at this juncture, plaintiff has failed to adduce any evidence to show either that he was treated differently than his non-Romanian counterparts, and that the difference in treatment was based upon his national origin. I therefore recommend dismissal of plaintiff's equal protection claims as a matter of law.

### G. *United Nations Resolutions*

**\*15** Each of plaintiff's eight causes of action is based, in part, upon two international agreements, including the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"). Defendants maintain that as a matter of law, those provisions do not support claims under section 1983.

Section 1983 provides, in pertinent part, for a right of action on behalf of any person deprived of "any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. Plaintiff argues that because the United States is a signatory to these two treaty-like provisions, they have the force of law and can be implemented, and individual treaty violations can give rise to recourse, under section 1983.

It is true that violation of a treaty entered into by the United States can serve as a basis for a claim for damages under section 1983, provided that the treaty allows for a private right of action to redress any alleged violations of its provisions. *Standt v. City of New York,* 153 F.Supp.2d 417, 422-30 (S.D.N.Y.2001) (finding private right of action under section 1983 for violation of the

Vienna Convention on Consular Relations, 21 U.S.T. 77, 101 T.I.A .S No. 6820, 596 U.N.T.S. 261 (April 24, 1963)). To the extent that the defendants argue otherwise, and contend that treaties-as distinct from constitutional and other types of federal statutory provisions-cannot support a claim for section 1983 liability, *see* Defendants' Memorandum (Dkt. No. 39) at 17-18, that position therefore lacks support.

As can be seen, analysis of the sufficiency of plaintiff's claims under the cited treaty provisions turns upon whether those international agreements confer individual rights of action. In order to be found deserving of enforcement under section 1983 as a "law", a treaty ratified by the Senate must either be found to be self-executing or, alternatively, must have been the subject of implementing legislation by Congress. *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1298 (3d Cir.1979).

Since plaintiff has pointed to no applicable implementing legislation, nor is the court aware of any, the availability of the ICCPR to support plaintiff's section 1983 claim depends upon whether it is self-executing. The majority of the courts addressing this issue, however, including within the Second Circuit, have concluded that it is not. [17] *See, e.g., Poindexter v. Nash,* 333 F.3d 372, 379 (2d Cir.2003); *Murray v. Warden, FCI Raybrook,* No. 9:01-CV-255, 2002 WL 31741247, at *11 n. 10 (N.D.N.Y. Dec. 5, 2002) (Sharpe, M.J.) (citing *U.S. ex rel. Perez v. Warden, FMC Rochester,* 286 F.3d 1059, 1063 (8th Cir.2002) and *Reaves v. Warden,* No. Civ. A3:01-CV-1149, 2002 WL 535398, at *9 (M.D.Pa. Mar. 22, 2002). Similarly, the UDHR has been characterized by the Second Circuit as "non-binding." *Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 167-68 (2d Cir.2003).

**\*16** Based upon the foregoing, and without deciding whether the evidence in the record demonstrates a genuine issue of material fact as to whether those provisions were violated by defendants' alleged actions toward the plaintiff, I find that Ciaprazi's claims under the ICCPR and UDHR are legally deficient as a matter of law. I therefore recommend dismissal of plaintiff's claims which are dependent on those two international agreements.

### H. *Personal Involvement*

Defendants claim that plaintiff's claims against defendants Goord and Selsky are legally deficient, in that the record fails to establish their requisite personal involvement in the constitutional violations alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

The basis for asserting liability against defendant Selsky arises exclusively from plaintiff's appeal from his disciplinary determination. That appeal was addressed by defendant Selsky, whose review of that appeal sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations. *See, e.g., Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994).

Plaintiff's claim against defendant Goord is far more tenuous. Plaintiff asserts that because his appeal was mailed directly to defendant Goord who, consistent with his established practice, then referred it to defendant

Selsky for review, the Commissioner "presumably read [its] contents." *See* Plaintiff's Memorandum (Dkt. No. 46) at 32. This, coupled with his contention that as the ultimate supervisor of the DOCS defendant Goord was positioned to remedy the violations which he suffered, forms the sole basis for his claims against defendant Goord. These are merely claims against defendant Goord in his supervisory capacity; to sanction them would be to allow for *respondeat superior* liability. Since it is well established that such liability does not lie under [section 1983](), and there is no other discernible basis to conclude defendant Goord's awareness of or involvement in the matters alleged in plaintiff's complaint, I recommend that defendants' motion be granted and plaintiff's claims against defendant Goord be dismissed based upon lack of personal involvement. *Richardson,* 347 F.3d at 435 (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985); "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim"); *Scott v. Coughlin,* 78 F.Supp.2d 299, 312 (S.D.N.Y.2000) (Commissioner's act of forwarding appeals addressed to him to Selsky insufficient to establish personal involvement; citing, *inter alia, Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1991)).

### IV. *SUMMARY AND RECOMMENDATION*

 **\*17** The plaintiff, an experienced and well-versed *pro se* litigant, has commenced this action asserting various claims arising out of the issuance of a disciplinary misbehavior report and the process which followed, including the punishment received. Upon examination of the record, I find no evidence tending to demonstrate that the adverse actions taken against the plaintiff were motivated by disciplinary animus, and thereby recommend the entry of summary judgment dismissing his retaliation claim. I do, however, find the existence of triable issues of fact regarding whether or not Ciaprazi was deprived of a constitutionally significant liberty interest, and whether the assistance provided to the plaintiff in anticipation of his hearing was constitutionally adequate, and therefore recommend against summary dismissal of plaintiff's procedural due process claims.

Addressing plaintiff's Eighth Amendment claims I find, particularly in view of the lack of any evidence to the contrary, that the conditions described by the plaintiff could lead a reasonable factfinder to conclude that they amounted to cruel and unusual punishment, and therefore recommend against the entry of summary judgment dismissing plaintiff's Eighth Amendment claim. I further find, however, no basis to conclude that a reasonable factfinder could find an Eighth amendment violation based on the Tier III regulatory scheme, a violation of the Equal Protection Clause of the Fourteenth Amendment, or that the international treaty provisions cited give rise to a private right of action. Accordingly, I recommend dismissal of those claims.

Finally, I recommend dismissal of plaintiff's claims against defendant Goord based upon the lack of his personal involvement, but against dismissal of plaintiff's claims against defendant Selsky on this basis. It is therefore hereby

RECOMMENDED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, I recommend that defendants' motion be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have TEN days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Fed.R.Civ.P. 6(a), 6(e), 72; 28 U.S.C. § 636(b)(1); *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citations omitted); and it is further hereby

ORDERED that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties by regular mail.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 3531464

Footnotes

1    The Clerk is hereby directed to attach the Report-Recommendation to constitute a complete record of the court's decision in this matter.

2    The court adopts the factual summary in Magistrate Judge Peebles' Report-Recommendation and assumes familiarity with the facts alleged in Ciaprazi's Complaint. *Dkt. Nos. 47,1.*

3    Ciaprazi also makes several procedural objections. For instance, he asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required by FRCP 11. Second, Ciaprazi objects to the defendants' alteration of the case caption. Third, Ciaprazi objects to the defendants' use of a name that did not appear in the original complaint. These arguments are without merit and the court adopts Judge Peebles articulated reasons for the their denial. *See Report Recommendation p. 10-11 n. 5, Dkt. No. 47.*

1    Keeplock confinement is defined by regulation to include restriction to one's prison room or cell. *See, e.g.,* 7 N.Y.C.R.R. 251-2.2.

2    The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

3    Of those sanctions, five months were suspended and deferred for a to tal of one hundred eighty days. Defendants' Motion (Dkt. No. 39) Exh. A at 00. The record is unclear regarding the amount of disciplinary confinement actually served by the plaintiff as a result of the hearing determination.

4    There is no indication on the docket sheet that defendant Fitzpatrick has been served in the action. While plaintiff requested and obtained the entry of that defendant's default on June 20, 2003, *see* Dkt. Nos. 20, 21, his default was subsequently vacated by order issued by District Judge David N. Hurd on January 13, 2004, based upon plaintiff's failure to prove that defendant Fitzpatrick had in fact been served. *See* Dkt. No. 35.

5    In his papers in opposition to defendants' summary judgment motion, plaintiff has raised several procedural objections to defendants' motion papers. In addressing those objections I am mindful of the preference that matters before the court, whenever possible, be decided on their merits rather than on the basis of technical procedural shortcomings. *See, e.g., Upper Hudson Planned Parenthood, Inc. v. Doe,* 836 F.Supp. 939, 943 n. 9 (N.D.N.Y.1993) (McCurn, S.J.). In any event, plaintiff's procedural objections are not well-founded.

     In his opposition papers, plaintiff asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required under Rule 11 of the Federal Rules of Civil Procedure. *See* Plaintiff's Memorandum (Dkt. No. 46) at 1. While not bearing signatures in the traditional sense, all of defendants' original moving papers, which were filed electronically with the court in accordance with this court's case management and electronic case filing requirements (*see* Northern District of New York Local Rule 5.1.2 and General Order No. 22), were properly signed.

     Plaintiff also complains of alterations by the defendants to the caption of the case as set forth in his complaint. Specifically, Ciaprazi challenges defendants' addition of the word "unknown" in relation to defendants Melino and Cole, who are identified in plaintiff's complaint only by last names. Since it is well established that the caption of a pleading is not substantive in nature, and therefore does not control, the addition of that word does not provide a basis to reject defendants' motion papers. *See* 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Civil § 1321 (3d ed. 2004) ("Although helpful to the district court ... the caption is not determinative as to the identity of the parties to the action"); *see also Prisco v. State of New York,* 804 F.Supp. 518, 521 (S.D.N.Y.1992) (citing an earlier edition of Wright & Miller).

     As plaintiff notes, defendants' Local Rule 7.1(a)(3) statement of uncontested, material facts, submitted along with the various other papers in support of their motion, indicates that it is submitted on behalf of a defendant Landry, even though there is no person by that name identified as a defendant in plaintiff's complaint. *See* Dkt. No. 39. Because this is an obvious typographical error, and the contents of the statement obviously relate to the facts of this case, I decline plaintiff's invitation to reject and treat the statement as a nullity on this basis.

     I note that Ciaprazi, who appears to be well versed in the applicable requirements of the federal and local rules, himself has overlooked the important requirement that legal memoranda submitted in connection with motions to not exceed twenty-five pages in length. Northern District of New York Local Rule 7.1(a)(1). Plaintiff's memorandum, which is thirty-four pages in length, has been accepted by the court, without objection by the defendants, despite his failure to obtain prior permission to file an oversized brief. Plaintiff is admonished that in the future, just as he seeks to hold defendants to the requirements of the governing rules, he too must conform to those requirements.

6    A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

7    Plaintiff has referred to his efforts in this regard as a "blitz of grievances and complaints[.]" Plaintiff's Aff. (Dkt. No. 46) ¶ 52.

8    The attorney's affirmation in and of itself is, of course, of no evidentiary value in determining the motion for summary judgment since none of the facts upon which such a finding would ostensibly be based are within his personal knowledge. *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011-12 (2d Cir.1986).

9    Prior to the Second Circuit's recent decision in *Gill,* defendants perhaps could have effectively argued that defendants' actions were not likely to deter, and in fact have not chilled, plaintiff's exercise of his First Amendment rights, and therefore do not give rise to a retaliation claim. *E.g., Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir.2002); *Curley v. Village of Suffern,* 268 F.3d 65, 72-73 (2d Cir.2001); *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992). In its recent decision in *Gill,* however, the Second Circuit clarified that such a finding does not end the inquiry, since the critical focus is not upon the subjective element, but is instead objective, examining whether the retaliatory conduct alleged "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)).

10    That amendment provides, in pertinent part, that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

11    In their motion, defendants have not argued lack of personal involvement with regard to their Eighth Amendment claims. It therefore remains to be seen whether plaintiff can establish the defendants' participation in the Eighth Amendment violations alleged.

12    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v.. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

13    While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n .5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

14    Among the due process violations alleged in plaintiff's complaint is the claim that by taking into account his prior disciplinary record when determining the appropriate punishment to be imposed based upon the finding of guilt, hearing officer Melino violated the constitutional guaranty against double jeopardy. Since it is well established that the double jeopardy clause does not apply in the prison disciplinary setting, this claim lacks merit. *Bolanos v. Coughlin,* No. 91 Civ. 5330, 1993 WL 762112, at *13 (S .D.N.Y. Oct. 15, 1993). Plaintiff's contention that the hearing officer's actions in this regard also violated an unspecified New York regulation fares no better, since such an allegation does not automatically support a claim of civil rights violations under 42 U.S.C. § 1983. *Alnutt v. Cleary,* 913 F.Supp. 160, 168 (W.D.N.Y.1996).

15    Unquestionably, a prisoner does enjoy a substantive due process right against the issuance of a false misbehavior report as retribution for having engaged in protected activity. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995). In light of my finding of no connection between plaintiff's complaints and the issuance by defendant Fitzpatrick of the misbehavior report, however, such a claim does not lie in this action.

16    Plaintiff is a Romanian citizen. Complaint (Dkt. No. 1) at 3.

17    Even in one of the cases relied heavily upon by the plaintiff, *Maria v. McElroy,* 68 F.Supp.2d 206, 231 (E.D.N.Y.1999)-a case which has since been effectively overruled on other grounds, *see Restrepo v. McElroy,* 369 F.3d 627 (2d Cir.2004)- the court recognized that the ICCPR was not "self-executing". 68 F.Supp.2d at 231.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent inmates posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1      In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4365274
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,

v.

Kurt ELLIS, et al, Defendants.

No. 9:11–CV–600 (MAD/ATB).
|
Signed Aug. 29, 2014.

**Attorneys and Law Firms**

Patrick Guillory, Dannemora, NY, pro se.

Office of the New York State Attorney General, The
Capitol, Gregory J. Rodriguez, AAG, of Counsel,
Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

### I. INTRODUCTION

 *1 Plaintiff, an inmate currently in the custody of
the New York State Department of Corrections and
Community Supervision ("DOCCS"), commenced this
civil rights action, pursuant to 42 U.S.C. § 1983, on May
31, 2011. See Dkt. No. 1. The remaining claims are that
Defendants violated Plaintiff's constitutional rights under
the First Amendment's Free Exercise Clause, as well as his
rights under the Religious Land Use and Institutionalized
Person's Act ("RLUIPA"), and subsequently retaliated
against him for attempting to exercise these rights by
destroying Plaintiff's mail and thus denying him access to
the courts. See Dkt. Nos. 1, 210.

In a very thorough Report–Recommendation dated July
23, 2014, Magistrate Judge Baxter recommended that the
Court grant Defendants' motion for summary judgment
and dismiss Plaintiff's complaint in its entirety. See
Dkt. No. 210. Specifically, Magistrate Judge Baxter
first found that in relation to the December 7, 2010
incident, Defendant Ready acted within the bounds of his
employment and according to the documentation before

him and thus, his inadvertent denial that caused Plaintiff
to miss one religious service did not substantially burden
Plaintiff's free exercise of his religion. See id. at 14. With
regards to the March 20, 2011 incident, Magistrate Judge
Baxter found that Defendant Ellis was not responsible for
the shortened duration of the Purim celebration, and that
while the delay may have been an inconvenience, Plaintiff
was still able to participate in the service, thus satisfying
the requirements of the First Amendment and RLUIPA.
See id. at 19–20. Magistrate Judge Baxter also found that
neither Defendant Ellis, nor Defendant Ready engaged in
the conduct mentioned above as a way to retaliate against
Plaintiff for any grievances that he had previously filed
either against them or any other correctional officer. See
id. at 39–40. Moreover, Magistrate Judge Baxter found
that Defendant Kupiec did not interfere with Plaintiff's
mail as a means to either retaliate against him or to deny
him access to the courts. See id. 35–36. Finally, Magistrate
Judge Baxter found that Plaintiff failed to establish that
he suffered an adverse action as a result of Defendant
Kupiec's alleged conduct. On August 4, 2014, the Court
received objections to the Report–Recommendation from
Plaintiff. See Dkt. No. 211.

### II. DISCUSSION

**A. Plaintiff's objections**
In his objection to Magistrate Judge Baxter's Report–
Recommendation, Plaintiff states that he objects to
the Report in its entirety. See id. Plaintiff relays his
astonishment at Magistrate Judge Baxter's choice to
"excuse Def[endant] Kupiec's conduct" and at his finding
that Plaintiff's position is "unfounded." See id. Plaintiff
further objects to Magistrate Judge Baxter's Report on
the grounds that he looked outside the pleadings and
"only to the Defendants Affidavits" when making his
determination to grant Defendants' motion for summary
judgment. See id.

**B. Standard of review**
 *2 A court may grant a motion for summary judgment
only if it determines that there is no genuine issue of
material fact to be tried and that the facts as to which
there is no such issue warrant judgment for the movant as
a matter of law. See Chambers v. TRM Copy Ctrs. Corp.,
43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When
analyzing a summary judgment motion, the court "cannot

try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

## C. Application

**\*3** In the present matter, although Plaintiff has filed objections to Magistrate Judge Baxter's Report–Recommendation, the objections that are given are mostly conclusory and "merely recite the same arguments" that were originally presented to Magistrate Judge Baxter. *See O'Diah,* 2011 WL 933846, at *1; *see generally* Dkt. No. 211. Moreover, some of the objections that Plaintiff makes are of an accusatory nature, in that he charges Magistrate Judge Baxter with excusing the behavior of Defendant Kupiec based on her race, and supporting "the Defendants [r]eckless lies." *See* Dkt. No. 211 at 1 ("I'm sure if Kupiec was black you would have treated her like all of the blacks who appear before you who are 'ignorant of the law' "). Nearly all of Plaintiff's "objections" lack the specificity needed to make a *de novo* determination. In light of his *pro se* status, however, the Court will address the arguments raised.

Plaintiff argues that Magistrate Judge Baxter improperly considered disputed facts in rendering his recommendation. *See* Dkt. No. 211 at 3. Having reviewed the Report–Recommendation, the Court finds that Magistrate Judge Baxter correctly relied only on undisputed facts in rendering his determination or construed any disputed facts in Plaintiff's favor in finding that Plaintiff's allegations were insufficient as a matter of law to support his claims. *See, e.g.,* Dkt. No. 210 at 39 (finding that "neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an 'adverse action' under the case law"). Further, contrary to Plaintiff's allegations, Defendants' motion for summary judgment

was properly supported by the record, including affidavits and deposition transcripts.

Finally, contrary to Plaintiff's assertions, Magistrate Judge Baxter correctly determined that Defendant Boll was not personally involved in the alleged conduct. The letter to which Plaintiff refers clearly establishes that Defendant Boll did not conduct an investigation into the underlying subject of Plaintiff's grievance, but was merely conducting an "investigation" into the status of Plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours." Dkt. No. 202–6 at Exhibit "A." Defendant Boll then stated that "[t]he CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is pending, it is recommended that you await the decision." *Id.* Magistrate Judge Baxter correctly determined that Defendant Boll's response to Plaintiff was insufficient to establish her personal involvement. *See Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009).

The Court has thoroughly reviewed the parties' submissions and Magistrate Judge Baxter's comprehensive Report–Recommendation and finds that Magistrate Judge Baxter correctly recommended that the Court grant Defendants' motion for summary judgment and dismiss this case.

### III. CONCLUSION

**\*4** After carefully reviewing Magistrate Judge Baxter's Report–Recommendation, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Report–Recommendation (Dkt. No. 210) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 202) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants subjected him to religious discrimination, denial of access to courts, and retaliation for the exercise of his First Amendment Rights, while he was incarcerated at Mid–State Correctional Facility. (Compl.; Dkt. 1). Plaintiff seeks monetary and injunctive relief.

### I. *Procedural History*

This case has had a long and complicated procedural history, complete with an appeal of the denial of a preliminary injunction to the Second Circuit, which dismissed plaintiff's appeal as lacking an arguable basis in law or fact. [1] (Dkt. No. 133). The court will attempt to briefly state the important aspects of the docket and outline the remaining issues. On October 31, 2012, defendants made a motion for judgment on the pleadings. (Dkt. No. 123). Plaintiff responded in opposition to that motion, but then also made a variety of other motions relating to venue, recusal, and discovery. (Dkt. Nos.119, 139, 140, 144, 145, 149).

On April 3, 2013, I issued an Order and Report–Recommendation, denying some of plaintiff's non-dispositive motions and recommending dismissal of some of his substantive claims on the pleadings. (Dkt. No. 148). On May 15, 2013, Judge D'Agostino affirmed my order and approved my recommendation. (Dkt. No. 155). Judge D'Agostino's order also disposed of plaintiff's Motion Requesting the Court to Take Judicial Notice of Plaintiff's State Court Decision (Dkt. No. 149), his "Motion for Reconsideration," (Dkt. No. 122), and ordered a response

to plaintiff's discovery motion (Dkt. No. 119). (Dkt. No. 155).

After Judge D'Agostino's Order, plaintiff filed additional motions: another Motion to Compel (Dkt. No. 159) and a Motion for Sanctions (Dkt. No. 160). On July 2, 2013, I held a telephonic conference with the parties regarding the outstanding motions, denying in part and granting in part, plaintiff's motions to compel (Dkt.Nos.119, 159); denying his motion for sanctions (Dkt.Nos.160); and finding that no action was necessary on other letters submitted by plaintiff. (Dkt.Nos.161–62). On September 13, 2013, plaintiff made a motion to "stop transfer" and requested that his deposition be held at his current facility, Wyoming Correctional Facility. (Dkt.Nos.173, 175). Plaintiff's transfer to Greene Correctional Facility rendered that motion moot, and it was denied on that basis. (Dkt. No. 178).

**\*5** On October 10, 2013, plaintiff made a motion for injunctive relief and appointment of counsel, which plaintiff later clarified was only a motion for appointment of counsel. (Dkt.Nos.182, 187). This court denied the motion on October 31, 2013, and plaintiff then sent the court a letter stating that he did not wish to be appointed counsel at the time of trial. (Dkt.Nos.189, 190). On January 7, 2014, plaintiff stipulated to the dismissal of all claims against defendants Fischer and Marlenga, which was "so ordered" by Judge D'Agostino on January 8, 2014. (Dkt.Nos.196–97). Defendants filed this summary judgment motion on February 4, 2014. (Dkt. No. 202). Plaintiff responded in opposition to the motion, and requested oral argument. (Dkt. Nos.205, 207). I denied plaintiff's motion for oral argument on April 18, 2014. (Dkt. No. 208).

Presently pending before me is the remaining defendants' motion for summary judgment, together with plaintiff's response in opposition. (Dkt.Nos.202, 205). Based upon Judge D'Agostino's order approving my recommendation on May 15, 2013 (Dkt. No. 155) and the parties' stipulation to dismiss all claims against defendants Fischer and Marlenga, the following defendants and claims remain:

1. A First Amendment Free Exercise Clause claim against defendants Ready and Ellis. (Compl.¶¶ 37–47, 65).

2. A Religious Land Use and Institutionalized Persons Act ("RLUIPA"), claim against defendants Ready and Ellis. (*Id.*)

3. A retaliation claim against defendants Ready and Ellis relating to the above First Amendment and RLUIPA issues.

4. First Amendment retaliation claims against defendant Kupiec relating to the opening, loss, or destruction of plaintiff's mail in retaliation for grievances filed against Kupiec and defendant Ready. (Compl.¶¶ 58–64).

5. A First Amendment denial of access to courts claim against defendant Kupiec. (Compl.¶¶ 67).

## II. *Facts*

Rather than engage in a lengthy discussion of the facts at the outset, the court will discuss the facts associated with each of plaintiff's claim within the relevant sections below.

## III. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475

U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## IV. *Religion Claims*

### A. Legal Standards

**1. First Amendment**

**\*6** Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) and *Turner v. Safely,* 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588.

In *O'Lone,* the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner,* 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citations omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis*

adverse effect on the valid penological interests. *See King v. Bennett,* No. 02–CV–349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin,* 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford,* 352 F.3d at 595.

**2. Religious Land Use and Institutionalized Persons Act**
RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

**\*7** 42 U.S.C. § 2000cc–1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial. *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc–2(b)). The burden then shifts to the government to show that the burden furthers a compelling governmental interest ***and*** that it is the ***least restrictive*** means of achieving that interest. *Id .* The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (citing, *inter alia, Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck,* 379 F.Supp.2d 550, 557 (S.D.N.Y.2005)). Furthermore, the substantial evidence test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) (discussing in a footnote the applicability of the "time-honored maxim *'de minimis non*

*curat lex' "* ). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003) (discussing First Amendment protections).

## B. Application

### 1. December 7, 2010 Incident:

Plaintiff alleges that defendant Ready denied plaintiff the right to attend Jewish Services for Lubavitch on December 7, 2010, even though he was on the call-out list for the service, and while making disparaging remarks about plaintiff's religion. (Compl.¶¶ 37–47). This court originally recommended denying defendant's motion for judgment on the pleadings, notwithstanding defendants' argument that one interference with plaintiff's religious services would not rise to the level of a constitutional violation. I found, instead, that plaintiff claimed that Ready intentionally denied plaintiff the opportunity to attend this religious service, and that this action was also in retaliation for plaintiff filing a successful grievance against defendants Johnston and Ellis. (Dkt. No. 148 at 13). Based only on the facts as stated by plaintiff, and with a very liberal review by the court, this court recommended denying the motion for judgment on the pleadings.[2] (*Id.* at 14) (this court also noted that it was "unclear" how plaintiff's claims would fare after a well-supported summary judgment motion).

Defendant Ready has submitted a declaration in support of summary judgment. He states that he has been a corrections officer ("CO") at Mid–State since September of 2010. (Ready Decl. ¶ 2) (Dkt. No. 202–3). On December 7, 2010, he was working on Unit 7–2. (*Id.* ¶ 5). His duties included running the desk at the entrance door of Building 7—the Program Building, ensuring that inmates were where they were scheduled to be, and permitting movement as necessary pursuant to "call-out sheets." (*Id.*) When an inmate is listed on a call-out sheet, defendant Ready requires the inmate to sign out from his program, and then he is allowed to go to the "call-out." (*Id.* ¶ 6).

**\*8** Defendant Ready states that on December 7, 2010, plaintiff came to him and stated that he had to leave his program for a "call-out." However, plaintiff's name was not listed on the call-out sheets that defendant Ready was given for that day. (*Id.* ¶ 8). If an inmate's name

is not on the sheet, he is not permitted to go to the "call-out," so defendant Ready informed plaintiff that he had to return to his program because his name was not on the sheet. (*Id.* ¶ 1). Defendant Ready states that he never made any comment about plaintiff's religion. (*Id.* at 11). Plaintiff did not seem upset or angry, did not ask to see a sergeant or supervisor, and "merely complied with [defendant Ready's] instructions and returned to class." (*Id.* ¶ 12).

Defendant Ready states that the only reason that he prevented plaintiff from going to the call-out (religious service) was because his name was not on any of the call-out sheets that he had been given, and defendant Ready was not authorized to allow plaintiff to attend the call-out. (*Id.* ¶¶ 10, 14). Finally, defendant Ready points out that he had just transferred to Mid–State in September of 2010, thus, he was not aware of plaintiff's September 2010 grievance when Ready did not allow plaintiff to attend the religious service on December 7, 2010. (*Id.* ¶ 13).

As Exhibit I to plaintiff's complaint, he attaches a copy of the "call-out" for Tuesday, December 7, 2010. Plaintiff's name clearly appears on that call-out. (Compl.Ex. I). Father Robert Weber [3] has filed a declaration in support of defendants' motion for summary judgment, stating that in December 2010, he was the Coordinating Chaplain at Mid–State. (Weber Decl. ¶ 3) (Dkt. No. 202–7). Father Weber states that when he arrived at work on December 7, 2010, he realized that there was no call-out for the Lubavitch Youth Organization, members of which were visiting the Jewish inmates for Chanukah. (*Id.* ¶ 6). In an attempt to rectify this error, Father Weber "caused a callout to be generated with the names of those inmates who regularly attend Jewish Services ." (*Id.* at 7). Although Father Weber states that a copy of the call-out is attached to his declaration as Exhibit A, no such copy is attached. The court will assume that the call-out to which Father Weber refers is the one that is attached to plaintiff's complaint as Exhibit I. (Dkt. No. 1 at 46). Plaintiff's name is on that call-out.

Father Weber then states that, after Deputy Superintendent for Programs ("DSP") Phillips approved the call-out, it was "hand-delivered to the Housing Units within the correctional facility." (Weber Decl. ¶ 8). "Inadvertently, the callout was not added to the daily callout packet nor was it delivered to the program areas that day." (*Id.* ¶ 9). Although plaintiff's name certainly

appears on the call-out, unfortunately defendant Ready, who was at the Program Building that day, did not have that call-out in front of him when plaintiff approached to ask about going to services, and defendant Ready was justified in refusing to let plaintiff attend the services. The Superintendent's investigation of plaintiff's grievance resulted in the same finding:

> **\*9** The facility investigation revealed that the Jewish Services call-out was not submitted with the other scheduled inmate call-outs on the day before (12/6/10), which is normal procedure; therefore, it was not included with 12/7/10 facility call-out packet. The inmate call-out packets are normally distributed to all program areas, housing units as well as other staff/inmate areas the day before the call-outs are scheduled. On the morning of the posted call-out (12/7/10), this error was brought to the attention of the Coordinating Chaplain, who then had the Jewish Services call-out hand delivered to the housing units but not to the program areas. Although the 7–2 officer [Ready] and the grievant's general business instructor [Gruen] reviewed the p.m. call-outs to verify/confirm the grievant's statements, neither staff member would have been aware the grievant was listed on the 12/7/10 Jewish Services call-out scheduled for 2:00 p.m. nor would they have been aware that there was an addition to the original call-out packet because it was never delivered to their program area.

(Compl.Ex. L) (Dkt. No. 1 at 50).[4] This document, attached as an exhibit to plaintiff's complaint, corroborates defendant Ready's and Father Weber's version of the events. Defendant Ready did not intentionally deny plaintiff the opportunity to attend the service on December 7, 2010 because although plaintiff's name was on the call-out list, defendant Ready did not have that list in front of him,[5] and he would not even

have been aware that the list existed because it was not delivered to the program area. This one, clearly inadvertent incident, does not rise to the level of a constitutional violation committed by defendant Ready.[6]

In his response to defendants' motion for summary judgment, plaintiff states that the defendants are lying, and that the call-out was delivered to *"all"* program areas. (Pl.'s Mem. ¶ 10) (Dkt. No. 205–1 at 9). Plaintiff states that he reaches this sweeping *conclusion* because "[t]he location where the Jewish Services [are] held (Building # 101) is *a Program Area,"* and security staff in that area must have had the call-out because they would not have let the thirteen other Jewish inmates in the building. (*Id.*) (emphasis added). If one program area had the call-out, then all the program "areas" must have had the call-out. However, plaintiff's argument misses the point. Defendant Ready was not in Building # 101. He was in Unit 7–2 in Building 7,[7] and the fact that the building in which the religious services were actually held had the call-out,[8] does not "prove" or even raise a question of fact regarding whether the call-out had been sent to the other program areas, in the face of Father Weber's sworn statement that he did not send the call-out to the program areas. Although plaintiff states that Building # 101 is "a" program area, it is not "the" Program Building.[9]

In my prior report, I recommended denying defendants' motion to dismiss on the pleadings, notwithstanding case law holding that missing one religious service does not constitute a substantial burden on the inmate's right to the free exercise of his religion under either under the First Amendment or under RLUIPA. (Dkt. No. 148 at 13) (citing inter alia *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622, at \* 15 (S.D.N.Y. Oct. 15, 1999)). In granting **summary judgment,** the court in *Troy* stated that "courts in the Second Circuit have held that an inmate's right to practice his religion is not substantially burdened if an inmate missed one religious service for *a valid reason." Id.* (emphasis added). I did not rely on *Troy* in my prior report, because the defendants in this case brought a motion for judgment on the pleadings, and this court was bound by the facts as stated in plaintiff's complaint. Now that defendants have moved for summary judgment, the court may consider material outside the complaint, such as sworn declarations, in determining that, while plaintiff missed one religious service through the actions of defendant Ready, this inadvertent denial

did not substantially burden the plaintiff's free exercise of his religion. In denying plaintiff the opportunity to attend his call-out, defendant Ready acted according to the documentation before him. Even if a mistake were made, it was the lack of proper documentation that caused plaintiff to miss his service. [10] Neither the First Amendment, nor RLUIPA was violated by defendant Ready.

### 2. The March 20, 2011 Incident

**\*10** The second incident occurred on March 20, 2011, when plaintiff claims that defendant Ellis intentionally cut short a visit from Lubavitch Rabbis who had come from Brooklyn to see plaintiff [11] at the facility. (Compl.¶ 65). Plaintiff claims that he was scheduled to meet with the Rabbis for one and one half hours in order to celebrate the Purim holiday. (*Id.*) Plaintiff claims that defendant Ellis cut the service to a matter of minutes and sent all of the Jewish inmates back to their housing units.

Defendant Ellis has submitted a declaration in support of defendants' motion for summary judgment. (Ellis Decl.) (Dkt. No. 202–5). Kurt Ellis is employed by DOCCS as a Protestant Reverend, and at the time of the declaration, held the position of Chaplain at Mid–State. (Ellis Decl. ¶¶ 1–2). Defendant Ellis states that on March 20, 2011, Rabbi Theodore Max scheduled a Purim celebration in the small chapel at MidState with some members of the Lubavitch organization. (*Id.* ¶ 5). The call-out was approved for 2:30 p.m. on March 20, 2011. Defendant Ellis spoke with Corrections Officer ("CO") Backer, the Building 101 main console officer and explained that the call-out was for 2:30, but that the Rabbi might be late because he was making Purim rounds at other facilities, and a delay was possible. (*Id.* ¶¶ 6–7).

Defendant Ellis states that at approximately 1:45 p.m., he noticed that plaintiff was working in the Law Library, which is adjacent to the Building 101 console. (*Id.* ¶ 8). Defendant Ellis mentioned to CO Backer that plaintiff was on the Purim call-out, but Ellis was not sure if plaintiff would need to go back to his housing unit at the 2:15 "go back" and then return for the Purim call-out. (*Id.*) CO Backer told defendant Ellis that plaintiff would have to go back to his housing unit and then return when it was time for the Purim call-out. (*Id.*)

Defendant Ellis told plaintiff that he knew that plaintiff had "an issue" before, and Ellis wanted to make sure that

plaintiff did not have any trouble that day. (*Id.* ¶ 9). Ellis told plaintiff that, because he was currently signed out for the Law Library, he would have to go back to his housing unit at 2:15 p.m. and then return "when they call for the service." Plaintiff responded that he did not have to go back and asked the Law Library officer whether plaintiff could go directly to the service from the Law Library at 2:30. CO Ippolito, the Law Library Officer gave plaintiff permission to do so. Defendant Ellis states that he left, but informed CO Backer what CO Ippolito told plaintiff, and CO Backer agreed that CO Ippolito "should not have said that." (*Id.*)

Reverend Ellis states that he has no authority over the procedure for "inmate movement" at the facility because movement is a matter of security. (*Id.* ¶ 10). At approximately 2:30 p.m., defendant Ellis went to the small chapel to see if the Rabbi had arrived, but the Rabbi was not there yet. Defendant Ellis went to check with CO Backer. Plaintiff also approached the "security bubble" to check with CO Backer. Plaintiff was told by CO Backer and by defendant Ellis that the Rabbi had not arrived, and plaintiff went back to the Law Library. (*Id.* ¶ 11).

**\*11** Defendant Ellis then went to see if Rabbi Max had arrived, but was told that the Rabbi had not been seen. Defendant Ellis did his "weekly rounds in the Visitor's Center, signing into the Log Book at 2:45 p.m." (*Id.* ¶ 12). After a brief conversation with a staff member, defendant Ellis saw the Lubavitch volunteers pulling into the parking lot. Defendant Ellis greeted Rabbi Max and continued on his daily rounds, stopping at the Watch Commander's Office to inform him that Rabbi Max had arrived. (*Id.*)

Defendant Ellis states that he was not involved in calling inmates for the Purim Service, nor did he attend the Service on March 20, 2011. [12] Defendant Ellis continued with his daily rounds and did not return to his office until approximately 3:45 p.m ., at which time he noticed the inmates in the small chapel with the Rabbis. (*Id.* ¶ 16). Defendant Ellis states that after the service ended, he spoke to Rabbi Max, who stated that the service went well. (*Id.* ¶ 17). Defendant Ellis states that he was not in charge of the Service, he had no involvement in the time that the Service began or ended, and he did not order the inmates back to their housing units at the conclusion of the Service. (*Id.* ¶¶ 18–20).

Defendants have also submitted the declaration of Rabbi Theodore Max, [13] who states that he is a Chaplain who is responsible for leading the primary congregational worship and prayer services for Jewish inmates. (Max Decl. ¶¶ 1–3). He is assigned to multiple correctional facilities, including Mid–State. (*Id.* ¶ 4). Rabbi Max states that he coordinated the Purim celebration, and he was advised to schedule the call-out for 2:30, even though he was not scheduled to arrive until 2:45 that day. The Service was scheduled to last approximately one hour. (*Id.* ¶¶ 6–7). Rabbi Max states that he was on a "very tight" schedule on March 20, 2011 because he was scheduled to visit "at least three correctional facilities" before his visit to Mid–State. (*Id.*) When he and the members of the Lubavitch organization arrived at Mid–State, there was a long line of visitors, which delayed their entrance into the facility, causing the Purim celebration to begin later than 2:45 p.m. (*Id.* ¶¶ 10–11). Rabbi Max states that pursuant to facility rules, the inmates were still required to return to their cells at 3:45 p.m., and that the Purim celebration ended at that time. (*Id.* ¶ 12).

Plaintiff does not claim that he missed the celebration, only that the celebration was shorter than originally scheduled. Rabbi Max has explained that he arrived late, causing the service to begin later, and run shorter than anticipated. Defendant Ellis had nothing to do with scheduling the event, with Rabbi Max being late, or with shortening the service.

Plaintiff argues that defendant Ellis sent plaintiff back to the law library and the other Jewish inmates back to their housing units, for the purpose of shortening the service. In his response to the motion for summary judgment plaintiff states that during *his* deposition, the defendants "admitted" that defendant Ellis sent the Jewish inmates back to their cells to shorten the service. (Pl.'s Mem. ¶ 19) (citing Deposition Transcript ("DT") at 49). The deposition transcript is not an "admission" by defendants, and does not state that defendant Ellis sent the inmates back to their cells.

**\*12** During his deposition, plaintiff testified that Reverend Ellis allows *Protestant* inmates to come to the chapel before Ellis is ready to conduct the service, but does not allow Jewish inmates to go to their place of worship and wait if the Rabbi is not there. (DT at 49). "Whenever we go to the Jewish services, he sends us all back. 'Go back to your housing unit.' " (*Id.*) Defense counsel then

asked plaintiff a question: "even though the rabbis came a little bit late, and even though they sent some of the inmates back to their cells, you were able to meet with the rabbis that day and have a short prayer service." (*Id.*) This *question by counsel* is **not** an *admission by a defendant,* and counsel was making the point that "even if" what plaintiff said were true—that someone sent the Jewish inmates back to their cells because Rabbi Max had not arrived— plaintiff still attended the service, notwithstanding that it was shorter than anticipated.

Rabbi Max's declaration shows that *he* was late beginning the service, and the inmates were required to return to their cells at 3:45. Defendant Ellis had nothing to do with the length of the service. [14] Under the appropriate definition, plaintiff's religious rights were not substantially burdened. In order for the defendant's interference to be a "substantial burden" on the inmate's religious exercise, the interference must be more than an inconvenience, and plaintiff must demonstrate that the government's action pressured plaintiff to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at \* 14 (S.D.N.Y. Apr. 22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at \*1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

In addition, although plaintiff may disagree, the shortening of his Purim celebration because the Rabbi was late or because plaintiff had to wait for other inmates to come back from their housing units did not amount to a "substantial burden." This delay may certainly have been "an inconvenience." However, plaintiff admits that the Service did occur, that prayers were said, and that the inmates were allowed to eat the food, albeit too quickly for plaintiff's liking. Thus, neither the Constitution, nor RLUIPA were violated by defendant Ellis. Plaintiff's retaliation claim will be discussed below.

## V. *Mail/Access to Courts/Retaliation*

### A. Legal Standards

#### 1. Mail

Among the protections enjoyed by prison inmates, subject to appropriate limitations, is the right "to the free flow

of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek,* No. 05–CV–172 (GLS/DRH), 2007 WL 3254373, at *6 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)). "The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise." *Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, at *5 (S.D.N.Y. March 29, 2001). This right, however, must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996)). "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)).

**\*13** Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safley,* 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection ... to outgoing mail than to incoming mail." *Davis,* 320 F.3d at 351 (citations omitted). Nonetheless, the Second Circuit has held that " 'where good cause is shown, outgoing mail can be read' without violating inmates' First Amendment rights." *Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979)).

Prison security is a legitimate penological interest that justifies limitations on an inmate's First Amendment rights related to regular mail. *See Cancel v. Goord,* 2001 WL 303713, at *6. "[T]he interception of a prisoner's correspondence does not violate that individual's First Amendment rights 'if prison officials had good or reasonable cause to inspect the mail." *Knight v. Keane,* No. 99 Civ. 3955, 2005 U.S. Dist. LEXIS 18702, at *18 (S.D.N.Y. August 26, 2005) (citing *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir.1998)) (Rep't–Rec.), *adopted* 2006 WL 89929 (S.D.N.Y. Jan. 12, 2006). To

establish a claim for interference with regular, non-legal mail, the plaintiff must show " 'a pattern and practice of interference that is not justified by any legitimate penological concern." *Singleton v. Williams,* No. 12 Civ.2021, 2014 WL 2095024, at *3 (S.D.N.Y. May 20, 2014) (quoting *Cancel, supra.*) An isolated incident is generally insufficient to establish a constitutional violation. *Id.* (citing *Davis,* 320 F.3d at 351).

Legal mail is entitled to a higher degree of protection than regular mail, and "prison policies or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Cancel v. Goord,* 2001 WL 303713, at *6–7 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). Plaintiff must still show that prison officials " 'regularly and unjustifiably interfered with the ... legal mail." *Singleton,* 2014 WL 2095024, at *4 (quoting *Cancel, supra.*) As few as two incidents of mail tampering may constitute an actionable violation if the incidents suggest an ongoing practice of censorship that is unjustified by a substantial governmental interest or if the tampering unjustifiably chilled the inmate's right to access to courts as discussed below or impaired legal representation that plaintiff received. *Vega v. Rell,* No. 3:09–CV–737, 2013 WL 6273283, at *10 (D.Conn. Dec. 4, 2013) (citing *Washington,* 782 F.2d at 1139).

### 2. Access to Courts

**\*14** Legal mail claims are sometimes related to claims that defendants have denied an inmate access to courts by interfering with legal mail. It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 823 (1977). The Supreme Court held in *Bounds* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *430 U.S. at 828.*

"Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995). In addition, "to establish a constitutional violation based on a denial

of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). *See Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008). In order to show actual injury, the defendants' conduct must have "hindered [plaintiff's] efforts to pursue a legal claim." 518 U.S. at 351.

### 3. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

**\*15** The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at \*3 & n. 11 (N.D.N .Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at \*3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

### B. Application

### 1. Defendant Kupiec

### a. Relevant Facts—Interference/Retaliation

In his complaint, plaintiff alleged that after he filed a grievance against defendant Ready, which was denied on January 14, 2011, defendant Kupiec [15] began to lose and/or destroy plaintiff's packages that were received in the mail room. [16] (Compl.¶¶ 57–64). Plaintiff claims that on January 14, 2011, the same day that the Superintendent rendered a decision on plaintiff's grievance against defendant Ready, plaintiff received a package from Stratford Career Center, to study for his paralegal degree. (Compl.¶ 58). Plaintiff states "Defendant Theda Kupiec 'got word' of the complaint contra the aforesaid officers and started to intentionally lose and destroy the plaintiff's legal packages from said school." (*Id.*) Plaintiff states that the "package" with his text and exams was never recovered, but he did "receive the Paralegal Course from the school on the said date in question." [17] (*Id.* & Ex. M).

Plaintiff states that he "was never once called down to the package room or mail room in the entire month of [J]anuary, 2011." (Compl.¶ 58). He then states that "this only indicates that anytime an inmate (in this case the

plaintiff) files a grievance against the defendant's [sic] —retaliation takes place." (*Id.*) Plaintiff speculates that retaliation can take the form of missing packages or "planting weapons on the inmate ... to make sure that the inmates [sic] goes to the box (Special Housing Units) where he is limited to legal materials." [18] (*Id.*)

The complaint also alleges that after he appealed the Superintendent's decision regarding the December 7, 2010 incident against Ready, a "Notice of Intention to File a Claim" ("Notice") was improperly sent "regular" mail, rather than by Certified Mail as is required under New York State Law and notwithstanding that plaintiff paid for certified mail. (Compl.¶¶ 60–63). Plaintiff alleges that on March 15, 2011, his parents sent him a food package that he never received, purportedly due to the retaliation by defendant Kupiec. (Compl.¶ 63). Several paragraphs later, plaintiff states that, on May 17, 2011, defendant Kupiec "slashed open" plaintiff's legal mail, removed the documents outside of his presence, and sent the documents to plaintiff in a coffeestained, "stampless" envelope. (Compl.¶ 82). In plaintiff's response to defendants' motion for summary judgment, he also mentions an incident that is not part of the complaint. Plaintiff alleges that defendant Kupiec opened his mail and ripped up his "law school exam scores." (Dkt. No. 205–1, ¶ 33). This court will not consider this final allegation against defendant Kupiec. [19]

**\*16** Defendants have filed the declaration of defendant Theda Kupiec, Senior Mail Clerk at Mid–State. (Kupiec Decl. ¶¶ 1–2) (Dkt. No. 202–4). Defendant Kupiec states that her responsibilities include sorting outgoing mail and placing the appropriate postage after verification that the inmate has sufficient funds, in addition to sorting incoming mail for distribution to the housing units. (*Id.* ¶ 6). Defendant Kupiec states that she has no responsibility "whatsoever" with respect to "packages" that are received for inmates. She states that the mail room in which she works is located in Building 20 of the Administration Building, which is located outside of the secure fence around the facility. However, the "package room" is located in Building 101, which is located inside the secure fence. (*Id.* ¶¶ 7–8).

Defendant Kupiec states that she was not aware of any grievance plaintiff may have filed against defendant Ready, and that she does "not personally know Correction Officer Ready." (*Id.* ¶¶ 11–12). Defendant

Kupiec states that "at some point," she became aware of plaintiff's claim that he did not receive the Stratford Career Institute package, but because defendant Kupiec does not work in the package room, and has no responsibility for packages, she has no knowledge of the result of plaintiff's complaint. (*Id.* ¶ 14).

Defendant Kupiec states that she did inadvertently mail plaintiff's Notice via regular mail. (*Id.* ¶ 15). Plaintiff requested that the envelope be sent Certified, and defendant Kupiec first sent the mail to the Business Office to verify that plaintiff had adequate funds for certified mail. When the mail was returned to her with the authorization, defendant Kupiec inadvertently sent the mail with regular postage. Defendant Kupiec states that she realized her mistake when plaintiff filed a grievance, to which she responded by admitting her error and reimbursing plaintiff for the difference in the postage. Defendant Kupiec states that the mistake was hers, and no one "told" her to send the mail out via regular mail rather than certified. (*Id.* ¶¶ 15–16 & Ex. A). Exhibit A to defendant Kupiec's declaration is a copy of the memorandum that she sent to plaintiff apologizing for the error and reimbursing him for the cost of the mailing [20] Defendant Kupiec states that she is completely unaware of plaintiff's missing food package because she does not work in the package room. (*Id.* ¶ 17).

Defendant Kupiec also states that on May 18, 2011, she received a manila envelope from the package room with plaintiff's name and DIN number on it, with no indication that it was legal mail. [21] She opened the envelope to record the contents, and when she realized that the mail was from a court, she wrote which court the mail came from on the front of the envelope and send the mail to the Legal Officer. (*Id.* ¶ 19 & Ex. B). Exhibit B is the memorandum that defendant Kupiec wrote to the IGRC, explaining what happened with the manila envelope. [22] (*Id.*) Defendant Kupiec states that she did not open plaintiff's legal mail intentionally or in retaliation for any grievance, but merely in the "normal course of [her] job duties ...." (*Id.* ¶ 20).

### b. Discussion

**\*17** These incidents do not show constitutional interference with plaintiff's mail, nor do the facts show that defendant Kupiec was retaliating against plaintiff for his grievances. First, it is clear that defendant Kupiec

does not work in the package room, and had no personal involvement in, and would not have been responsible for, either plaintiff's alleged text book "loss" or the alleged loss of his kosher food. [23] The court will focus on plaintiff's allegations that defendant Kupiec tampered with his mail on February 25, 2011 (certified mail claim) and on May 17, 2011 (opening of legal mail).

The fact that plaintiff's Notice was sent regular mail, rather than certified is not interference with plaintiff's mail. The mail was sent, it was just sent by a different method of delivery. [24] This mistake shows neither intent, nor a "pattern and practice" of interference. At worst, it shows an error by defendant Kupiec in sending out plaintiff's mail, for which plaintiff was reimbursed. [25] The incident in which defendant Kupiec sent plaintiff documents in a plain manilla envelope after she realized that the documents were sent by a court also shows an error by facility staff in the package room, that defendant Kupiec attempted to rectify by writing which court the documents came from on the envelope and having it delivered to plaintiff through the proper channels for legal mail. [26] Defendant Kupiec states that the court documents were already in the plain manilla envelope when she received them.

Plaintiff claims that defendant Kupiec was retaliating against plaintiff for the grievances that he filed. Plaintiff first mentions the grievance he filed against defendant Ready after the December 7, 2010 incident, which was denied by the Superintendent on January 14, 2011. [27] Plaintiff's statement that defendant Kupiec was aware of plaintiff's grievance against defendant Ready because an inmate named "Rogers" told defendant Kupiec about the grievance, is completely conclusory. The first time plaintiff ever mentioned inmate Rogers was at plaintiff's deposition. (Pl.'s Dep. at 61). Plaintiff stated that Inmate Rogers worked in the grievance office and knew who was filing grievances against officers, so Inmate Rogers told defendant Kupiec about the decision on plaintiff's grievance against Ready "because [plaintiff] was already putting in paperwork on why my legal mail was being messed with." (Pl.'s Dep. at 62). This statement by plaintiff is not even plausible. *See Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (no genuine issue of material fact when plaintiff's explanation is not even plausible); *Haust v. United States,* 953 F.Supp.2d 353, 361 (N.D.N.Y.2013) (court may discredit plaintiff's self-

serving testimony when it is so replete with inconsistencies and improbabilities that no reasonable fact-finder would undertake the suspension of disbelief necessary to credit the allegations made in his complaint) (quoting *Jeffreys, supra* ).

**\*18** Defendant Kupiec states that she does not know defendant Ready, and that plaintiff's allegation that an inmate named "Rogers" informed Kupiec of the grievance against Ready is untrue. (Kupiec Decl. ¶ 13). Although defendant Kupiec is aware that Inmate Rogers works in the grievance office, she could not identify Rogers, nor has she ever had any contact with him. (*Id.*) The grievance against defendant Ready had to do with religion, not mail. The fact that plaintiff may have begun "putting paperwork together" regarding a grievance about his legal mail against defendant Kupiec, which plaintiff did not file until March or April of 2011, would not support Inmate Rogers deciding to tell defendant Kupiec about a grievance filed against a different defendant, coincidentally on the same day that plaintiff claims a package was delivered for him. [28] As stated above, defendant Kupiec does not work in the package room and would not have been responsible for the alleged loss of any package delivered to the facility for plaintiff in January of 2011 or any other time.

In addition, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* No. 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at \*8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than

the defendants involved in the disciplinary action). *See also Faulk v. Fisher,* 545 F. App'x 56, 58–59 (2d Cir.2013) (temporal proximity to the protected action and excellent disciplinary history prior to the allegedly retaliatory misbehavior reports were insufficient to avoid summary judgment when there was no additional evidence, and neither of the officers were involved in the successful grievance); *Bennett v. Goord,* No. 06–3818–pr, 2008 WL 5083122, at *2 (2d Cir. Dec. 2, 2008) (citing *inter alia McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006) (speculation alone is insufficient to defeat a motion for summary judgment)).

 **\*19** Plaintiff also may be claiming that defendant Kupiec's subsequent actions were in retaliation for the grievance that plaintiff ultimately filed against defendant Kupiec in March or April of 2011. In her declaration, defendant Kupiec denies ever opening plaintiff's legal mail in retaliation for a grievance filed against *her.* [29] (Kupiec Decl. ¶ 18). In any event, plaintiff suffered no adverse action, as defined by the case law,[30] as the result of defendant Kupiec inadvertently opening plaintiff's legal mail that was sent to her from the package room.[31] This action would not deter a similarly situated inmate from exercising his constitutional rights. This action also would not deter a similarly situated inmate from asserting his rights.[32] It does not show malice or retaliation by defendant Kupiec. Plaintiff's mail interference and retaliation claims may be dismissed.

### b. Access to Courts

Plaintiff claims that defendant Kupiec's failure to send his Notice by certified mail denied plaintiff access to courts because he was forced to withdraw his action.[33] Plaintiff's allegation has no basis whatsoever. Plaintiff concedes that he withdrew his New York Court of Claims action of his own accord. At his deposition, plaintiff stated "I had to dismiss [the Court of Claims action] because after I found out about these reckless lies, I had to dismiss it." (Pl.'s Dep. at 79). At plaintiff's deposition, the Assistant Attorney General asked why plaintiff did not just send a new Notice if he really believed that his case would be dismissed without a notice sent by certified mail. It was clear that plaintiff would have had time to send a new one, and plaintiff had been reimbursed for the mail that was improperly sent. (*Id.* at 80–82). Plaintiff then

stated that the notice covered earlier incidents, and would have been untimely for the "earlier" incidents. (*Id.* at 82).

At the same time, plaintiff stated that he withdrew the action because he "wanted to change his theory" and go to federal court, because plaintiff stated that the "Court of Claims is only [for] negligence and property damage." (*Id.* at 83). Plaintiff then reasserted that the "Court" *would have* stricken his "motion"[34] because he did not serve the Attorney General with his Notice by certified mail. Plaintiff cannot "create" an access to courts claim by voluntarily withdrawing his action and then speculating what the court would have done if he had not withdrawn the action.

According to plaintiff, the Notice was required to be served on the Attorney General, not the Court. (T. 81). The court would have no way of knowing that the Notice was not served by certified mail, unless the Attorney General made a motion to dismiss on that basis. Even if the Attorney General made such a motion, plaintiff could have opposed the motion by stating that a mistake was made in mailing the item. There is no way to know that plaintiff's case would have been dismissed. In any event, it is clear from plaintiff's deposition that he would not have stayed in the Court of Claims. At his deposition, he clearly stated that he "wanted to change his theory" and go to Federal Court. (DT at 83). That is not a denial of access to courts "caused" by defendant Kupiec's conduct. Thus, plaintiff's access to courts claim may be dismissed.

### 2. Defendants Ready and Ellis

 **\*20** Plaintiff alleges that the actions taken by defendants Ready and Ellis were taken in retaliation for a grievance that plaintiff filed on September 20, 2010 against defendant Ellis and CO Johnston.[35] Defendant Ready states that he did not know about the September 20, 2010 grievance on December 7, 2010, because he was transferred to Mid–State in September of 2010. (Ready Decl. ¶ 13). In his response, plaintiff argues that defendant Ready must have known about the September grievance because "it was not until November 24, 2010 that the Grievance Supervisor disciplined the officers including Ready regarding allowing inmates ... to adhere to Jewish memos and callouts." (Pl.'s Mem. at ¶ 24) (Dkt. No. 205–1 at 18).

First, the court notes that there is no indication the Ready, or any other officer was "disciplined." The Superintendent's response states that the facility policies were reviewed and "corrective action taken." [36] This does not mean "discipline ." The Superintendent's response also states that the "referenced employees were advised and clarification given with regards to this matter." (Pl.'s Ex. N(1) (Dkt. No. 205–1 at 93). Defendant Ready was not one of the employees referenced in the grievance and was not involved in the September incident. [37] Thus, he would not have been disciplined or even "advised" of the incident. The memorandum cited by plaintiff, dated November 24, 2010 was between C. Tapia, the IGP Supervisor and DSP Phillips.

The fact that the defendants work in the same facility, or even on the same unit, is not sufficient to show that defendant Ready was aware of plaintiff's grievance against two other officers or that he would have retaliated against plaintiff for a grievance in which she was not involved. As stated above, generally, it is difficult to show retaliation for actions taken against another officer. *Hare v. Hayden, supra,* 09 Civ. 3135, 2011 WL 1453789, at *4.

Further, the court finds that neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an "adverse action" under the case law. Keeping plaintiff out of one service because defendant Ready did not have the correct call-out list, is not an action that would deter a "similarly situated" individual from exercising his rights. With respect to defendant Ellis, even assuming that he had anything to do with shortening the Purim service (which this court has found that he did not), this action would certainly not deter someone similarly situated to plaintiff from asserting his rights. [38] Additionally, plaintiff claims that defendant Ellis was responsible for sending *all* the inmates back to their housing unit to wait for the Rabbis. Clearly, even if that were true, plaintiff concedes that he did not return to his housing unit, and defendant Ellis could not have been retaliating against plaintiff by taking action against other inmates. [39] Therefore, any retaliation claims against defendants Ellis and Ready may be dismissed.

## VII. *Personal Involvement*

### A. Legal Standards

**\*21** Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F .3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

The mere receipt of a letter or similar complaint is insufficient to constitute personal involvement; otherwise, a plaintiff could create personal involvement by any supervisor simply by writing a letter. (*Id.*) (citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)). In order for a letter to suffice to establish personal involvement, plaintiff would have to show that the supervisor conducted a personal investigation or personally took action on the letter or grievance. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009); *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004). However, personal action does *not* include referring the letter to a subordinate for investigation. *Id.* (citing *Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)); *Hartnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008).

### B. Application

In my April 3, 2013 recommendation, I noted that in Judge D'Agostino's initial order, the allegations of personal involvement against defendants Fischer and Boll were "rather sparse." (Dkt. No. 148 at 24). Notwithstanding these "sparse" allegations, Judge D'Agostino allowed the case to continue as against these supervisory defendants.

(*Id.*) In a conclusory fashion, plaintiff claimed that he had so many documents from these two defendants, he could "flood the docket." (*Id.*) (citing Dkt. No. 129 at 22). Plaintiff's response to the defendants' motion for judgment on the pleadings implied that he could make the appropriate showing, perhaps by amending his complaint. Because at that time, I was recommending that this action proceed at least to a properly supported motion for summary judgment, I did not recommend dismissing the action as against defendants Fischer and Boll based on lack of personal involvement. (*Id.*)

**\*22** Plaintiff did not amend his complaint, and he later stipulated to dismissing the action as against Fischer. However, in his response to the motion for summary judgment, he maintains that defendant Boll was personally involved in the alleged constitutional violations because she stated in her response to interrogatories that her "office" became aware of plaintiff's September 9, 2010 grievance when a copy of plaintiff's correspondence to a Deputy Commissioner of Program Services was "forwarded to my office." (Dkt. No. 205–3 at 355). Defendant Boll states that she had no personal knowledge or recollection of the grievance itself because the Office of Counsel is not the appropriate department to file a grievance. (*Id.* at 355–56). Defendant Boll also states that "upon receipt of your letter, the matter was investigated by the Office of Counsel, and I responded to you on December 2, 2010. (Exhibit B attached hereto)." (*Id.* at 356). Plaintiff seizes upon this statement, and accuses defendant Boll of lying to the court because she "admits" that she responded to plaintiff.

First, it is unclear whether plaintiff's September 9, 2011 grievance against defendant Ellis has anything to do with the facts of this case. [40] Plaintiff has seen fit not to include the letter that defendant Boll said that she wrote to him in response. [41] However, defendant Boll has included the letter as an attachment to her declaration in support of the summary judgment motion. (Boll Decl. Ex. A) (Dkt. No. 202–6). In her declaration, defendant Boll states that as Deputy Commissioner and Counsel for DOCCS, she serves as legal counsel for the Commissioner of DOCCS and oversees DOCCS Office of Legal Counsel which is responsible for all of the legal services necessary for the day-to-day operation of the DOCCS Central Office and the correctional institutions that make up the department. (Boll Decl. ¶ 5).

Defendant Boll states that her office routinely received hundreds of letters per year from inmates or on behalf of inmates. (*Id.* ¶ 6). When the Office receives one of these letters, one of the defendant's support staff reads it and determines which of the attorneys on her staff or other staff person should address the issues in the letter. The letter is then forwarded to the attorney or other staff person to investigate and prepare a response, if warranted. The response may be prepared for the attorney's signature, a Deputy Counsel's signature, or defendant Boll's signature "depending on the circumstances." (*Id.*)

Contrary to plaintiff's accusations that defendant Boll is somehow trying to hide her involvement, defendant Boll admits responding to three letters received from the plaintiff. (*Id.* ¶ 7). The letter that plaintiff apparently believes is the "smoking gun" which shows that defendant Boll was personally involved in whatever constitutional violation the plaintiff alleged, is actually a letter reminding plaintiff that he had filed a grievance, and that his grievance had been appealed to the Central Office Review Committee ("CORC"), and a decision was pending. (*Id.* ¶ 8). In the letter, plaintiff was advised that the CORC would conduct a thorough investigation, and that plaintiff would be notified of its decision. (*Id.* & Ex. A). Defendant Boll states that she did not take any action to "investigate the claims contained in plaintiff's Inmate Grievance Complaint that [she] referenced in [her] December 2, 2010 letter to plaintiff." [42] (*Id.* ¶ 9).

**\*23** A reading of defendant Boll's letter supports her declaration. Her office's "investigation" was not an investigation of the "merits" of the grievance, it was merely an "investigation" of the status of plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours." (*Id.* Ex. A). Defendant Boll was reporting to plaintiff that an investigation had been conducted by other officials of DOCCS. Defendant Boll then stated:

> The CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is still pending, it is recommended that you await the decision.

(*Id.*) If an individual were able to create "personal involvement" by simply writing a letter to a superior, who was good enough to answer with an explanation such as this, it would eviscerate the well-settled principle that respondeat superior does not apply in civil rights cases. Clearly, defendant Boll did not conduct a "personal investigation" of the religious issue outlined in plaintiff's grievance.

Defendant Boll wrote another letter, dated January 28, 2011, in response to a new letter from plaintiff, dated December 20, 2011. (Boll Decl. ¶ 10 & Ex. B). Defendant Boll's letter merely stated that she had already written to plaintiff on December 2, 2010, and noted that the CORC had completed its review by correspondence dated December 8, 2010, accepting plaintiff's grievance in part. (Boll Decl. Ex. B). Defendant Boll further stated that plaintiff had been told "to bring further concerns to the attention of area supervisory staff, at [his] facility, at the time of the incident, for any remedial action deemed necessary." (*Id.*)

By the time of plaintiff's second letter to defendant Boll, the December 7th incident had occurred, and defendant Boll noted the "reoccurrence," stating that Superintendent William Hulihan had investigated the incident, "and advised you of his findings and actions on January 14, 2011." (*Id.*) Defendant Boll's explanatory letter does not create personal involvement as it is clear from the letter that she did not have anything to do with investigating the incident. She just determined that an investigation had taken place and was advising the plaintiff that he "should continue to follow the Directive for any further incidences that [h]e may have." (*Id.*)

Finally, plaintiff wrote to defendant Boll again, and she responded on March 3, 2011. (Boll Decl. ¶ 12 & Ex. C). Plaintiff claimed that no corrective action had been taken with regard to one of his grievances, and defendant Boll merely advised plaintiff that her office had contacted the staff at the correctional facility, who advised defendant Boll that plaintiff's claims had been properly investigated and corrective action had been taken. Defendant Boll took

no further action. (Boll Decl. ¶¶ 12, 14). Defendant Boll states that she took no investigative action on any of plaintiff's letters. (Boll Decl. ¶ 15). She merely inquired into the status of plaintiff's grievances and reported her findings to plaintiff. Defendant Boll's letters support her assertions, and plaintiff's attempt to create personal involvement by citing portions of one of the defendant's letters, without the entire letter must fail.

**\*24** Plaintiff may not understand the above-cited law and may be under the misapprehension that the simple fact that defendant Boll responded to his letters made her personally involved in the subject matter of the letter. The cases cited above show that this is not the law. Plaintiff is confusing the difference between a letter, telling him that someone else did an investigation, with a personal investigation of the merits after receipt of the letter. The former is not personal involvement, while the latter is personal involvement. Thus, the complaint may also be dismissed as against defendant Boll on this basis as well.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 202) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: July 23, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4365274

Footnotes

1  Plaintiff then attempted to appeal the Second Circuit decision to the United States Supreme Court. (Dkt. No. 130) (Notice of Appeal).

2  Plaintiff's response seems to take issue with the fact that defendants have now filed a motion for summary judgment because the case survived a prior motion for summary judgment, filed by plaintiff and a motion for judgment on the

pleadings, filed by defendants. (Pl.'s Mem. at ¶¶ 1–7) (Dkt. No. 205–1). Plaintiff faults the court for allowing defendants to respond to plaintiff's motion for summary judgment with a letter. (*Id.* ¶ 5). The court would point out that the lack of a "formal" response from the defendants did not prejudice plaintiff. The defendants did not, as plaintiff put it, "[get] away" with anything. *See* Pl.'s Mem. at 5. I noted in the Report–Recommendation that defendants had not formally responded to the motion for summary judgment. (Dkt. No. 54 at 8–9). The standard for summary judgment places the burden on the party moving for summary judgment to show that no question of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. at 323; Fed.R.Civ.P. 56(a). Unless that initial burden is met, the non-moving party need not make any showing. *See Salahuddin v. Goord,* 467 F.3d at 272–73. Only if the moving party satisfies its burden, is the non-moving party required to move forward with specific facts showing that there is a genuine issue for trial. *Id.* The fact that the court found, based upon the documents submitted by plaintiff, that a genuine issue of fact existed does not preclude a subsequent motion for *summary judgment* by defendants. The defendants' interim motion for judgment on the pleadings was denied because, based upon the facts stated in the complaint, plaintiff's claims had been stated. The summary judgment motion contains additional facts in the form of affidavits and deposition testimony. *See* Fed.R.Civ.P. 56(c). Even if the defendants had made a prior motion for summary judgment, the court has the discretion to consider multiple motions for summary judgment if the successive motion is supported by new material. *Robinson v.. Henschel,* No. 10 Civ. 6212, 2014 WL 1257287, at *8 (S.D.N.Y. March 26, 2014) (citing inter alia *Wechsler v. Hunt Health Sys., Ltd.,* 198 F.Supp.2d 508, 514 (S.D.N.Y.2002)). *See also Rodriguez v. It's Just Lunch, Internat'l,* No. 07 Civ. 9227, 2013 WL 1749590, at *1 (S.D.N.Y. April 23, 2013) (considering cross-motions for summary judgment "[fJollowing discovery proceedings and multiple motions to dismiss.")

3    Father Weber is not a defendant in this action.

4    Unless otherwise specified, the pages associated with a docket number will be the pages assigned to the document by the court's electronic filing system. (CM/ECF).

5    Plaintiff was deposed on October 8, 2013, and a copy of his deposition transcript has been included in defendants' summary judgment motion. (Dkt. No. 202–2). During his deposition, plaintiff testified that defendant Ready "had the call-out on his desk." (Dkt. No. 202–2 at 22). While defendant Ready may have had a call-out or call-outs on his desk, he did not have one with the plaintiff's name on it.

6    Plaintiff has also alleged a retaliation claim based on this incident, and the court will discuss that claim below.

7    (Ready Decl. ¶¶ 5).

8    This court makes no such finding.

9    Plaintiff's own exhibits confirm this finding. (Pl.'s Ex. G) (Dkt. No. 205–3 at 26). In his grievance documents, plaintiff states that "I signed out of Mr. Gruen's class and informed him that I had a call-out per DSP Phillips to **report to Bldg # 101** to attend Jewish Services. I subsequently attempted to sign out @ the 7–2 security desk whereby Correctional Officer Ready ... asked me where I was going." (*Id.*) Clearly, Building # 101 is not the same as Building # 7. Thus, whether an officer in Building # 101 has a document does not prove that someone in Building # 7 was given the same document.

10    To the extent that the failure to provide the appropriate call-out sheet was negligent or simply a mistake, defendant Ready was not responsible for that omission, and in any event, negligence is not actionable under section 1983. *Riehl v. Martin,* No. 13–CV–439, 2014 WL 1289601 at *8 n. 14 (N.D.N.Y. March 31, 2014). In his response to the motion for summary judgment, plaintiff asks why, even if defendant Ready did not have the call-out, "did he fail to pick up the phone and just call the Chaplain's Office to verify that the [plaintiff] was on the call-out?" (Pl.'s Mem. at 15). The fact that defendant Ready may or may not have acted correctly or logically, at worst, could constitute negligent action, which is not actionable under section 1983 or under RLUIPA. *Id. See also Booker v. Maly,* No. 9:12–CV–246, 2014 WL 1289579, at *25 (N.D.N.Y. March 31, 2014) (mistakes not actionable under the U.S. Constitution) (citations omitted); *Scott v. Shansiddeen,* No.2013 WL 3187071, at *4 (N.D.N.Y. June 20, 2013) (negligent actions that 'impinge to some degree on an inmate's religious practices' are insufficient to support a claim under RLUIPA) (citing 42 U.S.C. § 2000cc, et seq.; *Carter v. Washington Dep't of Corr.,* No. C11–5626, 2013 WL 1090753, at *14 (W.D.Wash. Feb. 27, 2013); *Lovelace v. Lee,* 472 F.3d 174, 194 (4th Cir.2006) (simple negligence does not suffice to meet the fault requirement under section 3 of RLUIPA)).

11    Although the complaint initially states that the Rabbis came to see "the plaintiff," it is clear that there were other Jewish inmates who were scheduled to participate in the Purim Services.

12    The declaration says "March 20, 2011." Although plaintiff refers to this as the March 30, 2011 incident, Purim was actually March 19–20, 2011. The discrepancy in the dates is not relevant to this court's decision because it is clear that all parties are referring to the same incident.

13    Rabbi Max is not a defendant in this action.

14    In his response to defendants' motion for summary judgment, plaintiff has submitted his grievance and the Superintendent's response to plaintiff's grievance regarding this incident. (Dkt. No. 205–3, Pl.'s Exs. R–Z). In this

grievance, plaintiff alleged that defendant Ellis "felt the need to answer for the officers in the bubble by stating ... 'The Rabbi is not here so go back to the law library.' " (Pl.'s Ex. R at 2; CM/ECF p. 123). Plaintiff claimed that he complied, after the other officer repeated that plaintiff should go back to the law library. (*Id.*) Plaintiff asked to use the bathroom, and while using the bathroom, "he overheard the the 'voice over the mic [sic]' direct the other Jewish inmates back to their housing units because the Rabbis had not arrived." (*Id.* & Ex. Z). The issue in the grievance appeared to be that the inmates were not allowed to enter the chapel and wait for the Rabbis. Plaintiff complained that "the Rabbis arrived at approximately 2:43 p.m., and by the time the inmates who were sent back to their units arrived for the second time; the services did not start until 3:15 p.m. ***As a result, the Jewish Services were shortened*** and they were dismissed at 3:45 p.m." (Pl.'s Ex. Z) (emphasis added). The fact that the inmates were not allowed to enter the chapel prior to the Rabbi's arrival, has nothing do with shortening the service (which would have been cut short anyway, because it is clear that the Rabbis were late in arriving). Plaintiff seems to speculate that Ellis was responsible for the other officer ordering the inmates back to their units. (Pl.'s Ex. R, Dkt. No. 205–3 at 123). In his declaration, defendant Ellis states that he disagreed that plaintiff should have been allowed to return to the library to wait for the Rabbis, but this did not affect plaintiff's attendance at the Purim celebration.

15     Plaintiff originally named Sheila Marlenga, the "Facility Steward," as a defendant in connection with plaintiff's mail claims. The complaint was dismissed with prejudice as against Ms. Marlenga by stipulation, dated January 8, 2014. (Dkt. No. 197). Thus, the complaint has proceeded only as against defendant Kupiec with regard to the remaining issues.

16     The court notes that the allegations in plaintiff's complaint relate more to retaliation than simply interference with his mail. However, in his memorandum of law in opposition to defendants' summary judgment motion he has one paragraph in which he discusses both interference and retaliation separately. (Dkt. No. 205–1 at ¶ 34). Because interference with mail may be a separate and independent claim from retaliation, the court will discuss all possible claims that plaintiff may have regarding the alleged interference with his mail.

17     The allegations in the complaint are a little unclear. In his deposition, plaintiff states that he ultimately received the package. (DT at 107). A reading of plaintiff's grievance documents indicates that he may have received a replacement package after plaintiff's father contacted the school to explain that plaintiff did not receive the January 2011 package. (Pl.'s Ex. Z(12), Dkt. No. 205–3 at 223). The court also notes that materials relating to a paralegal "course" do not constitute "legal mail." Legal mail is included in the definition of "Privileged Correspondence" and is defined, in relevant part, as correspondence with attorneys, legal representatives, and legal services organizations. *See* DOCCS Directive 4421(II) (A)(2) (citing [7 NYCRR § 721.2](#)).

18     The court notes that plaintiff's statement about "planting weapons" is irrelevant because there is no such claim in this case.

19     A plaintiff may not amend his complaint in a memorandum of law or other filing. *[Bryant v. Greater New Haven Transit Dist.,](#)* No. 3:12–CV–71, 2014 WL 2993754, at *7 (D.Conn. July 2, 2014) (citation omitted). The court notes that this final incident could not have been included in the complaint because it occurred after plaintiff filed this action, and plaintiff was still exhausting administrative remedies regarding this allegation, long after this complaint was filed. (*See* Pl.'s Ex. Z(16), Dkt. No. 205–3 at 250) (IGRC's September 22, 2011 response to plaintiff's grievance—this action was filed on May 31, 2011). Plaintiff will not be prejudiced by this court's failure to consider this allegation against defendant Kupiec because he has raised the same claim in a subsequent action that has been assigned to Senior Judge Lawrence E. Kahn and Magistrate Judge Treece. *Guillory v. Fischer,* No. 9:12–CV–280. Magistrate Judge Treece declined to recommend dismissal of this allegation in a Report–Recommendation, noting that notwithstanding my consideration of the issue in recommending denial of plaintiff's motion for summary judgment, the claim was more properly before him. *See id.* at 13– 16 (Dkt. No. 46 in 12–CV–280). It is more appropriate for Judge Treece to consider the allegations regarding plaintiff's test scores along with another factual allegation against defendant Kupiec that has not been mentioned in any part of this action and that occurred after the filing of this case.

20     A review of plaintiff's exhibits shows that, at the time plaintiff filed this action in May of 2011, he had not completed the exhaustion of administrative remedies as to his certified mail claim. He did not receive the CORC denial of his grievance until July 27, 2011. (Pl.'s Ex. Z(24), Dkt. No. 205–3 at 275). Although defendants raised failure to exhaust as a defense in their answer (Dkt. No. 46, ¶ 12), they have not argued failure to exhaust in their motion for summary judgment. While defendants would not have had the opportunity to argue non-exhaustion for claims that had not been raised prior to the motion for summary judgment (the test score claim discussed above), they would have had the opportunity to argue non-exhaustion as to claims that were in the complaint. Technically defendants have not waived the exhaustion requirement by raising it in their answer. *[Castillo v. Rodas,](#)* No. 09 Civ. 9919, 2014 WL 1257274, at *15 (S.D.N.Y. March 25, 2014). This court finds that it may recommend dismissal on the merits and will do so, rather that finding only that administrative remedies were not exhausted because defendants did not argue this in their motion.

21    A review of plaintiff's exhibits also shows that when he filed this action, he had not exhausted his administrative remedies regarding the allegation that defendant Kupiec "destroyed" his legal mail. The document, purporting to be a "grievance," in addition to various other things, was dated May 23, 2011. (Pl.'s Ex. Z(32), Dkt. No. 205–3 at 291–302, 293). It was addressed not only to the "Complaint Department" at Mid–State, but also to District Court Judge Mordue, Ruth Goldway from the Postal Regulatory Commission, and Anne Gallaudet from the U.S. Postal Service. (*Id.* at 291). The Superintendent's decision was dated June 16, 2011, after plaintiff filed this action. (Pl.'s Ex. Z(33), Dkt. No. 205–3 at 304). However, defendants have not argued non-exhaustion in their motion, and as stated in footnote 20 above, the court will consider the merits of the claim.

22    The memorandum explains that the envelope must have been delivered inadvertently to the package room. (Kupiec Decl. Ex. B). An individual working in the package room (defendant Kupiec speculated that it might have been a "fill in"), opened the envelope, realized it was legal mail, put it in a plain manilla envelope with plaintiff's name and number on it, and then sent it "over to the Mailroom for processing." (*Id.*) She noted that this was the "normal procedure for mail received in packages." (*Id.*) The court also notes that this memorandum is further support for defendant Kupiec's statement that the mail room and the package room are in two different locations.

23    Personal involvement is a prerequisite to the assessment of damages in a section 1983 case. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

24    Contrary to plaintiff's implication, there is no indication that defendant Kupiec would have been aware of the effect of her action. Defendant Kupiec is the senior mail room clerk. There is no indication that defendant Kupiec has any legal training or would have known the possible effect of sending plaintiff's Notice by regular mail.

25    To the extent that defendant Kupiec's actions could be considered negligent, as stated above, negligence is not actionable under section 1983. *See* n. 10, *supra.*

26    Plaintiff's response makes much of the fact that the "package" went to defendant Kupiec's office when she stated that she had nothing to do with packages. Plaintiff believes that this "admission" proves that defendant Kupiec was also tampering with his packages. Clearly, the item was not a "package," and that is why the package office sent it to defendant Kupiec. Unfortunately someone in the package office had already made a mistake in opening the envelope, placing the documents in another envelope with plaintiff's name and prison number on it. The only contact that defendant Kupiec states that she had with this mail was to place the name of the court on the envelope and have it delivered to plaintiff through the proper channels. This statement is not, as plaintiff claims, inconsistent with defendant Kupiec's statement that she does not work in the package room and has nothing to do with the packages that are delivered for inmates.

27    (Dkt. No. 1 at 50) (Superintendent's Decision dated 1/14/11). The September 2010 grievance is mentioned in this decision, but that grievance was against defendant Ellis. (*Id.*)

28    It is also unclear how inmate Rogers knew that plaintiff was contemplating a grievance against Kupiec because plaintiff only stated that he was "putting paperwork together" for a grievance about his mail, not that such a grievance had been filed. The connection between defendant Kupiec and defendant Ready is non-existent.

29    Plaintiff filed a grievance against defendant Kupiec on April 22, 2011. (Compl.Ex. Z(23)). The only actions that could have conceivably been in retaliation for grievances against defendant Kupiec herself would have been the May 17, 2011 incident involving the manilla envelope with court documents inside and the inadvertent tearing of plaintiff's test scores (which is not part of this action and apparently occurred in August of 2011, based on the August 22, 2011 memorandum of apology from defendant Kupiec). None of defendant Kupiec's other actions took place subsequent to the March or April grievance against her. (Pl.'s Ex. Z(19), Dkt. No. 205–3 at 256). Plaintiff filed a grievance about his test scores on September 1, 2011. (Pl.'s Ex. Z(18), Dkt. No. 205–3 at 254) (CORC decision dated January 18, 2012). At his deposition, plaintiff testified that he did not think he had filed any prior grievances against defendant Kupiec, and there are no documents in the record reflecting grievances prior to April 22, 2011. (DT at 111).

30    *Gill, supra.*

31    Contrary to plaintiff's assertion, this action by an employee in the package room does not prove that all packages go through defendant Kupiec. The legal mail was delivered to the package room in error, someone opened it, determined that it was *not* a "package," placed the documents in a plain manilla envelope with plaintiff's name and DIN number on it, and sent it to the mail room where defendant Kupiec works. She determined that the documents were from a court, placed them back in the manilla envelope, together with writing the name of the court from which they came, and sent them through the proper channels for legal mail. (Pl.'s Exs. Z(36); Z(35), Dkt. No. 205–3 at 316, 318) (CORC Determination dated 10/15/11; Memorandum from defendant Kupiec to DSP Phillips). Although plaintiff claimed that his legal mail was "destroyed," that is clearly not true, only the envelope was missing, and defendant Kupiec had nothing to do with that. *See* Pl.'s Ex. Z(32), Dkt. No. 205–3 at 293).

32    Even if the court were considering the test score incident, the court would find no adverse action because in a letter, dated November 14, 2011, Acting Commissioner for Program Services Catherine M. Jacobsen wrote to plaintiff, explaining the facility's response to the test tearing incident. (Pl.'s Ex. Z(31)) (Dkt. No. 205–3 at 289). The facility informed Acting Commissioner Jacobsen that "the mail was taped and placed into an envelope with a note of apology explaining the error." (*Id.*)

33    Plaintiff claims that the withdrawal of his action constitutes the "actual injury" he needs to establish an access to courts claim.

34    It is not clear what "motion" would have been stricken.

35    CO Johnston is a former defendant who was dismissed from this action pursuant to Judge D'Agostino's September 27, 2011 Order. (Dkt. No. 19).

36    The September incident was only tangentially related to the exercise of plaintiff's religious rights. Plaintiff had attended a religious service in the morning of September 9, 2010, and because of the religious holiday, he was excused from all programming on that day. Plaintiff chose to attend the law library in the afternoon because he had been excused from his other program, based upon a memorandum written by DSP Phillips. Plaintiff was prevented from doing so, but the grievance was resolved in his favor. However, plaintiff did not miss a religious service, he was only prevented from spending his free afternoon, pursuing non-religious activities the way he wished.

37    In fact, plaintiff was convinced that no "corrective action" was taken. However, he has included a memorandum from Christopher Tapia (IGP Supervisor) to Julie Dennis, dated December 7, 2010, stating that, after receiving a telephone call from DSP Phillips, Director Tapia spoke with CO Johnson the day that Director Tapia received the plaintiff's complaint. (Pl.'s Ex. Z(42), Dkt. No. 205–3 at 341). Director Tapia explained the proper procedure and "clarified" the memo. "The corrective action was that the memo was clarified. All referenced staff are now aware and no other complaints received." (*Id.*) No "discipline" was involved, and there is no reference to defendant Ready in this memorandum and no reason that he would have been advised of the issue because he was not involved in the incident.

38    In fact, the only adverse action alleged in plaintiff's grievance (aside from the shorter service) was that the inmates were not allowed to wait in the chapel for the rabbi or rabbis to arrive. Clearly, this is not "adverse" within the meaning of a retaliation claim.

39    During his deposition, plaintiff testified that Ellis was "taking it out" on all the other Jewish inmates because of a grievance written by plaintiff against him. (Pl.'s Dep. at 54). Plaintiff's complaint was that "Ellis won't even open the door until the last minute, so we all just hanging out outside the chapel because Ellis won't open the door." (*Id.* at 55). Failure to open a door before services are about to start can hardly be categorized as "adverse action." Once again, the court does not make any findings against defendant Ellis. The court is assuming the facts, hypothetically, for purposes of this particular discussion.

40    Plaintiff's interrogatory asks when defendant Boll became "aware" of plaintiff's September 9, 2010 grievance against defendant Ellis. (Dkt. No. 205–3 ¶ 7). However, none of the claims in this law suit relating to defendant Ellis occurred in September of 2010. Thus, any information in the September 9, 2010 grievance would not have even made defendant Boll aware of the claims in this action.

41    Clearly plaintiff received a copy of the letter as indicated in the response to the interrogatory. The letter is not supportive of plaintiff's claim, and it is disingenuous of plaintiff to omit the letter and cite only parts of defendant Boll's response to the interrogatories. Plaintiff's accusations that defendant is "lying" to the court are completely unfounded, and apparently plaintiff did not read the defendant's affidavit or see the letter that was attached. Plaintiff is constantly accusing others of nefarious conduct, while omitting important facts himself.

42    The court must point out that the incident with defendant Ready did not occur until December 7, 2010, and the incident with defendant Ellis did not occur until March of 2011, so the plaintiff's first letter and defendant Boll's December 2nd response could not have been related to an incident that had not yet occurred and could not have "created" any personal involvement in any event.

---

**End of Document**                                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.      21

2009 WL 890658
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tyrone HOUSTON, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.

No. 9:03-CV-1412 (GTS/DEP).
|
March 31, 2009.

**Attorneys and Law Firms**

Tyrone Houston, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Stephen M. Kerwin, Esq., Assistant Attorney General, of Counsel, for Defendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court in this *pro se* prisoner civil rights action are Defendants' motion for summary judgment (Dkt. No. 80), and United States Magistrate Judge David E. Peebles's Report-Recommendation recommending that Defendants' motion be granted and Plaintiff's Complaint be dismissed in its entirety (Dkt. No. 85). Plaintiff has timely filed Objections to the Report-Recommendation. (Dkt. No. 86.) For the reasons set forth below, the Report-Recommendation is accepted and adopted in its entirety, Defendants' motion is granted and Plaintiff's Complaint is dismissed.

## I. RELEVANT BACKGROUND

On November 21, 2003, Plaintiff filed this action against twenty-two (22) individuals currently and/or formerly employed by the New York State Department of Correctional Services, at various correctional facilities. Generally, in his Complaint, Plaintiff alleges that his rights under the First and Eighth Amendments were violated when (1) certain Defendants had him transferred in retaliation for grievances that he had filed, (2) certain Defendants issued false misbehavior reports against him in retaliation for grievances that he had filed, and (3)

certain Defendants deprived him of the opportunity to engage in outdoor exercise on two separate occasions. (*See generally* Dkt. No. 1.) [1]

On September 29, 2006, District Judge Lawrence E. Kahn issued a Memorandum Decision and Order dismissing (1) Plaintiff's claims for equitable relief due to Plaintiff's release from incarceration, which mooted this claim, and (2) Plaintiff's claims against the CORC and all of the individual defendants in their official capacities on Eleventh Amendment grounds. (Dkt. No. 69.)

On January 4, 2008, Defendants filed a motion for summary judgment seeking dismissal of all of Plaintiff's claims against them. (Dkt. No. 80.) Generally, Defendants' motion is premised on the following three grounds: (1) certain of Plaintiff's claims are procedurally barred based upon his failure to exhaust available administrative remedies with regard to those claims (2) no reasonable factfinder could conclude that the issuance of misbehavior reports or the transfer to different facilities were *caused* by Plaintiff's filing of grievances; and (3) no reasonable factfinder could conclude that Plaintiff was subjected to cruel and unusual punishment based on being denied certain exercise opportunities. (*Id.*) On February 1, 2008, Plaintiff filed a response in opposition to Defendants' motion. (Dkt. No. 82.).

On March 11, 2009, Magistrate Judge Peebles issued a Report-Recommendation recommending that Defendants' motion be granted, because (1) certain of Plaintiff's claims were not properly exhausted, and (2) no reasonable factfinder could rule in Plaintiff's favor on any of his claims. (Dkt. No. 85.) Familiarity with the grounds of the Report-Recommendation is assumed in this Decision and Order. On March 20, 2009, Plaintiff filed his Objections to the Report-Recommendation. (Dkt. No. 86.)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review on Objection from Report-Recommendation

 **\*2** When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)

(C). [2] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y.Sept.22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999). [3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at *1 (S.D.N .Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

**B. Standard Governing Motion for Summary Judgment**
Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323-24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations

omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986).

**\*3** As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se.* [4] (This is because the Court extends special solicitude to the *pro se* litigant, in part by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [5] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [6] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement [7] - even where the nonmoving party was proceeding *pro se* in a civil rights case. [8]

**III. ANALYSIS**
After carefully reviewing all of the papers in this action, including Magistrate Judge Peebles's Report-Recommendation and Plaintiff's Objections thereto, the Court rejects each of Plaintiff's Objections, and agrees with each of the conclusions stated in the Report-Recommendation. (*See* Dkt. Nos 85, 86.) Magistrate Judge Peebles employed the proper legal standards, accurately recited the facts, and reasonably applied the law to those facts. (*See* Dkt. No. 86.)

In particular, Magistrate Judge Peebles correctly determined that Plaintiff failed to exhaust some of his claims, as required by the Prison Litigation Reform Act, in that he failed to file grievances, and/or pursue these claims to completion, before bringing the claims to federal court. [9] Magistrate Judge Peebles also correctly determined that the only evidence that the misbehavior reports filed against Plaintiff were retaliatory is the fact

that they were filed in close proximity to Plaintiff's grievances. However, this inference alone is not enough for Plaintiff to defeat summary judgment, in light of the fact that (1) he was found guilty of at least some of the charges lodged in seven of the nine misbehavior reports with which he takes issue, (2) these reports were issued by nine different corrections officers in four different prisons, and (3) all but one of the officers submitted an affidavit expressly denying retaliatory motivation. [10] In addition, regarding Plaintiff's claim that his numerous transfers to various prison facilities was done in retaliation for filing grievances, as Magistrate Judge Peebles explained, (1) Plaintiff has offered no evidence that he was transferred in retaliation for filing grievances, and (2) Plaintiff has a history of claiming retaliation for numerous adverse actions taken against him. As a result, these retaliation claims are dismissed.

**\*4** Furthermore, as explained in Magistrate Judge Peebles' Report-Recommendation, Plaintiff's Eighth Amendment claims are without merit because (1) the harm that he allegedly suffered as a result of being denied the opportunity to exercise outdoors for less than two weeks is *de minimis,* and (2) being forced to exercise in an area that is eight-feet-five inches by six-feet-nine inches in size, while confined in a SHU facility, is not a constitutional violation. *See, e.g., Cody v. Jones,* 895 F.Supp. 431, 441 (N.D . N.Y.1995) (McCurn, J.) (applying *Sandin* and concluding that no liberty interest was triggered through the failure of the prison to regularly accord plaintiff one hour of daily outdoor exercise for a period of several months); *Anderson v. Coughlin,* 757 F.2d 33, 34-35 (2d Cir.1985) ("[T]hough courts have played a helpful role in assisting prisoners and prison officials to negotiate mutually acceptable terms for the provision of exercise opportunities, as has occurred in this case, they have not found in the Eighth Amendment a broad license to require prison officials to meet all of the recreational standards that have been recommended by penologists.") . [11]

In his Objections to the Report-Recommendation, Plaintiff argues, *inter alia,* that his failures to fully exhaust his available administrative remedies with regard to certain of his claims was due to his being transferred to different facilities shortly after filing grievances, and that his efforts to inform Defendant Goord and Wardens of this issue "are sufficient to invoke the limited exceptions to the grievance requirement." (Dkt. No. 86.) In addition, Plaintiff appears to argue that the Report-Recommendation should not be adopted because of its failure to appreciate that the "personal involvement on [the] part of all Defendants [regarding his retaliation claims]" constitutes sufficient evidence of a conflict, thereby warranting denial of summary judgment. (Dkt. No. 86.) [12]

With regard to Plaintiff's exhaustion claim, as an initial matter, the Court is not persuaded by Plaintiff's argument that his letters to Defendants Goord and Wardens created an exception to the exhaustion requirement. [13] This is because (1) administrative remedies were available to Plaintiff, who is extremely experienced in the inmate litigation process, [14] (2) Defendants have not waived the exhaustion defense, and (3) special circumstances do not exist which would excuse Plaintiff from complying with the procedural requirements. [15] However, even if the Court were persuaded that Plaintiff's letters created an exception to the exhaustion requirement, such a finding would not help Plaintiff withstand summary judgment on the claims at issue. This is because, while Magistrate Judge Peebles found that some of Plaintiff's retaliatory transfer claims were unexhausted, Magistrate Judge Peebles also found that all of Plaintiff's retaliatory transfer claims were unsupported by sufficient record evidence from which a reasonable factfinder could conclude that the transfers were caused by Plaintiff's filing of grievances (as opposed to being caused by legitimate, penological considerations).

**\*5** Finally, with regard to Plaintiff's claim that a "conflict" existed (or exists) in this case, the Court rejects that argument. Plaintiff has not offered any evidence of such a conflict. The fact that District Judge Gary L. Sharpe issued a ruling in *Houston v. Leclaire,* 01-CV-0067, Decision and Order (N.D.N.Y. filed July 22, 2004) (Sharpe, J.) (denying, in part, defendants' motion for summary judgment requesting dismissal of Plaintiff's retaliation claim arising from the filing of false misbehavior reports against him, and the destruction of his legal materials, in 1999) in no way collaterally estops or otherwise precludes the Court from dismissing Plaintiff's claims in this current action due to a lack of supporting record evidence. [16] As a result, and for the reasons stated by Magistrate Judge Peebles in his Report-Recommendation, Plaintiff's retaliation claims with regard to the misbehavior reports are dismissed.

For all of these reasons, the Court grants Defendants' motion for summary judgment.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles's Report-Recommendation (Dkt. No. 85) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 80) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is ***DISMISSED*** in its entirety.

*REPORT AND RECOMMENDATION*

[DAVID E. PEEBLES](), United States Magistrate Judge.

Plaintiff Tyrone Houston, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to [42 U.S.C. § 1983](), *inter alia,* alleging violation of his civil rights. In his complaint, plaintiff maintains that as a result of having been engaged in activity protected under the First Amendment to the United States Constitution, including filing grievances and commencement and pursuit of prior lawsuits, he was subjected by prison officials to a series of inter-prison transfers, the filing of false misbehavior reports, the imposition of unwarranted disciplinary confinement, and unfavorable program assignments. Plaintiff also complains of the deprivation of outdoor exercise, contending that the denial represented cruel and unusual punishment, in violation of his rights under the Eighth Amendment. Plaintiff's complaint seeks both equitable relief and the recovery of compensatory and punitive damages.

Currently pending before the court is a motion filed on behalf of the defendants seeking the entry of summary judgment dismissing each of plaintiff's claims. In support of their motion, defendants assert that certain of plaintiff's causes of action are procedurally barred, based upon his failure to exhaust available administrative remedies before filing suit, and that all of his claims are subject to dismissal on the merits, arguing that no reasonable factfinder could conclude that he was subjected to unlawful retaliation or

cruel and unusual punishment. For the reasons set forth below, I recommend that defendants' motion be granted.

I. *BACKGROUND* [1]

**\*6** At the times relevant to his claims plaintiff Tyrone Houston, apparently also known as Tyrone Black, was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff's claims, which are expansive in terms of both their substantive breadth and the time period involved, arise from incidents occurring while he was confined in various facilities operated by the DOCS including, the Mid-State Correctional Facility, the Mohawk Correctional Facility, the Marcy Correctional Facility, the Great Meadow Correctional Facility, the Downstate Correctional Facility, the Auburn Correctional Facility, the Five Points Correctional Facility, the Cayuga Correctional Facility, the Elmira Correctional Facility, and the Ogdensburg Correctional Facility.

During the period of his incarceration, plaintiff filed a series of grievances and commenced suits against various prison workers. Plaintiff claims that as a direct result of that activity he experienced recrimination, in the form of issuance of several false misbehavior reports, leading to procedurally flawed disciplinary hearings and ensuing unlawful disciplinary confinement in various facility special housing units ("SHUs"). Plaintiff also attributes the various inter-prison transfers which he experienced, including in October of 2000 to the Mohawk Correctional Facility in lieu of a facility closer to his place of residence, to retaliatory animus, in further response to his grievances and lawsuits. Plaintiff additionally asserts that while in disciplinary confinement, he was subject to a DOCS policy under which SHU inmates are ineligible for participation in outdoor exercise. As a result, plaintiff was unable to participate in such outdoor activities for an aggregate period of 222 days, extending intermittently from September of 2001 until mid-2003. [2]

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on November 21, 2003. Dkt. No. 1. As defendants, plaintiff's complaint names twenty-two present or past employees of the DOCS including the agency's commissioner, Glenn S. Goord, as well as the Central Office Review Committee (the

"CORC"), which was sued as an entity, and asserts claims against the defendants in both their individual and official capacities.[3] *Id.* Issue was joined by the filing of answers on behalf of the majority of the defendants on September 30, 2005, and by defendant Dana C. Smith on November 28, 2005, generally denying the material allegations of plaintiff's complaint and interposing various affirmative defenses. Dkt. Nos. 58, 60.

On January 4, 2008, following the completion of pretrial discovery, defendants moved for summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 80. In their motion, defendants argue that portions of plaintiff's claims are procedurally barred, based upon his failure to exhaust available administrative remedies before commencing suit. Addressing the merits, defendants assert that plaintiff's claims lack factual support and that the record fails to contain evidence from which a reasonable factfinder could conclude that the adverse actions attributed by the plaintiff to retaliatory animus were in fact motivated by his protected activity. Defendants also contend that as a matter of law plaintiff's complaints regarding the denial of exercise do not implicate constitutional considerations. Plaintiff has since responded in opposition to defendants' motion in papers filed with the court on February 1, 2008. Dkt. No. 83.

**\*7** Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation to the assigned district judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).[4] *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,*

391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law ...." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process). When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is appropriately granted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Failure to Exhaust Remedies*
**\*8** In their motion defendants assert that, as a threshold matter, certain of plaintiff's claims are procedurally barred based upon his failure to exhaust available administrative remedies with regard to those claims.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and "to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit.[5] *Jones,* 127 S.Ct. at 918. In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).

"Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's

critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F .3d at 43 (quoting *Johnson,* 380 F.3d at 697-98) (emphasis omitted).

**\*9** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[6] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to CORC, which makes the final administrative decision. *Id .* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Without question the plaintiff, who by all accounts has frequently availed himself of New York's IGP while in DOCS custody, has filed grievances raising many of the issues forming the basis for his complaint in this action. The record now before the court, however, contains no indication that this is true with regard to all of Houston's claims. The only grievance which plaintiff claims to have lodged addressing the question of his many, allegedly retaliatory inter-prison transfers, for example, was filed on March 17, 2003. *See* Complaint (Dkt. No. 1) ¶ 46

and pp. 109-111.[7] Accordingly, it does not appear that plaintiff has exhausted available administrative remedies with respect to inter-prison transfers effectuated after the filing of that grievance, including his transfers 1) on June 13, 2003, into the Riverview Correctional Facility; 2) on June 16, 2003, into the Gouverneur Correctional Facility; and 3) on August 15, 2003, into the Elmira Correctional Facility. Similarly, there is no indication in the record now before the court that plaintiff's alleged denial of outdoor exercise covering the period from September 15, 2001 through November 21, 2001, forming the basis for a portion of plaintiff's cruel and unusual punishment claim, *see* Complaint (Dkt. No. 1) ¶ 47, was grieved. While plaintiff did apparently file a grievance on July 29, 2003 regarding his confinement in the Gouverneur SHU beginning on June 17, 2003, *see* Complaint (Dkt. No. 1) at p. 120, there is no evidence of pursuit of that grievance through to completion.

**\*10** In light of these failures and the fact that plaintiff has not offered any evidence which would indicate that the grievance procedure was not available to him or otherwise form a proper basis for excusing the grievance requirement, I recommend that the portions of plaintiff's claims for which there was no grievance filed and pursued to completion be dismissed on this procedural basis.[8]

### C. *Retaliation*

Plaintiff's complaint centers principally upon his claim of retaliation, which is comprised of two discrete components. First, plaintiff maintains that the issuance of various misbehavior reports, alleged by him to have contained false accusations, and resulting findings of guilt following disciplinary hearings, were prompted by his having engaged in protected activity, including the filing of grievances and lawsuits. Additionally, plaintiff asserts that for the same retaliatory reasons he was excessively transferred among various prison facilities, including into some at remote locations from his place of residence. In their motion, defendants contend that the record fails to disclose the basis upon which a reasonable factfinder could conclude that the adverse actions upon which plaintiff's retaliation claims hinge were in fact prompted by retaliatory animus.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F .3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that: 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff successfully shoulders this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*11** Analysis of retaliation claims thus requires thoughtful consideration of the evidence presented concerning the protected activity in which the inmate plaintiff has engaged and the adverse action taken against him or her, as well as evidence tending to link the two. When such claims, which ordinarily are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is warranted. *Flaherty,* 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See Abascal v. Hilton,* No. 04-CV-1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D.J. and Lowe, M.J.).

1. *False Misbehavior Report Claim*

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). Mere conclusory allegations of such retaliatory motivation will not suffice to survive a summary judgment motion; to establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is typically lacking, a plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

Plaintiff's complaint alleges the issuance of nine allegedly false misbehavior reports, each authored by a different corrections officer, between April 8, 2001 and June 9, 2003. Complaint (Dkt. No. 1) ¶¶ 13-29. In each instance plaintiff attributes the issuance to retaliatory motives, citing different protected activity, as follows:

| Date of Issuance | Author | Alleged Protected Activity Precipitating Issuance | Disposition |
| --- | --- | --- | --- |
| 4/8/01 | Van Slyke | Submission of grievance dated 4/12/01 against Van Slyke's girlfriend, identified only as "SHU Counselor". [9] | Dismissed (no hearing held) |

**\*12** *Id.*

The only evidence offered by the plaintiff which could potentially support the finding of a nexus between an instance of protected activity alleged in his complaint and a corresponding misbehavior report is the inference to be drawn from the relevant chronology. It is true such an inference, flowing from a closeness in proximity between protected activity and the issuance of a misbehavior report can in certain instances suffice to avoid summary judgment dismissal of a retaliation claim. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) citing *Flaherty v. Coughlin,* 713. F.2d 10, 14 (2d Cir.1983). As defendants note, however, in many circumstances this alone is insufficient to avoid summary judgment. *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); citing *Ayers v. Stewart,* 1996 WL 346049, at *1 (2d Cir.1999); *see*

*also Ethier v. City of Cohoes,* No. 1:02 Civ. 1584, 2006 WL 1007780, *7 (N.D.N.Y. April 18, 2006).

In this instance there are misbehavior reports issued which, taken in isolation, could give rise to a determination by a reasonable factfinder that the misbehavior report was issued in retaliation for protected activity. Taken together and considered in the light of all relevant facts, however, the record in this instance simply does not support the inference of such a connection. Prior to April of 2001, plaintiff had amassed a disciplinary record which included twelve separate findings of guilt in connection with alleged violations between October, 1993 and July, 27, 1999. *See* Kerwin Decl. (Dkt. No. 80-8) Exh. B. The allegedly retaliatory misbehavior reports now in dispute were issued over a two-year period by nine different corrections workers, while

plaintiff was incarcerated at four different prison facilities. With the exception of defendant Hammill, each of the individuals authoring the subject misbehavior reports has submitted an affidavit expressly denying having done so prompted by retaliatory motivation.[12] In seven of the nine instances, plaintiff was found guilty of at least some of the charges lodged, with an acquittal in one additional instance and one other misbehavior report having been dismissed for failure to conduct a timely disciplinary hearing. Given the totality of these circumstances, no reasonable factfinder could conclude that the issuance of the various misbehavior reports and resulting findings of guilty was prompted by retaliatory animus. I therefore recommend dismissal of this portion of plaintiff's retaliation claim.

### 2. *Prison Transfer Claim*

The second aspect of plaintiff's retaliation claim concerns his frequent transfer among prisons.[13] The record supports plaintiff's claim regarding the frequency of his prison transfers. Plaintiff was transferred among various New York prisons thirteen times between May 7, 2001 and August 15, 2003, as set forth below:

**\*13** Complaint (Dkt. No. 1) ¶¶ 7-10, 32-46; Knapp-David Aff. (Dkt. No. 80-22) Exh. B. Citing some specific instances of protected activity, plaintiff alleges that all of these transfers were prompted by retaliatory motives on the part of prison officials. *See* Complaint (Dkt. No. 1), *id.* Without question, prison officials retain significant flexibility and wide discretion in managing the corrections system and placing inmates appropriately. *See* N.Y. Correction Law §§ 23, 72 and 112(1); *see also Prins v. Coughlin,* 76 F.3d 504, 507 (2d Cir.1996) *citing Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538 (1976) (prisoner generally has no due process right to challenge a transfer from one facility to another). As the Supreme Court has noted, New York's statute governing prison transfers "imposes no conditions on the discretionary power to transfer, and we are advised by the State that no such requirements have been promulgated." *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543 (1976).

While the discretion of prison officials to place and transfer prisoners is broad, it is not unfettered; when such a transfer is made out of purely retaliatory motivation, in response to constitutionally protected activity, a claim

of unlawful retaliation under the First Amendment is established. *Meriwether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir.1989); *Hohman v. Hogan,* 597 F.2d 490, 492-93 (2d Cir.1979).

In this instance plaintiff's allegations of retaliatory transfers appear to center upon defendants Knapp-David, LeClaire and Goord. *See* Complaint (Dkt. No. 1) ¶¶ 32, 35-42, 45 and pp. 18-19, 79-81, 88-89, 91-92, 94-95. Plaintiff apparently theorizes that these high ranking DOCS officials undertook a campaign of retaliatory transfers in order to punish him for his filing of grievances and lawsuits against various corrections workers assigned to the prison to which plaintiff was assigned.

In an affidavit given in support of defendants' motion, defendant Knapp-David, formerly the Director of Classification and Movement for the DOCS, explains the hub system implemented by the agency to designate the 63,500 inmates in the system and the process utilized to effectuate inmate transfers. Knapp-David Decl. (Dkt. No. 80-22) ¶¶ 2-7. That affidavit reflects that "transfers of inmates between hubs or transfer of maximum security inmates were approved and made by classification analysts on [Knapp-David's] staff when [she] was the Director of Classification and Movement .... As a routine matter [she] was not personally involved in inmate transfer decisions."[14] *Id.* ¶ 3. In that declaration defendant Knapp-David denies both having any retaliatory motivation, and participating in the decisions to make the disputed transfers. *Id* . Since personal involvement is a constitutional violation is a pre-requisite to establishing liability, defendant Knapp-David is entitled to dismissal on this basis. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977).

**\*14** Aside from his sheer conjecture, plaintiff has offered no evidence from which a reasonable factfinder could determine that any of the cited prison transfers were ordered out of retaliation for plaintiff's filing of grievances and commencement of lawsuits, rather than resulting from legitimate, penological considerations. Given this and plaintiff's well documented history of claiming retaliation in connection with many adverse actions taken against him overtime by prison officials, I conclude that the entry of summary judgment dismissing this portion of plaintiff's retaliation claim is also warranted.[15]

### D. *Cruel and Unusual Punishment*

The last element of plaintiff's complaint is focused upon the alleged denial of the opportunity to engage in outdoor exercise while confined to S-Blocks and at Ogdensburg. Complaint (Dkt. No. 1) ¶¶ 47-48. Defendants maintain that they are entitled to the entry of summary judgment dismissing this claim as well.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98, 111 S.Ct. 2321, 2323-2324 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

Without question, prison inmates must be afforded a reasonable opportunity for exercise. *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985); *see also Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996) and *Sostre v. McGinnis,* 442 F.2d 178, 193 & n .25 (2d Cir.1971)

(en banc), *rev'd on other grounds, cert. denied Sostre v. Oswald,* 404 U.S. 1049, 92 S.Ct. 11190 (1972). Not every deprivation of this opportunity, however, rises to a level of constitutional significance; instead, to sustain an Eighth Amendment claim a plaintiff must show that he or she was denied of all meaningful exercise for a substantial period of time. *See Davidson v. Coughlin,* 968 F.Supp. 121, 129 (S.D.N.Y.1997). When determining whether this showing has been made, a court may consider such relevant factors as 1) the duration of the deprivation; 2) its extent; 3) the availability of other out-of-cell activities; 4) the opportunity for in-cell exercise; and 5) the justification offered for the deprivation. *See Williams v. Goord,* 111 F.Supp.2d 280, 291 (S.D.N.Y.2000).

**\*15** Plaintiff's exercise claim is comprised of two components. First, he contends that when confined to an "S" block for disciplinary purposes he was not permitted to engage in outdoor exercise, but instead only permitted to exercise utilizing an outdoor recreation pen attached to his cell. *See* Complaint (Dkt. No. 1) ¶¶ 48 and p. 113. Secondly, plaintiff asserts that he was confined to his cell for twenty-four hours each day between March 22, 2003 and April 4, 2003, pending a hearing at the Ogdensburg Correctional Facility, and thus denied any meaningful opportunity to exercise during that period. (Dkt. No. 1) ¶ 49 and p. 116.

#### 1. *"S" Block Confinement*

While confined in facility SHU's, plaintiff was restricted to an exercise area measuring eight feet five inches in width, six feet nine inches in depth, and with the ceiling height of twelve feet seven inches. Complaint (Dkt. No. 1) ¶¶ 47-48; Prack Aff. (Dkt. No. 80-30) ¶ 5. SHU exercise areas have three solid walls, with a fourth side made of woven rod security screen through which inmates can view the open surroundings. Prack Aff. (Dkt. No. 80-30) ¶ 5.

The relevant portions of plaintiff's complaint and exhibits describe standard SHU conditions of confinement, which have been found to pass constitutional muster. *See, e.g., Sostre v. McGinnis,* 442 F.2d at (outdoor exercise for one hour in small enclosed yard open to the sky consistent with Eighth Amendment); *Anderson,* 757 F.2d at 35) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed one hour per day of outdoor exercise-with no access to indoor exercise area); *Young v. Scully,* Nos. 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6769, 1993 WL 88144, at *5 (S.D.N.Y. March 22,

1993) (holding that Eighth Amendment was not violated when inmate was deprived of exercise for periods lasting several days); and *Jordan v. Arnold,* 408 F. Supp 869, 876-877 (M.D.Pa.1976) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed two hours of exercise per week). In this instance the court declines plaintiff's invitation to enter the arena of prison management, and instead recommends a finding that this portion of plaintiff's complaint fails to allege a cognizable constitutional deprivation.

### 2. *Denial of Exercise While at Ogdensburg*

The second element of plaintiff's cruel and unusual punishment claim relates to the denial of exercise for a period of thirteen days while awaiting a disciplinary hearing. *See* Complaint (Dkt. No. 1) ¶ 49 and p. 116. In order to sustain a constitutional claim this cause of action must assert an "unquestioned and serious deprivation of basic human needs" or "depri[vation] of the minimal civilized measure of life's necessities. *Anderson,* 757 F.2d at 35. The denial of exercise for a period of thirteen days is, relatively speaking, *de minimis* and does not rise to a level sufficient to support a constitutional deprivation. *See Young v. Scully,* 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6768 and 91 Civ. 6769, 1993 WL 88144, at *5 (deprivation of exercise over several days found to be *de minimis* ); *Davidson v. Coughlin,* 968 F.Supp. 121, 128-131 (S.D.N.Y.1997) (holding that "temporary and sporadic deprivations of outdoor activity [for no longer than fourteen days in a row] do not fall below the minimum standards of the Eighth Amendment"); *see also Trammell v. Keane,* 338 F.3d 155 (2d Cir.2003); *Branham v. Meachum,* 77 F.3d 626, 630-31(2d Cir.1996) (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately twenty-two days does not violate the Eighth Amendment).

**\*16** There appears to be another basis on which dismissal of this portion of plaintiff's complaint would be warranted. The deprivation of exercise while in Ogdensburg does not appear to be attributed to subjective indifference on the part of any of the named defendants to plaintiff's well being, but instead was the result of a facility procedure at Ogdensburg which was later amended following plaintiff's successful grievance regarding the matter. *See* Kurz Decl. (Dkt. No. 80-26) ¶ 9. Under these circumstances plaintiff has failed to establish the subject deliberate indifference on the part of any of the defendants

toward his safety and well being. *Hathaway v. Coughlin,* 99 F.3d 550, 554 (2d Cir.1996) (charged official must act with sufficiently culpable state of mind that is equivalent to criminal recklessness); *see also Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

### IV. *SUMMARY AND RECOMMENDATION*

The plaintiff, a frequent litigator and an inmate who over the period of his confinement with the DOCS accumulated an extremely poor disciplinary record, now complains alleging that nine misbehavior reports authored by nine separate corrections officers at four corrections facilities over a two year period, seven of which resulted of findings of guilt following disciplinary hearings, were issued out retaliatory motivation. Having carefully considered the record now before the court, I conclude that no reasonable factfinder could agree that those misbehavior reports were issued for retaliatory purposes. Plaintiff further claims that various inter-prison transfers which he experienced over time were retaliatory, in response to his having filed grievances and lawsuits. Once again, the record fails to contain evidence from which a reasonable factfinder could draw this conclusion. Finally plaintiff contends that he was subjected to cruel and unusual punishment by the denial of adequate opportunities for exercise. Having carefully reviewed the record, I conclude that no reasonable factfinder could determine that he was in fact subjected to cruel and unusual punishment.

For these reasons, and additionally because certain of his claims are procedurally barred based upon his failure to exhaust available administrative remedies, I recommend dismissal of plaintiff's complaint in its entirety. It is therefore respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 80) be GRANTED, and that all plaintiff's claims in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 890658

Footnotes

1   On September 30, 2005, all of the Defendants except one filed their Answer to Plaintiff's Complaint. (Dkt. No. 58.) On November 28, 2005, Defendant Smith filed her answer to the Complaint. (Dkt. No. 59.)

2   On de novo review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

3   *See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

4   *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) (granting motion for summary judgment; *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

5   *Krug v. County of Rennselaer,* 04-CV-0640, 2006 WL 2669122, at *3 (N.D.N.Y. Sept. 18, 2006) (McAvoy, J.) ("When dealing with a *pro se* party, certain procedural rules apply so as to insure that the *pro se* litigant in not disadvantaged by the lack of legal training. In this regard, the Local Rules require that [a *pro se* party be informed of the consequences of failing to respond to a motion for summary judgment, before those consequences may be imposed]."); *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("This Court has also held that summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default.") [citations omitted]; *see also* Jessica Case, *"Pro Se Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?"* 90 Ky. L.J. 701, 704, n. 24 (Spring 2001) ("The Second, Fourth, Seventh, Tenth, Eleventh, and D.C. Circuit Courts of Appeals mandate that notice of summary judgment requirements be given to *pro se* litigants.... The Ninth Circuit requires notice of summary judgment requirements for *pro se* prisoner litigants only.") [citations omitted].

6   *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *McKaskle v. Wiggins,* 465 U.S. 168, 184 (1984) ("Nor does the Constitution require judges to take over chores for a *pro se* [litigant] that would normally be attended to by trained counsel as a matter of course."); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826 (1980) ("[I]in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant]."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*"[P]ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them .... This is especially true in civil litigation.") [internal quotation marks and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[T]he right [to benefit from reasonable allowances as a *pro se* litigant]

does not exempt [the *pro se*] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

7   Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

8   *See, e.g., Hassig v. N.Y.S. Dep't of Environmental Conservation,* 01-CV-0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd,* No. 04-1773, 2005 WL 290210 (2d Cir. Feb. 2, 2005); *Lee,* 2004 U.S. Dist. LEXIS 20746, at *12-13, 15, *aff'd,* No. 04-1921, 2004 U.S.App. LEXIS 21432; *Harvey v. Morabito,* 99-CV-1913, 2003 WL 21402561, at *1, 3-4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99-CV-1913, Order, at 2-3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd,* No. 04-1008, 115 F. App'x 521 (2d Cir. Dec. 23, 2004); *Krug,* 2006 WL 2669122, at *2-3; *Fox,* 2006 U.S. Dist. LEXIS 9147, at *2-3; *Singleton v. Caron,* 03-CV-0455, 2005 WL 2179402, at *3-4 (N.D.N.Y. Sept. 5, 2005) (Peebles, M.J.), *adopted by* 03-CV-0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan,* 289 F.Supp.2d at 295; *Butler v. Weissman,* 00-CV-1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00-CV-1240, Decision and Order, at 1-2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.); *Costello v. Norton,* 96-CV-1634, 1998 WL 743710, at *1, n. 2 (N.D.N.Y. Oct. 21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96-CV-1812, 1998 WL 566773, at *1, n. 2 (N.D.N.Y. Aug. 21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a][3] "to carry out the conduct of its business").

9   The Court notes that a detailed recitation of the claims and Plaintiff's procedural errors are provided in Magistrate Judge Peebles's Report-Recommendation. (Dkt. No. 85, at 8-14.) Accordingly, the Court will not repeat this thorough analysis.

10  *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) ("Although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment.") (citing *Ayers v. Stewart,* No. 96-2013, 1996 WL 346049, at *1 [2d Cir.1999] ).

11  *See also Sostre v. McGinnis,* 442 F.2d 178, 187-92 (2d Cir.1971), *rev'd on other grounds, Sostre v. Oswald,* 404 U.S. 1049 (1972).

12  In addition, in his Objections to the Report-Recommendation, Plaintiff appears to argue, for the first time, that the Court lacks jurisdiction over his claims. The Court rejects this argument for a number of reasons, including the fact that (1) such a jurisdictional challenge is not timely, and (2) such a jurisdictional challenge flies in the face of Plaintiff's Complaint, which alleged that the Court had "jurisdiction over each of Plaintiff's claims."

13  "Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases." *Chaney v. Koupash,* 04-CV-0136, 2008 WL 5423419, at *7 (N.D.N.Y. Dec. 30, 2008) (citing *Porter v. Nussle,* 534 U.S. 516, 524 (2002) [other citation omitted].). "While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that 'certain caveats apply.' " *Chaney,* 2008 WL 5423419, at *7 (citations omitted). "Exhaustion is generally achieved through the [Inmate Grievance Program]." *Id.* (citation omitted). "However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims." *Id.* "A court must consider whether (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Id.* (citations omitted).

14  "Administrative remedies are unavailable when there is no possibility of relief for the action complained of." *Chaney,* 2008 WL 5423419, at *7 (citations and internal quotations omitted). "The test to determine the availability of an administrative remedy is an objective one asking whether 'a similarly situated individual of ordinary firmness' would have deemed it accessible." *Id.* (citation omitted). "Courts have found unavailability where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Id.* (citations and internal quotations omitted).

15  *See, e.g., Carini v. Austin,* 06-CV-5652, 2008 WL 151555, at *4 (S.D.N.Y. Jan. 14, 2008) (noting that an inmate must point to "an affirmative act by prison officials that would have prevented him from pursuing administrative remedies, ... [because] his transfer to another facility is not a 'special circumstance' that excuses his failure to exhaust").

16  To the extent that Plaintiff argues that there existed a conflict of interest resulting from his disciplinary hearing officers knowing each other, or knowing the correctional officers having charged Plaintiff with disciplinary charges, it is true that "[p]risoners have a constitutional right to have a fair and impartial hearing officer preside over their disciplinary hearings."

*Chaney,* 2008 WL 5423419 at *7 (citing *Sira v. Morton,* 380 F.3d 57, 69 [2d Cir.2004] ). "However, the degree of impartiality required of prison officials does not rise to the level of that required of judges as it is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citations and internal quotations omitted). "While the Supreme Court held 'that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] ...,' the Second Circuit has held that the test is whether there was 'reliable evidence' of the inmate's guilt." *Id.* (citations omitted).

1    In light of the procedural posture of the case the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted).

2    Each of these claims and their factual underpinnings will be discussed in more detail further on in this report.

3    Plaintiff's claim against the CORC, as well as those asserted against the remaining defendants in their official capacities, were dismissed by order issued by Senior District Judge Lawrence E. Kahn, on September 29, 2006 (Dkt. No. 69), acting on a report and recommendation issued by me on August 28, 2006. Dkt. No. 67.

4    This matter was transferred from Judge Kahn to District Judge Glenn T. Suddaby on October 2, 2008. *See* Dkt. No. 84.

5    In their answers, defendants have included an affirmative defense alleging plaintiff's failure to satisfy his exhaustion obligation. *See* Dkt. Nos. 58, ¶ 16 and 60, ¶ 16.

6    The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

7    In support of their motion, defendants have offered a version of plaintiff's complaint, which is exceedingly comprehensive, together with the extensive exhibits attached, all paginated for ease of reference. *See* Kerwin Decl. (Dkt. No. 80-8) Exh. A. In this report and recommendation I will adopt defendants' pagination when citing to those materials.

8    In his memorandum in opposition to defendants' motion, plaintiff alleges, for the first time, that certain prison officials, identified as defendants DeBejian and G. Molnar, interfered with his grievances out of retaliatory animus. *See* Plaintiff's Memorandum (Dkt. No. 82) at pp. 11-12. This conclusory statement draws no evidentiary support from the record, and is not viewed by the court as sufficient to invoke the limited exceptions by the Second Circuit in its group of decisions issued in 2004. *See, Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004); *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004); and *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004). I note, moreover, that whether the *Hemphill* test survives intact following the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378 (2006), has been a matter of some speculation. In one relatively recent decision a judge of another district within this Circuit concluded that at least the first two prongs of the *Hemphill* three part inquiry, requiring the court to assess whether administrative remedies were in fact "available" to prisoners and whether defendants should be estopped from raising the affirmative defense of non-exhaustion, retain continued vitality. *Amador v. Superintendent of Dep't of Correctional Services,* No. 03 Civ. 0650(KTD)(GWG), 2007 WL 4326747, at *6-7 (S.D.N.Y. Dec. 4, 2007). I note that another judge of this court has similarly concluded that

> it appears that these decisions have **not** been overruled ... In [his] concurring opinion, Justice Breyer specifically noted that two circuits, the **Second** Circuit and Third Circuit, have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts(,) ...,"

> further buttressing the conclusion that the Second Circuit's *Hemphill* test retains vitality. *Miller v. Covey,* No. 9:05-CV 649, 2007 WL 952054, at *3 (N.D.N.Y. Mar. 29, 2007) (*Emphasis in original* ).

9    While the grievance for which plaintiff claims he was retaliated against in this count was filed on April 12, 2001, according to the exhibit attached to plaintiff's complaint, Houston contends that it was filed earlier and that there was a delay on the part of the IGRC in passing the complaint through for filing. *See* Houston Aff. (Dkt. No. 82) ¶ 4. While plaintiff's actual grievance complaints are annexed as exhibits in connection with other claims of retaliation, plaintiff did not include a copy of his handwritten grievance in this instance. It should be noted, however, that the handwritten complaints filed in other instances and the resulting formal IGRC sheet all bear the same filing dates. *See, e.g.,* Complaint (Dkt. No. 1) at pp. 19-21, 24-25, 59-61 and 116-18.

| 8/15/01 | Elliott | Grievances filed on 8/9/01 and and 8/12/01 [10] | Guilty (all counts) |
|---|---|---|---|

10    While plaintiff alleges having filed grievances on August 9, 2001 and August 12, 2001 against defendants Elliott and DeBejain, the record contains only the August 12, 2001 grievance. *See* Complaint (Dkt. No. 1) at ¶ 15 and pp. 20-21. Additionally, although plaintiff claims that the resulting false misbehavior report was issued on August 15, 2001 by both defendants Elliot and DeBejain, the report contains only Elliot's signature. *Id.* at p. 21.

| | | | |
|---|---|---|---|
| 8/20/01 | Kelley | Filing of grievances (dates and content unspecified) | Guilty (two counts)/Not Guilty (one count) |
| 8/23/01 | Wurst | Filing of grievances and lawsuits against defendant Wurst's "buddies at Mohawk" (dates and specifics not specified) | Guilty of all charges |
| 11/26/02 | Morse | Plaintiff "verbally complaining to [Morse's] supervisor about his racist behavior" (neither dates nor specifics provided) | Acquitted on all counts |
| 3/3/03 | Touron | "[Plaintiff's] exercise of freedom of information" (neither dates nor specifics provided) | Guilty on all counts |
| 3/22/03 | Shaver | Grievance filed on 3/12/03 | Guilty (two counts), Not Guilty (one count). |
| 5/29/03 [11] | Hammill | Written complaint dated 5/29/03 to defendant Smith re: defendant Hammill [submitted by plaintiff] | Guilty (all counts) |

11      Plaintiff contends that this misbehavior report was issued on May 30, 2003, but backdated by one day. *See* Complaint (Dkt. No. 1) ¶ 26.

| | | | |
|---|---|---|---|
| 6/9/03 | Pirie | Pursuit of grievance appeal resulting in CORC decision dated 6/4/03 | Guilty (all counts); hearing result subsequently reversed on appeal to defendant Donald Selsky, Director of SHU/ Inmate Disciplinary Program |

12      No explanation is offered for the failure to include an affidavit for that defendant.

13      It should be noted that this is not the first time the plaintiff has had occasion to raise the claim of retaliation associated with this inter-prison transfers. In another action also filed in 2003, in the Western District of New York, plaintiff's complaint included claims of retaliation based upon prison transfers; plaintiff's claims in that case were dismissed, on motion for summary judgment, by order issued by District Judge David G. Larimer. *Houston v. ZenZen,* No. 03-CV-6118 L, (N.D.N.Y. September 26, 2005). *See* Kerwin Decl. (Dkt. No. 80-8) Exh. M (Decision and Order). Significantly, among the defendants named in that action was defendant Knapp-David. *Id.* It therefore could well be that plaintiff's claims in this action alleging retaliatory inter-prison transfer are barred by claim preclusion, or at the very least issue preclusion, based upon Judge Larimer's determination and the resulting judgment. *See Hill v. Coca Cola Bottling Co.,* 786 F.2d 550, 552-53 (2d Cir.1986) and *Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 455, 482 N.E.2d 63, 67 (1985).

| *Date of Transfer* | *Transferee Facility* |
|---|---|
| 5/7/01 | Mohawk Correctional Facility |
| 9/15/01 | Marcy Correctional Facility SHU |
| 11/21/01 | Downstate Correctional Facility SHU |
| 11/23/01 | Great Meadow Correctional Facility SHU |
| 11/27/01 | Downstate Correctional Facility SHU |
| 12/2/01 | Auburn Correctional Facility SHU |
| 12/5/01 | Five Points Correctional Facility |
| 7/11/02 | Cayuga Correctional Facility |
| 8/16/02 | Auburn Correctional Facility |
| 2/3/03 | Ogdensburg Correctional Facility |
| 6/13/03 | Riverview Correctional Facility |
| 6/17/03 | Gouverneur Correctional Facility |
| 8/15/03 | Elmira Correctional Facility |

14      In her declaration, Knapp-David also explained that inmate transfers can be prompted by a number of factors, including required court appearances or the need for specialized medical treatment, additionally pointing out that on occasion when an inmate is moved between hubs, a transfer may include short term stays at various facilities along the way. Knapp-David Decl. (Dkt. No. 80-22) ¶ 9. Knapp-David further explained that this is the likely reason for certain transfers in rapid succession not necessarily reflected on plaintiff's inmate transfer history including, for example, the September 2001 transfer from Marcy to Great Meadow, with an intermediate stop at Downstate, and a return trip through Downstate with

a final destination of Five Points, with only the Marcy to Five Points transfer having been noted on the plaintiff's transfer history. *See* Knapp-David Decl. (Dkt. No. 80-22) ¶ 9 and Exh. B.

15    In a declaration given in support of defendants' motion, Attorney Stephen M. Kerwin, Esq. recounts his search for actions commenced by the plaintiff, revealing eleven civil cases commenced by Houston against DOCS employees, several of which include allegations of retaliation. *See* Kerwin Decl. (Dkt. No. 80-8) ¶¶ 5, 9-11.

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2899751
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Joy MACCHARULO et al., Plaintiffs,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES et al., Defendants.

No. 08 Civ. 301(LTS).
|
July 21, 2010.

West KeySummary

**1**     **Civil Rights**
👉   Medical Care and Treatment

Contention that prison denied mentally ill
prisoner access to level one services while in
a level two facility failed under the ADA
as it was a challenge to the adequacy of
the mental health services received. Prisoner
failed to allege disparate treatment as a result
of mental illness. Further, prisoner was at all
relevant times provided with mental health
services in an effort to accommodate his
particular mental health disability. Americans
with Disabilities Act of 1990, § 2, 42 U.S.C.A.
§ 12101.

Cases that cite this headnote

*MEMORANDUM OPINION AND ORDER*

LAURA TAYLOR SWAIN, District Judge.

**\*1** This action arises out of the alleged denial of access to
a particular mental health services program to Plaintiffs'
decedent Frank Kucharczyk ("Decedent"), a mentally
ill person who was at all relevant times incarcerated
in the New York State prison system. Plaintiffs Joy
Maccharulo and Dolores Kucharczyk ("Plaintiffs"), Co–
Administrators of Decedent's estate, assert claims under

Title II of the Americans with Disabilities Act, 42
U.S.C. § 12101, *et seq.* ("ADA"), and Section 504 of the
Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation
Act"). In their Second Amended Complaint ("SAC"),
Plaintiffs name as defendants the New York State
Department of Correctional Services ("DOCS"), the New
York State Office of Mental Health ("OMH"), and
the Central New York Psychiatric Center ("CNYPC")
(collectively, "Defendants"). The Court has subject matter
jurisdiction of the action pursuant to 28 U.S.C. § 1331.
Defendants have moved to dismiss the SAC pursuant to
Federal Rule of Civil Procedure 12(b)(6). The Court has
considered thoroughly the parties' submissions. For the
following reasons, Defendants' motion is granted in its
entirety.

*BACKGROUND*

Plaintiffs' Second Amended Complaint asserts claims
under ADA Title II and Section 504 of the Rehabilitation
Act against DOCS, OMH, and CNYPC. (SAC ¶¶ 8–
11.) The following facts are alleged in the SAC and
are taken as true for purposes of this motion practice.
*See Roth v. Jennings,* 489 F.3d 499, 501 (2d Cir.2007).
Decedent, at the time of his death in 2004, was a 44–
year–old man who suffered from paranoid schizophrenia.
Symptoms of paranoid schizophrenia include a limited
ability to communicate, control impulses, and interact
appropriately with others. (SAC ¶¶ 14–15.)

On October 31, 2002, Decedent was sentenced to a term
of seven years of incarceration after pleading guilty to
attempted robbery and assault. (SAC ¶ 16.) Prior to
being assigned to a prison facility, Decedent underwent
a mental health screening conducted by CNYPC for an
OMH classification and service level designation, which
would be relied upon to place him appropriately in the
correctional system. The OMH classification system ranks
each subject on a scale from level one to level five,
with level one subjects requiring and receiving the most
intensive mental health treatment. (SAC ¶¶ 17, 19.)

CNYPC concluded that Decedent required psychiatric
treatment for a major mental health disorder and
classified him as OMH level two. (SAC ¶¶
17, 19.) Accordingly, he was assigned to Fishkill
Correctional Facility ("Fishkill"), a level two facility,
on or about January 26, 2003. (SAC ¶ 20, 25.)

While he was incarcerated at Fishkill, Decedent's mental health deteriorated significantly. Specifically, Decedent experienced an increased number of auditory hallucinations and severe paranoia. (SAC ¶ 25.) Additionally, Decedent demonstrated poor judgment and impulse control as a result of his disability and was disciplined for that behavior. For example, on one occasion, Decedent failed to follow an order to return to his desk while participating in Fishkill's pre-GED program. On another occasion, Decedent cursed at a correctional officer. (SAC ¶ 27.) Pursuant to the facility's regular disciplinary measures, Decedent was removed from his pre-GED program and was sent to the Special Housing Unit ("SHU"). (SAC ¶ 27.) Placement in the SHU exacerbated Decedent's mental health problems. (SAC ¶ 23.) In June 2003, the Fishkill staff reclassified Decedent as level one and, accordingly, he was transferred later that month to Auburn Correctional Facility ("Auburn"), a level one facility. While receiving level one treatment at Auburn, Decedent's mental health improved significantly. He was able to attain his GED and to work. (SAC ¶¶ 25, 41–42.)

**\*2** In July 2004, prison employees initiated a request to transfer Decedent back to a level two facility. Decedent wrote a letter requesting that he not be transferred. (SAC ¶¶ 43–44.) However, after spending approximately thirteen months at Auburn, on August 4, 2004, Decedent was transferred back to Fishkill. (SAC ¶ 49.) At Fishkill, Decedent's mental health deteriorated again. He experienced increased paranoia, auditory hallucinations, insomnia, and restlessness. Decedent again began demonstrating poor judgment and impulse control, which led to disciplinary problems. He was punished for his behavior by being placed in the SHU. (SAC ¶¶ 51–52 .) On September 23, 2004, an employee of OMH noted that Decedent's classification would be changed to level one and that he should not be transferred back to a level two facility when his condition improved. (SAC ¶ 35.) Three weeks later, Decedent was transferred to a level one facility. On the day of his transfer, Decedent died of a prescription drug overdose. (SAC ¶¶ 35–36.)

## DISCUSSION

In deciding a Rule 12(b)(6) motion to dismiss, the Court accepts as true the non-conclusory factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Roth v. Jennings,* 489 F.3d 499, 501 (2d Cir.2007); *see also Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ——U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

The ADA is intended "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C.A. § 12101(b)(1) (West 2005); *see Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003). The statute provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132 (West 2005). Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency." 29 U.S.C.A. § 794(a) (West 2008). The purpose of both statutes is to "eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied." *Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998). Neither the ADA nor the Rehabilitation Act, however, applies to claims regarding the quality of mental health services, *Atkins v. County of Orange,* 251 F.Supp.2d 1225, 1232 (S.D.N.Y.2003), nor do the statutes "create a remedy for medical malpractice," *Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir.1996) (applying the ADA).

**\*3** Courts generally apply the same legal standards when adjudicating claims arising under ADA Title II and ones arising under the Rehabilitation Act. *Harris v. Mills,* 572 F.3d 66, 73 (2d Cir.2009). Although there are some differences between the statutes, "unless one of those subtle distinctions is pertinent to a particular

case, [the Court] treat[s] claims under the two statutes identically." *Henrietta D.,* 331 F.3d at 272. To state a claim under ADA Title II, plaintiffs must allege that: "(1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities." *Id.* (quoting 42 U.S.C.A § 12132); *see also Harris,* 572 F.3d at 73–74. In addition, to state a claim under the Rehabilitation Act, plaintiffs must demonstrate that the entity defendant receives federal funding. *Id.* Here, there is no dispute that Plaintiffs have adequately alleged that Decedent falls under the protection of ADA Title II and the Rehabilitation Act (SAC ¶¶ 14) and that Defendants are subject to the provisions of the ADA and the Rehabilitation Act (SAC ¶¶ 38–39).

Under the ADA, public entities are obligated to make reasonable accommodations for disabled individuals to ensure that they have meaningful access to public benefits. *See Henrietta D.,* 331 F.3d at 273. Similarly, the Rehabilitation Act requires that qualified disabled individuals "receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations." *Powell v. National Bd. of Medical Examiners,* 364 F.3d 79, 85 (2d Cir.2004). The purpose of these requirements is to ensure that services provided to non-disabled individuals are not denied to disabled individuals because of their disability. *Pfrommer,* 148 F.3d at 83. Therefore, when there is no allegation of "disparate treatment," *Atkins,* 251 F.Supp.2d at 1232, between disabled and non-disabled individuals, the plaintiff has not stated a claim under the ADA or the Rehabilitation Act. *Id.; see Pfrommer,* 148 F.3d at 83. Moreover, neither the ADA nor the Rehabilitation Act requires that all disabled individuals who are receiving public services be provided with identical benefits. *Flight v. Gloeckler,* 68 F.3d 61, 63 (2d Cir.1995). Thus, a claim that challenges the adequacy, *Pfrommer,* 148 F.3d at 82, or the substance, *id. at 84,* of services that are being provided to a disabled individual is not a valid claim under either the ADA or the Rehabilitation Act. *See Atkins,* 251 F.Supp.2d at 1232.

Plaintiffs' Amended Complaint is one that challenges the adequacy of services rather than the denial to disabled persons of access to programs or services provided to non-

disabled individuals. Specifically, Plaintiffs argue that Decedent was denied the opportunity to receive level one services on account of his schizophrenia. Plaintiffs allege that the specific nature of schizophrenia is such that, when treated properly (as it was when Decedent was incarcerated at Auburn and receiving level one services), its symptoms recede. Because Decedent did not manifest the symptoms of his disability while at Auburn, Defendants transferred him back to a level two facility and removed his access to level one services—despite the fact that Plaintiff continued to require those services. Plaintiffs argue that Defendants denied Decedent access to level one services because of the particular nature of his disability, that is, because he suffered from a disability whose symptoms would lie dormant while he was in receipt of proper care (SAC ¶¶ 3–4), and that Defendants' decision to transfer Decedent out of the level one program despite his latent schizophrenia violated the ADA and the Rehabilitation Act.

**\*4** Plaintiffs also allege that, while Decedent was at Fishkill, Defendants disciplined Decedent by placing him in the SHU. Plaintiffs allege that Defendants should have recognized that Decedent's misbehavior owed to the inadequacy of the level two services and they should have responded by providing him with level one services rather than by imposing disciplinary measures. (SAC ¶ 4.) Plaintiffs do not allege, however, that Decedent was denied the level two services that he otherwise received at Fishkill while he was in the SHU.

Defendants contend that Plaintiffs have not stated a claim that Decedent was excluded from participating in a prison program, benefit, service, or activity by reason of his disability. Rather, Plaintiffs' allegations regarding Decedent's placement in a level two facility and his disciplinary relegation to the SHU challenge the adequacy of the mental health treatment that Decedent received but do not allege the type of denial of services that is required to state a claim under the ADA or the Rehabilitation Act.

ADA Title II and the Rehabilitation Act require that public entities and entities that receive federal funding make "reasonable accommodations" for disabled individuals to enable them to participate in programs, and secure services, offered to the non-disabled population. *Powell,* 364 F.3d at 84–85. Read in the light most favorable to Plaintiffs, the Second Amended Complaint pleads that Decedent was at all relevant times provided

with mental health services in an effort to accommodate his particular mental health disability and that he was specifically provided with level one services at various times throughout his incarceration. Plaintiffs' complaint regarding the failure to provide consistent access to the level one treatment program is, on its face, one having to do with a program provided to persons with disabilities, rather than one provided to non-disabled persons. Plaintiffs' complaint thus is a challenge to the adequacy and the nature of the mental health services Decedent was receiving rather than a claim that Decedent was wrongfully denied a public service. A challenge to the adequacy of services provided, as opposed to a challenge alleging denial of services provided to non-disabled persons, is not a valid claim under the ADA or the Rehabilitation Act. *See Pfrommer,* 148 F.3d at 82; *Atkins,* 251 F.Supp.2d at 1231.

Plaintiffs' argument that Defendants violated ADA Title II and the Rehabilitation Act by placing Decedent in the SHU rather than providing him with level one services when he manifested poor impulse control as a result of his disability also fails to state an actionable claim under the ADA or the Rehabilitation Act. Plaintiffs do not plead facts demonstrating that Decedent was treated differently from non-disabled individuals exhibiting the same behavior. Rather, their assertion is that Decedent could, with different and more intensive treatment for his particular disability, have been enabled to avoid the offending behavior. Like that of the plaintiffs in *Atkins v. County of Orange* (discussed below), their complaint falls outside the purview of the ADA and the Rehabilitation Act. 251 F.Supp.2d at 1232.

**\*5** In *Atkins v. County of Orange,* mentally ill inmates asserted claims under ADA Title II and the Rehabilitation Act, alleging that the defendants discriminated against them by placing them in keeplock isolation as punishment for demonstrating symptoms of their mental illness. *Atkins,* 251 F.Supp.2d at 1231. The *Atkins* Court held that the plaintiffs had not stated an actionable claim under either the ADA or the Rehabilitation Act because they were not alleging "that the mentally disabled are the only prisoners subjected to this procedure while the non-mentally disabled prisoners are excluded therefrom." *Id.* at 1232. Rather, prison procedures mandated that any inmate who "presents risk of danger to self or others"

would be placed in keeplock isolation. *Id.* Therefore the placement of individuals in keeplock isolation applied equally to all inmates who demonstrated dangerous behavior and did not reflect discrimination against any particular group on account of their disability. *Id.* Similarly, Plaintiffs here do not allege that only mentally disabled prisoners are punished by being placed in the SHU, or that prisoners who are not disabled are provided with more appropriate alternatives to the SHU. As in *Atkins,* there are no allegations in Plaintiffs' pleading to support any inference other than that Prisoners who misbehave similarly are disciplined similarly. Because the purpose of the ADA and the Rehabilitation Act is to "eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied," *Pfrommer,* 148 F.3d at 82, a claim that does not allege such discriminatory treatment is not a viable claim under either statute. *See Atkins,* 251 F.Supp.2d 1232.

In sum, Plaintiffs' contentions that Decedent was inappropriately denied level one services while in a level two facility and while placed in the SHU are challenges to the adequacy of the mental health services that Decedent received. The unfortunate circumstances alleged here notwithstanding, neither the ADA nor the Rehabilitation Act provides a cause of action for challenges to the quality of mental health services provided or for allegations of negligent medical malpractice. *Bryant,* 84 F.3d at 249; *Atkins,* 251 F.Supp.2d at 1232. Therefore, Plaintiff have not stated a claim upon which relief can be granted under ADA Title II or the Rehabilitation Act.

*CONCLUSION*

For the foregoing reasons, Plaintiffs' ADA Title II and Rehabilitation Act claims against DOCS, OMH, and CNYPC are dismissed. This Order Resolves docket entry no. 29. The Clerk of Court is respectfully requested to enter judgment accordingly and close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2899751

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   4

2012 WL 3230435
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Cornelius MARTIN, II, Plaintiff,

v.

The NIAGARA COUNTY JAIL, et al,, Defendants.

No. 05–CV–868(JTC).
|
Aug. 6, 2012.

**Attorneys and Law Firms**

Cornelius Martin, II, pro se.

Webster Szanyi, LLP (Charles E. Graney, Esq. and Mark C. Davis, Esq., of Counsel), Buffalo, NY, for Defendants Niagara County Jail, Beilein, Mahar, Drehs, and Woock.

Roach, Brown, McCarthy & Gruber, P.C. (Joel J. Java, Jr., Esq., of Counsel), Buffalo, NY, for Defendants Hohensee, Aikin, and Inter–Community Memorial Hospital.

JOHN T. CURTIN, District Judge.

## INTRODUCTION

**\*1** Plaintiff brought this action pursuant to 42 U.S.C. § 1983 seeking compensatory and punitive damages for the alleged deliberate indifference to his serious medical needs and the deprivation of medical care. Currently pending before the court are the defendants' motions for summary judgment (Items 59, 60) and plaintiff's cross-motion for summary judgment on liability (Item 62).

## BACKGROUND

Plaintiff commenced this action on December 12, 2005 with the filing of a *pro se* complaint pursuant to Title 42 U.S.C. § 1983 (Item 1). He filed an amended complaint on March 30, 2006 (Item 6). Plaintiff seeks injunctive relief and compensatory and punitive damages for the alleged deliberate indifference to his medical needs in violation

of his rights under the Eighth Amendment to the United States Constitution.

Answers to the amended complaint were filed on November 13, 2006, by defendants Mahar, Drehs, Woock, Niagara County Jail, and Beilein ("the County defendants") (Item 18), and on November 15, 2006 by defendants Hohensee, Aikin, and Inter–Community Memorial Hospital ("the medical defendants") (Item 22). Plaintiff's deposition was taken on September 4, 2008. Following the deposition, the parties stipulated to the following: 1) plaintiff agreed to withdraw his claims against the defendants based on excessive dust, regarding his treatment for sinus problems, and arising from his lack of a mattress and pillow for 12 hours; 2) plaintiff agreed to withdraw his claims against defendants Drehs and Woock individually; 3) all issues regarding plaintiff's CPAP machine were resolved; and 4) plaintiff acknowledged that his claim that he did not receive an inmate handbook did not constitute a violation of the Eighth Amendment (Item 53).

Pursuant to a case management order and following the parties' exchange of discovery materials, on August 27, 2009, the medical defendants moved for summary judgment pursuant to Fed.R.Civ.P. 56 (Item 59). On August 28, 2009, the County defendants filed a motion for summary judgment (Item 60). Defendants assert the following grounds for summary judgment: 1) the plaintiff failed to exhaust his administrative remedies in accordance with the Prison Litigation Reform Act of 1995; 2) Inter–Community Memorial Hospital cannot be held liable on the basis of *respondeat superior;* 3) there was no deliberate indifference to plaintiff's medical needs; 4) defendants are entitled to qualified immunity; and 5) plaintiff's claims against Sheriff Beilein must be dismissed as they are based on a policy that does not exist.

Plaintiff filed his cross-motion for summary judgment on August 31, 2009 (Item 62). He asserted that administrative remedies were unavailable to him as he never received an inmate handbook at the Niagara County Jail. Plaintiff also argued that he suffers from a serious medical need and that the interference by the defendants with his ongoing medical treatment constituted deliberate indifference.

**\*2** On October 30, 2009, defendants filed responses in opposition to plaintiff's motion for summary judgment (Items 66, 67). Plaintiff filed a response to defendant's

motions on November 5, 2009 and agreed to withdraw his claim against Inter–Community Memorial Hospital (Item 68, p. 3). Thereafter, on January 27, 2010, the medical defendants filed a reply (Item 70), and the County defendants filed a reply on January 29, 2010 (Item 71).

The court has determined that oral argument is unnecessary. For the reasons that follow, defendants' motions for summary judgment are granted, and plaintiff's motion for summary judgment is denied.

## FACTS [1]

Plaintiff was incarcerated at the Niagara County Jail ("NCJ") from May 11, 2005 through July 5, 2005, and again from October 7, 2005 until February 3, 2006. At the time he entered the jail, he had been undergoing treatment following multiple spinal surgeries which consisted of physical therapy; two 80 milligram time-released oxycontin pills, one taken at night and one in the morning; and five milligram oxycodone pills to be taken in combination with aspirin or tylenol for breakthrough pain (Item 59, Exh. H, "Martin Dep.," p. 20). Plaintiff stated that while he was not addicted to oxycontin, he was physically "dependent" on the medication. Id., p. 34.

At the time he was booked into the NCJ on May 11, 2005, plaintiff was evaluated by defendant Mahar, a nurse employed by the NCJ. She noted a diagnosis of diabetes and sleep apnea and a prior history of spinal surgery (Item 60, Att. 6, "Mahar Aff.," Exh. A). Nurse Mahar contacted defendant Aikin, the nurse practitioner for the NCJ, who issued a telephone order for plaintiff to be started on the facility's diabetes and detoxification protocols. Id., ¶¶ 14–15. According to the signed standing medical orders of the detox protocol, Nurse Mahar gave plaintiff one tablet of darvocet on the evening of May 11, 2005. Id., ¶ 16.

As a result of being on the detox protocol, plaintiff was housed in an area of the NCJ that he described as "squalor" (Martin Dep., pp. 51, 97). On May 13, 2005, plaintiff asked to be removed from the detox program so that he could be moved to more suitable housing for federal prisoners. Id., p. 98. As a result of being denied oxycontin, plaintiff testified that he suffered sweats, tremors, extremely high blood pressure, diarrhea, and pain in his extremities which lasted about a week to

ten days. Id., p. 41, 42. Other than extremity pain, the withdrawal symptoms plaintiff experienced as a result of the detox protocol have all resolved. Id., p. 47. While housed at the NCJ, plaintiff was also prescribed Ultram for pain, nasal spray for rhinitis, Imodium for diarrhea, and blood pressure medication for hypertension. Id., pp. 44, 54, 106–07.

Prior to his admission to the NJC, plaintiff had not spent a significant amount of time in custody in a New York State jail or prison. He spent 14 days at the Erie County Medical Center awaiting extradition to Ohio in 1995, and approximately one hour in Fredonia awaiting bail in 1990 (Martin Dep., pp. 61–62). He was not familiar with the grievance process and had never filed a grievance. Id., pp. 62–63. Plaintiff stated that he learned of the grievance process in December 2005 or January 2006 by reading the New York State "Minimum Standards" binder in the facility law library. Id., pp. 65, 86.

**\*3** During the intake process, plaintiff signed a form acknowledging receipt of a inmate handbook, although he denies receiving the handbook either time he was processed. Plaintiff stated that he simply signed the acknowledgment because he was told to do so by the admitting officer (Martin Dep., pp. 80, 84–85). He filed a grievance related to his Eighth Amendment claim on January 2, 2006 and pursued the grievance through the appeals process. Id., pp. 71–72.

In support of the motion for summary judgment, defendants submitted an affidavit of Captain Duane Vendetta, grievance coordinator for the Niagara County Sheriff's Department (Item 60, att. 7). The grievance policy in effect at the time plaintiff was incarcerated provided that inmates must complete and submit a grievance form within five days of the act or occurrence giving rise to the grievance. Id., ¶ 9. If the inmate is dissatisfied with the decision of the grievance coordinator, he can appeal to the Chief Administrative Officer of the facility. Id., ¶ 10. After receiving a response from the Chief Administrative Officer, the inmate could seek review of the decision with the Citizen's Policy and Complaint Review Council ("CPCRC") of the New York State Commission of Correction. Id., ¶ 11. Capt. Vendetta stated he reviewed the grievance file for the time period that plaintiff was incarcerated at the NCJ and found no grievances filed by the plaintiff until January 3, 2006 and January 13, 2006. Id., ¶¶ 15–16. Additionally, Capt.

Vendetta stated that it is standard practice for all incoming inmates to receive an inmate handbook that outlines the grievance process. *Id.,* ¶ 24. Even if plaintiff did not receive a handbook, the grievance process is outlined in reference books available in the NCJ law library. *Id.,* ¶ 25. All officers in the housing units are familiar with the grievance process and are instructed to provide grievance forms to any inmate wishing to report a problem. *Id.,* ¶ 26.

In further support of the motion for summary judgment, Dr. James Hohensee stated that at the NCJ, the use of narcotics for pain control is strictly scrutinized (Item 59, att. 17, ¶ 14). In a correctional facility, there is a preference for non-narcotic pain management, if medically possible, but narcotics are prescribed in some cases. *Id.,* ¶ 15. The detoxification protocol at the NCJ in 2005 consisted of a set of standing orders. *Id.,* ¶ 17. The order to place plaintiff on the detox protocol was given by Nurse Practitioner Christopher Aikin and carried out by Rebecca Mahar, a jail nurse. *Id.,* ¶ 18. Thereafter, Dr. Hohensee reviewed plaintiff's chart and countersigned the detox order. *Id.,* ¶ 19. Dr. Hohensee saw plaintiff on June 28, 2005 for a scheduled follow-up visit. Plaintiff complained that the Ultracet he was prescribed was not helping his pain and that he had swelling in his legs. *Id.,* ¶ 22. Dr. Hohensee did not believe narcotics were clinically warranted and chose to add 600 mg. of Motrin to be given three times per day. *Id.,* ¶ 23. On December 2, 2005, Dr. Hohensee saw plaintiff for sinus complaints. *Id.,* ¶ 25. Dr. Hohensee saw plaintiff on December 30, 2006 for complaints of knee pain. He saw no evidence of acute injury and did not feel additional medication was necessary. *Id.,* ¶ 28. Dr. Hohensee saw plaintiff for the last time on January 27, 2006. Plaintiff complained of nosebleeds associated with his use of a CPAP machine. *Id.,* ¶ 27.

**\*4** In his affidavit, Christopher Aikin stated that he practices medicine at the NCJ in collaboration with Dr. Hohensee. As a licensed nurse practitioner, he may examine patients, write prescriptions, and order tests (Item 59, att. 18, ¶ 8). On May 11, plaintiff was booked at the NCJ and was evaluated by Rebecca Mahar, R.N. *Id.,* ¶ 14. At NJC, narcotic medications are strictly regulated, although there is no blanket prohibition against their use when medically necessary. *Id.,* ¶ 17. Mr. Aikin examined plaintiff on May 12, 2005. He confirmed that plaintiff was appropriately on the detox protocol, requested plaintiff's medical records from his neurosurgeon, and determined that narcotic pain medication was not medically necessary. *Id.,* ¶ 19. On May 13, 2005, plaintiff denied detox symptoms, told Mr. Aikin that he had taken only dose of oxycontin in the last 14 days, and requested to be removed from the detox protocol. *Id.,* ¶ 21. On May 16, 2005, Mr. Aikin ordered Zestril for plaintiff's hypertension. *Id.,* ¶ 23. On May 19, 2005, Mr. Aikin saw plaintiff again, discontinued the Zestril, ordered Imodium for gastrointestinal complaints, and prescribed Ultracet for pain. *Id.,* ¶ 25. On June 3, 2005, Mr. Aikin increased the dosage of Ultracet. *Id.,* ¶ 27. On June 14, 2005, Mr. Aikin saw plaintiff, who complained of constipation. Mr. Aikin ordered magnesium citrate and advised plaintiff to increase his fruit and vegetable intake. *Id.,* ¶ 28. Upon his return to the NCJ in October 2005, plaintiff had lost 75 pounds, no longer needed blood pressure medication, and was taking only Ibuprofen for pain. *Id.,* ¶¶ 31–33. He was seen by Mr. Aikin on October 12, 2005 for treatment of a sebaceous cyst and for sinus problems. *Id.,* ¶ 34. He was seen again on November 15, 2005 for sinus complaints, at which time Mr. Aikin prescribed a different allergy medication. *Id.,* ¶ 35. On December 16, 2006, plaintiff was seen by Mr. Aikin, complaining of knee pain. Mr. Aikin tested the knee for ligament tears and ordered x-rays. *Id.,* ¶ 38. The last time Mr. Aikin saw the plaintiff was on January 6, 2006 for a follow-up visit regarding his knee. The x-ray was negative for fracture but indicated osteoarthritis. *Id.,* ¶ 41. During plaintiff's second incarceration, he never presented in sick call for complaints related to neck or back pain. *Id.,* ¶ 42.

Dr. Paul Adler reviewed plaintiff's records from the NCJ, the Federal Bureau of Prisons, and the Northeast Ohio Correctional Center, the amended complaint, plaintiff's responses to interrogatories, and his deposition testimony. He stated that "it is well within the standard of care for nurse practitioners to see and treat patients with the plaintiff's medical issues both in and out of a correctional setting." (Adler Aff., ¶ 13). It is also standard practice in the hospital or correctional setting for a nurse to execute a telephone order from a physician or nurse practitioner. *Id.,* ¶ 16. Dr. Adler stated that Mr. Aikin's initial examination of plaintiff on May 12, 2005 was consistent with the standard of care and his order to begin detoxification was "within good medical judgment." *Id.,* ¶ 20. During plaintiff's initial incarceration at NCJ, defendants Aikin and Hohensee evaluated and addressed plaintiff's various medical issues, changing and/or increasing his pain medication as needed. *Id.,* ¶ 33. Additionally, during his subsequent incarceration

at NCJ, plaintiff's complaint regarding knee pain was appropriately evaluated. *Id.,* ¶¶ 43, 47, 49.

**\*5** Dr. Adler stated that detoxification in correctional facilities is a "standard intervention," and the "decision of whether to prescribe narcotic versus non-narcotic pain relief is in the judgment of the prescribing physician." (Adler Aff., ¶ 52). The plaintiff was seen in sick call 14 times during the less-than six months he was housed at the NCJ, and was seen and treated for various reasons, including detoxification, pain, edema, hypertension, diabetes, sleep apnea, rhinitis, and knee pain. *Id.,* ¶ 56. In Dr. Adler's opinion, the medical care rendered to plaintiff by defendants Hohensee and Aikin "reflects not deliberate indifference, but clearly health care that is consistent with the applicable standard of care." *Id.,* ¶ 57.

In her affidavit, defendant Mahar stated that she followed medical orders provided to her by the Chief Medical Officer or the nurse practitioner. She never deviated from these orders and merely dispensed medication that had been prescribed by authorized medical providers (Mahar Aff., ¶¶ 19–20).

Major John T. Saxton, chief administrative officer of the NCJ, stated in an affidavit that the NCJ does not have, nor did it have at any time relevant to this litigation, a blanket prohibition preventing the Chief Medical Officer, Dr. James Hohensee, or Nurse Practitioner Aikin from prescribing narcotic pain medication in appropriate circumstances (Item 60, att. 8, ¶ 6). It is the policy of the NCJ to provide narcotic pain medication "when and if such medication is medically necessary." *Id.,* ¶ 7.

## DISCUSSION

### 1. Summary Judgment Standard

Rule 56 provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Although the language of this Rule has been amended in recent years, the well-settled standards for considering a motion for summary judgment remain unchanged. *See, e.g., Faulkner v. Arista Records LLC,* 797 F.Supp.2d 299, 311 n. 7 (S.D.N.Y.2011). Under those standards, the party seeking summary judgment bears the initial burden

of establishing that no genuine issue of material fact exists. *Rockland Exposition, Inc. v. Great American Assur. Co.,* 746 F.Supp.2d 528, 532 (S.D.N.Y.2010), *aff'd,* 445 Fed.Appx. 387 (2d Cir.2011). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law .... " *Id.*

Once the court determines that the moving party has met its burden, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks and citation omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars showing that a trial was needed ...." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotation marks and citation omitted) (quoted in *Kaminski v. Anderson,* 792 F.Supp.2d 657, 662 (W.D.N.Y.2011)). In considering whether these respective burdens have been met, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004) (internal quotation marks and citation omitted).

**\*6** The court recognizes its duty to "extend extra consideration" to *pro se* plaintiffs and that *"pro se* parties are to be given special latitude on summary judgment motions." *Bennett v. Goord,* 2006 WL 2794421, at \*3 (W.D.N.Y. Aug.1, 2006), *aff'd,* 2008 WL 5083122 (2d Cir.2008) (quoting *Salahuddin v. Coughlin,* 999 F.Supp. 526, 535 (S.D.N.Y.1998)); *see also McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (*pro se* party's pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest"). "Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 1999 WL 983876, at \*3 (S.D.N.Y. October 28, 1999) (citing cases).

The defendants contend that summary judgment should be granted dismissing the complaint as plaintiff failed to exhaust his administrative remedies in accordance with the grievance procedures in place at the NCJ. Additionally, they argue that plaintiff has not shown deliberate indifference to his medical needs. Plaintiff contends that administrative remedies were unavailable to him as he was unaware of the grievance procedures at the NCJ and was never given an inmate handbook. He also argues that the defendants violated the Eighth Amendment by interfering with his ongoing treatment for pain related to his spinal surgeries, by denying him narcotic pain medication, and by providing medical evaluation and treatment by a registered nurse and nurse practitioner.

## 2. Exhaustion of Administrative Remedies

The Prisoner Litigation Reform Act of 1995 ("PLRA"), mandates exhaustion by prisoners of all administrative remedies before bringing an action regarding prison conditions. *See* 42 U.S.C. § 1997e(a). Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* The Supreme Court has held that the PLRA's "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Smart v. Goord,* 441 F.Supp.2d 631, 636 (S.D.N.Y.2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). Failure to exhaust is an absolute bar to an inmate's action in federal court; section 1997e(a) "requires exhaustion of available administrative remedies before inmate-plaintiffs may bring their federal claims to court at all." *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

In assessing the affirmative defense of non-exhaustion, the Second Circuit employs a three-part inquiry. *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). A court must (1) determine whether administrative remedies were in fact "available" to the prisoner; (2) consider whether the defendant has forfeited the affirmative defense of non-exhaustion or is estopped from raising it; and (3) determine whether "special circumstances"

justify the prisoner's failure to comply with administrative procedural requirements. *Id.* "Courts should be careful to look at the applicable set of grievance procedures, whether city, state or federal" in assessing availability. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003).

**\*7** In New York, formal exhaustion for prisoners in county jails requires compliance with the three-step grievance and appeal procedure outlined in the New York State Minimum Standards for Management of County Jails. *See* N.Y. Comp.Codes R. & Regs. tit. 9 ("9 N.Y.C.R.R."), § 7032.1. In this case, the NCJ employed a three-tiered grievance process with review of an inmate's complaint by the grievance coordinator, the Chief Administrative Officer of the facility, and finally the New York State Commission of Correction. Generally, "[a] prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hairston v. LaMarche,* 2006 WL 2309592, at \*7 (S.D.N.Y. August 10, 2006) (citing cases).

Here, as stated by Capt. Vendetta, there was a grievance procedure in place at the NJC that was available to plaintiff (Item 60, att. 7, ¶ 5). Pursuant to this policy, an inmate must complete and submit a grievance within five days of the act or occurrence giving rise to the grievance. *Id.,* ¶ 9. Capt. Vendetta stated he reviewed the grievance file for the relevant time period and found no formal grievances filed by the plaintiff between May 11 and July 5, 2005, the dates of his initial incarceration at the NCJ. *Id.,* ¶ 16. On January 3, 2006, plaintiff filed a grievance claiming that the NCJ seized oxycontin and oxycodone upon his initial admission to the NJC and that he was unlawfully placed on the detox protocol in May 2005. *Id.,* ¶ 17. Capt. Vendetta stated that this grievance was untimely, as it referenced events that occurred significantly more than five days prior to its filing. Despite the untimeliness, the grievance was processed through the system. *Id.,* ¶ 20.

Plaintiff contends that he did not file a timely grievance because he was unaware of the grievance procedure and was never issued an inmate handbook upon his admission to the NJC. Grievance procedures may be deemed unavailable "where plaintiff is unaware of the grievance procedures or did not understand [them] or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Murrary v. Palmer,* 2010 WL 1235591, at \*5 (N.D.N.Y. March 31, 2010); *Hargrove*

*v. Riley,* 2007 WL 389003, at *8 (E.D.N.Y. January 31, 2007). Here, there is no dispute that plaintiff had not spent a significant amount of time in custody in New York State. While he signed an intake form acknowledging his receipt of an inmate handbook on both of his admissions to the NCJ, plaintiff stated that he signed the form without reading it and because he was told to do so by the admitting officer. He was unaware of the grievance policies and procedures until approximately December 2005, when he read the grievance policy in the law library. Construing the facts in the light most favorable to plaintiff, he has raised a material fact as to whether a similarly situated person would have been unaware of the grievance process, rendering it unavailable. *See Brown v. Fischer,* 2010 WL 5797359 (N.D.N.Y. December 8, 2010) (failure to exhaust administrative remedies was excusable where inmate was unaware of the grievance procedures and there was no evidence he received an inmate handbook). Accordingly, the defendants' motions for summary judgment based on the plaintiff's failure to exhaust administrative remedies are denied.

### 3. Constitutional Claims

**\*8** Even excusing plaintiff's failure to exhaust his administrative remedies, the complaint must nonetheless be dismissed as plaintiff has failed to establish a violation of the Eighth Amendment.

Title 42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. "In order to maintain a section 1983 action, two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct

complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994); *see also Kasiem v. Guzman,* 2011 WL 4352387, at *3 (W.D.N.Y. September 16, 2011).

"The Eighth Amendment's prohibition against cruel and unusual punishment has been construed to include the denial of adequate medical care for an inmate's serious medical needs." *Woods v. Goord,* 2002 WL 31296325, *2 (S.D.N.Y. October 10, 2002); *see also Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The care provided to prisoners to treat their injuries or illnesses must meet minimum medical standards of adequacy and be reasonably intended to satisfy their medical needs. To show that prison medical treatment was so inadequate as to amount to "cruel or unusual punishment" prohibited by the Eighth Amendment, plaintiff must prove that defendants' actions or omissions amounted to "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. at 106; *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000).

Under 42 U.S.C. § 1983, every claim for deliberate indifference to a serious medical need must pass a two-pronged test consisting of objective and subjective elements. First, the court must determine whether, objectively speaking, plaintiff's condition is such that the alleged deprivation of medical assistance is "sufficiently serious." *Woods,* 2002 WL 31296325, at *3 (citing *Hathaway v. Coughlin,* 37 F.3d 63, 66–67 (2d Cir.1994)); *see also Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Second, the court must consider whether the official " 'knew that an inmate faced a substantial risk of serious harm, and disregarded that risk by failing to take reasonable measures to abate it.' " *Woods* 2002 WL 31296325 at *3 (internal cites and alterations omitted); *Harrison v. Barkley,* 219 F.3d at 137.

A serious medical need is one with some urgency or one which, if ignored, may produce death, degeneration, or extreme pain. *Hathaway,* 37 F.3d at 66. As the Second Circuit held in *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003), there is no precise metric to guide the court in its estimation of the seriousness of a prisoner's medical condition. Any inquiry into the objective component of an Eighth Amendment claim must be tailored to the specific

facts of each case. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003). In *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998), the court set forth a non-exhaustive list of factors that are relevant to the inquiry whether a given medical condition is serious. These factors include: (1) whether a reasonable doctor or patient would perceive the medical need in question as "important and worthy of comment or treatment;" (2) whether the medical condition significantly affects daily activities; and (3) "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

**\*9** Plaintiff's medical conditions included pain as a result of previous spinal surgeries, edema from a blood pressure medication, and knee pain. He acknowledges that the defendants adequately responded to his complaints of allergic rhinitis and sleep apnea. Edema and knee pain are not sufficiently serious to cause death, degeneration, or extreme pain. Accordingly, the plaintiff's only medical conditions that are arguably "serious" relate to plaintiff's pain resulting from his previous spinal surgeries.

Even if the court were to assume that plaintiff's pain as a result of multiple spinal surgeries constituted a serious medical need, there is no evidence of defendants' deliberate indifference to that medical need. Plaintiff's Eighth Amendment claim is based on his assumption that there is a policy against the prescription of any and all narcotic pain medications in the NCJ. He complains that defendant Mahar ordered the detox protocol and that Major Saxton, the Chief Administrative Officer of the NCJ, implemented a policy of no narcotic pain medication. Plaintiff offers no proof to support these factual assumptions. In contrast, the defendants have established that there is no blanket prohibition against the prescription of narcotic medications and that Nurse Mahar initiated the detox protocol upon the order of Nurse Practitioner Aikin.

Plaintiff also complains that he was not seen by Dr. Hohensee until June 28, 2005, 48 days after his arrival at the NCJ. He argues that given his serious medical need, he should have been seen by a physician earlier. "A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference." *Sonds v. St. Barnabas Hosp. Corr. Health Serv.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001); *see also Chance,* 143 F.3d 698 at 703; *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988) ("[T]here is no right to the medical

treatment of one's choice if the prescribed treatment is based on applicable medical standards."). Additionally, "[m]ere delay in the rendering of medical treatment in and of itself does not rise to the level of a constitutional violation." *Smith v. Montefiore Med. Ctr.-Health Serv. Div.,* 22 F.Supp.2d 275, 280 (S.D.N.Y.1998). "Nor does the fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred." *Sonds,* 151 F.Supp.2d at 311; *see also Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). "To demonstrate a constitutional violation, a plaintiff must show that he sustained substantial harm because of the delay in the rendering of medical treatment." *Smith,* 22 F.Supp.2d at 280. "As long as the medical care is adequate, there is no Eighth Amendment violation." *Sonds,* 151 F.Supp.2d at 311; *see also Wandell v. Koenigsmann,* 2000 WL 1036030, \*3 (S.D.N.Y. July 27, 2000) ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

**\*10** Additionally, plaintiff contends that the medical staff of the NCJ improperly interfered with his treatment by his personal physician by discontinuing his use of oxycontin and oxycodone and placing him on the detox protocol. Plaintiff's assertion that he should have been given narcotic pain medication is likewise a disagreement over the course of treatment. "[M]ere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. Although plaintiff claims that the defendants ignored and overruled the treatment plan in place when he entered NCJ, an inmate is not entitled to the treatment of his choice. *Id.* at 702. Plaintiff's demand for narcotic pain medications and defendants' unwillingness to prescribe them does not create an Eighth Amendment claim. *See Ifill v. Weinstock,* 2012 WL 162405, \*4 (W.D.N.Y. January 19, 2012); *Guarneri v. Wood,* 2011 WL 4592209, at \*13 (N.D.N.Y. September 2, 2011) ("Defendants regularly offered [plaintiff] non-narcotic pain medication ..... [Plaintiff]'s complaints about the type of medication given to him for pain again amounts to a disagreement over treatment, which is insufficient to allege a constitutional violation.").

In this case, plaintiff was seen by a registered nurse on the day of his admission. He was seen by Nurse Practitioner Aikin on May 12, 13, 16, and 19, 2005, June 3 and 14, 2005, October 12, 2005, November 15, 2005, December 16, 2005, and January 6, 2006. He was seen by Dr. Hohensee on

June 28, 2005, December 2, and 30, 2005, and January 27, 2005. He received medication, medical advice, diagnostic x-rays, and followup care with a physician. Even granting plaintiff the benefit of every favorable inference, it cannot be said that this medical care was inadequate or evinces deliberate indifference on the part of the defendants. Based on the foregoing, no reasonable jury could find that the defendants acted with deliberate indifference to plaintiff's medical needs in violation of his rights under the Eighth and Fourteenth Amendments. Accordingly, defendants are entitled to summary judgment as a matter of law dismissing plaintiff's complaint. The court need not address the argument that the defendants are entitled to qualified immunity.

## CONCLUSION

The defendants' motions for summary judgment (Items 59, 60) are granted and the complaint is dismissed.

Plaintiff's cross motion for summary judgment (Item 62) is denied. The Clerk of the Court is directed to enter judgment in favor of defendants and to close this case.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).* Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**\*11**  So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3230435

---

Footnotes

1    This factual statement is taken from the plaintiff's medical and grievance records (Item 59, Exhs. G, J–M), the plaintiff's deposition testimony (Item 59, Exh. H), the affidavits of James Hohensee, M.D., Christopher Aikin, N.P. and Paul Adler, D.O., with exhibits (Item 59, atts. 17–21), and the affidavits of Rebecca Mahar, Duane Vendetta, and John T. Saxton (Item 60, atts. 6–8).

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.  8

2006 WL 1006538
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Anson MOORE, Plaintiff,
v.
Supt. William PHILIPS; Dep. Comm. Lucien J.
Leclaire; Dir. Shu Donald Selsky; Capt. Thomas
R. Griffin; Lt. Richard Ward; ADP William
Haggett; and Sgt. David Jolicoeur, Defendants.

No. 04 Civ. 8908(DLC).
|
April 18, 2006.

**Attorneys and Law Firms**

Anson Moore, for Plaintiff, pro se.

Kevin P. McCaffrey, Assistant Attorney General, State of
New York, New York, NY, for Defendants.

*OPINION AND ORDER*

COTE, J.

**\*1** This Opinion concludes that a prison rule that
prohibits actions that may be "detrimental to the
order of the facility" did not provide an inmate
with adequate notice that he may be disciplined for
initiating or participating in a letter-writing campaign
regarding alleged misconduct by guards. Plaintiff Anson
Moore ("Moore") brings this action under 42 U.S.C.
§ 1983 against various officials of the New York State
Department of Correctional Services ("DOCS") and
Green Haven Correctional Facility ("Green Haven") in
Stormville, New York, where he was incarcerated. Moore
alleges that defendants retaliated against him for his
involvement in a letter-writing campaign by initiating a
disciplinary proceeding and sentencing him to 90 days in
the Special Housing Unit ("SHU"). He also claims he was
not provided with due process at the hearing.

Defendants move for summary judgment, arguing that
Moore's constitutional rights were not violated, and
alternatively, that defendants are protected by qualified
immunity. Defendant Lucien Leclaire ("Leclaire") also
moves for summary judgment on the ground that Moore
has not established that he was personally involved in the
relevant events. For the reasons set forth below, partial
summary judgment is granted for plaintiff because the
rule under which he was disciplined did not provide him
with sufficient notice that his actions were prohibited.
Therefore, the disciplinary proceeding violated plaintiff's
Fourteenth Amendment due process rights, and the
infraction must be expunged from his record. Defendants'
motion for summary judgment is also granted in part, as
defendants are protected by qualified immunity from an
award of monetary damages. An injunction shall issue
expunging the finding that Moore violated the prison rule.

*Background*

The following facts are undisputed unless otherwise
noted. Moore has been incarcerated since 1986, serving
a sentence for second degree murder. In early 2004,
when the events at issue took place, he resided on the J
Block of Green Haven. J Block housed participants in
the Residential Substance Abuse Treatment ("RSAT")
program. At the time, Moore, who had already completed
the program, was serving as an RSAT peer educator, a role
in which he facilitated group discussions and occasionally
spoke one-on-one with program participants.

In early 2004, inmates in J Block began complaining about
the conduct of the guards who worked the 3:00 p.m.-11:00
p.m. shift. Among the allegations were that the guards
arbitrarily denied or delayed privileges, such as mail
delivery, recreation, showers, and meals; that they yelled
and cursed at inmates; and that certain prisoners were
assaulted. Plaintiff was not personally affected by most
of the alleged misconduct. The inmates, including Moore,
discussed how to proceed, and Moore recommended that
they write letters of complaint to DOCS officials in
Albany. Moore also discussed the content of the letters
with individual inmates outside of the group sessions,
and on at least one occasion provided another inmate
with a copy of the complaint letter Moore had written. [1]
At least seven inmates sent signed letters to DOCS
officials in mid-January 2004. The letters are substantially
similar to one another: they make the same allegations of
guard misconduct and frequently use identical words and
phrases. [2]

**\*2** On February 18, lieutenant Richard Ward ("Ward")
assigned sergeant David Jolicoeur ("Jolicoeur") to

investigate the complaints. Jolicoeur interviewed a number of inmates who had drafted letters, including a confidential informant who allegedly stated that plaintiff was the organizer of a letter-writing campaign. On February 23 or 24, plaintiff sent two anonymous letters to Leclaire, the deputy commissioner of correctional facilities for DOCS, complaining about both the RSAT guards' original misconduct and Jolicoeur's investigation. Plaintiff claimed that Jolicoeur was encouraging inmates to name Moore as the initiator of the alleged letter-writing campaign.

On February 29, Jolicoeur supervised a search of Moore's cell, during which guards found three copies of an unsigned complaint letter similar to those that had been sent by other inmates. Plaintiff admitted that he was the author of the anonymous letters. Jolicoeur then prepared an Inmate Misbehavior Report ("IMR") in which he stated that Moore had violated Rule 104.12 of the Department of Correctional Services' Standards of Inmate Behavior ("Rule 104.12") by "initiat[ing] a conspiracy to organize other J [Block] inmates to mail complaint letters to officials in Albany DOCS." Rule 104.12 prohibits inmate involvement in "work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7 § 270.2(B)(5)(iii). Ward reviewed the report and determined that the alleged violation qualified as "Tier III," the most serious type of prison disciplinary charge.

On March 5, hearing officer William Haggett ("Haggett") presided over a hearing regarding the charges against plaintiff. Jolicoeur, RSAT counselor Chrles Sommers, and the confidential informant testified at the hearing. Haggett also reviewed and compared the letters written by plaintiff and the other inmates. Plaintiff, who was provided with an employee assistant to help him prepare for the hearing, argued that he had not initiated the letter-writing effort and that his conduct should not subject him to discipline. On March 11, Haggett found Moore guilty of violating Rule 104.12, assessed a $5 fine against him, and sentenced him to three months in the SHU.

Plaintiff was confined to the SHU from February 29 to May 29, 2004. [3] SHU inmates are separated from the general population in single- or double-occupancy cells and are entitled to fewer privileges, such as showers, outside visitors, and mail, than inmates in general

population. Plaintiff also alleges that the SHU was cold and that he was unable to turn out the lights.

On March 11, plaintiff appealed Haggett's determination to Donald Selsky ("Selsky"), the director of special housing and inmate discipline for DOCS. He argued that the IMR was retaliatory and that the alleged acts did not constitute a violation of Rule 104.12. Moore further objected to the hearing on the grounds that he had been unable to confirm that the witnesses he wished to call were unwilling to testify on his behalf, and that the confidential informant was not proven to be reliable. Selsky affirmed the disposition on May 11. On June 7, after Moore learned that certain procedural objections he made at the hearing were not included in the record, Moore requested that Selsky reconsider his decision. On October 15, Selsky again affirmed the disposition. Moore also sent at least two letters of complaint to Leclaire in the spring of 2004. Leclaire forwarded the letters to Ada Perez, an assistant commissioner of DOCS. Perez informed Moore that an investigation had found "no evidence ... to substantiate your allegations." [4] Moore also wrote to William Philips ("Philips"), superintendent of Green Haven, requesting a discretionary review of his punishment. Philips declined the request.

**\*3** On November 10, 2004, Moore filed this action under 42 U.S.C. § 1983 ("Section 1983"), alleging that defendants violated his First and Fourteenth Amendment rights. Moore's primary claim is that defendants filed a misbehavior report against him in retaliation for his involvement in constitutionally protected conduct-namely, the sending of complaint letters to DOCS officials. Moore argues that the IMR was "false" both factually and legally. First, he claims that defendants fabricated the evidence of his leadership role in the letter-writing campaign. Second, he contends that, whatever role he played, his actions do not constitute a violation of Rule 104.12. In addition, Moore objects to the manner in which the disciplinary hearing was conducted. Although not articulated as such, these objections amount to a claim that he was not provided with the due process required under the Fourteenth Amendment.

Moore seeks a declaratory judgment that defendants violated his constitutional rights. He also requests that the Court issue an order that the IMR be expunged from his record and an injunction that would prohibit defendants from engaging in "further retaliation against plaintiff or

against other inmates who have submitted affidavits" on his behalf. Moore further seeks compensatory and punitive damages for the time he served in the SHU and the costs he incurred in bringing this litigation. [5] Defendants bring this motion for summary judgment on the grounds that (1) Moore's constitutional rights were not violated, (2) defendants are entitled to qualified immunity, and (3) plaintiff has not established the personal involvement of Leclaire.

*Discussion*

Summary judgment under Rule 56, Fed.R.Civ.P., is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 465 (2d Cir.2000). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment should only be granted when "no reasonable trier of fact could find in favor of the non-moving party." *James v. New York Racing Ass'n,* 233 F.3d 149, 152 (2d Cir.2000) (citation omitted).

As noted above, plaintiff alleges both that he was improperly disciplined in retaliation for engaging in constitutionally protected conduct, and that he did not receive the procedural protections he was due at his disciplinary hearing. Before reaching those arguments, however, it is necessary to address the threshold issue of whether the regulation under which Moore was disciplined put him on notice that his actions were prohibited. [6] A finding that the notice was constitutionally insufficient would render the disciplinary proceedings improper, "regardless of the procedural means applied." *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (citation omitted).

**\*4** A penal statute must provide individuals with notice of the conduct that is prohibited. *Kolender v. Lawson,* 461 U.S. 352, 357 (1982); *Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972). To determine whether a statute is unconstitutionally vague, "a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides

explicit standards for those who apply it." *United States v. Roberts,* 363 F.3d 118, 122 (2d Cir.2004). The degree of vagueness that the Due Process Clause will tolerate "depends in part on the nature of the enactment at issue." *Hoffman Estates v. Flipside,* 455 U.S. 489, 498 (1982); *see also Chatin v. Coombe,* 186 F.3d 82, 86 (2d Cir.1999). There is a greater tolerance for "enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Hoffman,* 455 U.S. at 499; *see also Chatin,* 186 F.3d at 86. Where the lack of clarity "threatens to inhibit the exercise of constitutionally protected rights," there is the greatest cause for concern. *Hoffman,* 455 U.S. at 499.

Plaintiff was disciplined under Rule 104.12, which states: "An inmate shall not lead, organize, participate, or urge other inmates to participate, in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7 § 270.2(B)(5)(iii). Moore did not participate in any of the specifically enumerated activities, but his conduct was nonetheless determined to have been detrimental to the order of Green Haven.

As used against plaintiff, this portion of Rule 104.12 fails both prongs of the vagueness test. A person of ordinary intelligence would not be able to discern with any degree of certainty whether a letter-writing campaign would threaten "the order of the facility." Similarly, the Rule does not provide anything approaching "explicit standards" for those charged with enforcing the Rule, at least insofar as they must determine when to apply it to behaviors that are not akin to the enumerated forbidden activities. The activities-participating in or encouraging participation in a work-stoppage, sit-in, or lock-in-directly impact the physical environment of the prison. This is equally true of the behaviors prohibited by the other subsections of the Rule: taking over or conspiring to take over a facility; threatening or engaging in violent conduct; talking loudly or after designated quiet time; playing a radio, television, or tape player in a loud or improper manner; and playing a musical instrument in a loud or improper manner. N.Y. Comp.Codes R. & Regs. tit. 7 § 270.2(B)(5)(i), (ii), (iv). Nothing in the text of the Rule suggests how or whether it might apply to situations, such as a letter-writing campaign, where the threat to facility order is less direct or observable. Moreover, the statutory canon of *ejusdem generis,* which holds that "where general words follow specific words in

a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words," counsels against a determination that such behavior is covered by the Rule. *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 115 (2001).

**\*5** Defendants correctly point out that a regulation "need not achieve meticulous specificity" in order to pass constitutional muster, and "may instead embody flexibility and reasonable breadth." *Perez v. Hoblock,* 368 F.3d 166, 175 (2d Cir.2004) (citation omitted). Such flexibility can arguably be greater in the context of a prison, since security is of utmost importance, and "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights." *Johnson v. California,* 543 U.S. 499, 510 (2005) (citation omitted). As construed by defendants, however, Rule 104.12 would go much farther than the Constitution allows, giving prison officials virtual carte blanche and providing inmates with little notice of what they may and may not do.

Defendants concede that it is at least an "open question" whether Rule 104.12 puts inmates on notice that a coordinated letter-writing effort is prohibited. Nonetheless, they argue that the evaluation of the Rule's vagueness must be made with respect to plaintiff's actual conduct, "and not with respect to hypothetical situations at the periphery of the regulation's scope or with respect to the conduct of other parties who might not be forewarned by the broad language." *Perez,* 368 F.3d at 175 (citation omitted). According to defendants, plaintiff indicated at his deposition that he understood that organizing a letter-writing campaign was prohibited; therefore, he cannot claim to have lacked notice that his behavior could result in an IMR.

This argument fails for two reasons. First, Moore's deposition testimony demonstrates that he did *not* believe that the inmates' letter-writing campaign violated any regulations.[7] Indeed, at his deposition, Moore stated that the reason the inmates wrote letters rather than signing a petition was that they understood the latter was prohibited, while the former was not. Second, and more fundamentally, the question is not whether plaintiff thought he would be punished, but whether the language of the statute provides notice that plaintiff's behavior is eligible for punishment. *See, e.g., Chatin v. New York,*

No. 96 Civ. 420(DLC), 1998 WL 196195, at \*7 (S.D.N.Y. Apr. 23, 1998) (holding that plaintiff's knowledge that some inmates had been disciplined for praying under a rule prohibiting "[r]eligious services" proved "nothing more than that he had observed arbitrary discipline of inmates praying"). Here, the answer is clearly no.

Rule 104 is entitled "Riot, Disturbances and Demonstrations." As noted above, the specific behaviors it prohibits are all related to physical acts. The rules give no further definition of prohibited behaviors beyond those enumerated above. Each official and inmate is left to guess whether the Rule reaches the organization of or participation in an effort to voice inmate complaints. Therefore, even assuming every allegation against Moore is true, the Tier III hearing violated plaintiff's due process rights protected by the Fourteenth Amendment because the statute under which plaintiff was disciplined does not provide adequate notice that a letter-writing campaign is prohibited.

*Relief*

A. Monetary Relief

**\*6** Plaintiff seeks to hold defendants liable under Section 1983, which provides a cause of action against anyone who, under color of state law, deprives another person of his or her constitutionally protected rights. Here, defendants' conduct did violate Moore's rights. As government officials performing discretionary functions, however, they are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 609 (1999) (citation omitted); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The purpose of the doctrine is to balance "the need, on one hand, to hold responsible public officials exercising their power in a wholly unjustified manner and, on the other hand, to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury." *Connecticut ex rel. Blumenthal v. Crotty,* 346 F.3d 84, 101 (2d Cir.2003) (citation omitted).

Qualified immunity arises when an official's conduct did not violate "clearly established law." *Id.* at 102. To determine whether qualified immunity applies, a court must consider:

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005) (citation omitted). There is a strong presumption in favor of finding qualified immunity, so that "all but the plainly incompetent or those who knowingly violate the law" are protected. *Saucier v. Katz,* 533 U.S. 194, 202 (2001).

Here, the constitutional issues raised by the application of Rule 104.12 to plaintiff's conduct were anything but "clearly established" under the law of this Circuit. In fact, the Second Circuit has twice explicitly declined to rule on the issue of whether Rule 104.12 puts prisoners on notice that preparing or circulating a petition is barred. *See Gayle v. Gonyea,* 313 F .3d 677, 680 n. 3 (2d Cir.2002); *Duamtef v. O'Keefe,* 98 F.3d 22, 25 (2d Cir.1996). In the same decisions, the Second Circuit also implicitly left open the question of whether a prohibition of letter-writing campaigns is constitutionally permissible. Although the Court of Appeals held that prison officials could bar the circulation of petitions through the appropriate regulation, *Duamtef,* 98 F.3d at 24, it did not address whether they could prohibit an inmate from encouraging other inmates to file grievances. *Gayle,* 313 F.3d at 680 n. 3. As a result, it was reasonable for defendants to believe that disciplining Moore was permissible, and they are therefore protected by qualified immunity. [8] Defendants' motion for summary judgment is granted with respect to Moore's claim for monetary damages.

**B. Equitable Relief**

**\*7** For the purposes of obtaining declaratory and injunctive relief, defendants are sued in their official capacity, *supra* note 5, and qualified immunity does not apply. Moore did not move for summary judgment with respect to his requests for a declaratory judgment that his rights were infringed, an order expunging the IMR from his disciplinary record, or an injunction prohibiting

future retaliatory actions. A district court may grant summary judgment *sua sponte,* however, so long as care is taken to ensure that the party against whom summary judgment is entered "has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law." *Schwan-Stabilo Cosmetics GmbH & Co. v. Pacificlink Intern. Corp.,* 401 F.3d 28, 33 (2d Cir.2005) (citation omitted).

Defendants here have had the opportunity to raise any factual issues that would defeat a finding that Rule 104.12 is impermissibly vague as applied to plaintiff's conduct. As noted, they directly addressed the issue in their motion papers. Therefore, summary judgment is granted for plaintiff with respect to his request for a declaratory judgment. Further, since plaintiff was disciplined pursuant to a rule that could not be constitutionally applied to his conduct, DOCS will be required to expunge the IMR from Moore's record and restore any attendant credits or benefits. Because this Opinion makes clear that no further disciplinary action may be taken against Moore or any other inmate for involvement in the letter-writing campaign, and because Moore has not introduced any evidence indicating that there is a threat of "further retaliation," his request for an injunction prohibiting such actions is denied.

*Conclusion*

Defendants' motion for summary judgment is granted with respect to Moore's request for damages; it is denied with respect to Moore's requests for equitable relief. Summary judgment is granted for plaintiff with respect to his requests for entry of a declaratory judgment that the disciplinary action against him was unconstitutional, and that the inmate misbehavior report filed against plaintiff on February 29, 2004 be expunged from plaintiff's record. Any attendant good time credits or other benefits of which plaintiff was deprived because of the disciplinary action shall be restored. The Clerk of Court shall enter judgment in accordance with these rulings and close the case.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1006538

Footnotes

1   Defendants imply that Moore was the source of a model complaint letter that was provided to other inmates. Moore says that he only provided a single inmate with a copy of the letter he drafted.

2   Moore contends that more than seven inmates sent letters, but that defendants have highlighted only those that were similar to one another.

3   Moore's confinement began upon Jolicoeur's preparation of the IMR.

4   It appears that this investigation was conducted by Thomas Griffin ("Griffin"), a captain at Green Haven.

5   Moore purports to sue defendants in both their personal and official capacities. Because states are immune under the Eleventh Amendment from suits for monetary relief, the claim for damages can only be brought against defendants in their individual capacity. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989); *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000). Moore may, however, "seek injunctive and declaratory relief against the defendants in their official capacity because official-capacity actions for prospective relief are not treated as actions against the State." *Id.* (quoting *Will,* 491 U.S. at 71 n. 10).

6   Plaintiff does not directly raise a vagueness challenge in this action or in his appeal below. Defendants argue that plaintiff thereby waived the argument. It is well established, however, that "when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations." *Jacobs v. Ramirez,* 400 F.3d 105, 106 (2d Cir.2005) (citation omitted). Plaintiff argues here, as he did below, that the allegations in the IMR do not support a finding of a Rule 104.12 violation. This is sufficiently similar to a vagueness challenge to preserve and raise that objection. Moreover, defendants understood that Moore's arguments amounted to a challenge to Rule 104.12 based on unconstitutional vagueness and addressed the issue in their motion papers.

7   Further, Moore's deposition testimony shows how problematic the vagueness of Rule 104.12 can be for an inmate trying to anticipate how it will be applied to behavior that is not obviously similar to the enumerated banned acts:

Q. Do you believe it would have been a violation of regulations if you made a copy of one letter and each individual signed their own copy and sent it out?

A. If you made a copy of one letter and each individual signed that copy and sent it out?

Q. Do you think that would be a violation of regulations as you understand it?

A. Say it again, do I believe that it was a violation of regulations, depends on circumstances I believe as far as being at-the RSAT program is run and it is group therapy and about the group helping the group.... So in RSAT format, no, I wouldn't say that was particularly a violation, but I feel that still that an individual would be better off writing his own complaint even if he wrote similar or the same thing someone else wrote....

Q. Do you think it would have been proper for an inmate each inmate to send out an identical copy of the letter of complaint, do you think it would be proper in the general population to do that? You can answer yes or no?

A. I can't really answer yes or no without explaining myself....

Q. How about a photocopy, one letter typewritten and there was a photocopy provided to every inmate for them to sign on their own, would that be appropriate?

A. Not so much appropriate or not I think it calls into account whether the individual wanted to do that or not, so that is my answer to that....

Q. If an inmate were to provide a typewritten letter to ten inmates asking those inmates to send them out assuming for the purposes all wanted to send them out individually, would that be as you extend [sic] a violation of the regulation?

A. No.

8   Because defendants are entitled to qualified immunity, it is not necessary to reach Leclaire's argument that he is also shielded from liability because of his lack of personal involvement in the events at issue.

---

                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   6

KeyCite Yellow Flag - Negative Treatment
Distinguished by Arnett v. Shojaie, C.D.Cal., November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

### *DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony

was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

### I. RELEVANT LEGAL STANDARD

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial review." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R.

§§ 701.5, 701.6(g), 701.7.[1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the

time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.[4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number.[5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative.[6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

> A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

> B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

> C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e) (2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). [7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, [8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. [9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim, [10] (b) the inmate was specifically informed that the claim in question was grievable, [11] (c) the inmate separately

pursued the proper grievance process by filing a grievance with the IGRC, [12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion, [13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC. [14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim, [15] and/or (b) the inmate did not appeal his disciplinary hearing conviction. [16]

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, \*4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [17]

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court. [18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury. [19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law. [20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.) [21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also

on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 U.S. 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,* --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury. [22]

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at \*8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would]

have deemed them available." *Hemphill,* 380F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at \*8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [25]

### B. Estoppel

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to

exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

**C. Special Circumstances**

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at \*8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in

this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations, [27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order. [28]

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is *DISMISSED* **in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1235591

Footnotes

1  *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

2  The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

3  *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

4  7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step."); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5  *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6  *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when

he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

7    The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8    *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9    *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10   *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11   *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12   *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13   *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14   *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

15  *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

16  *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

17  *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

18  *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense.' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

19  *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

20  *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing

be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff's] grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff's] failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law." [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21   *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22   *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

23   The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

24   In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restraints against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance

Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

25    For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

26    *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

27    *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

28    The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

2014 WL 4659327
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeffrey A. NELSON, Plaintiff,

v.

Bruce PLUMLEY, et al., Defendants.

No. 9:12–CV–422.
|
Signed Sept. 17, 2014.

**Attorneys and Law Firms**

Jeffrey A. Nelson, Attica, NY, for Plaintiff.

Hon. Eric T. Schneiderman, New York State Attorney General, Gregory Rodriguez, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* 42 U.S.C. § 1983 action was referred to the Hon. David E. Peebles, Jr. United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b). Magistrate Judge Peebles recommends that the Defendants' motion for summary judgment, dkt. # 49, be granted in part and that the Court conduct an evidentiary hearing to determine whether Plaintiff's failure to exhaust his administrative remedies on his excessiveforce claim can be excused. *See Dkt. # 59.* Plaintiff has filed objections to the ReportRecommendation.

When objections to a magistrate judge's Report–Recommendation are lodged, the Court reviews the record *de novo. See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Court may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.* Thus, the Court reviews the instant matter *de novo.*

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept and adopt in part the recommendation of Magistrate Judge Peebles for the reasons stated in the ReportRecommendation. Therefore:

1. Plaintiff's objections, dkt. # 60, to the Report–Recommendation of Magistrate Judge Peebles, dkt. # 59, are hereby OVERRULED;

2. The Report–Recommendation is hereby ADOPTED;

3. The Defendants' motion for summary judgment, dkt. # 49, is GRANTED in part and DENIED in part. The motion is GRANTED with respect to Plaintiff's Eighth Amendment conditions-of-confinement claim and Fourteenth Amendment procedural due process claim. The motion is DENIED with leave to renew with respect to Defendants' claim that Plaintiff failed to exhaust his administrative remedies on *all* of his claims. An evidentiary hearing is necessary to determine whether Plaintiff exhausted his administrative remedies with respect to his remaining excessive-force claim against Defendants Plumley and Spear. Defendants may renew their motion following this hearing; and

4. The case is REFERRED to Magistrate Judge Peebles to conduct an evidentiary hearing on exhaustion of administrative remedies. The Magistrate Judge should also consider Plaintiff's request to have counsel appointed to represent him at that hearing.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

Pro se plaintiff Jeffrey A. Nelson, a New York State prison inmate, has brought this action pursuant to 42 U.S.C. § 1983 alleging that several individuals employed by or affiliated with the New York State Department of Corrections and Community Supervision ("DOCCS") have deprived him of his civil rights. Plaintiff contends that, while incarcerated, two of the defendants used excessive force against him, two other defendants subjected him to conditions of confinement tantamount to cruel and unusual punishment, and a fifth defendant

denied him procedural due process during a disciplinary hearing.

**\*2** Now that discovery in the action has closed, defendants have moved for summary judgment dismissing plaintiff's claims. Defendants seek dismissal of two of plaintiff's claims based on his alleged failure to exhaust administrative remedies before filing suit, and contend that plaintiff's other claims lack merit. For the reasons set forth below, I recommend that plaintiff's conditions of confinement and due process claims be dismissed on the merits, and that an evidentiary hearing be conducted to determine whether plaintiff properly exhausted available administrative remedies in connection with his excessive force claim.

## I. *BACKGROUND* [1]

Plaintiff is a prison inmate currently in the custody of the DOCCS. *Dkt. No. 1 at 1.* While he is now incarcerated elsewhere, at the time of the relevant events Nelson was confined in a satellite unit of the Central New York Psychiatric Center ("CNYPC") in the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *Id.* at 1, 4. Plaintiff suffers from mental illnesses, described by him as "depression, nervous panic attacks, ... and memory loss." *Id.* at 16.

On December 26, 2011, plaintiff was placed in the Residential Crisis Treatment Program ("RCTP") at Clinton for observation based upon a threat of self-harm. *Dkt. No. 50–1 at 2.* Upon entering an observation cell in the RCTP, plaintiff was provided with a specialized tear —and fire-resistant mattress, two tear-resistant mats, a specialized tear-resistant smock, soap, a toothbrush, and toothpaste. [2] *Id.*

Plaintiff alleges that, on January 3, 2012, while confined in his RCTP observation cell, he was involved in an altercation with defendants Bruce Plumley and Jeffrey Spear, both of whom are corrections officers at Clinton. *Dkt. No. 1 at 4–5; Dkt. No. 57–1 at 11–12.* Plaintiff alleges that he was assaulted by the two officers without provocation and, as a result, lost consciousness and suffered a concussion and laceration near his right eye requiring stitches. Dkt. No. 1 at 7; Dkt. No. 57–1 at 12– 13. After being treated for his injuries by medical staff at Clinton, Nelson was returned to the RCTP observation cell without incident. Dkt. No. 49–6 at 2, 6.

As a result of the physical altercation, defendants Plumley and Spear each issued plaintiff separate misbehavior reports dated January 3, 2012. *Dkt. No. 1 at 13; Dkt. No. 49–3 at 2,* 9–10. Both misbehavior reports accused Nelson of failing to obey a direct order, assaulting a staff member, and engaging in violent conduct. *Dkt. No. 49–3 at 2,* 9– 10. Beginning on or about January 9, 2012, Corrections Lieutenant John Miller, a defendant in this action, conducted a Tier III disciplinary hearing to address the charges contained in the misbehavior reports. [3] *Id.* at 3, 58–89. On or about January 20, 2012, following the close of the hearing, defendant Miller found Nelson guilty on all six counts, and imposed a penalty that included eighteen months of disciplinary confinement in a facility special housing unit ("SHU"), with a corresponding loss of telephone, package, and commissary privileges, and a recommendation that plaintiff lose twelve months of good time credits. *Id.* at 12, 88–89. Defendant Miller's determination was affirmed following review by D. Venettozzi, the DOCCS Acting Director of Special Housing/Inmate Disciplinary Program. *Id.* at 91.

**\*3** On January 3, 2012, the date of the alleged assault by defendants Plumley and Spear, the RCTP cells at Clinton were monitored by defendant Dr. Sohail Gillani, [4] a psychiatrist employed by the New York Office of Mental Health ("OMH") and assigned to the CNYPC satellite unit at Clinton. *Dkt. No. 50–1 at 1,* 3. On that date, according to defendant Gillani, he ordered that plaintiff be permitted only a smock in his cell after determining that plaintiff was at risk to himself, based upon his expression of suicidal ideation. *Id.* at 3. A "smock only" instruction meant that plaintiff would be provided only with a cloth smock comprised of heavy tear-resistant quilted material and designed to provide coverage and warmth to his body and reduce the risk of self-inflicted harm. *Dkt. No. 50–1 at 3.* In accordance with standard procedures applicable to observation cells in the RCTP, defendant Gillani's "smock only" order, and his corresponding instruction that plaintiff not be provided a blanket, were to be reviewed every twenty-four hours. *Id.* at 4. Accordingly, plaintiff was evaluated on January 4, 2012, by defendant Dr. Jean Berggren, another OMH psychiatrist assigned to the facility. Dkt. *No. 50 at 1,* 3. Based upon her observations, defendant Berggren discharged plaintiff from the RCTP on that date. *Id.* at 3–4.

Plaintiff, in some contrast, alleges that while confined in an RCTP observation cell after receiving medical treatment and meeting with defendant Gillani on January 3, 2012, he was left naked and "without a[ ] mattress, mats, smock, clothes, shoes, blanket, nor any shelter of warmth" for twenty-two hours in an "extremely cold cell." *Dkt. No. 1 at 9–10,* 13; Dkt. *No. 57–1 at 16.* In support of their motion, however, defendants have submitted evidence demonstrating that the temperatures in the CNYPC satellite unit, where the RCTP observation cells are located, are controlled by a Siemens computerized heating and cooling system designed to maintain a temperature of between 68 and 72 degrees Fahrenheit. *Dkt. No. 49–7 at 2.* The computers used in connection with the heating and cooling system are located in the main maintenance office at Clinton and a maintenance office located in the basement of Building 156, the building in which the CNYPC satellite unit is located. *Id.* Those computers are accessible only to maintenance workers at Clinton. *Id.* While there are thermometers in Building 156 that corrections officers and other staff members may use to verify and record temperatures, there are no manually adjustable thermostats located in the building to permit adjustment of the computer-controlled temperatures. *Id.* Accordingly, OMH employees have no ability to control ambient temperatures within the CNYPC satellite unit at Clinton. *Dkt. No. 50 at 4; Dkt. No. 50–1 at 4.*

Defendants have also submitted excerpts of logbook entries recording readings taken from thermometers located in the CNYPC satellite unit, and specifically the RCTP observation cell in which plaintiff was confined at the relevant times. *Dkt. No. 49–6 at 2.* According to those logbooks, the temperature recorded at the beginning of the 3:00 p.m. to 11:00 p.m. shift on January 3, 2012, was 70 degrees. *Dkt. No. 49–6 at 7.* At the beginning of the next shift, commencing at 11:00 p.m., the temperature was recorded at 72 degrees. *Dkt. No. 49–6 at 8.* At 6:55 a.m. on January 4, 2012, the temperature of the observation cells was recorded at 70 degrees. *Id.* at 9–10.

## II. *PROCEDURAL HISTORY*

**\*4** Plaintiff commenced this action on March 8, 2012. *Dkt. No. 1.* Plaintiff's complaint was accompanied by an application for leave to proceed *in forma pauperis* ("IFP"), a motion for preliminary injunction, and a request for appointment of counsel. Dkt. Nos. 2, 4, 5. Named as defendants in plaintiff's complaint are Corrections Officers Bruce Plumley and Jeffrey Spears;

Drs. Jean Berggren and S. Gillani; Joanne Waldron, a DOCCS mental health unit chief; Lester Wright, DOCCS Deputy Commissioner and Chief Medical Officer; and Corrections Lieutenant John E. Miller. *Dkt. No. 1* at 2–3. Following an initial review of plaintiff's complaint and IFP application, Senior District Judge Thomas J. McAvoy entered an order on June 1, 2012, granting plaintiff IFP status, denying his motions for a preliminary injunction and appointment of counsel, and approving the filing of Nelson's complaint subject to dismissal of his claim asserted against defendants Plumley and Spear for the alleged issuance of false misbehavior reports. *Dkt. No. 9.*

As a result of a subsequent dismissal motion filed by the defendants, my issuance of a report and recommendation concerning that motion, and a decision and order from Senior District Judge McAvoy, issued on March 18, 2013, adopting the report, plaintiff's claims have been further narrowed. Dkt. Nos. 25, 32, 34. By virtue of those decisions and plaintiff's subsequent filing of an affidavit abandoning any claims associated with the duration of his confinement arising from the disciplinary proceeding conducted by defendant Miller, *Dkt. No. 35,* the claims that remain pending are (1) an excessive force cause of action asserted against defendants Plumley and Spear; (2) a conditions of confinement claim asserted against defendants Berggren and Gillani; and (3) a procedural due process cause of action asserted against defendant Miller.

On November 25, 2013, following the close of discovery, defendants moved for the entry of summary judgment. *Dkt. No. 49.* In their motion, defendants request (1) dismissal of plaintiff's excessive force and conditions of confinement claims based upon his alleged failure to exhaust available remedies before commencing suit, and (2) dismissal of plaintiff's conditions of confinement and procedural due process claims on the merits. *See generallyDkt. No. 49–1.* Plaintiff has since responded in opposition to defendants' motion. Dkt. Nos. 55, 57. Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*5** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); see also Anderson, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Exhaustion of Administrative Remedies*
In support of their motion, defendants contend that plaintiff is procedurally barred from pursuing his excessive force and conditions of confinement causes of action based upon his alleged failure to exhaust all available administrative remedies before commencing this action. *Dkt. No. 49–1 at 6–9.*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [5] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete [ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *accord, Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007). [6]

**\*6** In accordance with the PLRA, the DOCCS has instituted a grievance procedure, called the Inmate Grievance Program ("IGP"), and made it available to inmates. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson,* No. 96–CV–5396, 2004 WL 234898, at \*4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a) (1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* A representative of the facility's inmate grievance resolution committee

("IGRC") has up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b) (2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [7] *Id.* at § 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be entered within a specified period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer,* No. 03–CV–1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia,* 7 N.Y.C .R.R. § 701.6(g)(2)).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

In this case, plaintiff does not contend that he fully exhausted the available administrative remedies with respect to his excessive force and conditions of confinement claims. Rather, he maintains that his efforts to fully exhaust were thwarted by corrections officials at Clinton and at the Upstate Correctional Facility ("Upstate") following his transfer into that facility.

Because there is no record evidence to suggest that plaintiff did fully exhaust the administrative remedies, I have examined only whether plaintiff's failure to exhaust may be excused.

**\*7** In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. *Id.* If the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

A review of the record in this case reveals a genuine dispute of material fact as to whether plaintiff's efforts to file grievances concerning the incidents at Clinton on January 3, 2012, were obstructed by DOCCS officials. According to plaintiff, he filed two grievances against defendants Plumley, Spear, Gillani, and Berggren while at Clinton on January 9, 2012, and January 10, 2012. *Dkt. No. 57–1 at 2; Dkt. No. 55–3 at 2–3.* Although the photocopies of the grievances submitted by plaintiff in opposition to the pending motion are difficult to decipher, it appears that they contain allegations that he was subjected to excessive force and cold temperatures on January 3, 2012. *Dkt. No. 55–3 at 2–4.* Plaintiff alleges that he provided the two grievances, which were inside a sealed envelope, to an unidentified corrections officer at Clinton responsible for collecting the mail. *Dkt. No. 57–1 at 2.* According to plaintiff, Christine Gregory, the Inmate Grievance Program Supervisor at Clinton, "decline[d] to respond and did not process" his grievances filed in January. [8] *Id.* at 3.

In contrast to plaintiff's contentions, defendants have submitted an affidavit from Gregory, in which she states that there is no record at Clinton of plaintiff filing any grievances dated January 9, 2012, or January 10, 2012. *Dkt. No. 49–5 at 2.* Instead, Gregory notes that, on February 15, 2012, following plaintiff's transfer into Upstate, she received a letter from plaintiff requesting the status of the two grievances allegedly filed in January 2012, while he was still confined at Clinton. *Id.* Gregory responded to him by memorandum, advising him that there was no record of plaintiff filing grievances dated January 9, 2012, or January 10, 2012. *Dkt. No. 49–5 at 7.* She further advised plaintiff that any complaints must be processed through the IGP at Upstate, the facility in which he was then confined. *Id.*

**\*8** In apparent compliance with Gregory's instruction, on or about February 16, 2012, plaintiff attempted to file his grievances concerning the incident at Clinton on January 3, 2012, to Brandi White, the Inmate Grievance Program Supervisor at Upstate. *Dkt. No. 49–4 at 7–9.* In a cover letter, plaintiff advised White that he had attempted to file the grievances at Clinton but "that prison made the remedy unavailable by obstructing access to the grievance process." *Id.* at 7. Without addressing plaintiff's allegation of obstruction to the IGP at Clinton, White wrote plaintiff a memorandum, dated February 17, 2012, advising that his grievances submitted to her at Upstate were untimely, and, in accordance with DOCCS policies, she returned the grievances to plaintiff. *Id.* at 13. Plaintiff again attempted to file his grievances at Upstate on February 22, 2012, and White again rejected them as untimely.[9] *Id.* at 3, 15. In his affidavit submitted in opposition to the pending motion, plaintiff insists that Gregory and White "intentionally inhibited and obstructed [him] from using and availing himself of the facilities ['] administrative grievance program by not processing [his] two timely filed grievance complaints." *Dkt. No. 57–1 at 3.*

In light of the foregoing record evidence, I find that a dispute of fact exists as to whether special circumstances exist justifying plaintiff's failure to fully exhaust the available administrative remedies prior to commencing this action.[10] The Second Circuit has said that "non-exhaustion is an affirmative defense subject to estoppel in cases where prison officials inhibit an inmate's ability to utilize administrative grievance procedures." *Giano,* 380 F.3d at 677 (citing *Ziemba v. Wezner,* 366 F.3d

161, 163 (2d Cir.2004)). Although courts in this circuit have interpreted this holding to mean that only a named-defendant may be *estopped* from asserting the exhaustion defense,[11] other courts have extended the spirit of the holding by applying special circumstances where a non-defendant prison official interferes with an inmate-plaintiff's ability to file a grievance. *See, e.g., Murray,* 2010 WL 1235591, at *6 (finding an allegation "that an unspecified number of unidentified corrections officers (who are not [named-defendants] ) somehow interfered with the delivery of [the plaintiff's] grievance and appeals ... could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations"); *Sandin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (finding that the plaintiff's allegation that a prison official's "refusal to accept or forward plaintiff's appeals ... effectively rendered the grievance process unavailable to [the plaintiff]" and would also constitute special circumstances). Because plaintiff has alleged that DOCCS officials (including the unidentified corrections officer at Clinton responsible for collecting mail, as well as Gregory and White) interfered with his ability to file the grievances concerning the incident at Clinton on January 3, 2012, and defendants have not provided the court with evidence to the contrary, I find that a dispute of material fact exists precluding the granting of defendants' motion with respect to their contention that plaintiff failed to exhaust the available administrative remedies prior to commencing this action. Accordingly, I recommend that the court conduct an evidentiary hearing to evaluate the issues of fact and assess plaintiff's credibility.[12] *See Messa v. Goord,* 652 F.3d 305, 310 (2d Cir.2011) ("[T]he Seventh Amendment does not guarantee a jury trial on factual disputes regarding administrative exhaustion under the PLRA.").

### C. *Conditions of Confinement*

**\*9** Although defendants seek dismissal of plaintiff's conditions of confinement claim, asserted against defendants Berggren and Gillani, based on plaintiff's failure to exhaust administrative remedies, they also contend the claim is ripe for dismissal on the merits. Specifically, defendants maintain that, based on the record evidence, no reasonable factfinder could conclude that plaintiff was subjected to cruel and unusual punishment under the Eighth Amendment. *Dkt. No. 49–1 at 7–13.* Defendants also contend that defendant

Berggren was not personally involved in the alleged constitutional violation, and defendant Gillani, who is allegedly responsible for plaintiff remaining naked in the RCTP observation cell for twenty-two hours, is entitled to qualified immunity from suit. *Id*. at 13–15.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or 'involve[s] the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v.. Chapman,* 452 U.S. 337, 349 (1981)). A claim alleging that prison conditions have violated the Eighth Amendment must satisfy both an objective and subjective requirement. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996). As to the objective requirement, "the plaintiff must demonstrate that the conditions of his confinement result in 'unquestioned and serious deprivations of basic human needs.' " *Jolly,* 76 F.3d at 480 (quoting *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.2985)); *see also Walker v. Schult,* 717 F.3d 119, 125 (2d Cir.2013) ("To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."). As to the subjective requirement, "the plaintiff must demonstrate that the defendants imposed those conditions with 'deliberate indifference,' " *Jolly,* 76 F.3d at 480 (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)); *see also Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837; *see also Waldo,* 1998 WL 713809, at *2; *Davidson,* 920 F.Supp. at 308.

Without question, exposure to extreme temperatures in a prison setting can constitute cruel and unusual punishment as proscribed under the Eighth Amendment. *See Benjamin v. Fraser,* 343 F.3d 35, 52 (2d Cir.2003), *overruled on other grounds by Caiozzo v. Koreman,* 581 F.3d 63 (2d Cir2009), (affirming the district court's conclusion that "exposure to extremes of temperature violated the detainees' constitutional rights"); *Gatson v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (finding that the plaintiff's allegation that he was exposed to freezing temperatures from November 1990 through March 1991 stated a claim under the Eighth Amendment); *Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (reversing the district court's grant of summary judgment where there was evidence that the plaintiff had been deliberately exposed to bitter cold in his cell block for three months).

**\*10** In this instance, plaintiff maintains that, by virtue of defendant Gillani's orders to DOCCS corrections officers, he was left naked in his RCTP observation cell and subjected to "extreme[ ] cold" for a period of "twenty-two hours" between January 3, 2012, and January 4, 2012. *Dkt. No. 1 at 9–10, 13; Dkt. No. 57–1 at 16*. In support of their motion for summary judgment, however, defendants have submitted evidence demonstrating that (1) the temperature in Building 156, where the CNYPC satellite unit is located, is controlled by a computer system located separate from the unit, and set to between 68 and 72 degrees at all times; (2) during the twenty-two hours in question, DOCCS corrections officers independently confirmed that the temperature in the unit was within the specified range; (3) only maintenance staff is authorized and able to access the computer system controlling the temperature in Building 156, and, accordingly, neither defendant Berggren nor defendant Gillani could have altered the temperature in plaintiff's cell; and (4) after he received medical treatment following the alleged assault by defendants Plumley and Spear, plaintiff expressed suicidal ideation to defendant Gillani, who subsequently issued an order that plaintiff be denied a blanket and anything other than a smock in order to prevent any attempted self-harm. *Dkt. No. 49–6 at 2,* 7, 8, 9–10; *Dkt. No. 49–7 at 2; Dkt. No. 50 at 4; Dkt. No. 50–1 at 4.*

While the court acknowledges the parties' conflicting accounts regarding the temperature in plaintiff's cell on January 3, 2012, and whether he was provided any clothing at all on that date, even assuming plaintiff's version of the events are accurate, I find that no reasonable factfinder could conclude that plaintiff was subjected to cruel and unusual punishment by defendants Berggren and Gillani. [13] *See Trammell v. Keane,* 338 F.3d 155, 164–65 (2d Cir.2003) (concluding that the plaintiff "no doubt" experienced uncomfortable conditions of confinement,

including, according to the plaintiff, being kept naked for a " 'prolonged period in bitter cold,' " but finding no constitutional violation where there was no evidence "that the cell in which he was housed was open to the elements, that it lacked adequate heat, or ... that the cell was 'bitter cold' "); *Flake v. Peck,* No. 12–CV–0517, 2014 WL 1289582, at *21 (N.D.N.Y. Mar. 31, 2014) (D'Agostino, J., *adopting report and recommendation by* Baxter, M.J.) (finding that the plaintiff's allegations that he was subjected to bitter cold in various cells from July 2010 until January 2011 was not sufficient to defeat the defendants' motion for summary judgment where the defendants had submitted evidence that the plaintiff was given one blanket when he asked for it and maintenance checked the temperature of his cells when he complained of the temperature); *Borge v. McGinnis,* No. 03–CV–6375, 2007 WL 1232227, at *5–6 (W.D.N.Y. Apr. 26, 2007) (dismissing the plaintiff's conditions of confinement claim where he alleged that, for three days, he was provided only a paper gown, paper slippers, and a thin mattress in a cell maintained at approximately fifty degrees). Moreover, plaintiff's mere allegations that he was left naked in an "extremely cold cell," without any supporting evidence, are insufficient to defeat defendants' motion, which includes evidentiary support demonstrating that plaintiff's RCTP observation cell was maintained at a reasonably warm temperature on January 3, 2012, and January 4, 2012. See *BellSouth Telecomm., Inc. v. W.R. Grace & Co.-Conn.,* 77 F.3d 603, 615 (2d Cir.1996) ("An adverse party may not rest upon mere conclusory allegations or denials. The party opposing the motion for summary judgment must set for concrete particulars. It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts." (quotation marks, alterations omitted); *Wilson Jones v. Gilbert & Bennette Mfg. Co.,* 332 F.2d 216, 219 (2d Cir.1964) ("Mere conclusory affidavits that an issue exists no longer suffice to defeat well[-]grounded motions for summary judgment."). Accordingly, I recommend that the court grant defendants' motion for summary judgment with respect to plaintiff's conditions of confinement claim asserted against defendants Berggren and Gillani.

### C. *Procedural Due Process*

**\*11** Defendants also seek dismissal of plaintiff's due process claim, based on their contention that plaintiff received the full panoply of rights guaranteed under the Fourteenth Amendment during the Tier III disciplinary hearing conducted by defendant Miller. *Dkt. No. 49–1 at 16–21.*

Under the Fourteenth Amendment, a prison inmate who is deprived of a protected liberty interest must be afforded due process of law.[14] *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, and include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonnell,* 418 U.S. 539, 564–69 (1974); *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487–88.

The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citing *Wolff,* 418 U.S. 570–71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen,* 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (quoting *Hill,* 472 U.S. at 455).

Here, plaintiff alleges that he was denied due process when defendant Miller refused to call several witnesses requested by plaintiff, including defendants Berggren and Gillani, twenty-three other OMH staff, and the nurse that treated plaintiff following the alleged assault by defendants Plumley and Spear. *Dkt. No. 1 at 13–16; Dkt. No. 57–1 at 19–24.* According to plaintiff, those individuals may have witnessed the alleged assault. *Id.* Plaintiff also accuses defendant Miller of being impartial during the disciplinary hearing, and failing to afford him the opportunity to present a proper defense. [15] *Id.*

**\*12** To refute plaintiff's allegations, defendants have submitted several documents related to the disciplinary hearing, including a full transcript of the hearing that commenced on January 9, 2012. *Dkt. No. 49–3 at 3.* Although plaintiff initially refused assistance in preparing for the hearing, once it commenced, he reconsidered and requested assistance. *Dkt. No. 49–3 at 15,* 61–62. Defendant Miller adjourned the hearing at that time to permit plaintiff to meet with his assistant and prepare a defense. *Dkt. No. 49–3 at 62.* The assigned assistant, A. Bezzio, met with plaintiff on January 10, 2012, and submitted a request for any unusual incident report concerning the altercation between defendants Plumley and Spear and plaintiff, as well as the opportunity to review the videotape recording of plaintiff's escort to medical personnel for treatment. *Dkt. No. 49–3 at 16.* The assistance form filed by Bezzio did not list any potential witnesses to be interviewed. *Id.*

At the continuation of the hearing, on January 18, 2013, although plaintiff requested testimony from two inmates who were confined in adjoining RCTP observation cells at the time of the alleged assault, those inmates refused to testify. *Dkt. No. 49–3 at 18–19,* 69–71. Defendant Miller reviewed the videotape depicting plaintiff's escort to the prison hospital following the incident, and then plaintiff testified in his own defense. *Id.* at 63–72. After determining that live testimony should be elicited from defendants Plumley and Spear, defendant Miller again adjourned the hearing. *Id.* at 70.

Plaintiff's Tier III disciplinary hearing resumed on January 20, 2012. *Dkt. No. 49–3 at 73.* During that session, defendants Plumley and Spear testified that the incident occurred in the RCTP observation cell area and there were no staff members other than themselves in the vicinity. *Dkt. No. 49–3 at 74–80.* Plaintiff's disciplinary hearing was

again adjourned and resumed on January 23, 2012, based on plaintiff's request that Sergeant W. Bissell, the area supervisor on the date of the incident, be called to testify. *Dkt. No. 49–3 at 84–86.*

During the hearing, defendant Miller addressed plaintiff's request for additional unidentified witnesses and determined that no one was present during the incident, as alleged by plaintiff. Defendant Miller based his determination, in part, on the testimony of Sergeant Bissell, who stated that when he arrived after the incident, "there was nobody on that company." *Dkt. No. 49–3 at 86.* Defendant Miller also reviewed the logbook for the unit where plaintiff was housed on January 3, 2012, and concluded that no one had entered the area at or around the time of the incident, and up until after the incident. [16] *Id.* at 80–81. Although plaintiff requested the testimony of the nurse that treated him after the incident, defendant Miller denied that request because the nurse had not been present during the incident and therefore could not provide any relevant testimony. *Id.* at 87. At the conclusion of the hearing, defendant Miller provided plaintiff with a written disposition finding him guilty of all of the charges listed in the two misbehavior reports issued by defendants Plumley and Spear. *Id.* at 88–89. Defendant Miller based his findings based on several pieces of evidence, including the misbehavior reports authored by defendants Plumley and Spear, the unusual incident report, the use of force paperwork, employee injury reports and photos, the testimonies of defendants Plumley and Spear, and the testimony of OMH staff regarding plaintiff's mental health status at the time of the incident. *Id.*

**\*13** In light of the foregoing evidence, I conclude that plaintiff was not deprived any due process. With respect to plaintiff's request to call two inmates that may have seen or heard the altercation on January 3, 2012, "[a] hearing officer has no power to force an inmate to testify, and when the inmate refuses, the hearing officer need not call that witness." *Dumpson v. Rourke,* No. 96–CV–0621, 1997 WL 610652 at \*5 (N.D.N.Y. Sept. 26, 1997) (Pooler, J., *adopting report and recommendation by* DiBianco, M.J.) (citing *Silva v. Casey,* 992 F.2d 20, 21–22 (2d Cir.1993)); *see also Wolff,* 418 U.S. at 568–69 (recognizing prison officials' discretion to call inmates as witnesses). In addition, defendant Miller's decision not to call plaintiff's treating nurse, as requested by plaintiff, was also reasonable. It is clear from plaintiff's testimony that the

nurse was not present during the alleged assault, and the record of plaintiff's injuries and treatment, coupled with the videotape reviewed by defendant Miller, adequately addressed their scope and extent. *See Wolff,* 418 U.S. at 566 (citing "lack of necessity" as a proper ground for refusing to call a potential witness at a disciplinary hearing). Defendant Miller's failure to call several other unidentified individuals to determine whether they had any additional information was also reasonable based on the testimonies of defendants Plumley and Spear and Sergeant Bissell, to the effect that no one else was present at the time of the altercation. *See Silva,* 992 F.3d at 21–22 ("[I]f a prison official, presiding over a prison disciplinary hearing, reasonably concludes that it would be futile to call a witness to testify, his refusal to do so will not constitute a violation of the prisoner's constitutional rights."). Finally, a careful review of the hearing record reveals that defendant Miller's determination was well supported by the evidence presented.

In sum, the record evidence in this case discloses that plaintiff was afforded the full extent of the procedural process due him under *Wolff* and its progeny, and no reasonable factfinder could conclude otherwise. Accordingly, I recommend dismissal of plaintiff's due process cause of action asserted against defendant Miller.

IV. *SUMMARY AND RECOMMENDATION*
Defendants' arguments concerning plaintiff's alleged failure to exhaust available administrative remedies before commencing suit present issues of fact that must be addressed during an evidentiary hearing before the question of exhaustion can be decided by the court as a matter of law. Turning to the merits of plaintiff's conditions of confinement and due process claims, I conclude that no reasonable factfinder could find that plaintiff was exposed to conditions tantamount to cruel and unusual punishment or was denied procedural due process in connection with his Tier III disciplinary hearing. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (*Dkt. No. 49* ) be GRANTED, in part, and that plaintiff's Eighth Amendment conditions of confinement and Fourteenth Amendment procedural due process claims be DISMISSED; and it is further hereby

**\*14** RECOMMENDED that an evidentiary hearing be conducted pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), to address whether, with respect to his Eighth Amendment excessive force claim, plaintiff's failure to exhaust administrative remedies prior to commencing this action may be excused.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed Aug. 13, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4659327

Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2    Although plaintiff denies that he was provided with these amenities while in the observation cell, *Dkt. No. 57–1 at 16–17,* the parties' disagreement does not create a genuine dispute of material fact precluding the entry of summary judgment.

3    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n. 1 (2d Cir.1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n. 1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

4    The clerk is respectfully directed to modify the court's records to reflect the correct spelling of this defendant's name, as demonstrated in the declaration submitted in support of defendants' pending motion. *Dkt. No. 50–1 at 1.*

5    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

6    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

7    Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c) (i), (ii).

8    Plaintiff also alleges that, in addition to submitting the grievances through the IGP, he sent letters concerning the incidents on January 3, 2012, to the DOCCS Inspector General and other officials. *Dkt. No. 57–1 at 2–3.* As noted above, while placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson,* 380 F.3d at 697–98 (emphasis omitted)). Accordingly, to the extent that plaintiff submitted letters to DOCCS officials outside the formal IGP, those efforts are not relevant to the exhaustion analysis.

9    Notwithstanding White's insistence that "[g]rievances that are returned [to inmates] as untimely are not logged in at the grievance office with a date or grievance number" and that the grievances are "returned to the inmate," she attached copies of plaintiff's cover letter and grievances, each dated February 17, 2012, to her affidavit submitted in support of defendants' pending motion. *Dkt. No. 49–4 at 7–9.* White did not, however, attach a copy of the grievances submitted to her by plaintiff on February 22, 2012.

10   Plaintiff does not allege that the IGP was unavailable to him, nor does he contend that any of the named defendants attempted to thwart his efforts to process his grievances. Accordingly, the first two exceptions to the exhaustion rule under *Macias* and *Hemphill* are not applicable in this action. *See, e.g., Collins v. Caron,* No. 10–CV–1527, 2014 WL 296859, at *5–6 (N.D.N.Y. Jan. 27, 2014) (Suddaby, J.) ("A defendant in a prisoner civil rights action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies ... based on the actions or inactions of *other* individuals." (citing cases) (emphasis in original)).

11   *See, e.g., Collins,* 2014 WL 296859, at *5–6 (citing cases).

12   Because I recommend that plaintiff's conditions of confinement claim be dismissed on the merits, *see* Part III.C., *post,* however, during the evidentiary hearing, the court need only inquire into whether plaintiff is excused for failing to exhaust administrative remedies in connection with his excessive force claim asserted against defendants Plumley and Spear.

13   In his affidavit, plaintiff also states that an unidentified corrections sergeant told him that he was secured in his cell without a mattress, mats, or a smock based on a " 'doctor[']s orders.' " *Dkt. No. 57–1 at 15–16.* Setting aside the fact that the identity of both the corrections sergeant and doctor referenced are unknown, the corrections sergeant's statement constitutes inadmissible hearsay. Consequently, plaintiff cannot be rely on the statement to create a genuine dispute of material fact. *See Burlington Coat Factory Warehouse Corp. v. Espirit de Corp.,* 769 F .2d 919, 924 (2d Cir.1985) ("[A party] cannot rely on inadmissible hearsay in opposing a motion for summary judgment."); *accord, Chansamone v. IBEW Local 97,* 523 F. App'x 820, 822 n. 4 (2d Cir.2013).

14   Because the penalty imposed by defendant Miller, following plaintiff's Tier III hearing, included eighteen months of disciplinary SHU confinement, plaintiff has satisfied the element of a due process claim requiring that he be deprived a protected liberty interest. *See Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (finding that, even under normal SHU conditions, confinement for more than 305 days implicates a prisoner's liberty interests); *accord, Palmer v. Richards,* 364 F.3d 60, 65 (2d Cir.2004).

15   Plaintiff also complains that his disciplinary hearing was not timely commenced. *Dkt. No. 1 at 16.* That argument, however, is based upon New York State regulations governing disciplinary hearings. *See, e.g.,* 7 N.Y.C.R.R. § 251–5.1. It is well settled, however, that "violations of state law that do not deprive the plaintiff of a right 'secured by the Constitution and laws' are insufficient to support a claim under [section] 1983." *Allred,* 2010 WL 3911414, at *5 (quoting *Baker v. McCollan,* 443 U.S. 137, 139–40 (1979)); *see also Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990).

16   According to defendant Miller, anyone entering the unit, whether an employee or otherwise, is required to sign the logbook in accordance with facility policy. *Dkt. No. 49–3 at 6.*

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 667531
United States District Court,
N.D. New York.

Kelly SEALE and David Seale, Plaintiffs,

v.

MADISON CNTY.; Allen Riley, Individually
and in his Official Capacity as Madison Cnty.
Sheriff; Matthew Episcopo, Individually and in his
Official Capacity as Captain of the Madison Cnty.
Sheriff's Ofc.; Doug Bailey, Individually and in
his Official Capacity as Former Undersheriff for
Madison Cnty.; and Ryan Aylward, Individually
and in his Official Capacity as Coordinator of
Labor Relations for Madison Cnty., Defendants.

No. 5:11−CV−0278 (GTS/ATB).
|
Signed Feb. 17, 2015.

**Attorneys and Law Firms**

O'Hara, O'Connell & Ciotoli, Stephen Ciotoli, Esq., of
Counsel, Fayetteville, NY, for Plaintiffs.

The Law Firm of Frank W. Miller, Charles C. Spagnoli,
Esq., Frank W. Miller, Esq., Bryan N. Georgiady, Esq.,
of Counsel, East Syracuse, NY, for Defendants.

### *DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this employment
discrimination action filed by Kelly Seale and David Seale
("Plaintiffs") against the above-captioned government
entity and four named individuals ("Defendants"), is
Defendants' motion for summary judgment pursuant to
Fed.R.Civ.P. 56. (Dkt. No. 34.) For the reasons set forth
below, Defendants' motion for summary judgment is
granted.

## I. RELEVANT BACKGROUND

### A. Procedural History
Because this Decision and Order is intended primarily for
the review of the parties, the Court will not recite this

action's procedural history, including Defendants' motion
for judgment on the pleadings, which was granted in
part and denied in part. *See Seale v. Madison Cnty.,* 929
F.Supp.2d 51 (N.D.N.Y.2013).

### B. Plaintiffs' Claims
The following claims survived Defendants' motion for
judgment on the pleadings: (1) a hostile work environment
claim by Plaintiff Kelly Seale ("Kelly Seale") against
Defendant, Madison County ("the County") pursuant to
Title VII of the Civil Rights Act of 1964, as amended,
42 U.S.C. § 2000e *et seq.* ("Title VII") and the New
York Human Rights Law, N.Y. EXEC. LAW § 296
("NYHRL"); (2) a hostile work environment claim
by Kelly Seale against Defendant, Matthew Episcopo
("Episcopo") pursuant to 42 U.S.C. § 1983 ("Section
1983"); (3) a retaliation claim by Kelly Seale against
the County pursuant to Title VII; (4) a retaliation
claim by Kelly Seale against the County as well as
Defendants, Episcopo, Allen Riley ("Riley") and Ryan
Aylward ("Aylward") pursuant to NYHRL; (5) a First
Amendment retaliation claim by Kelly Seale against the
County, Riley, Episcopo and Aylward; and (6) a First
Amendment retaliation claim by Plaintiff, David Seale
("David Seale") against the County, Riley, Episcopo,
Aylward and Defendant, Doug Baily ("Bailey").

### C. Undisputed Material Facts [1]
Unless otherwise followed by citations to the record, the
following material facts have been asserted and supported
by Defendants in their Local Rule 7.1 Statement of
Undisputed Material Facts, and either admitted or denied
without a supporting record citation by Plaintiffs in their
Local Rule 7.1 Response (*compare* Dkt. No. 34–1 [Defs.'
Rule 7.1 Statement] with Dkt. No. 38 [Pls.' Rule 7.1
Response] ), or have been asserted and supported by
Plaintiffs in their Local Rule 7.1 Statement of Additional
Undisputed Material Facts, to which Defendants have
failed to respond (*see* Dkt. No. 38 at 70–77 [Pls.' Rule 7.1
Statement] ).

Kelly Seale is a former employee of the County. She
was employed as the Community Services Aide at the
County Sheriff's Office from January 2, 2008 until she
resigned effective May 31, 2010. Kelly Seale was a part-
time employee and was not entitled to vacation time, sick
leave or other compensated leave. Kelly Seale's husband,
David Seale, is currently employed by the County in the

Sheriff's Office. David Seale began his employment as a Deputy in the Sheriff's Office in 1998. According to Sheriff Riley, David Seale was promoted to Sergeant effective August 9, 2014. (*See* Dkt. No. 41–2 at ¶ 4 [Reply Aff. of Allen Riley, Aug. 22, 2014].)

**\*2** Defendant Riley is the current Sheriff of the County. He was elected to that position in November 2009 and assumed office in January 2010. Defendant Bailey was employed as Undersheriff of the County from 1991 until he retired on December 1, 2010. From September 2009, when former Sheriff Ronald Cary ("Cary") resigned, until Sheriff Riley took office, Bailey performed the duties of Sheriff on an interim basis.

Defendant Aylward is currently employed as the Director of Labor Relations in the County's Personnel and Civil Service Department. He has held that position since Spring, 2010. Prior to Spring, 2010, he was employed as the County's Coordinator of Labor Relations.

Defendant Episcopo was formerly a Captain in the Sheriff's Office. He held that position from 2005 until he retired in May, 2011. According to Sheriff Riley and Undersheriff Bailey, Episcopo did not have the ability to hire, fire, promote, demote, make any decision substantially changing the salary or benefits of, or make any decision substantially reassigning the duties of any other employee of the Sheriff's Office, including Kelly Seale. (Dkt. No. 34–3 at ¶ 4 [Riley Aff., June 25, 2014]; Dkt. No. 34–5 at ¶ 2 [Bailey Aff., July 1, 2014].) Kelly Seale testified that she did not have any information, nor was she told, that Episcopo could have hired, fired, promoted, denied a promotion to, or reassigned her. (Dkt. No. 34–19 at 82:21–84:7 [Kelly Seale Dep., Oct. 30, 2013].) Plaintiff David Seale testified that Episcopo was involved in the firing of several corrections officers and deputy sheriffs throughout the years, meaning that Episcopo made recommendations to the Sheriff and Undersheriff, who usually followed his recommendations, although the Sheriff had the ultimate authority to make that decision. (Dkt. No. 37–3 at 130:11–131:8 [David Seale Dep ., Oct. 31, 2013].) Bailey testified that during his twenty years as Undersheriff, he never saw a recommendation for termination or suspension, but saw recommendations for additional training. (Dkt. No. 37–6 at 15:1–24 [Bailey Dep., Apr. 9, 2014].)

At all relevant times, the County had in place a policy proscribing sexual harassment in the workplace and providing a procedure by which employees may report alleged sexual harassment. (Dkt. No. 34–32 [Ex. S to Spagnoli Aff., July 1, 2014]; Dkt. No. 34–33 [Ex. T to Spagnoli Aff.].) The County provided regular training and instruction on its sexual harassment policy to its employees, including Episcopo and Kelly Seale. (Dkt. No. 34–21 [Episcopo Dep., Apr. 7, 2014, 36:20–37:4 that he attended annual training]; Dkt. No. 34–18 [Kelly Seale 50–h Dep., June 24, 2010, 58:7–60:9 that she attended training and was told how to file a complaint].)

Kelly Seale claims that she "was subjected to repeated instances of sexual harassment, intimidation, humiliation, and discrimination by Defendant Episcopo" from "shortly after the beginning of her employment in January 2008 until January 2010." (Dkt. No. 1 at ¶ 27 [Compl.].) However, it is undisputed that prior to November 5, 2009, Kelly Seale did not state or report to any employee of the County, including her husband, that she was being sexually harassed by Episcopo. [2]

**\*3** From January 2, 2008 until November 5, 2009, Kelly Seale worked in an alcove outside the office of Episcopo in the County's Public Safety Building ("PSB").

On May 19, 2008, Episcopo placed a radio on a cabinet outside of his office and turned it on with the volume set at a high level. He told Kelly Seale it was to ensure that she could not hear conversations inside his office. He asked her if that was ok, and she did not object. Subsequently, Kelly Seale complained to then Sheriff Cary, after which Episcopo removed the radio, stating to Kelly Seale, "your radio privileges have been revoked." [3]

In September 2008, after David Seale was taken out of work again by his doctor, Episcopo failed to timely turn in Kelly Seale's time sheet record. As a result, Kelly Seale did not receive her paycheck on schedule. According to Kelly Seale, the prior general practice had been that she filled out her time sheets and put them in Episcopo's mail slot, after which he would sign them and pass them on to payroll. (Dkt No. 37–8 [Ex. 8–F to Ciotoli Aff.].)

On October 20, 2008, Episcopo was in his office with his door shut speaking to a deputy, who had apparently returned to work while still using crutches after having been out on worker's compensation. In a loud tone of

voice that Kelly Seale could hear, Episcopo stated, "This department is made up of a bunch of fucking cry-babies that can't do their jobs ... [this deputy] came back early on crutches and others are still milking comp and crying that their arms hurt. If I had my way, a lot of people wouldn't have their fucking jobs and we all know who I am talking about." At that time, David Seale was out on worker's compensation for a shoulder injury. (Dkt No. 37–8 [Ex. 8–G to Ciotoli Aff.].)

On December 10, 2008, Kelly Seale discovered a pornographic snowman cartoon, lying face down on her desktop keyboard. The cartoon depicted three snowmen masturbating while they stare at a large breasted snow woman. Kelly Seale was sick and upset and went home early because she thought someone was making fun of her. She thought Episcopo left the cartoon because she always catches him staring at her breasts when he's around her. Kelly Seale was afraid to tell anyone about the cartoon because she thought no one would believe her word over Episcopo's. (Dkt No. 37–8 [Ex. 8–H to Ciotoli Aff.].) David Seale testified that at some point between 2001 and 2005, the snowman cartoon was posted on a bulletin board when he worked in investigations. It was the same cartoon that Episcopo had previously sent to David Seale and others in an email, but David Seale agreed that he does not have any information that Episcopo is the one who posted the cartoon on the bulletin board. (Dkt. No. 37–3 at 51:4–54:5 [David Seale Dep., Oct. 31, 2013].) At her deposition, Kelly Seale agreed that anyone who was in the PSB around the point in time that she discovered the snowman cartoon on her desk could have left it there and that she has no firsthand knowledge that it was Episcopo who did so. (Dkt. No. 37–17 at 73:1–8 [Kelly Seale 50–H Dep., June 24, 2010].)

**\*4** On July 13, 2009, the day after Kelly Seale returned from a week's vacation, Episcopo entered his office with a deputy after first seeing Kelly Seale, and began singing in a loud voice, "The bitch is back, the bitch is back, spread her legs and eat her for a snack." Episcopo and the deputy then began saying, in a loud manner, "Red rocket. Red rocket." [4]

On September 24, 2009, James Zophy ("Zophy") announced his intention to run for the office of County Sheriff in the 2009 election. At some point thereafter, David Seale placed a sign supporting Zophy's candidacy on the lawn of his home. Prior to that time, David Seale

had not expressed his support for Zophy's candidacy. Kelly Seale was neutral with respect to Zophy's candidacy and did not personally express support for Zophy in his bid for County Sheriff.

On November 3, 2009, Riley won the election for Sheriff against Zophy.

On the day before the election, Episcopo went out of his way to talk to other employees and inform them that they should help themselves to snacks in the break room, but did not extend the same invitation to Kelly Seale. (Dkt. No. 37–8 [Ex. 8–J to Ciotoli Aff.] .)

On the day after the election, Episcopo was in his office speaking loudly about Zophy to a lieutenant. Episcopo stated that he was so happy "that fucking cock sucking Zophy didn't get elected" and "I know I'm saying this loud enough so that whoever is sitting outside my door listening knows that changes are coming and they won't like it." Episcopo further stated that he was going to get rid of "those Zophy supporters one by one." (Dkt No. 37–8 [Ex. 8–K to Ciotoli Aff.].) Thereafter, Kelly Seale told Kathy Chaires, the confidential secretary to the Sheriff, about Episcopo's comments. Kelly Seale did not tell Ms. Chaires anything about sexual harassment. That same day, after Kelly Seale was no longer at work, Ms. Chaires relayed to Bailey Kelly Seales' allegations regarding the comments made by Episcopo.

On November 5, 2009, Bailey spoke to Episcopo about what had been reported the previous day. Episcopo testified that he believed Bailey further told him to stay away from Kelly Seale. (Dkt No. 34–21 at 94:3–9 [Episcopo Dep., Apr. 7, 2014].) Bailey denies telling Episcopo to stay away from Kelly Seale, but rather, he informed Episcopo that Kelly Seale was upset by the comments and that it did not matter which candidate won the election. (Dkt. No. 34–22 at 45:24–46:15 [Bailey Dep., Apr. 9, 2014].) Shortly after Bailey spoke to Episcopo, Episcopo returned to his office, followed by Ms. Chaires. As he entered his office, Episcopo stated, "it's a glorious morning, it's such a nice day, you can't wipe the smile off my face!" and then, as Ms. Chaires was leaving his office, he said "I love it!" over and over again. (Dkt No. 37–8 [Ex. 8–L to Ciotoli Aff.].)

At some time later in the day on November 5 or on November 6, 2009, Kelly Seale became aware that Ms.

Chaires informed Bailey of her complaint about Episcopo. Bailey requested that Kelly Seale speak to him regarding her concerns, which she did. During that conversation, Kelly Seale reported for the first time that Episcopo was sexually harassing her. When Bailey realized that Kelly Seale was claiming sexual harassment, he informed her that the matter would be referred to the County's Personnel Department. After speaking with Kelly Seale, Bailey notified the County's Personnel Department of her complaint of sexual harassment. A few days later, representatives of the Personnel Department interviewed Kelly Seale to obtain her complaint.

**\*5** At the County's request, its outside counsel engaged Public Sector Human Resource Consultants ("PSHRC"), an independent consulting firm, to conduct an impartial investigation into Kelly Seale's claims of sexual harassment. PSHRC consultant Nanette Hatch conducted the investigation. She had never spoken to Episcopo prior to the investigation. She interviewed Episcopo, Kelly Seale, David Seale, Ms. Chaires, and other employees. Ms. Hatch chose who to interview based on her own judgment, expertise, and evaluation of the evidence and witnesses. Ms. Hatch rendered a report that expressed her conclusion that there was no unlawful hostile environment created by Episcopo.

After the investigation was completed, Episcopo was removed from Kelly Seale's chain of command. Also, at some point after Kelly Seale's complaint was made and the investigation completed, some of Kelly Seale's duties having to do with the website were taken away from her. Episcopo did not take those duties from her.

Beginning November 5, 2009 until approximately January 11, 2010, Kelly Seale worked from home. On January 7, 2010, Aylward advised Kelly Seale that her complaint was unsubstantiated, but that to improve the work environment she would be allowed to report directly to Sheriff Riley rather and Episcopo and her work location would be changed.

Effective approximately January 11, 2010, Kelly Seale's assigned work location was changed from outside Episcopo's office to an office in the County Office Building ("COB"). Kelly Seale worked in that location until she resigned on May 31, 2010. During this time, Kelly Seale's time records reflect that on several occasions she worked before and after normal work hours and on weekends.

Kelly Seale did not have access to the COB on nights and weekends because she was not allowed to have a key to the building. (Dkt. No. 37–5 at 49:21–50:17, 51:352:25 [Dep. of Allen Riley, Apr. 10, 2014].) David Seale testified to one instance when Kelly Seale was unable to get into the COB after hours to obtain her laptop and other materials and it created a problem for her. (Dkt. No. 34–20 at 178 (David Seale Dep., Oct. 31, 2013].) Kelly Seale testified that she was able to perform her job duties from home but that "it was harder." (Dkt. No. 34–19 at 90:6–8 [Kelly Seale Dep., Pct. 30, 2013].) Both Riley and Bailey were not aware that Kelly Seale contended she needed access to her work location during non-work hours.

Riley made the decision to change Kelly Seale's work location following the recommendation of Aylward, in order to allow her to avoid contact with Episcopo. At the time Riley made this decision, he had no information that Kelly Seale had made allegations that Episcopo made comments directed against her and David Seale on the premise that they were supporters of Zophy's candidacy. Aylward's sole involvement in the change of Kelly Seale's work location was to recommend that her work location be changed to avoid friction between her and Episcopo; to obtain information regarding other potential work locations; and to inform Riley that there was work space available in the County Office Building.

**\*6** Riley advised Bailey of the locations he reviewed as potential work locations for Kelly Seale and Bailey advised Riley of the unavailability of at least one potential location, but Bailey had no other involvement in the change of Kelly Seale's work location, and he was not involved in the actual decision to change her work location. Moreover, Episcopo had no involvement in the change in Kelly Seale's work location.

The space in the COB was selected after a search indicated other possible locations were unavailable for various reasons, including space in the Department of Social Services building and the Public Health building. Riley testified that there was a photo room in the PSB, although it was "filled with all kind of stuff" at the time, but has since been converted into an office. (Dkt. No. 34–24 at 57:9–23 [Riley Dep., Apr. 10, 2014].) Kelly Seale testified that she had previously asked Sheriff Cary for the photo room to be her office since it was just a storage closet at the time, and that after her move to the COB, the photo room was made into an office for the SWAT team, although

she does not know when the preparations for that office began. (Dkt. No. 37–2 at 90:12–21, 94:21–96:4 [Kelly Seale Dep., Oct. 30, 2013].) Kelly Seale also testified that she asked Riley to be moved into the Department of Social Services building and that she told him several times she did not want to move to the COB. (*Id.,* at 96:10–100:24.)

The COB was located in the same complex as the PSB where Kelly Seale previously worked, and is about two to three hundred yards from Kelly Seale's home. Other employees of the Sheriff's Office worked in the COB, although not on the basement floor where Kelly Seale's office was located.

Prior to May, 2010, Kelly Seale was assigned for her use a Chevy Tahoe owned by the County, which bore side markings identifying it as an official police vehicle. Beginning May, 2010, Kelly Seale was assigned for her use instead a green van owned by the County, which did not bear side markings identifying it as a police vehicle. Riley made the decision to change the vehicle assigned to Kelly Seale because he was concerned that a civilian employee should not be driving a marked police vehicle. While he discussed his concerns, with Bailey, Riley made the decision to change Kelly Seale's vehicle assignment. Episcopo's sole involvement in the change of Kelly Seale's vehicle assignment was to identify, at Riley's command, other vehicles in the Sheriff's Office fleet that were unmarked and would permit Kelly Seale to perform her duties. Episcopo notified Riley that the green van was the only unmarked vehicle in the Sheriff's Office fleet at that time that would permit Kelly Seale to perform her duties. Bailey and Aylward had no involvement in changing Kelly Seale's vehicle assignment.

Deputy Jay Pokorny used the green van for evidence transport before, during, and after the period in which Kelly Seale used it. He did not experience any mechanical problems with the van or find it to be dirty or to smell bad. (Dkt. No. 34–9 at ¶ 6 [Aff. of Jay Pokorny, June 19, 2014].) Neither Riley or Bailey had any information that the green van had any mechanical problems. Kelly Seale testified that the one time she used the green van, she experienced problems with the brakes where she had to keep pumping them. (Dkt. No. 37–2 at 89:6–20 [Kelly Seale Dep., Oct. 30, 2013].) In her response to Defendants' interrogatory asking for a description of any and all mechanical breakdowns of the green van that occurred during the time it was assigned to her, Kelly Seale stated

"there would be motor pool and maintenance records regarding its history and breakdowns in Defendants' possession, which would have included prior problems with brakes, transmission, engine, battery and it would shake (*sic* ). When Kelly Seale used this vehicle it was dirty, unclean, it smelled and it was rusty." (Dkt. No. 37–9 at ¶ 10 and Dkt. No. 37–16 at ¶ 3 [Pls.' Resp. to First Set of Interrogs. for Aylward].)

 **\*7**  Since Kelly Seale's work station was relocated, she saw Episcopo on less than five occasions, at which times he did not say or do anything to her that was unprofessional. (Dkt. No. 34–18 at 128:10–18 [Kelly Seale 50–H Dep., June 24, 2010].)

Other than being required to attend the County's regular sexual harassment training, Episcopo was not disciplined or punished as a result of Kelly Seale's allegations against him.

In or about early November 2009, after Kelly Seale filed her complaint against Episcopo, David Seale requested to exercise the "vacation buyback" option provided by the collective bargaining agreement covering his position. At that time, David Seale had been out on leave since March 29, 2009 and was receiving his full salary according to the provisions of New York General Municipal Law § 207–c ("Section 207–c").

Prior to receiving David Seale's request, Bailey had not previously been involved in any Section 207–c vacation buyback issues. Bailey discussed David Seale's request with Aylward. Bailey and Aylward determined that under the collective bargaining agreement, David Seale was not eligible to exercise the vacation buyback option because he had been absent on leave receiving benefits pursuant to Section 207–c for more than three months. Bailey notified David Seale that his request was denied because his extended leave rendered him ineligible to exercise the vacation buyback option, and that to exercise the vacation buyback option, he would need to return to active duty. According to David Seale, he had exercised his vacation buyback option without issue when he was out of work in the previous year. (Dkt. No. 34–20 at 75:10–4–17 [David Seale Dep., Oct. 31, 2013].) Aylward confirmed that the first time he was asked to check on the appropriateness of David Seale's request for vacation buyback was after Kelly Seale had filed her complaint against Episcopo, although he clarified that the request was denied because David

Seale was on 207–c leave at the time and not because of Kelly Seale's complaint against Episcopo. (Dkt. No. 37–7 at 69:13–70:8 [Dep. of Ryan D. Aylward, Apr. 9, 2014].)

David Seale returned to active duty on December 21, 2009. Thereafter, he successfully exercised his vacation buyback option for 2009. Episcopo and Riley had no involvement in the temporary denial of David Seale's request to exercise the vacation buyback option.

David Seale took worker's compensation again beginning in March or April, 2010. On April 19, 2010, Riley sent a letter to David Seale instructing him that while he remained on worker's compensation leave receiving his salary under Section 207–c, he must communicate to his supervisor when he planned to leave his residence during work hours. David Seale was the only County employee ever to receive such an order.

Prior to his election as Sheriff, Riley was a New York State Trooper. He observed that when a New York State Trooper was on sick leave, the officer was required to account to his or her supervisors for his or her whereabouts during work hours, and to communicate to them when he or she planned to leave his or her residence during work hours. Riley also obtained an opinion from Town of Greenburgh Police Chief John Kapica, which analyzed issues relating to Section 207–c leave and concluded that the heads of police departments could require employees on leave receiving Section 207–c benefits to account for their whereabouts during scheduled work shift hours.

**\*8** Riley discussed the issue with Aylward before sending the April 19, 2010 letter. (Dkt. No. 37–8, Ex. 8–S to Ciotoli Aff. [April 8, 2010 email from Aylward to Riley stating "The letter looks good to me" and cautioning that Kapica's summary of benefits under Section 207–c "is not a legal opinion" and that "we need to be prepared for a few bumps down the road. If you are ok with this, then I think that you should proceed with the letter."].) However, Episcopo and Bailey had no involvement in Riley's decision to issue the April 19, 2010 letter.

After a union attorney objected, Aylward advised Riley to rescind the April 19, 2010 letter to avoid even the appearance that the County was retaliating against David Seale. On May 6, 2010, Riley sent a letter to David Seale rescinding the instructions in his April 19, 2010 letter.

During the seventeen days that the instructions in the April 19, 2010 were in effect, David Seale was never denied a request to leave his home.

On April 29, 2010, David Seale requested to switch shifts with another officer. At the time of the request, David Seale was still on Section 207–c leave and was anticipated to return to active duty in May, 2010. Riley denied the request because he was concerned that such rescheduling matters were subject to bidding and posting under the applicable collective bargaining agreement. Episcopo and Bailey had no involvement in Riley's decision to deny David Seale's request to switch shifts. Aylward testified that he does not recall whether he was involved in that decision. On May 11, 2010, at Aylward's suggestion, in order to avoid even the appearance of retaliation, Riley rescinded the denial and approved David Seale's request to change shifts. When David Seale returned to active duty in May 2010, he immediately started the transition to the shift he had requested.

According to David Seale, when he returned to work prior to December 28, 2009 in order to obtain his vacation buyback, the County worker's compensation insurer, Public Employers Risk Management Association ("PERMA"), denied his request for reimbursement for further physical therapy. The denial of physical therapy was by PERMA, the County's third-party worker's compensation administrator. Riley, Bailey, Episcopo and Aylward each averred or testified that they had no involvement in the denial of David Seale's request for physical therapy reimbursement through PERMA. However, David Seale contends, through his response to Defendants' interrogatories, that whenever an issue came up in the past regarding authorization of payment for his physical therapy, Sheriff Cary would take care of it. But when Riley took over, these issues with the denial payment for physical therapy would not be taken care of. (Dkt. No. 37–14 at ¶ 2 [Pls.' Response to Defs.' Interrogs].)

On July 14, 2008, David Seale claimed that the patrol car he used had been vandalized by someone who had slashed his tire. The alleged vandalism was investigated on or about July 14, 2008. The report concluded that a nail had gone up through the tread of the tire and damaged the sidewall of the tire. The incident was found to be accidental, not vandalism. David Seale alleges that he found the patrol car he customarily used "vandalized" in miscellaneous ways when he returned

to active duty in May 2010. David Seale testified that he has no information that Riley, Bailey, or Aylward were involved. According to David Seale's response to Defendants' interrogatories, he "does not know who performed these acts of vandalism, but right after Kelly Seale made her complaint against Episcopo, these acts of vandalism started to occur to his patrol car, where before, there had never been any such acts of vandalism [.]" (Dkt. No. 37–13 at ¶ 5 [Pls.' Response to Defs.' Interrogs.].) Episcopo avers that he was not involved in any such "vandalism" of David Seale's patrol car.

**\*9** David Seale testified that in 2008, Episcopo directed a sergeant to write him up for his use of sick time in conjunction with his pass days. As a result, David Seale received a written counseling and was directed to obtain a doctor's note when he wished to use sick leave for a period of one year. (Dkt. No. 34–20 at 69:1–70:4 [David Seale Dep., Oct. 31, 2013].)

In January 2014, David Seale submitted a bid for a sergeant position, but he was not invited to interview for that position. Thereafter, the position was offered to and accepted by another deputy, Julie Netzband. Riley testified that he had previously interviewed Deputy Netzband and that she was his first choice for the sergeant position. According to Riley's testimony, New York Civil Service law permits him to choose anyone of the top three candidates. (Dkt. No. 37–5 at 90:1–8 [Riley Dep., Apr. 10, 2014].)

### D. Parties' Briefing on Defendants' Motion

#### 1. Defendants' Memorandum of Law

Generally, in support of their motion for summary judgment, Defendants assert the following six arguments: (1) Kelly Seale's Title VII hostile work environment claim fails because she cannot show that the County was negligent; (2) Kelly Seale's Title VII and NYHRL claims fail because the County has established the elements of the *Faragher/Ellerth* affirmative defense; (3) Kelly Seale's NYHRL hostile work environment claim fails because she cannot show that the County condoned or acquiesced in the alleged harassment; (4) Kelly Seale's Section 1983 hostile work environment claim fails because she cannot show that Episcopo acted under color of law; (5) Kelly Seale's First Amendment retaliation claim fails because (a) she admitted that she did not express support for Mr. Zophy, (b) she cannot show that the actions taken were

sufficiently adverse to be actionable, and (c) there were legitimate reasons for the change in her work location and vehicle, which she cannot show were pretextual; and (6) David Seale's First Amendment retaliation claim fails because he cannot show that any of the actions taken were actionable. (*See generally* Dkt. No. 34–12 [Defs.' Mem. of Law].)

#### 2. Plaintiffs' Opposition Memorandum of Law

Generally, in response to Defendants' motion, Plaintiffs assert the following three arguments: (1) Kelly Seale has stated a proper hostile work environment claim under Title VII and the NYHRL because (a) all of the elements of a hostile work environment claim are satisfied, (b) Episcopo was Kelly Seale's supervisor and the *Faragher/Ellerth* defense does not bar her action, (c) the County condoned and acquiesced in the discriminatory and harassing conduct, (d) Episcopo can also be held individually liable for his discriminatory actions under the NYHRL, and (e) Kelly Seale has stated a proper Section 1983 claim against Episcopo, who was acting under color of state law; (2) Kelly Seale has properly stated a Title VII retaliation claim because (a) she participated in a protected activity, (b) Defendants took tangible adverse employment action against her, (c) the timing between the protected activity and retaliatory actions is enough to create an arguable causal link, and (d) she has presented evidence proving the existence of pretext; and (3) David Seale has properly stated a First Amendment retaliation claim because (a) he engaged in the type of speech protected by the First Amendment, (b) Defendants took adverse employment actions against him, and (c) his speech was a motivating factor for Defendants' retaliatory actions. (*See generally* Dkt. No. 38–1[Pls.' Opp'n Mem. of Law.)

#### 3. Defendants' Reply Memorandum of Law

**\*10** Generally, in reply to Plaintiffs' response, Defendants assert the following five arguments: (1) Episcopo was not a supervisor and Kelly Seale's hostile work environment claims fail; (2) Kelly Seale's NYHRL claim fails because she cannot show condonation; (3) Episcopo did not act under color of law; (4) Kelly Seale's retaliation claims fail; and (5) David Seale's retaliation claim fails. (*See generally* Dkt. No. 41 [Defs.' Reply Mem. of Law].)

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standard Governing a Motion for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed.R.Civ.P. 56(a),(c),(e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (citation omitted). *See also Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (the "non-moving party may not rely on conclusory allegations or unsubstantiated speculation" to defeat summary judgment). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Of course, when a non-movant has failed to respond to a movant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically."

*Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Rather, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the movant's motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the movant. *Champion,* 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the movant's motion does is lighten the movant's burden on its motion.

**\*11** Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[5] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at \*1, n. 1 (N.D.N.Y. Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at \*2 & n. 3 (N.D.N.Y. Aug.7, 2009) (Suddaby, J.) (collecting cases).

### B. Legal Standards Governing Plaintiff's Claims

#### 1. Hostile Work Environment

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of," *inter alia,* "such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In enacting Title VII, Congress intended to protect against "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Redd v. New York Div. of Parole,* 678 F.3d 166, 174–175 (2d Cir.2012) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

In order to establish a claim for a hostile work environment under Title VII, a plaintiff must prove that the underlying harassment is "sufficiently severe or pervasive," both subjectively and objectively, "to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Redd,* 678 F.3d at 175 (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295). [6] Further, the plaintiff must prove that the hostile or abusive treatment was because of his or her membership in a class of persons protected by Title VII. *See Redd,* 678 F.3d at 175. The types of workplace conduct that may be actionable on a claim for hostile work environment based on sex "include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor,* 477 U.S. at 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (citing 29 C.F.R. § 1604.11(a) (1985)).

A determination of whether an environment is objectively hostile or abusive requires an evaluation of all the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Redd,* 678 F.3d at 175 (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367, 126 L.Ed.2d 295). Whether an environment is subjectively hostile or abusive may be determined by the effect on the plaintiff's psychological well-being, although no single factor is required. *See id.*

**\*12** Moreover, in order to establish her claim for hostile work environment, a plaintiff need not show that her "working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Redd,* 678 F.3d at 175 (quoting *Pucino v. Verizon Commc'ns, Inc.,* 618 F.3d 112, 119 (2d Cir.2010)). Typically, isolated incidents will not suffice to establish a hostile work environment, "although we have often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd,* 678 F.3d at 175–176 (citing, inter alia, *Feingold v. New York,* 366 F.3d 138, 150 (2d Cir.2004) ("[A] single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." (internal quotation marks omitted)).

It is important to keep in mind, however, that "while the central statutory purpose of Title VII was eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace." *Redd,* 678 F.3d at 176 (quoting *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 771, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Title VII is "meant to protect individuals from abuse and trauma that is severe[, but is] not intended to promote or enforce civility, gentility or even decency." *Taylor v. New York City Dept. of Educ.,* No. 11–CV–3582, 2012 WL 3150388, at \*8 (E.D.N.Y. Aug.2, 2012) (quoting *Curtis v. DiMaio,* 46 F.Supp.2d 206, 213–14 (E.D.N.Y.1999)).

In addition to establishing that she was subjected to a hostile work environment, a plaintiff must also establish that the conduct which created the hostile environment may be imputed to her employer. *See Shiner v. State Univ. of New York,* No. 11–CV–1024, 2012 WL 5398658, at \*4 (W.D.N.Y. Nov. 2, 2012) (citing *Leopold,* 239 F.3d at 245). An employer's liability for such conduct depends on whether the harasser is a coworker or supervisor. *See Vance v. Ball State Univ.,* ––– U.S. ––––, ––––, 133 S.Ct. 2434, 2439, 186 L.Ed.2d 565 (2013).

The actions of a plaintiff's coworkers will be imputed to the employer only if the employer was negligent. *See Vance,* ––– U.S. at ––––, 133 S.Ct. at 2439. In other words, where the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it[,]" the harasser's conduct will be imputed to it. *Wiercinski v. Mangia 57, Inc.,* No. 09–CV–4413, 2012 WL 2319142, at \*10 (E.D.N.Y. June 19, 2012) (quoting *Murray v. N. Y. Univ. Coll. of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995)).

However, an employer is strictly liable for the actions of a plaintiff's supervisor [7] "unless the employer is able to successfully raise an affirmative defense that examines the reasonableness of the conduct of both the employer and the employee." *Shiner,* 2012 WL 5398658, at \*4. This defense requires the employer to show that it "exercised reasonable care to prevent and correct any harassing behavior" and that the plaintiff "unreasonably failed to take advantage of any preventive or corrective

opportunities provided by the employer to avoid harm otherwise." *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Where an employer "maintains a policy against sexual harassment and provides a process through which employees can complain about violations of that policy," it will have met the first prong of its affirmative defense. *Joyner v. City of New York,* No. 11–CV–4958, 2012 WL 4833368, at *3 (S.D.N .Y. Oct. 11, 2012). Further, where a plaintiff fails to take advantage of that system until more than a year after the alleged harassment began, and where the offensive conduct ceased once plaintiff reported it, an employer will establish the second prong of its defense. *See Joyner,* 2012 WL 4833368, at *3 (citing *Leopold,* 239 F.3d at 246).

### 2. Retaliation–Title VII

**\*13** To establish a claim of retaliation under Title VII, a plaintiff must prove "(1) participation in a protected activity; (2) the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Bir v. Pfizer, Inc.,* 510 F. App'x 29, 33 (2d Cir.2013) (citing *Hicks v. Baines,* 593 F.3d 159, 164 (2d Cir.2010) (internal quotation marks omitted)).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000) (noting that a protected activity need not "rise to the level of a formal complaint in order to receive statutory protection"). [8] Protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). A plaintiff "need not establish that the conduct [he] opposed was in fact a violation of [the law]," *Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 416 (S.D.N.Y.2006), but he must demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law," *id.* (quoting *Sumner,* 899 F.2d at 209). The reasonableness of a plaintiff's belief is to be assessed in light of the totality of the circumstances. *See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996).

Adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White,* 548 U.S. at 68, 126 S.Ct. at 2415. "[T]ermination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). Similarly, being laid off constitutes adverse employment action. *See Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000); *Walker v. City of New York,* 98–CV–2695, 2002 WL 31051534, at *4 (E.D.N.Y. July 22, 2002) ("Plaintiff's temporary lay-off during the summer of 1997[was] sufficient to meet Plaintiff's burden of putting forth evidence to show that the terms of her employment were altered.").

A plaintiff may establish a causal connection between the protected activity and the adverse employment action "either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Schanfield v. Sojitz Corp. of Am.,* 663 F.Supp.2d 305, 343 (S.D.N.Y.2009) (citing *Knight v. City of New York,* 303 F.Supp.2d 485, 496 (S.D.N.Y.2004)).

"Direct evidence giving rise to an inference of discrimination may include 'a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees not in the protected group more favorably.' " *Id.* (quoting *Hunter v. St. Francis Hosp.,* 281 F.Supp.2d 534, 542 (E.D.N.Y.2003)).

**\*14** In order for a court to "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case," the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing cases finding temporal proximity of three months and more to be insufficient).

Claims of retaliation under Title VII and the NYHRL are governed by the burden-shifting analysis announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Guzman v. News Corp.,* No. 09–CV–9323, 2013 WL 5807058, at *19 (S.D .N.Y. Oct. 28, 2013) (citing *Fincher v. Depository*

*Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010); *Lennert–Gonzalez v. Delta Airlines, Inc.,* No. 11–CV–1459, 2013 WL 754710, at *9 (S.D.N .Y. Feb. 28, 2013)). *See also Puglisi v. Town of Hempstead,* 545 F. App'x 23 (2d Cir. Oct.18, 2013) (discussing Title VII retaliation claim in context of *McDonnell–Douglas* burden-shifting framework).

"Under *McDonnell Douglas,* once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory business rationale to justify its adverse employment action." *Schanfield,* 663 F.Supp.2d at 343.

If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to show that, 'but for' the protected activity, she would not have been terminated. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar,* —— U.S. ——, ——, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013). The Supreme Court recently clarified that 'a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer,' as distinct from 'a motivating factor,' which had previously been the standard in the Second Circuit. *Id.* at 2534; *see Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006).

*Guzman,* 2013 WL 5807058, at *19. *See* also *Puglisi,* 2013 WL 5663223; *Leacock v. Nassau Health Care Corp.,* No. 08–CV–2401, 2013 WL 4899723, at *11 (E.D.N.Y. Sept. 11, 2013); *Wesley–Dickson v. Warwick Valley Cent. Sch. Dist.,* 973 F.Supp.2d. 386, 408 (S.D.N.Y.2013).

### 3. First Amendment Retaliation–42 U.S.C. § 1983

In order to establish a claim pursuant to 42 U.S.C. § 1983, a plaintiff must prove "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

**\*15** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Kregler v. City of New York,* 821 F.Supp.2d 651, 655–656 (S.D.N.Y.2011) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (internal quotation marks omitted)). A plaintiff may prove the personal involvement of a defendant who occupies a supervisory position by alleging that the defendant: "(1) directly participated in the infraction; (2) failed to remedy the wrong after learning of the violation; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) exhibited 'gross negligence' or 'deliberate indifference' to the constitutional rights of [the plaintiff] by having actual or constructive notice of the unconstitutional practices and failing to act." *Kregler,* 821 F.Supp.2d at 655–56 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501).

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Dillon v. Suffolk Cnty. Dep't of Health Servs.,* 917 F.Supp.2d 196, 205 (E.D.N.Y.2013) (quoting *Garcetti v. Ceballos,* 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)). In order to establish a claim for First Amendment retaliation, a public employee must prove that (1) she engaged in "constitutionally protected speech" because she spoke as a citizen on a matter of public concern; (2) she suffered an adverse employment action; and (3) the speech at issue was a substantial or motivating factor in the decision. *Dillon,* 917 F.Supp.2d at 204 (quoting *Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir.2003)). The threshold inquiry is whether the employee spoke as a citizen on a matter of public concern. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti,* 547 U.S. at 418. "The Supreme Court has defined 'a matter of public concern' as one that 'relat[es] to any matter of political, social, or other concern to the community.' " *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). The support of a candidate for public office can reasonably be considered a matter of public concern. *See Kelly v. Huntington Union Free Sch. Dist.,* 675 F.Supp.2d 283, 294 (E.D.N.Y.2009) (citing *Connick,* 461 U.S. at 149, 103

S.Ct. 1684, 75 L.Ed.2d 708 (holding that plaintiff's speech about whether government employees were pressured to participate in political campaign touched on a matter of public concern)).

In the context of a First Amendment retaliation claim, an adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights [.]" *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225 (2d Cir.2006). Such actions can include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," or may include "lesser actions" such as "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Zelnik,* 464 F.3d at 226 (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) *(abrogated on other grounds by, White,* 548 U.S. at 67)).

**\*16** Regarding the third element of a retaliation claim under the First Amendment, a plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action. *See Cobb v. Pozzi,* 363 F.3d 89, 108 (2d Cir.2004) (internal citation omitted). Since a direct showing requires plaintiff to provide "tangible proof" of retaliatory animus, "conclusory assertions of retaliatory motive" are insufficient. *Id.*

Once a plaintiff establishes a prima facie case of First Amendment retaliation, a government defendant may still prevail on a motion for summary judgment where it can establish "by a preponderance of the evidence that it would have taken the same adverse employment action 'even in the absence of the protected conduct.' " *Smith v. County of Suffolk,* —— F.3d ——, ——, 2015 WL 161701, at \*3 (2d Cir.2015) (citing *Morris,* 196 F.3d at 110 (2d Cir.1999) (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), *abrogated on other grounds by, White,* 548 U.S. at 67, 126 S.Ct. 2405, 165 L.Ed.2d 345)).

## III. ANALYSIS

### A. Kelly Seale's Hostile Work Environment Claims

After carefully considering the matter, the Court grants Defendants' motion for summary judgment on Kelly Seale's hostile work environment claims against the County and Episcopo for the following reasons.

First, Defendants have met their burden to show the absence of a material issue of fact regarding Kelly Seale's Title VII hostile work environment claims against the County. As indicated in Part II .B.1. of this Decision and Order, where the alleged harasser is a co-worker, an employer will be liable on a hostile work environment claim where it was negligent, i.e., where it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it. On the other hand, where the alleged harasser is a supervisor, the employer is strictly liable unless it can show that is exercised reasonable care to prevent and correct the harassment and that the plaintiff acted unreasonably in failing to take advantage of preventive or corrective opportunities provided by the employer. Here, it is clear that Episcopo is not a supervisor for purposes of imputing liability to the County on Kelly Seale's hostile work environment claim. Moreover, even if he were a supervisor, the County has established its affirmative defense to Kelly's Seale's claim. Finally, having concluded that Episcopo was Kelly Seale's co-worker, the County cannot be deemed negligent based on the uncontroverted evidence that no one at the County knew of the harassment until after the fact and, once learning of Kelly Seale's complaint, immediately took steps to prevent any further harassment.

The Supreme Court defines a "supervisor" for purposes of an employer's vicarious liability under Title VII as an employee who is empowered by the employer "to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance,* 133 S.Ct. at 2439, 2443 (quotation and citation omitted). Defendants have identified undisputed record evidence that Episcopo did not have the ability to effect a significant change in Kelly Seale's employment status. For example, both Riley and Bailey testified that Episcopo did not have the ability to hire, fire, promote, demote, make any decision substantially changing the salary or benefits of, or substantially reassigning the duties of Kelly Seale. The only record evidence to the contrary is

David Seale's conclusory testimony that Episcopo made recommendations of termination to the Sheriff, who usually followed those recommendations. As indicated in Point II.A. of this Decision and Order, a non-moving party may not rely on conclusory allegations to defeat a motion for summary judgment.

**\*17** Also, Plaintiffs make much of the several references throughout the record that Episcopo was in Kelly Seale's chain of command or that he signed her time sheets, effecting her pay. To be sure, the only evidence in the record regarding Kelly Seale's pay is that Episcopo would occasionally receive her time records and would then sign them and pass them on to payroll and that on one occasion he did not timely pass along her time sheet to payroll. This incident, resulting in a one-time delay in Kelly Seale receiving a paycheck, does not rise to the level of a substantial change in salary. Moreover, the mere ability to direct or assign work does not amount to a "tangible employment action." *Wiercinski v. Mangia 57, Inc. ., —— F.Supp.2d ——, ——, 2014 WL 1672381, at \*17 (E.D.N.Y.2014)* (citation omitted).

However, even assuming Episcopo was Kelly Seale's supervisor, the County has identified undisputed evidence that during the time of the events underlying this action, it had a sexual harassment policy in the workplace and provided a procedure by which employees could complaint of such harassment. In addition, the record is clear that Kelly Seale was aware of the policy and procedures for making a complaint but that prior to November 5, 2009, she never complained to anyone at the County, including David Seale, about the harassment, which she claims began as early as May 2008. The record is also clear that Kelly Seale experienced no harassment from Episcopo after she complained to Bailey on November 5, 2009. As indicated in Part II.B.1. of this Decision and Order, where, as here, an employer maintains a policy against sexual harassment and provides a process through which employees can complain about violations of the policy; where, as here, the plaintiff employee fails to take advantage of that system until more than a year after the alleged harassment began;[9] and where, as here, the offensive conduct ceased once the plaintiff reported it, an employer will have established its affirmative defense to a claim of strict liability for the harassing behavior of its supervisor-employee.

Finally, given that Episcopo was Kelly Seale's co-worker, Defendants have identified undisputed record evidence that the County provided a reasonable avenue for complaint, of which Kelly Seale was aware, and that it did not learn of the harassment until November 5, 2009, after which time Kelly Seale admits, she experienced no further harassment by Episcopo.

For these reasons, Defendants' motion for summary judgment on Kelly Seale's Title VII and NYHRL hostile work environment claims is granted.[10]

Second, Plaintiffs' Section 1983 claim of hostile work environment against Episcopo must be dismissed because the record contains undisputed evidence that the alleged incidents of harassment are not severe or pervasive as a matter of law.

Here, Kelly Seale identifies the following incidents in support of her hostile work environment claim: (1) in May 2008, Episcopo placed a radio, at a loud volume, outside of his office so that Plaintiff could not hear what was being said in his office, and later, after Kelly Seale complained, Episcopo removed the radio, telling Kelly Seale, "your radio privileges have been revoked," (2) in September 2008, Episcopo failed to timely pass Kelly Seale's timesheet to payroll, resulting in her paycheck being late, (3) in October 2008, Episcopo loudly stated from inside his office that "this department is made up of a bunch of fucking cry babies that can't do their jobs" and referenced others "milking comp and crying that their arms hurt," (4) on December 10, 2008, a pornographic snowman cartoon appeared on Kelly Seale's desk, (5) in July 2009, after Kelly Seale returned from vacation, Episcopo loudly sang "the bitch is back" song and stated "red rocket" from inside his office, (6) on November 2, 2009, Episcopo invited everyone in the office except Kelly Seale to help themselves to snacks in the break room, and (7) on November 4, 2009, Episcopo loudly stated from his office that he was happy Zophy lost the election and that he was going to get rid of "those Zophy supporters one by one."

**\*18** As indicated in Part II.B.1. of this Decision and Order, in order to be considered actionable conduct for purposes of a hostile work environment claim based on sex, the treatment must be because of the plaintiff's membership in a protected class, such as unwelcome sexual advances, requests for sexual favors, or, as is

relevant here, other conduct of a sexual nature. The only incidents of conduct here that comport with the definition of actionable conduct are the December 2008 snowman cartoon incident and the July 2009 "bitch is back" incident. The remaining asserted incidents of conduct, while seemingly offensive or rude, are not actionable because they are not predicated on Kelly Seale's sex. *See Matthews v. Corning Inc.,* ——— F.Supp.3d ———, ———, 2014 WL 7499457, at \*14 (W.D.N.Y.2014) (failure to connect any gender based comment to other allegations of unfair treatment and crass and offensive remarks that are not predicated on plaintiff's protected class are not actionable) (citations omitted).

Regarding the actionable conduct, the Court notes that there is a lack of record evidence that it was Episcopo who placed the pornographic snowman cartoon on Kelly Seale's desk. Kelly Seale testified that anyone who had access to the hallway where her work station was located could have placed the cartoon on her desk and she has no firsthand knowledge that it was Episcopo who did so. David Seale's testimony that, several years prior to December 2008, he and others received the exact same snowman cartoon from Episcopo via email, does not constitute evidence upon which a reasonable jury could conclude that Episcopo placed the cartoon on Kelly Seale's desk in December 2008.

However, even assuming there was evidence that it was Episcopo who placed the cartoon on Kelly's desk, that incident, coupled with the July 2009 "bitch is back"/"red rocket"[11] incident, do not rise to the requisite severe or pervasive conduct to prevail on a hostile work environment claim. *See, e.g., Monclova v. City of New York,* No. 12–CV–3187, 2014 WL 4828813, at \*11 (E.D.N.Y. Sept. 29, 2014) (citing *Godineaux v. Laguardia Airport Marriott Hotel,* 460 F.Supp.2d 413, 422–23 (E.D.N.Y.2006) (holding that defendant's sexual comment and gestures in front of plaintiff, defendant's promise that defendant would "give Plaintiff stock tips if Plaintiff would sleep with him," and defendant's attempt to kiss plaintiff "did not rise to the level" of a hostile work environment); *DeSimone v. JP Morgan/Chase Bank,* No. 02–CV–7039, 2004 WL 2978011, at \*6 (S.D.N.Y. Dec.22, 2004) (granting defendant's motion for summary judgment on plaintiff's hostile work environment claim where, over a six-week period, plaintiff's supervisor "asked her out for drinks and dinner repeatedly, despite being rejected each time," "leered and stared at [plaintiff's]

body during their encounters in the office," and made derogatory comments about other female employees); *Spina v. Our Lady of Mercy Med. Ctr.,* No. 97–CV–4661, 2003 WL 22434143, at \*3 (S.D.N.Y. Oct.23, 2002) (holding that defendants' actions were not sufficiently severe to create a hostile work environment where plaintiff's supervisor called her a "bitch," complimented her hair and eyes, and told her she "looked good in tight pants")).

**\*19** Moreover, the Court of Appeals for the Second Circuit has found far more inappropriate conduct not to be sufficiently severe or pervasive to create a hostile work environment. *See Monclova,* 2014 WL 4828813, at \*11 (citing *Cristofaro v. Lake Shore Cent. Sch. Dist.,* 473 F. App'x 28, 30 (2d Cir.2012)). In *Cristofaro,* the Court of Appeals found that the record indicated "only limited, infrequent, and at worst, mildly offensive conduct falling well short of the severity and frequency required to raise a triable issue of fact as to the existence of an objectively hostile work environment" where over a seven year period, an employee's supervisor "occasionally commented on [plaintiff's] physical appearance," "participated in a bet with three other male employees as to whether [the supervisor] would be able to engage [plaintiff] in sexually explicit conversation," engaged "in conversation unrelated to work once a month for three-and-half years," and "briefly made contact with the side of [plaintiff's] body," among other actions. *See Cristofaro,* 473 F. App'x at 30 (citing *Alfano v. Costello,* 294 F.3d 365, 379–80 (2d Cir.2002)). Here, at best, Kelly Seale experienced two incidents of inappropriate sexual conduct in the workplace that occurred seven months apart, neither of which was physically threatening. Based on the totality of evidence, no reasonable jury could conclude that Kelly Seale was subjected to a hostile work environment. *See Alfano,* 294 F.3d at 378–80 (five incidents, spanning more than four years, including a graphic cartoon and several sexually humiliating events witnessed by others did not rise to the requisite level of severe or pervasive conduct for a reasonable jury to conclude that plaintiff's workplace was "permeated with discriminatory intimidation, ridicule and insult") (citation omitted). For these reasons, Defendants' motion for summary judgment dismissing Kelly Seale's Section 1983 hostile work environment claim against Episcopo is granted.

**B. Kelly Seale's Retaliation Claims**

After carefully considering the matter, the Court grants Defendants' motion for summary judgment on Kelly Seale's Title VII and First Amendment retaliation claims.

First, Defendants have met their burden to show the absence of a material issue of fact regarding Kelly Seale's Title VII retaliation claim. Kelly Seale claims that Defendants retaliated against her for her complaint of sexual harassment against Episcopo by changing her office location and changing her vehicle assignment. Neither action is adverse for purposes of a Title VII retaliation claim.

To be sure, the Court denied Defendants' motion for judgment on the pleadings regarding this claim "in an abundance of caution" due to Kelly Seale's allegation that the change in office location resulted in a drastic change in the flexibility of her work schedule. *Seale,* 929 F.Supp. at 76–77. In support, the Court relied on *Lundy v. Town of Brighton,* 732 F.Supp.2d 263, 276 (W.D.N.Y.2010) (citing *Washington v. Illinois Dep't of Revenue,* 420 F.3d 658 (7th Cir.2005)). In *Lundy,* the plaintiff police officer alleged that she was having mental health issues and needed to seek treatment, which prevented her from participating in a training schedule mandated by her employer. There, the court observed that "[t]hough a simple change in work schedule will not ordinarily rise to the level of a materially adverse action, when viewed in the context of the difficulties that plaintiff was experiencing at the time and the other surrounding circumstances, the schedule changes could reasonably be found to constitute adverse actions." *Lundy,* 732 F.Supp.2d at 276. The Seventh Circuit Court of Appeals in *Washington,* relied on by the court in *Lundy,* found that a change in work schedule requiring the mother of a disabled child to arrive at work two hours earlier is materially adverse for her, even though it would not have been for 99 percent of the staff. *See Washington,* 420 F.3d at 662.

**\*20** Here, after discovery, there are no facts in the record to support the conclusion that the change in Kelly Seale's office location was adverse to her. To the contrary, David Seale testified that, other than when one of their kids was sick, there was nothing that Kelly Seale needed to be doing at home or elsewhere during the hours of 9 a.m. and 3:30 p.m. (Dkt. No. 37–3 at 174:8175:5.) Plaintiffs have failed to identify any record evidence of extenuating circumstances that would render Kelly Seale's change

in office location, and consequent change in schedule flexibility, materially adverse.

Regarding Plaintiff's change in vehicle assignment, the record is devoid of facts upon which a reasonable jury could rely to conclude that such employment action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White,* 548 U.S. at 68, 126 S.Ct. at 2415. Here, Kelly Seale testified that the green van she was assigned to use, which she drove on only one occasion, was dirty, smelly, and that the brakes did not work well, requiring her to keep pumping them and to push the brake pedal all the way to the floor to get the vehicle to stop. Even assuming a jury were to credit this testimony, it does not rise to the level of adverse action required to prevail on a Title VII retaliation claim. The Court of Appeals for the Second Circuit, in an ADEA retaliation case applying the same standard as applied in Title VII cases pursuant to *Burlington Northern & Santa Fe Railway,* affirmed a lower court's holding that the plaintiff failed to assert an adverse employment action based on the denial or substantial delay of his ability to have necessary mechanical repairs and maintenance performed on his work vehicle. *See Witkowich v. Holder,* No. 05–CV–7756, 2010 WL 1328364, at *8 (S.D.N .Y. Mar. 21, 2010), *aff'd,* 424 F. App'x 20 (2d Cir.2011).

In addition, the record contains no direct evidence that the decisions to change Kelly Seale's work location or to reassign her vehicle were motivated by retaliation for her complaint of sexual harassment. Rather, the only evidence of retaliatory motive is the temporal proximity between Kelly Seale's November 2009 complaint and her January 2010 office relocation and May 2010 vehicle reassignment. Even assuming that evidence is enough to establish causation, Defendants have met their burden to identify uncontroverted record evidence of legitimate, non-retaliatory reasons for the decision to relocate Kelly Seale's office and the decision to reassign her vehicle. The record shows that Kelly Seale's office was moved to the COB in order to reduce friction between her and Episcopo and that there were safety concerns motivating Riley's decision to reassign Kelly Seale, a civilian employee, to an unmarked vehicle.

For these reasons, Defendants' motion for summary judgment is granted regarding Kelly Seale's Title VII retaliation claim.

Second, Defendants have met their burden to show the absence of a material issue of fact regarding Kelly Seale's First Amendment retaliation claim. Plaintiffs have failed to oppose Defendants' motion regarding this claim. As indicated in Part II.A. of this Decision and Order, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a modest burden. *See* N.D.N.Y. L.R. 7.1(b)(3).

**\*21** Defendants argue both that the record fails to support Kelly Seale's assertion that her support of Zophy was a motivating factor in Defendants' retaliation or that she suffered an adverse action for purposes of a First Amendment retaliation claim. Defendants are correct.

Regarding causation, Kelly Seale testified that she was neutral regarding Zophy's candidacy and did not express support for his bid for County Sheriff. Accordingly, the record does not support Kelly Seale's claim that she engaged in constitutionally protected speech, which is the first element of her First Amendment retaliation claim.

Further, the record does not reflect any evidence that Kelly Seale suffered an adverse action that would warrant relief on this claim. As indicated above in Part II.B.3., in the context of a First Amendment retaliation claim, an adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[.]" *Zelnik,* 464 F.3d at 225. This standard is broader than the standard of what constitutes an adverse action on a gender discrimination claim, but is similar to the standard for the same element of a Title VII retaliation claim, which is any action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461 F.3d 199, 207 (2d Cir.2006) (quoting *White,* 548 U.S. at 68, 126 S.Ct. at 2415). "The list of adverse actions has included harsh measures, such as discharge, refusal to hire, refusal to promote, reduction in pay, and reprimand, as well as some lesser sanctions, such as failure to process a teacher's insurance form, demotion, reassignment to a place that aggravated physical disabilities, and express accusations of lying." *Wrobel v. Cnty. of Erie,* 692 F.3d 22, 30 (2d Cir.2012) (citation omitted). Here, the record

is devoid of any factual basis for Kelly Seale's assertion that she suffered adverse action warranting relief on her First Amendment retaliation claim for the same reasons that such assertion fails regarding her Title VII retaliation claim, as previously articulated.

For these reasons, Defendants' motion for summary judgment is granted regarding Kelly Seale's retaliation claims under both Title VII and the First Amendment.

### C. David Seale's First Amendment Retaliation Claim

After carefully considering the matter, the Court grants Defendants' motion for summary judgment on David Seale's First Amendment retaliation claim.

Defendants have met their burden to show the absence of a material issue of fact regarding David Seale's First Amendment retaliation claim. David Seale claims that Defendants engaged in several separate adverse actions in retaliation for his support of Zophy in the 2009 election for County Sheriff. For the following reasons, these alleged adverse actions are not actionable grounds to support David Seale's First Amendment retaliation claim and/or the record is devoid of facts upon which a reasonable juror could find that Defendants' actions were motivated by the protected speech.

**\*22** First, David Seale contends that he was retaliated against for his support of Zophy in when, in 2008, he received a written counseling, at the direction of Episcopo, for his use of sick days in conjunction with his pass days. Also, David Seale contends that one of the tires on his patrol car was slashed by Episcopo in July 2008 in retaliation for his support of Zophy. "[I]t is obvious that protected activity must precede any purported retaliation to [establish] a First Amendment retaliation claim." *Rankel v. Town of Somers,* 999 F.Supp.2d 527, 542 (S.D.N.Y. Feb.25, 2014) (citing *Parkash v. Town of Se.,* No. 10–CV–8098, 2011 WL 5142669, at \*7 (S.D.N.Y. Sept.30, 2011), *aff'd,* 468 F. App'x 80 (2d Cir.2012)). Here, David Seale publicly supported Zophy in the Fall of 2009. Accordingly, no reasonable jury could find that the 2008 incidents of alleged adverse actions were retaliatory.

Next, David Seale contends, for the first time in his memorandum of law in opposition to Defendants' motion for summary judgment, that Riley's failure to interview him for a sergeant position in January 2014 was motivated by David Seale's support of Zophy in the 2009 election.

The Court need not, and does not, consider a claim presented for the first time in an opposition to a summary judgment motion. *See Weber v. City of New York,* 973 F.Supp.2d 227, 275, n. 26 (E.D.N.Y.2013) (citing *Lyman v. CSX Transp., Inc.,* 364 F. App'x 699, 701 (2d Cir.2010)). Nonetheless, even if the Court were to consider this new ground, David Seale's retaliation claim cannot survive on this basis because the record is devoid of any evidence, either direct or temporal, that Riley was motivated by retaliation and the evidence that has been submitted supports the conclusion that Riley would have offered the position to another candidate even in the absence of David Seale's support for Zophy.

In addition, David Seale's contention that his patrol vehicle was vandalized in various ways when he returned to active duty in May 2010 cannot form the basis for his retaliation claim because there is no admissible evidence that any of the Defendants were involved in any such vandalism. The record regarding the May 2010 vandalism includes David Seale's testimony that he has no information that Riley, Bailey or Aylward were involved and Episcopo's affidavit stating that he was not involved. David Seale's interrogatory response that he does not know who performed the acts of vandalism, but that they started to occur shortly after Kelly Seale filed her complaint against Episcopo when there had never been any such acts of vandalism before is not direct or circumstantial evidence that Episcopo was involved in the May 2010 vandalism, and even if it were evidence of his involvement, the assertion is that he engaged in the alleged adverse action in retaliation for Kelly Seale's complaint against him, not David Seale's support of Zophy. [12] For these reasons, the alleged May 2010 vandalism may not form the basis for David Seale's First Amendment retaliation claim.

 **\*23** David Seale's contention that the December 2009 denial of reimbursement for physical therapy is retaliatory also fails as a basis for his First Amendment retaliation claim because the record does not contain any evidence that any of the Defendants were involved in that decision. In fact, Riley, Bailey, Episcopo and Aylward each averred or testified that they had no involvement in the denial of David Seale's physical therapy reimbursement. David Seale himself testified that it was PERMA who denied his request, not the County. David Seale's conslusory assertion, by interrogatory response, that in the past, Sheriff Cary would intervene on his behalf with PERMA

to take care of the issues with the denial of payment for physical therapy, but that, once Riley became Sheriff, he would not take care of these issues, is not evidence that Riley denied the reimbursement in the first instance. Accordingly, the December 2009 denial of reimbursement for physical therapy by PERMA cannot form the basis of David Seale's retaliation claim against Defendants.

The remaining alleged acts of retaliation include the November 2009 denial of vacation buyback benefits by Bailey, the April 19, 2010 directive from Riley that, while out on worker's compensation and Section 207–c leave, David Seale must communicate to his supervisor when he planned to leave his residence during work hours, and the April 29, 2010 denial by Riley of David Seale's requested shift change. To be sure, David Seale returned to work the following month, avoiding any loss of buyback benefits, and each of the April 2010 actions were rescinded, with minimal or no harm to David Seale.

The Court of Appeals has held that actions which are *de minimus* in nature may not be considered adverse for purposes of a First Amendment retaliation claim. *See Zelnik,* 464 F.3d at 227–228 (finding that the denial of emeritus status for a professor is not an adverse action where the benefits of such status carried little or no value and was merely honorific). Also, while a combination of seemingly minor incidents may form the basis of adverse action once they reach a "critical mass" and "create a working environment unreasonably inferior to what would be considered normal for that position," that is not the case here. *Cf. Shanks v. Vill. of Catskill Bd. of Trs.,* 653 F.Supp. 158, 166 (N.D.N.Y.2009) (quoting *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir.2002)) (finding a workplace environment that included "a sustained, systematic course of verbal harassment, threats, ostracism and generally demeaning behavior in order to drive [plaintiff] out of the Company" as well as the assignment of menial tasks, harassment outside plaintiff's home with obscene gestures, verbal insults, threats and the honking of horns to be considered a critical mass of incidents that create an adverse action for purposes of a First Amendment retaliation claim). Here, David Seale suffered no loss of income or employment benefit and the effects of each decision lasted less than a month before it was rectified or reversed. On this record, no reasonable juror could conclude that a person of ordinary firmness would be deterred by this alleged conduct from exercising his right to free speech.

**\*24** Moreover, the record is devoid of any direct evidence that any of the Defendants involved in these three alleged adverse actions were motivated by David Seale's support of Zophy in the 2009 election. While there is an indirect inference of retaliatory animus based on temporal proximity between David Seale's support of Zophy and the denial of his vacation buyback benefits, the April 2010 actions are too remote, especially given the lack of direct evidence of animus. The Supreme Court has observed that "the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 27374, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing decisions that hold three and four month intervening periods te be too attenuated to support inference of causality).

Therefore, for the foregoing reasons, Defendants' motion for summary judgment on David Seale's First Amendment retaliation claim is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' letter motion to strike Plaintiffs' response to Defendants' Statement of Material Facts and to award Defendants attorney's fees for their preparation of the letter motion (Dkt. No. 43) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 34) is **GRANTED;** and it is further

**ORDERED** that Plaintiffs' Complaint (Dkt. No. 1) is **DISMISSED.** The Clerk of the Court is directed to enter judgment and close this case.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 667531, 2015 Fair Empl.Prac.Cas. (BNA) 176,803

Footnotes

1    Defendants ask the Court to strike Plaintiffs' response to Defendants' Statement of Material Facts and to deem Defendants' Statement of Material Facts admitted due to Plaintiffs' pervasive violations of Local Rule 7.1. Moreover, Defendants ask the Court to award them their costs and fees associated with the preparation of their request, including a 41–page appendix detailing all of the improprieties in Plaintiffs' Response. (*See* Dkt. No. 43.) Defendants' request is granted in part and denied in part. To be sure, Plaintiffs' response to Defendants' Statement of Material Facts is replete with violations of Local Rule 7.1. However, rather than strike Plaintiffs' entire response, the Court will deem admitted those Statements of Fact that Plaintiffs deny without record citations, which support their denial or where their purported denial is merely argument unrelated to the Statement of Fact, so long as the Statement of Fact itself is supported by the record. In addition, the Court denies Defendants' request for an award of fees and costs. Finally, Plaintiffs' counsel is strongly cautioned to carefully adhere to this Court's Local Rule 7.1 in the future.

2    Plaintiffs state, without citation to the record for support, that Kelly Seale did not initially report her claim of sexual harassment because she was afraid that she would be the victim of retaliation.

3    According to Plaintiffs' response to Defendants' Statement of Material Fact, Paragraph 19, this "was the first act of harassment by Captain Episcopo." (Dkt. No. 38 at ¶ 19 [Pls.' Response to Defs.' Statement of Material Facts].) This incident is also the first that Kelly Seale recorded on a Madison County Workplace Violence Incident Report form, which she did not share with anyone until after November 5, 2009. (Dkt No. 37–8 [Exs. 8E–8L to Ciotoli Aff.].)

4    Apparently, according to Plaintiffs' Complaint, the reference to "Red rocket" has to do with an episode of the animated television show, *South Park,* when one of the characters masturbates a dog in order to "milk it." (Dkt. No. 1 [Compl.].) In fact, the Complaint includes the allegation that, during the same exchange Kelly Seale overheard on July 13, 2009, Episcopo and the deputy were talking about the episode, including the aforementioned description of the origin of "Red rocket." *Id.,* ¶ 30(e). Plaintiffs' Statement of Material Fact, Paragraph 110, includes the same allegation as in the Complaint, but presented as fact, citing Kelly Seale's deposition testimony, wherein she admits that "They said 'Red rocket' and that's all." (Dkt. No. 38 at ¶ 110 [Pls.' Statement of Material Facts]; Dkt. No. 37–17 at 79:17–81:16 [Kelly Seale's 50h Dep., June 24, 2010].) Plaintiffs also include this inaccurate representation of fact in their opposition memorandum of law. (Dkt. No. 38–1 at 6, 9 [Pls.' Mem. of Law].)

5    *See, e.g., Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at *27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02–CV–0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov.29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

6    "Because New York courts require the same standard of proof for claims brought under the NYHRL as for those brought under Title VII," those claims may be analyzed in tandem. *Leopold v. Baccarat, Inc.,* 239 F.3d 243, 264 n. 1 (2d. Cir.2001) (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995), *abrogated on other grounds by, Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). *See also Salmon v. Our Lady of Victory Hosp.,* 514 F.3d 217, 226 n. 2 (2d Cir.2008)). Accordingly, a court's ruling regarding a plaintiff's Title VII claims applies with equal force to those claims under the NYHRL. *See Leopold v. Baccarat, Inc.,* 174 F.3d 264 n. 1 (2d Cir.199).

7    The Supreme Court has recently held that an employee is a supervisor for purposes of vicarious liability under Title VII if he or she is empowered by the employer "to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance,* 133 S.Ct. at 2439, 2443 (quotation and citation omitted).

8    Superceded by regulation on other grounds as noted in *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 109 (2d Cir.2013).

9    Plaintiffs' frequent unsupported assertions throughout its Response to Defendants' Statement of Material Facts that Kelly Seale did not timely report the harassment because she was afraid of retaliation fails to create a question of material fact for two reasons. First, in violation of this Court's Local Rules and caselaw, Plaintiffs fail to cite to any evidence in the record supporting this assertion. Second, Plaintiffs fail to cite any record evidence supporting the basis for Kelly Seale's asserted fear of retaliation. *See Leopold,* 239 F.3d at 246 ("A credible fear must be based on more than the employee's subjective belief. Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints.").

10    As indicated in Part II.B.1. of this Decision and Order, this Court's ruling regarding Kelly Seale's Title VII claim applies with equal force to her tandem claim under the NYHRL. Nonetheless the Court briefly addresses the parties' arguments that there is a different standard regarding employer liability under the NYHRL. To be sure, New York courts have held that "[a]n employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it." *Doe v. State,* 89 A.D.3d 787, 933 N.Y.S.2d 688, 690 (2011)). "Condonation, which may sufficiently implicate an employer in the discriminatory acts of its employee to constitute a basis for employer liability under the Human Rights Law, contemplates a knowing, after-the-fact forgiveness or acceptance of an offense." *Div. of Human Rights v. St. Elizabeth's Hosp.,* 487 N.E.2d 268, 66 N.Y.2d 684, 687, 496 N.Y.S.2d 411 (1985); *see also Selmanovic v. NYSE Grp., Inc.,* No. 06–CV–3046, 2007 WL 4563431, at *4 (S.D.N.Y. Dec. 21, 2007) (same). Alternatively, an employer's "calculated inaction in response to discriminatory conduct, may as readily as affirmative conduct, indicate condonation ." *Guzman v. Macy's Retail Holdings, Inc.,* No. 09–CV–4472, 2010 WL 1222044, at *11 (S.D.N.Y. Mar. 29, 2010) (quoting *Melendez v. Int'l Serv. Sys., Inc.,* No. 97–CV–8051, 1999 WL 187071, at *15 (S.D.N.Y. Apr.6, 1999)). Here, again, the record contains undisputed evidence that, once aware of Kelly Seale's allegations of harassment, it took action to investigate and prevent further harassment. Moreover, the evidence is clear that no further harassment took place after the County learned of Kelly Seale's complaint. Accordingly, on this alternative basis, Defendants' motion for summary judgment is granted regarding Kelly Seale's NYHRL hostile work environment claim against the County.

11    To be sure, the phrase, "red rocket" alone is insufficiently actionable, given that Kelly Seale testified that, as of July 2009, she did not understand its origin, and that Episcopo and the deputy he was conversing with merely said "red rocket" without any further discussion of its context.

12    Despite the multiple references in Plaintiffs' opposition papers to retaliatory acts against David Seale that were motivated by Kelly Seale's harassment complaint against Episcopo, the Court has previously dismissed, as a matter of law, David Seale's retaliation claim on that basis. *See Seale,* 929 F.Supp.3d at 78–79 (citing *Thompson v. North Am. Stainless, LP,* 562 U.S. 170, 131 S.Ct. 863, 870, 178 L.Ed.2d 694 (2011)) (dismissing David Seale's Title VII claims, including his claim for retaliation, based on lack of subject matter jurisdiction due to his failure to file a charge with the Equal Employment Opportunity Commission).

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.